UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN P. "JACK" FLYNN and LESLIE A. FLYNN, | |
| Plaintiffs, | |
| -v- | CIVIL ACTION NO.: 21 Civ. 2587 (GHW) (SLC) |
| CABLE NEWS NETWORK, INC., | **REPORT AND RECOMMENDATION** |
| Defendant. | |

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE GREGORY H. WOODS**, United States District Judge:

## I. INTRODUCTION

Plaintiffs John P. ("Jack") and Leslie A. ("Leslie") Flynn (together, the "Flynns"), assert that Defendant Cable News Network, Inc. ("CNN") defamed them when it displayed their image captioned with a chyron stating, "CNN Goes Inside a Gathering of QAnon Followers." (ECF No. 7 ¶ 4). The Flynns allege that they are _not_ "followers" of QAnon, and assert against CNN claims for defamation and false light under Rhode Island law. (Id. ¶¶ 3, 6). CNN has moved to dismiss the Flynns' claims for failure to state a claim and for attorneys' fees and costs. (ECF No. 17 (the "Motion")). For the reasons set forth below, I respectfully recommend that the Motion be GRANTED insofar as the Flynns' claims be dismissed with prejudice, and DENIED as to CNN's request for attorneys' fees and costs.

## II.BACKGROUND

### A. Factual Background

The Court summarizes the Flynns' factual allegations in the Amended Complaint ("AC") (ECF No. 7), which the Court accepts as true for purposes of the Motion.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002); Sanderson v. Leg Apparel LLC, No. 19 Civ. 8423 (GHW), 2020 WL 3100256, at *1 n.1 (S.D.N.Y. June 11, 2000) ("Sanderson I").

### 1. QAnon

The Flynns allege that, "[a]ccording to the Federal Bureau of Investigation ('FBI') and the Department of Homeland Security ('DHS'), 'QAnon' is a 'domestic violence extremist ('DVE') group and a 'domestic terrorism threat.'"  (ECF No. 7 ¶ 1).[1]  The Flynns cite The Wall Street Journal's description of QAnon as a:

> far right-wing, loosely organized network and community of believers who embrace a range of unsubstantiated beliefs [that] center on the idea that a cabal of Satan-worshipping pedophiles — mainly consisting of what they see as elitist Democrats, politicians, journalists, entertainment moguls and other institutional figures — have long controlled much of the so-called deep state government, which they say sought to undermine [former President] Trump, mostly with aid of media and entertainment outlets.

---

[1] This is a reference to the May 30, 2019 FBI Intelligence Bulletin entitled, "Anti-Government, Identity Based, and Fringe Political Conspiracy Theories Very Likely Motivate Some Domestic Extremists to Commit Criminal, Sometimes Violent Activity," which was first published by Yahoo! News.  Jana Winter, Exclusive: FBI Document Warns Conspiracy Theories are a New Domestic Terrorism Threat, YAHOO! NEWS (Aug. 1, 2019), https://www.yahoo.com/now/fbi-documents-conspiracy-theories-terrorism-160000507.html?guccounter=1 (the "FBI Bulletin").  Because the Flynns rely in the AC on the FBI Bulletin's characterization of QAnon as a "domestic violence extremist" group which CNN falsely accused them of following, (ECF No. 7 ¶ 1), the Court takes judicial notice of the publication of the FBI Bulletin but not the truth of the matters asserted therein.  See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (on motion to dismiss, court may take judicial notice of public documents but "not for the truth of the matters asserted").

(Id. ¶ 1 (quoting Brett Forrest, What is QAnon? What We Know About the Conspiracy-Theory Group, THE WALL STREET JOURNAL (Feb. 4, 2021 8:38 PM), https://www.wsj.com/articles/what-is-qanon-what-we-know-about-the-conspiracy-theory-11597694801?mod=article_inline] (the "WSJ Article")).  The Flynns allege that, "[o]n January 6, 2021, adherents of QAnon were among the 'most prominent members of the mob' [that] stormed the United States Capitol in Washington, D.C." (the "January 6 Riot").  (Id. (quoting the WSJ Article)).  The Flynns also cite a United States House of Representatives Resolution passed on October 2, 2020 (the "House Resolution"), which referenced the FBI Bulletin, stating that "QAnon is a movement promoting a collection of unfounded conspiracy theories that have spread widely on the internet since 2017," and "condemn[ed] QAnon and reject[ed] the conspiracy theories it promotes . . ."  (ECF No. 19-5 at 3–4; see ECF No. 7 at 12 n.5 (alleging that "[t]he defamatory nature of CNN's false statements associating [the Flynns] with QAnon is evidenced by the wholesale condemnation of QAnon in the [House Resolution]")).

The Flynns allege that, "[i]n the wake of the January 6, storming of the Capitol, a chorus of left-wing media outlets began to spread false narratives about QAnon."  (ECF No. 7 ¶ 2).  Those "false narratives included the assertion that retired Lieutenant General Michael T. Flynn" ("General Flynn"), who previously served as National Security Advisor to former President Donald J. Trump, "was the 'founder' of QAnon."  (Id. ¶¶ 2, 4).

### 2. The Flynns

The Flynns are citizens of Rhode Island.  (ECF No. 7 ¶ 8).  Jack is the General Manager of a seafood processing business, and Leslie is a stay-at-home mother.  (Id.)  The Flynns have been

married for 23 years, during which they have raised four children and have three grandchildren. (Id.)  They previously "enjoyed an untarnished reputation in the community."  (Id.)

General Flynn is Jack's brother.  (ECF No. 7 ¶ 2).  On July 4, 2020, General Flynn posted to Twitter a video taken during a Fourth of July barbeque at the Flynns' home in Rhode Island (the "Video").  (Id. ¶ 4).  In the Video, General Flynn, the Flynns, and other members of their family stood with their right hands raised and repeated the oath to the United States Constitution (the "Oath").  (Id.)[2]  After repeating the Oath, General Flynn stated, "where we go one, we go all," which the Flynns and their family each repeated, and then stated, "God Bless America."  (Id.)

For several years, Jack maintained the Twitter account, @GoJackFlynn, and Leslie maintained the Twitter account, @lflynn1998.  (ECF No. 7 ¶¶ 14, 23(a)).  The AC features screenshots of several of Jack's tweets, and notes that all of his "tweets and retweets are preserved."  (Id. at 16 n.7).  In an August 13, 2020 thread, Jack tweeted, "What's wrong with the statement: Where We Go 1 We Go All?? ANYONE?? #WWG1WGA," and invited another Twitter user to "repost the [O]ath we took on the 4th," i.e., the Video.  (ECF No. 7 at 13 ¶ 23.a.).  In an August 20, 2020 thread, Jack tweeted:

> I was told today that QAnons are dangerous people to be aligned with.  That there is actually "no plan".  True or not, most people seem pretty normal to me who support the idea of Q.  I advocate for the Constitution and Bill of Rights.  [American flag emoji] if Q does too~No harm no foul.  #KAG2020.
> [Retweeting:] There is nothing wrong with QAnon.  Just people doing their own research and learning independence of thought to find the truth . . .

(ECF No. 7 at 14 ¶ 23.a.).  In an August 21, 2020 tweet, Jack replied to a tweet containing the American flag overlaid with a large "Q" and text reading "WHERE WE GO ONE WE GO ALL,"

---

[2] 5 U.S.C. § 3331.

stating "If this means you believe in the constitution and equal justice under the law then this works for me. [American flag emoji]" (ECF No. 7 at 15 ¶ 23.a.). In another tweet the same day, Jack stated, "I don't know who or what Q is so there's that. But no ones [sic] hurting each other its [sic] civilized encouraging people to learn independently supports [sic] trump and the constitution. So. WTF. #WWG1WGA". (Id. ¶ 9).[3] On January 7, 2021, the day after the January 6 Riot, "Jack left Twitter." (Id. ¶ 14).[4]

In the AC, the Flynns cite reports that the phrase, "where we go one, we go all," was engraved on a bell on a sailboat owned by former President John F. Kennedy, and also on the bell of a "1911 brigantine rigged sailing ship Eye of the Wind," which was referenced in a 1996 Ridley Scott film, White Squall. (ECF No. 7 at 4 n.1). The Flynns state that their recitation of "where we go one, we go all" in the Video "was not an oath of allegiance to QAnon, or any kind of oath at all. It was a simple, family, July 4 statement of support for each other." (Id.) They also point to a July 6, 2020 tweet by General Flynn's attorney, Sidney Powell, stating that, "To all those apparently traumatized or struggling to comprehend [the V]ideo above, including all the #Left and R[e]gressive media, the oath comes from federal statute at 5 USC 1331." (Id. at 19 ¶ 23.a). In a separate tweet, quoted in the AC, Powell also stated that the phrase, "where we go one, we go all":

> represents the sentiments expressed by John Donne in For Whom The Bell Tolds [sic]. Those who would make it into a 'conspiracy theory' of any kind or anything negative are really grasping for straws. We love this great country and our fellow man. We salute the #flag & #StandUp for all that is good & true. As Donne wrote: "No man is an island, entire of itself; every man is a piece of the continent." "a

---

[3] "WWG1WGA" is the abbreviation of "where we go one, we go all."
[4] As one judge in this District has aptly noted, "[i]f the Internet is akin to the Wild West . . . Twitter is, perhaps, the shooting gallery, where verbal gunslingers engage in prolonged hyperbolic crossfire." Ganske v. Mensch, 480 F. Supp. 3d 542, 545 (S.D.N.Y. 2020).

part of the main.  If a clod be washed away by the sea Europe is the less, as well as if a promontory were, as well as if a manor of thy friend's or of thine own were: any man's death diminishes me, because I am involved in mankind[.]"

(ECF No. 7 at 22–23 ¶ 23.a).  Powell then quoted the oath, followed by "WWG1WGA."  (Id. at 23 ¶ 23.a).

The Flynns state that they "are not followers or supporters of any extremist or terrorist groups, including QAnon."  (ECF No. 7 ¶ 6).  The Flynns allege that "Jack did not use QAnon slogans or code language or retweet users because they had a 'Q' in their handle," (id. at 16 ¶ 23.a.), and assert that "CNN misrepresented that [they] followed and supported QAnon and pledged allegiance to this extremist group."  (Id. at 25 ¶ 23(a)).

### 3.  CNN's Reporting

On July 7, 2020, CNN[5] published the Video, accompanied by an article written by Marshall Cohen, who noted that General Flynn's Twitter post of the Video included the hashtag, "#TakeTheOath", with an American flag emoji.  (ECF No. 7 at 4 n.2 (the "Cohen Article")).  The Flynns allege that CNN's assertion in the Cohen Article that #TakeTheOath "was a QAnon hashtag" was false.  (Id.)

On January 31, 2021, CNN aired a "Special Report" hosted by Anderson Cooper ("Cooper") entitled "Inside the QAnon Conspiracy."  (ECF No. 7 ¶ 2 (the "January 31 Report")).  In the January 31 Report, "CNN called QAnon a 'deranged conspiracy cult[,]" said that QAnon's conspiracy theories were "'actually based on age-old racist and anti-Semitic beliefs[,]" and said that QAnon "promoted 'ancient and dark biases and bigotry in World history.'"  (Id.)  CNN

---

[5] CNN is a Delaware corporation with its principal place of business in New York.  (ECF No. 7 ¶ 9). Jurisdiction is based on the parties' diversity of citizenship.  (Id. ¶ 10).

characterized QAnon supporters as "detached from 'reality'" and having "an utter 'disregard' for the facts." (Id.) CNN stated "that it was 'abundantly clear' that QAnon was a 'dangerous and violent movement' . . . that has become 'insurrectionist.'" (Id.)

On February 3, 2021, CNN aired a report by Donie O'Sullivan ("O'Sullivan") entitled "CNN Goes Inside A Gathering of QAnon Followers" (the "February 3 Report"), which is the subject of the Flynns' defamation claims. (ECF No. 7 ¶ 4; ECF No. 19-7.) The February 3 Report begins with images of reporters attending an October 2020 meeting in Arizona of supporters of then-President Donald Trump. (ECF No. 19-7 at 0:01–1:00.) Shown in attendance at the meeting is an individual referred to as the "QAnon Shaman," who, footage shows, later "storm[ed] the Capitol" during the January 6 Riot. (ECF No. 19-7 at 1:01–1:08.) The February 3 Report then returned to the meeting, where a man playing a guitar sang, "where we go one, we go all." (ECF No. 19-1 at 1:09–1:16.) Over images of insignia showing "where we go one, we go all" and "WWG1WGA," O'Sullivan stated that "'where we go one, we go all,' was an 'infamous QAnon slogan promoted by . . . [General] Flynn.'" (ECF Nos. 7 ¶ 4; 19-1 at 1:18–1:24.) The February 3 Report then showed a clip from the Video in which General Flynn, standing next to the Flynns, is heard reciting, "where we go one, we go all," but without the Oath and the phrase, "God Bless America," as they appear in the full Video. (ECF Nos. 7 ¶ 4; 19-1 at 1:24–1:25.) Below the images of General Flynn and the Flynns appeared the chyron "CNN Goes Inside a Gathering of QAnon Followers." (ECF Nos. 7 ¶ 4; 19-1 at 1:24–1:25.) Returning to the meeting, O'Sullivan stated that "where we go one, we go all" was repeated as an "anthem at this meeting of Trump supporters," over an image of the "QAnon Shaman" carrying a sign in the meeting that said, "Q SENT ME." (ECF No. 19-1 at 1:25–1:29.) A speaker at the meeting said that then-President Trump had spoken about "this QAnon

thing" but did not "disavow it."  (ECF No. 19-1 at 1:29–1:44).  O'Sullivan then referenced a clip of former President Trump at a Town Hall being asked by CNN reporter Savannah Guthrie whether he would "disavow" QAnon.  (ECF No. 19-1 at 1:45-2:08).  O'Sullivan stated that the meeting included "prominent figures in the QAnon movement" and "at least two people who would go on" to participate in the January 6 Riot, images and video of which were shown during the February 3 Report.  (ECF No. 19-1 at 2:23–3:00).  The February 3 Report next showed a clip of an individual stating the reasons why he had attended the meeting.  (ECF No. 19-1 at 3:43–4:08).  It concluded with a clip of the meeting attendees singing, "Where we go one, we go all."  (ECF No. 19-1 4:10–4:12).  In addition to its live broadcast of the February 3 Report, CNN published it to its over twelve million YouTube subscribers and its 459,000 Twitter followers.  (ECF No. 7 ¶ 5).

On February 26, 2021, CNN broadcast a program entitled, "CNN Special Report: The Cult of QAnon," which included reporting by Cooper and O'Sullivan.  (ECF Nos. 7 ¶ 15; 19-7 (the "February 26 Report")).  In his introduction to the February 26 Report, Cooper stated that:

> QAnon is based on this fantasy that Donald Trump is some kind of messianic figure, waging a crusade against a secret global cabal of Democrats and celebrities who worship Satan, sexually abused children and harvest their blood in order to extract, ingest a chemical called adrenochrome.  I know it sounds crazy but there are hundreds of thousands of people, perhaps millions who actually believe this.  And tonight, we are going to hear directly from some of them.

(ECF No. 19-7 at 2).  The Video did not appear in the February 26 Report.  (ECF No. 33 at 44).

The Flynns allege that, through O'Sullivan's words and the selective editing of the Video in the February 3 Report, CNN "falsely accused [them] of being 'followers' and supporters of the 'dangerous', 'violent', 'racist', 'extremist', 'insurrectionist', 'domestic terrorism' movement — QAnon."  (ECF No. 7 ¶¶ 3–4).  The Flynns allege that CNN's February 3 Report "falsely attributed to [them] associations that never existed, actions [they] never took, including an oath of

allegiance or pledge to QAnon, and views [they] never held." (Id. ¶ 6; see id. ¶ 18 ("CNN falsely attributed to [the Flynns] an affiliation/association, beliefs and views that [they] have never had.")). They allege that "CNN's false statements constitute express defamation or defamation by implication" because "they accuse and impute to [them] an unfitness to perform the duties of an office or employment for profit, including being members of a dangerous, violent, insurrectionist, domestic terrorist organization." (Id. ¶ 19). They note that, in the weeks after the January 6 Riot, "CNN's false attributions exposed [the Flynns] to public scorn, ridicule and contempt, and lowered their esteem in the community, causing insult, embarrassment, humiliation and substantial injury to [their] reputations." (Id. ¶ 6). After they learned about the February 3 Report from a friend of Leslie's who saw it on television, the Flynns "have had to explain away CNN's hurtful misstatements, and defend their good standing and reputations in the community." (Id.) CNN's statements exposed the Flynns to "threats of bodily and emotional harm from persons hell-bent on exposing 'QAnon.'" (Id. ¶ 19). The Flynns allege that "CNN exposed Jack to the hazard of losing his job, and rendered him odious and unfit or less fit to fulfill the duties of General Manager of an international seafood business." (Id.)

As to CNN's state of mind, the Flynns allege that "CNN acted with actual malice and reckless disregard for the truth." (ECF No. 7 ¶ 23). In support of their assertion that CNN acted with actual malice, the Flynns first allege that "CNN's false statements were neither fair nor accurate[,]" and that "CNN knew or should have known that the false statements would be republished over and over by third parties to [the Flynns'] detriment." (Id. ¶ 20). They contend that "CNN lacked reasonable grounds for a belief in the truth of its statements, and acted negligently in failing to determine the true facts." (Id. ¶ 22). For example, "CNN failed to contact

[the Flynns] prior to publication and had no independent evidence to corroborate that [they] were followers or supporters of QAnon because none exists." (Id.). The Flynns also state that "CNN had no factual basis to accuse Jack of being an adherent of QAnon based on the content of his tweets and retweets." (Id. at 17 ¶ 23.a.; see ECF No. 33 at 29 ("When Jack Flynn says re-Tweet the video, it has nothing to do with QAnon."); ECF No. 33 at 36 ("[I]f [CNN] reviewed [Jack's] Tweets, they would have saw [sic] that he was not a QAnon follower at all."); id. at 37 (quoting the Flynns' attorney referring to the "re-Tweet from 'Escape the Matrix' with a big letter Q on it" and asserting "[t]hat's far from being a QAnon follower"); id. at 38 ("CNN, based on its review of Jack Flynn's Tweets, fabricated the claim that he was QAnon follower"); see also id. at 30–31 ("[W]ith regard to Leslie Flynn, what [defendant] attached as an exhibit is one Tweet that could not possibly be construed . . . as being evidence that you're a QAnon follower.")).

As a second basis for CNN's actual malice, the Flynns' allege that "CNN deliberately altered" the Video "to associate [the Flynns] with the QAnon domestic terrorists and extremists, and, thereby, conveying a defamatory meaning as to" them. (ECF No. 7 ¶ 23.b; see ECF No. 33 at 38–39). They contend that the edits to the Video "were deliberate and were made by editors and producers who were following a preconceived propaganda narrative (crafted by CNN President Jeff Zucker [('Zucker')]) to link the Flynn family members to the violent extremist group QAnon." (ECF No. 7 ¶ 23.b; see also ECF No. 33 at 38–39).

As a third basis for CNN's actual malice, the Flynns allege that in the "wake" of the January 6 Riot, "CNN's statements were intentionally extreme and dangerous" and "CNN knew that publication would cause a media frenzy." (ECF No. 7 ¶ 23.c; see ECF No. 33 at 39). "[T]o sensationalize the news" and "increase ratings, viewership and profits," the Flynns contend that

"CNN intentionally published false statements" about them as "part of a deliberate corporate policy that emanated from Zucker."  (ECF No. 7 ¶ 23.c).

As a fourth basis for CNN's actual malice, the Flynns assert that "CNN is an agent of the Democratic Party and a Democratic Party trumpet," which "harbors an institutional animosity, hostility, hatred, extreme bias, spite and ill-will towards the Flynn family, and, in particular, General Flynn" that "motivated CNN to publish the intentionally false statements and insinuations about [the Flynns] in this case."  (ECF No. 7 ¶ 23.d).

As a result of CNN's defamatory statements, the Flynns allege that they have "suffered presumed damages, actual damages and special damages, including, but not limited to, insult, pain, embarrassment, humiliation, emotional suffering, injury to their reputations, lost future earnings and diminished earning capacity, costs, and other out-of-pocket expenses . . ."  (ECF No. 7 ¶ 24).  The Flynns seek damages on theories of defamation and false light of at least $75 million.  (Id.)

B. **Procedural Background**

The Flynns filed the original complaint ("Complaint") in this action on March 25, 2021. (ECF No. 1).  On April 15, 2021, before CNN had been served with the summons and Complaint, CNN wrote to the Flynns' counsel "demanding" that they withdraw their claims.  (ECF No. 19-2 at 2).  On May 7, 2021, they filed the AC, which added images of Jack's August 20, 2020 Twitter thread as well as tweets by Powell.  (ECF No. 7 at 14, 18–25).  On June 21, 2021, CNN filed the Motion, which had been referred to the undersigned.  (ECF Nos. 14, 17).  On July 6, 2021, the Flynns filed their Memorandum of Law in Opposition to the Motion ("Opposition"), and on July 13, 2021, CNN filed its Reply Memorandum of Law ("Reply").  (ECF Nos. 23, 26).  In response

to CNN's request, on October 14, 2021, the Court heard oral argument on the Motion.  (ECF No. 29).  With the Court's permission, the parties submitted post-argument supplemental letters. (ECF Nos. 35; 36; 37).

### III.LEGAL STANDARDS

#### A.  Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). Where a defendant moves to dismiss a complaint for failure to state a claim on which relief could be granted under Fed. R. Civ. P. 12(b)(6), the Court must assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Co. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).

To survive a motion to dismiss, "the plaintiff must provide the grounds upon which his [or her] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 555).  In evaluating a motion to dismiss, the Court "accept[s] all facts alleged in the complaint as true and draw[s] all reasonable inferences in the plaintiff's favor."  Sanderson v. Leg Apparel LLC, No. 19 Civ. 8423 (GHW), 2020 WL 7342742, at *3 (S.D.N.Y. Dec. 14, 2020) ("Sanderson II") (citing Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 124 (2d Cir. 2008) (per curiam)); see Burke v. Gregg, 55 A.3d 212, 218 (R.I. 2012) (in evaluating motion

to dismiss defamation claim under Rhode Island law, the "[c]ourt examines the allegations contained in the plaintiff's complaint, assumes them to be true, and views them in the light most favorable to the plaintiff") (quoting Palazzo v. Alves, 944 A.2d 144, 149 (R.I. 2008)).  The Court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." Sanderson II at *2 (quoting Rothstein v. UBS AG, 708 F.3d 82, 94 (2d Cir. 2013)).  "[A] complaint that offers 'labels and conclusions' or 'naked assertion[s]' without 'further factual enhancement' will not survive a motion to dismiss."  Id.  "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  Id. (quoting DeJesus v. HF Mgmt. Servs., LLC, 726 F.3d 85, 87–88 (2d. Cir. 2013)).

For purposes of Rule 12(b)(6), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (citations omitted).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  Id. at 153 (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "[A] plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."  Id.  "The Court need not accept allegations that are 'contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint.'"  Tsinberg v. City of New York, No. 20 Civ. 749 (PAE), 2021 WL 1146942, at *4 (S.D.N.Y. Mar. 25, 2021) (quoting Fisk v. Letterman, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005)); see Sazerac Co. v. Falk, 861 F. Supp. 253, 257–58 (S.D.N.Y. 1994)

(granting motion to dismiss where documents on which plaintiff relied in complaint contradicted plaintiff's allegations).

**B.** **Defamation**

  **1.** **Choice of Law**

"A federal court sitting in diversity applies the choice of law rules of the forum state." Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999) (citing Klaxon Co. v. Stentor Elec. Mfg., 313 U.S. 487, 496 (1941)).  Under New York's choice of law analysis, the first inquiry is "whether there is an actual conflict of laws." Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) (citing Allstate Ins. v. Stolarz, 81 N.Y.2d 219, 223 (1993)).  If "the applicable law from each jurisdiction provides different substantive rules, a conflict of laws analysis is required." Id.

In defamation cases, "New York applies the law of the state with the most significant interest in the litigation."  Lee 166 F.3d at 545.  In a defamation case involving nationwide statements, such as this one, "the tort essentially lacks a locus, but rather injures plaintiff everywhere at once[,]" requiring "a more comprehensive analysis" as to the state with "the most significant relationship." Condit v. Dunne, 317 F. Supp. 2d 344, 353 (S.D.N.Y. 2004).  New York courts weigh several factors in this analysis, including: "where plaintiff suffered the greatest injury"; "where the statements emanated and were broadcast"; "where the activities to which the allegedly defamatory statements refer took place"; and "the policy interests of the states whose law might apply." Id. at 353–54.

Applying this analysis, the Court agrees with the parties that Rhode Island has the most significant interest in the litigation.  (See ECF Nos. 18 at 14 n.5; 23 at 10 n.4).  The Flynns reside in Rhode Island, which is where the Video was taken.  (ECF No. 7 ¶¶ 4, 8).  CNN is incorporated

in Delaware and maintains its primary place of business in New York, from which the February 3

Report emanated.  (Id. ¶ 9).  Thus, "New York's interest in the litigation is not insignificant, but

none of the conduct about which [CNN] spoke took place in New York, and [the Flynns have] no

specific connection to New York."  Condit, 317 F. Supp. 2d at 355.  In addition, although CNN

broadcast the February 3 Report from New York, the contents of the February 3 Report do not

have a "specific connection" to New York or target a New York audience.  See id.  Because the

Court finds that Rhode Island has a more significant interest in this dispute than does New York,

the Court will apply Rhode Island's defamation law.  See id. (applying California law to defamation

claim by California congressman against reporter who "happened to be physically present in New

York when he uttered the statements that were broadcast nationwide"); see Machleder v. Diaz,

801 F.2d 46, 52 (2d Cir. 1986) (finding that New Jersey's "interest in protecting its citizens from

defamation" outweighed New York's interest "in establishing a standard of fault for its news

media") (quoting Machleder v. Diaz, 538 F. Supp. 1364, 1370 (S.D.N.Y. 1982)); La Luna Enterprises

v. CBS Corp., 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999) (applying Florida law to defamation claim

brought by Florida plaintiff who was injured in Florida).

### 2.  Rhode Island Law

Under Rhode Island law, "[a] plaintiff in a defamation action carries a substantial burden

. . . of proving that a defendant communicated a 'false and defamatory' statement about him or

her."  Alves v. Hometown Newspapers, Inc., 857 A.2d 743, 750 (R.I. 2004) (quoting Beattie v. Fleet

Nat'l Bank, 746 A.2d 717, 721 (R.I. 2000)).  To prove that a statement was defamatory, the

plaintiff "must show that the statement is 'false and malicious, imputing conduct which

injuriously affects a [person's] reputation, or which tends to degrade him [or her] in society or

bring him [or her] into public hatred and contempt.'"  DiBattista v. State, 808 A.2d 1081, 1088 (R.I. 2002) (quoting Swerdlick v. Koch, 721 A.2d 849, 860 (R.I. 1998)).

Rhode Island courts require a plaintiff asserting a defamation claim to plead and prove four elements: "(1) the utterance of a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence; and (4) damages."  Cullen v. Auclair, 809 A.2d 1107, 1110 (R.I. 2002) (per curiam).  The Second Circuit has explained that, "when falsity is an element of a state defamation claim" — as it is here — "federal courts have required plaintiffs to plead facts that, if proven, would allow a reasonable person to consider the statement false."  Tannerite Sports, LLC v. NBCUniversal News Grp., 864 F.3d 236, 247 (2d Cir. 2017).

The question "whether a particular statement or conduct alleged to be defamatory is, in fact, defamatory is a question of law for the court to decide."  Alves, 857 A.2d at 750; Elias v. Youngken, 493 A.2d 158, 161 (R.I. 1985) ("The question of whether or not the meaning of a particular communication is defamatory is one of law for the court."); see also Frascatore v. Blake, 344 F. Supp. 3d 481, 493 (S.D.N.Y. 2018) ("[A] threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it.") (quoting Levin v. McPhee, 119 F.3d 189, 195 (2d Cir. 1997) (internal citations omitted)).  To recover for defamation, a plaintiff must plead and prove "that the publication was defamatory either per se or by reason of its susceptibility of the defamatory meaning attributed to it by way of innuendo."  Elias, 493 A.2d at 161 (quoting Andoscia v. Coady, 210 A.2d 581, 584 (1965)).

In addition, as noted above, "Rhode Island law incorporates the concept of falsity into its definition of a defamatory statement." Lyons v. R.I. Pub. Emps. Council 94, 516 A.2d 1339, 1342 (R.I. 1986).  In determining whether conduct was false and defamatory, "the court must take into account 'the context of the statement in which the publication occurs and the plain and ordinary meaning of the words in the community in which the publication occurred.'" Alves, 857 A.2d at 751 (quoting DiBattista, 808 A.2d at 1088)); see Elias, 493 A.2d at 161–162 (referencing dictionary definition of allegedly defamatory word in determining that it was not, in fact, defamatory). "[W]ords cannot be isolated from the circumstances in which they are uttered[,]" and "the decisive question is what the person . . . to whom the communication was published reasonably understood as the meaning to be expressed." Lyons, 516 A.2d at 1343 (quoting Restatement (Second) Torts § 563 cmt. e (Am. Law Inst. 1977)).  Rhode Island "cases holding that a particular comment is defamatory are few and far between . . . ." Burke, 55 A.3d at 220.

Whether a plaintiff is a public or a private figure is also a threshold determination for the court in evaluating a defamation claim.  See Major v. Drapeau, 507 A.2d 938, 941 (R.I. 1986) (explaining that "a critical determination must be made initially in regard to whether the plaintiff is a public figure . . .").  Persons "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures." Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974).  As the United States Supreme Court explained in Gertz:

> [f]or the most part, those who attain this status have assumed roles of especial prominence in the affairs of society.  Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.  More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.  In either event, they invite attention and comment . . . [Thus], the

communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.  No such assumption is justified with respect to a private individual.

Id. at 345.  The reason for this distinction is that:

[p]ublic officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.  Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

Id. at 344.

A public figure asserting a defamation claim must plead and prove by clear and convincing evidence "that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  Cullen, 809 A.2d at 1110 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964)); see Gertz, 418 U.S. at 342 (explaining that public figures may recover for defamation "only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth"); Major, 507 A.2d at 941 ("One of the major premises of the law of defamation today is that public officials and public figures cannot recover damages for defamatory falsehoods except on proof that the statement was made with 'actual malice.'"); see also Cabello-Rondon v. Dow Jones & Co., No. 16 Civ. 3346 (KBF), 2017 WL 3531551, at *5 (S.D.N.Y. Aug. 16, 2017) ("To adequately plead actual malice, a public figure must plead 'plausible grounds' to infer that a 'publisher had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of [] its truth or falsity.'") (quoting Celle v. Filipino Reports Enterprises Inc., 209 F.3d 163, 182 (2d Cir. 2000)).  In the defamation context, "reckless conduct is not measured by whether a reasonably prudent man would have published."  St.

Amant v. Thompson, 390 U.S. 727, 731 (1968).  Rather, "the defendant must have made the false publication with a 'high degree of awareness of . . . probable falsity,' or must have 'entertained serious doubts as to the truth of [the] publication.'"   Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 667 (1989) (internal citations omitted).   In addition to a false statement of fact, a public figure plaintiff must "prove more than general hostility or mere ill will because 'actual malice is not synonymous with common-law spite or ill will.'"  Alves, 857 A.2d at 751 (quoting Major, 507 A.2d at 941)).  Statements that are "derogatory and exaggerated" are not "alone sufficient under the actual-malice test."  Major, 507 A.2d at 941.

Rhode Island courts also recognize the "limited purpose public figure" designation.  As explained by the United States Supreme Court:

> [w]e would not lightly assume that a citizen's participation in community and professional affairs rendered him [or her] a public figure for all purposes . . . It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.

Healey v. New Eng. Newspapers, Inc., 555 A.2d 321, 325 (R.I. 1989) (quoting Gertz, 418 U.S. at 351–52); see Wolston v. Reader's Digest Ass'n Inc., 443 U.S. 157, 167 (1979) (explaining that "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention").  A limited purpose public figure seeking damages for defamation "must show that the statements were made with 'actual malice' — that is, with knowledge that the statements were false or with reckless disregard as to their falsity."  Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015) (citations omitted).  "[A]ctual malice is actual knowledge of the falsehood or reckless disregard for the truth or falsity of the allegedly defamatory material."  Healey, 555 A.2d at 327 (noting that Rhode Island Supreme Court "has

adopted the 'actual malice' standard set forth by the Supreme Court in <u>New York Times Co. v. Sullivan</u>[], for an award of punitive damages in a defamation action"). "[A]ctual malice must be plausibly alleged[,]" and while "[f]ailure to investigate does not in itself establish bad faith," allegations that the defendant "reli[ed] on anonymous or unreliable sources without further investigation may support an inference of actual malice." <u>Biro</u>, 807 F.3d at 546 (internal citations omitted); <u>see</u> <u>Church of Scientology Int'l v. Behar</u>, 238 F.3d 168, 174 (2d Cir. 2001) (explaining that "the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication").

In contrast, a private figure need only allege negligence, not actual malice, to recover for defamation. <u>See</u> <u>Healey</u>, 555 A.2d at 324. For a private figure plaintiff to recover punitive damages, however, he or she must prove "by clear and convincing evidence that defendant acted with actual malice in publishing a story that contained the implication of undisclosed defamatory facts." <u>Id.</u> at 327.

### IV. <u>DISCUSSION</u>

#### A. <u>Extrinsic Evidence</u>

In support of the Motion, CNN has submitted several exhibits, including documents that the Flynns quote or reference in the AC: a recording of the February 3 Report; articles the Flynns have quoted; the House Resolution; and a transcript of the February 26 Report. (ECF Nos. 19; 19-1; 19-4; 19-5; 19-6; 19-7; 19-8). The Court may appropriately consider these materials. <u>See</u> <u>Condit</u>, 317 F. Supp. 2d at 357 (considering recordings and transcripts on motion to dismiss "because plaintiff relies on them and they are integral to plaintiff's action").

In addition, CNN submits for the Court's consideration documents that are not specifically quoted in the AC: screenshots of Jack's Twitter profile on four dates, Leslie's Twitter profile, and archived tweets by both Flynns.  (ECF Nos. 19-9–19-14).  As noted above, in deciding a Rule 12(b)(6) motion, a court may take judicial notice "of documents that are 'integral to the complaint'" and "of materials in the public record . . . for the limited purpose of noting what the documents state, rather than to 'prove the truth of their contents.'"  Hesse v. Godiva Chocolatier, Inc., 463 F. Supp.3d 453, 462 (S.D.N.Y. 2020) (internal citation omitted).  As one court in this District has noted, where additional "tweets are integral to the allegations in the complaint and necessary to place [a party's] comments in context," it is appropriate to take judicial notice of the contents of those tweets."  Ganske, 480 F. Supp. 3d at 546.

With respect to the Flynns' Twitter profiles (ECF Nos. 19-10–19-11), CNN offers these documents as evidence that the number of Jack's Twitter followers increased after the posting of the Video, and Leslie's continued presence on Twitter.  (ECF No. 18 at 10).  Those purposes go beyond simply taking notice of a statement in a public document, and instead would require the Court to accept the truth of the statements therein, i.e., how many Twitter followers Jack had, and whether Leslie is still posting on Twitter.  In addition, the Flynns do not specifically reference the number of Twitter followers, let alone rely on those numbers, and they have not been incorporated by reference into the AC.  See Solstein v. Mirra, 488 F. Supp. 3d 86, 89 n.1 (S.D.N.Y. 2020) (declining to consider, on Rule 12(b)(6) motion, documents that plaintiff did not "specifically reference, let alone rely upon," and therefore did not incorporate by reference, in complaint).  The Court therefore declines to consider or take judicial notice of the Flynns' Twitter profiles in analyzing the Motion.

With respect to the Flynns' other tweets and retweets, however, the Flynns not only reference their Twitter feeds in the AC, but invite the Court to view them.  For example, the Flynns allege that, because of "its review of Jack's <u>entire</u> Twitter account," CNN knew:

> that Jack regularly retweeted users who supported the United States of America and its Constitution and Laws, who supported President Trump, the Republican Party and Conservative causes, and, most importantly, who supported General Flynn in his legal battle for freedom and against corruption.  Jack did not use QAnon slogans or code language or retweet users because they had a "Q" in their handle.  He retweeted Candace Owens, Herschel Walker, Harmeet Dhillon, Dr. Stella Immanuel, Jenna Ellis and others — voices trying to make America a better place.

(ECF No. 7 ¶ 23.a at 16 (emphasis added)).  The Flynns also assert that "CNN had no factual basis to accuse Jack of being an adherent of QAnon based on the <u>content of his tweets and retweets</u>." (<u>Id.</u> at 16–17 (emphasis added)).  They list various "hashtags" that Jack used "from time to time in his Twitter profile and sometimes in tweets," and reference "Jack's retweets" that CNN reviewed.  (<u>Id.</u> at 17–18).  In addition, the Flynns provide the Court with a link to review "Jack's tweets and retweets," which have been preserved.  (<u>Id.</u> at 16 n.7).  The additional tweets and retweets that CNN has submitted are also from the same time period — mid-2020 — as the tweets that the Flynns have incorporated into the AC.  That the Flynns did not quote these integral tweets and retweets does not preclude the Court from reviewing them on this Motion because their "failure to include matters of which as pleaders they had notice and which were integral to their claim — and that they apparently most wanted to avoid — may not serve as a means of forestalling the [Court's] decision on [a Rule 12(b)(6)] motion."  <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 44 (2d Cir. 1991) (holding that it was appropriate to consider, on Rule 12(b)(6) motion, emails that were not in complaint but were attached to defendant's counterclaim).  In light of the Flynns' intentional references to their Twitter feeds in the AC,

therefore, the Court finds that it may consider in analyzing the Motion those additional tweets and retweets (ECF Nos. 19-9, 19-12, 19-13, 19-14) that are "integral to the allegations in the [AC] and necessary to place [CNN's] comments in context." Ganske, 480 F. Supp. 3d at 547; see also Boulger v. Woods, 917 F.3d 471, 482 (6th Cir. 2019) (conducting "[a] review of [defendant's] Twitter feed" to evaluate "the allegedly defamatory statement in the context of [defendant's] other tweets" at that time).

## B. **The Flynns Are Private Figures.**

The Court must first determine whether the Flynns are public figures, limited public figures, or private figures. See Major, 507 A.2d at 941 (explaining that "a critical determination must be made init[i]ally in regard to whether the plaintiff is a public figure . . ."); Capuano v. Outlet Co., 579 A.2d 469, 472 (R.I. 1990) (noting that whether a plaintiff is a public figure is a threshold question for the court); see also Celle, 209 F.3d at 176 (2d Cir. 2000) ("Whether a plaintiff is a public figure is a question of law for the court."). CNN argues that Jack is a limited purpose public figure who must plead and then prove actual malice by clear and convincing evidence that CNN "realized that [its] statement was false or that [it] subjectively entertained serious doubts as to the truth of [its] statement." (ECF No. 18 at 27 (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n.30 (1984). It is undisputed on the Motion that Leslie is a private figure. (ECF Nos. 18 at 30 n.15; 33 at 17).

The Court finds that, like Leslie, Jack is a private figure. First, Jack alleges that he is a "private individual[]." (ECF No. 7 ¶ 8). Jack is employed at a seafood factory (id.); there is no allegation that he holds public office or any civic position. See Gertz, 418 U.S. at 351 (finding that plaintiff was a private figure because he "had never held any remunerative governmental

position" when the report was published).  Second, it is undisputed that the Video was taken during a private barbecue at the Flynns' home in July 2020.  (ECF Nos. 7 ¶ 4; 33 at 12, 38]).  Third, although the AC quotes three tweets by Jack that mention QAnon, there is no allegation that he discussed QAnon with any reporters or was quoted by CNN, or any other media outlet, as having done so.  See Gertz, 418 U.S. at 352 (finding that plaintiff was "not a public figure" in part because he "never discussed" his affairs "with the press and was never quoted as having done so"); cf. Major, 507 A.2d at 941 (finding that plaintiff who "actively sought publicity by issuing statements to the press and requesting a newspaper reporter to be present" "made himself a public figure").  And, as the AC alleges, Jack left Twitter on January 7, 2021, more than a month before the February 3 Report.  (ECF No. 7 ¶ 14).

CNN argues that Jack's "substantial social media following renders him a public figure," citing to the screenshots of Jack's Twitter profile.  (ECF No. 18 at 28; see also ECF Nos. 7 at 10; 18 at 28 n.13).  As noted above, however, the Court declines to take judicial notice of these screenshots on a Rule 12(b)(6) motion.  (See supra Section IV.A & note 1).  CNN also argues that "QAnon is clearly a public controversy," as to which Jack "has been anything but silent," using "his Twitter deed to advocate for his brother, defend QAnon, to discuss the meaning behind #WWG1WGA and to debunk the most outlandish of the QAnon theories (that John F. Kennedy Jr. is still alive)."  (ECF No. 18 at 28).  Apart from Twitter, however, CNN does not point to any media in which Jack made any statements about QAnon, or any reports in which he consented to be interviewed about QAnon — indeed, it is undisputed that no statement by Jack appears in the February 3 Report or any other report by CNN.  Jack is thus distinguishable from the plaintiffs in Capuano, who were deemed to be limited-purpose public figures because they "operated one

24

of the major waste disposal enterprises in th[e] state" and admitted that they were "prominently referenced in [dozens of] newspaper articles."  579 A.2d at 473.  The Court declines to find that an otherwise private individual who makes statements on Twitter could thereby eliminate the heightened protections the law affords his or her reputation.  See Gertz, 418 U.S. at 345 (explaining that "private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery").

CNN also cites a California decision holding that a plaintiff "who had promoted her own status as a celebrity" and had over 50,000 Twitter followers was a public figure.  (ECF No. 18 at 28–29) (citing Jackson v. Mayweather, 10 Cal. App. 5th 1240, 1248 (Cal. 2017), as modified (Apr. 19, 2017)).  In Jackson, however, the plaintiff, who dated an internationally-famous boxer, "promoted her own status as a celebrity" on social media, had her own website, and was interviewed on radio and television.  10 Cal. App. 4th at 1248.  The AC lacks comparable examples of Jack engaging in such conduct, nor do Jack's tweets equate to the "regular and continuing access to the media" that the Second Circuit has required for a defamation plaintiff to rise to the level of a limited public figure.  La Liberte v. Reid, 966 F.3d 79, 91 (2d Cir. 2020) (quoting Contemp. Mission, Inc. v. New York Times Co., 842 F.2d 612, 617 (2d Cir. 1988)).  Jack is also unlike the plaintiff in Barbash v. STX Financing, LLC, who pled guilty in open court, "gave at least two interviews to reporters and published her own memoir" about those crimes, thus making "it appropriate to treat [her] as a limited-purpose public figure."  Barbash v. STX Financing, LLC, No. 20 Civ. 123 (DLC), 2020 WL 6586155, at *6 (S.D.N.Y. Nov. 10, 2020); see Ayyadurai v. Floor64, Inc., 270 F. Supp. 3d 343, 357 (D. Mass. 2017) (finding that plaintiff, "a world-renowned scientist, inventor, lecturer, philanthropist and entrepreneur," by "publishing books, participating in

interviews, and posting on his own website," had "'thrust [himself] to the forefront' of the controversy 'in order to influence the resolution of the issues involved' in it" and was thus "at least a 'limited-purpose' public figure"); see also Gertz, 418 U.S. at 352 (finding that individual who "never discussed" the matter at issue "with the press and was never quoted as having done so" was not a public figure).

Accordingly, the Court finds that, at the pleading stage, Jack is a private figure.  Because both Flynns are private figures, they need only allege "fault amounting at least to negligence on the part of" CNN.  Healey, 555 A.2d at 324.  (See infra Section IV.B).

## C.  **"Of and Concerning"**

CNN argues that that the Flynns have failed to satisfy their burden of pleading that the February 3 Report is "of and concerning" them.  (ECF No. 18 at 8, 15).  CNN contends that the February 3 Report "says nothing" about the Flynns, who are "barely seen, are not identified, and are not heard saying anything," and does not say that they "are associated with QAnon."  (Id. at 15–16).  At most, CNN contends, the February 3 Report stated that "they stood next to General Flynn when he uttered the QAnon Slogan," which is an undisputedly true statement.  (ECF No. 18 at 22).  Even if, CNN contends, the February 3 Report accused the Flynns of "mere association with QAnon," that "is not, absent more, defamatory."  (Id. at 15–16 (internal citations omitted)).

In their Opposition (ECF No. 23 at 12), the Flynns point to paragraph 16 of the AC, which alleges:

> Viewed in context, CNN made, published and republished false factual statements of or concerning [the Flynns].  Using an edited video clip and a flashy chyron, CNN falsely stated or implied and insinuated that [they] had predilictions [sic] towards or were linked to and involved in or with the violent extremist group QAnon.

(ECF No. 7 ¶ 16).  Because the February 3 Report contained their image, which one of Leslie's friends recognized, and bore the caption, "CNN Goes Inside A Gathering of QAnon Followers," the Flynns contend that the February 3 Report was "of and concerning" them.  (ECF No. 23 at 12–13).

"To satisfy the 'of and concerning' element, it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed."  Budget Termite & Pest Control, Inc. v. Bousquet, 811 A.2d 1169, 1172 (R.I. 2002) (quoting Croixland Props. Ltd. P'ship v. Corcoran, 174 F.3d 213, 216 (D.C. Cir. 1999)).  "At the pleading stage [] the bar to satisfy this element is low."  Palin v. New York Times Co., 940 F.3d 804, 816 (2d Cir. 2019).  To satisfy this element, "the plaintiff must establish some reasonable personal application of the words to himself [or herself].  Beyond that, if the words have no personal application to the plaintiff, they are not actionable by him [or her]."  Budget Termite, 811 A.2d at 1172 (internal citation omitted).  "While the 'of and concerning' requirement is generally an issue of fact for the jury to decide, the court may properly dismiss an action where the libelous statement is 'incapable of supporting a jury's finding' that it refers to the plaintiff."  Goldman v. Reddington, 417 F. Supp. 3d 163, 172 (E.D.N.Y. 2019) (quoting Greene v. Paramount Pictures Corp., 138 F. Supp. 3d 226, 234 (E.D.N.Y. 2015)).  The question for the Court on the Motion, then, is whether an ordinary viewer of the February 3 Report would have "reasonably" understood that CNN was making a statement with "personal application" to the Flynns.  Budget Termite, 811 A.2d at 1172.

The Court finds that the Flynns have adequately alleged that the February 3 Report is "of and concerning" them.  They allege that the February 3 Report displayed their image, and that at

least one person — Leslie's friend — recognized them even though the Flynns were not named. (ECF No. 7 ¶ 6).  This allegation demonstrates that someone who watched the February 3 Report could conclude — and in fact did conclude — that it referred to the Flynns even though they were "never named."  Budget Termite, 811 A.2d at 1173 (quoting Croixland, 174 F.3d at 216); see Church of Scientology Int'l v. Time Warner, Inc., 806 F. Supp. 1157, 1161 (S.D.N.Y. 1992) (finding that allegations that church was visible in one of six photographs on one page of article, when viewed in context with rest of article, was sufficient to survive motion to dismiss).

CNN's assertion that the only statement about the Flynns in the February 3 Report is that "they stood next to General Flynn when he uttered the QAnon slogan" is overly myopic.  (ECF No. 18 at 22).  CNN acknowledges that the Court must consider "the allegedly defamatory words 'in the context of the publication in which they appear,' rather than read them in isolation."  (Id. at 17 (quoting Burke, 55 A.3d at 218).  Using "common sense," as CNN urged the Court to do during oral argument (ECF Nos. 18 at 20; 33 at 12), the Court finds the conclusion inescapable that the February 3 Report, by showing the photo of the Flynns above the words "CNN Goes Inside A Meeting of QAnon Followers," equates to a statement that the Flynns were QAnon followers.  If CNN had not intended to make such a statement, and instead only that General Flynn was reciting "where we go one, we go all" and was therefore a QAnon follower, it could have blurred the faces of the other individuals in the Video, or shown another clip of General Flynn alone reciting the phrase.  CNN did not do so, and instead, labeled the Flynns as QAnon followers.

As noted above, the bar for pleading the "of and concerning" element of a defamation claim is "low," and the Flynns' "allegations are more than sufficient to plausibly allege that the

challenged statements were 'of and concerning'" them.  <u>Palin</u>, 940 F.3d at 816.  Accordingly, the

Flynns have sufficiently alleged "some reasonable personal application" of the February 3 Report

to them for purposes of their defamation and false light claims.  <u>Budget Termite</u>, 811 A.2d at

1172 (citation omitted).

### D.  <u>Calling the Flynns QAnon Followers Was Neither Substantially False Nor Defamatory.</u>

To be defamatory under Rhode Island law, a statement must be "false <u>and</u> defamatory."

<u>RainSoft v. MacFarland</u>, 350 F. Supp. 3d 49, 57 (D.R.I. 2018) (quoting <u>Swerdlick</u>, 721 A.2d at 859

(emphasis added)).

"A false statement is one whose 'gist or . . . sting' is untrue."  <u>RainSoft</u>, 350 F. Supp. 3d at

57  (quoting <u>Healey</u>, 555 A.2d at 325).  Where an allegedly defamatory statement is regarding an

issue of "public concern," the plaintiff must show "that the statements at issue are not

substantially true," <u>i.e.</u>, they are "materially false."  <u>Pan Am Sys., Inc. v. Atl. Ne. Rails & Ports, Inc.</u>,

804 F.3d 59, 66 (1st Cir. 2015).  "A statement is substantially true unless 'it would have a different

effect on the mind of the reader from that which the pleaded truth would have produced.'"

<u>RainSoft</u>, 350 F. Supp. 3d at 60 (quoting <u>Masson v. New Yorker Magazine, Inc.</u>, 501 U.S. 496, 517

(1991) (internal quotations omitted)).  Rhode Island courts also hold that "[a]ny words, if false

and malicious, imputing conduct which injuriously affects a [person's] reputation, or which tends

to degrade him [or her] in society or bring him [or her] into public hatred and contempt, are in

their nature defamatory . . ."  <u>Elias</u>, 493 A.2d at 161 (internal citation omitted).  "The decisive

inquiry" for the Court "is what the person . . . to whom the communication was published

reasonably understood the meaning to be expressed."  <u>Lyons</u>, 516 A.2d at 1343 (quoting

Restatement (Second) <u>Torts</u>, § 563 cmt. e (Am. Law Inst. 1977)).  The "plaintiff must show that

the publication was defamatory on its face" — defamatory per se — "or by way of innuendo" —

defamatory per quod.  Marcil v. Kells, 936 A.2d 208, 213 (R.I. 2007) (citing Andoscia, 210 A.2d at

584 (R.I. 1965)).  If a statement is ambiguous, "the language should be submitted to the jury to

be considered in connections with other circumstances in order to determine whether it was in

fact defamatory." Burke, 55 A.3d at 219.

CNN argues that, at most, the February 3 Report said only that the Flynns "stood next to

General Flynn when he uttered the QAnon Slogan," which the Flynns have not alleged is false.

(ECF No. 18 at 22).  CNN argues in the alternative that it was "substantially true" to label the

Flynns as QAnon followers, pointing to their tweets, both in the AC and in their Twitter feeds,

showing that "they have actively endorsed QAnon as a movement." (Id. at 23–24).

The Flynns allege that their use of the phrase "was not an oath of allegiance to QAnon, or

any kind of oath at all," but rather "a simple, family, July 4 statement of support for each other."

(ECF No. 7 ¶ 4 n.1).  They cite film and literary sources as the origin of the meaning of and their

desire to use the phrase. (Id.)

In analyzing whether a statement is false, Rhode Island courts follow the principle that

"language is not to be forced or tortured . . . in order to make it actionable.  It is to be taken in its

plain and ordinary sense." Elias, 493 A.2d at 161 (quoting Reid v. Providence J. Co., 27 A. 637,

637 (R.I. 1897)).  For the "ordinary sense" of a word, the Court may consult its dictionary

definition. Id.  The Merriam-Webster Dictionary's definition of "follower" includes, as is relevant

here, "one in the service of another[,]" "one that follows the opinions or teachings of another[,]"

"one that imitates another[,]" or "one who subscribes to a feed especially on social media[.]"[6] The second and third of these definitions are most applicable here.

The Flynns' tweets and retweets reflect that they meet the dictionary definition of follower in the sense that they have "follow[ed] the opinions" of QAnon.  For example, on or about August 21, 2020, Jack tweeted: "Qanon is not violent or conspiracy.  We are every day people seeking truth . . . Qanon's, share and tell your story."  (ECF No. 19-12 at 3 (emphasis added); see ECF No. 19 ¶ 18).  By using the word "we," Jack included himself as one who "follows the opinions" of QAnon, and invited others who "share[d]" those opinions to join his comments. (ECF No. 19-12 at 3); see Merriam-Webster.  The same day, Jack retweeted the image of "Q" over "WHERE WE GO ONE WE GO ALL," and stated, "If this means you believe in the constitution and equal justice under the law then this works for me."  (ECF No. 7 ¶ 23.a. at 15 (emphasis added)). Similarly, on August 20, 2020, Jack tweeted: "There is nothing wrong with QAnon.  Just People doing their own research and learning independence of thought to find the truth."  (ECF No. 7 ¶ 23.a. at 14).  He added, "I advocate for the Constitution and Bill of Rights . . . if Q does too~No harm no foul."  (Id.)  In a May 9, 2020 post, Leslie forwarded to Jack a tweet that included both a bold "Q" and "#WWG1WGA."  (ECF No. 19-13 at 3).  Thus, the Flynns' own statements indicate that it was "substantially true" to state that they "follow[ed] the opinions" of QAnon.

As to the third dictionary definition, "one that imitates another," both Flynns' Twitter feeds include instances in which they retweeted or liked posts featuring "Q" or "QAnon" in the Twitter handle or the text of the post itself.  (ECF Nos. 19-12 ("QBlueSky" and "QAnon"); 19-13

---

[6]Follower,  Merriam-Webster.com,  https://www.merriam-webster.com/dictionary/follower (last visited Oct. 19, 2021) ("Merriam-Webster").

("Q" and "WWG1WGA"); see ECF No. 7 ¶ 23.a at 15); see also Merriam-Webster.  Further, the Flynns do not dispute that they said the phrase, "where we go one we go all."  (ECF No. 7 ¶ 4). Although they contend that their use was innocuous, the connection between the phrase and QAnon is a matter of public record, with at least one federal court recognizing the "association of this phrase with QAnon."  United States v. Languerand, No. 21 Crim. 353 (JDB), 2021 WL 3674731, at *3 n.8 (D.D.C. Aug. 19, 2021) (citing Will Rahn & Dan Patterson, What is the QAnon conspiracy theory?, CBS News (Mar. 29, 2021, 3:36 PM), https://www.cbsnews.com/news/what-is-the-qanon-conspiracy-theory/).  Indeed, the August 21, 2020 tweet that the Flynns include in the AC shows an image of the letter "Q" over the phrase "where we go one we go all," as to which Jack then commented, "this works for me."  (ECF No. 7 ¶ 23.a. at 15 (emphasis added)).  Because the Flynns' Twitter feeds contradict their allegation that "Jack did not use QAnon slogans or code language or retweet users because they had a 'Q' in their handle," (ECF No. 7 ¶ 23.a. at 16), the Court need not credit this allegation in determining the plausibility of their claims.  See Tsinberg, 2021 WL 1146942, at *5 (rejecting allegations that were contradicted by documents on which complaint relied); see also Kirch v. Liberty Media Corp., 449 F.3d 388, 398 (2d Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss.") (internal citations omitted).

Applying at least two of the dictionary definitions of follower, then, the Flynns' own statements show that they followed the opinions of and imitated QAnon such that CNN's statement that they were QAnon followers was substantially true and not defamatory.  Having said, in their own words, that QAnon's principles "work for" them (ECF No. 7 ¶ 23.a. at 15), the Flynns cannot turn around and characterize CNN's making the same statement as defamatory.

See Wheeler v. Twenty-First Century Fox, 322 F. Supp. 3d 445, 454 (S.D.N.Y. 2018) (finding that plaintiff failed to state a claim for defamation based on statement that was "not materially different" from plaintiff's own statement in television interview); see also Guitar v. Westinghouse Elec. Corp., 396 F. Supp. 1042, 1050 (S.D.N.Y. 1975) (holding that plaintiff failed to state a libel claim based on "quotes" that "c[a]me substantially from the book" that she had written and statements she had made "in public meetings"), aff'd 538 F.2d 309 (2d Cir. 1976); Lovejoy v. Mutual Broadcasting Sys., 220 S.W.2d 308, 314 (Tex. Ct. Civ. App. 1948) (cited in ECF No. 23 at 14) (finding that, if defendant's statement "tended to injure plaintiff's reputation it was on account of the publication of his" statements in his letter that defendant quoted, and therefore, he had not stated a defamation claim).

In opposition to the Motion, the Flynns cite several cases for the proposition "that words or conduct falsely implying an association or connection between the plaintiff and a violent extremist group, like QAnon, is defamatory." (ECF No. 23 at 13–15). The Court agrees that falsely implying a connection to a violent extremist group can be defamatory — but as set forth above, CNN's statement connecting the Flynns to QAnon is not substantially false. (See supra Section IV.D). By their own statements, both in the AC and in the Twitter feeds that the Flynns invited the Court to consider, the Flynns connected themselves to QAnon, and therefore, cannot plausibly allege that CNN's statements were substantially false.

### 3. Negligence

Having failed to allege that CNN made a false and defamatory statement, it is not necessary to analyze the remaining elements of the Flynns' defamation claim. In the event that

the District Court disagrees with the conclusion above, however, the Court will consider the sufficiency of the remaining elements.

As noted above, a private citizen asserting a defamation claim must also plausibly allege "fault amounting at least to negligence on the part of the publisher."  Healey, 555 A.2d at 324 (internal citation omitted).  Very few Rhode Island courts have addressed in detail the level of allegations necessary to plausibly allege a defendant's negligence for purposes of a defamation claim.  The Court notes that the Restatement (Second) of Torts, which Rhode Island courts have followed approvingly in the defamation context,[7] describes negligence as "conduct that creates an unreasonable risk of harm," as measured by the standard of "a reasonable person under like circumstances."  Restatement (Second) Torts § 580B cmt. g (Am. Law Inst. 1977).  As to the truth or falsity of the statement, the relevant question is "whether [the defendant] had reasonable grounds for believing that the communication was true," that is, "whether the defendant acted reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it."  Id.  Factors the Restatement lists as relevant to determining whether the defendant acted reasonably include whether and how thoroughly the defendant checked the accuracy and potentially defamatory nature of the statement, which interests the defendant was seeking to promote in making the statement, and how much the plaintiff's reputation was or could have been damaged by the falsity of the statement.  Id. cmt. h.

---

[7] See, e.g., Marcil, 936 A.2d at 212 (explaining requirements of defamation per se and citing Restatement (Second) Torts § 570 (Am. Law Inst. 1977)); Nassa v. Hook-SupeRx, Inc., 790 A.3d 368, 373 n.10 (R.I. 2002) (listing elements of defamation claim and citing Restatement (Second) Torts § 558 (Am. Law Inst. 1977)); Healey, 520 A.2d at 150 (discussing defamation claim and citing Restatement (Second) Torts § 566) (Am. Law Inst. 1977).

Here, the Flynns allege that "CNN lacked reasonable grounds for a belief in the truth of its statements, and acted negligently in failing to determine the true facts[,]" such as by contacting the Flynns before the February 3 Report or obtaining "independent evidence to corroborate that [they] were followers or supporters of QAnon . . . ." (ECF No. 7 ¶ 22).  The Flynns assert that "CNN knew where was no basis for linking [them] to any domestic violent extremist groups, including QAnon."  (Id. ¶ 23.a.).  As particular evidence available to CNN that they were not QAnon supporters, the Flynns cite Jack's statements on Twitter (quoted in the AC) that there was nothing "wrong" about "where we go one we go all," and that "most people seem pretty normal to me who support the idea of Q.  I advocate for the Constitution and Bill of Rights . . . if Q does too~No harm no foul."  (Id.)

In its Motion, CNN contends that the Flynns have failed to plausibly allege negligence, because the Flynns do not dispute that they said "where we go one we go all," and that QAnon uses that phrase.  (ECF No. 18 at 30 (citing ECF No. 7 ¶ 4)).  CNN also notes that Leslie herself "twice liked Tweets that undeniably express support for QAnon."  (Id. at 31 (citing ECF No. 19-13)).  Thus, CNN contends that the Flynns' own statements gave it "reasonable grounds to believe" that they "supported and followed the QAnon movement," and therefore the Flynns have not plausibly alleged that CNN failed to comply with the requisite standard of care.  (Id.)

The Court finds that the Flynns have not alleged, and cannot allege, that CNN lacked reasonable grounds for believing the truth of the statement that they were QAnon followers. Again, the Flynns' own statements establish that they meet the dictionary definition of a follower of QAnon.  (See supra note 6).  Given that their own statements contradict their allegations that they were not QAnon followers, the Court is not required to give those assertions any credence.

See Tsinberg, 2021 WL 1146942, at *4; In re Yukos Oil Co. Secs. Litig., No. 04 Civ. 5243 (WHP), 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006) ("The Court need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint, or materials amenable to judicial notice."); see also Brimelow v. New York Times Co., No. 21 Civ. 66, 2021 WL 4901969, at *3 (2d Cir. Oct. 21, 2021) (holding that plaintiff's conclusory allegations of actual malice did not defeat motion to dismiss).  Similarly, the Flynns' statements in the AC and in their tweets and retweets contradict their assertion that CNN "had no independent evidence to corroborate that [they] were followers or supporters of QAnon."  (ECF No. 7 ¶ 22).  In fact, that "independent evidence" does corroborate that the Flynns followed — both literally and figuratively — the opinions and ideas of QAnon.  Accordingly, the Flynns have not plausibly alleged that CNN breached the standard of care under Rhode Island law.

### 4.  Special Damages

A defamation plaintiff under Rhode Island law must also plead and prove special damages, unless the statement was defamatory per se.  See Swerdlick, 721 A.2d at 861 (explaining that, where "statements at issue were defamatory per se . . . any need for a special damages showing" is obviated).  To be defamatory per se, the "publication [must] impute[] insolvency, financial embarrassment, unworthiness of credit, or failure in business to a plaintiff, . . . [b]ut to make them so . . . it is essential that such imputation relate to or affect the plaintiff in his business."  Id. (quoting Andoscia, 210 A.2d at 584 (R.I. 1965)); see Marcil, 936 A.2d at 213 (explaining that a statement is defamatory per se "if it charges improper conduct, lack of skill, or integrity in one[']s profession or business, and is of such a nature that it is calculated to cause injury to one in his profession or business"); id. at 212 ("To be actionable as slander per se — without proof of special

damages — the false statement must impute to the other: (1) a 'criminal offense,' (2) a 'loathsome disease,' (3) a 'matter incompatible with his business, trade, profession, or office,' or (4) a 'serious sexual misconduct.'") (quoting Restatement (Second) Torts § 570 (1977)). "Disparagement of a general character, equally discreditable to all persons, is not enough" to constitute defamation per se "unless the particular quality is peculiarly valuable to the plaintiff[']s business or profession." Id. at 213.

In support of their assertion that the February 3 Report was defamatory per se, the Flynns allege that CNN's statements "accuse and impute to [them] an unfitness to perform the duties of an office or employment for profit, including being members of a dangerous, violent, insurrectionist, domestic terrorist organization." (ECF No. 7 ¶ 19). By implying that they are "prone to violence, lack good judgment and harbor extremist views," the Flynns contend that CNN has cast them as the opposite of "good business people." (ECF No. 23 at 18).

Even if CNN's statement that the Flynns were QAnon followers were substantially false (which the Court has found they were not), the Court finds that such a statement would not be defamatory per se. The February 3 Report does not mention Jack's seafood business, nor does the AC suggest "that anyone with whom [Jack] did business knew of," let alone took an adverse action against Jack after seeing CNN's statement. Swerdlick, 721 A.2d at 861. The Flynns allege that Leslie is a stay-at-home mother (ECF No. 7 ¶ 8), and do not allege that she had any business dealings that were affected by CNN's accusations. None of the Flynns' allegations plausibly allege the sort of "insolvency, financial embarrassment, unworthiness of credit, or failure in business" that Rhode Island courts require to demonstrate defamation per se. Swerdlick, 721 A.2d at 861.

Rather, the Court finds that the defamation they allege is "of a general character," equally applicable to anyone who might be falsely labeled as a QAnon follower.  Marcil, 936 A.2d at 213.[8]

Because the February 3 Report was not defamatory per se, the Flynns must plead special damages, which requires specific pleading of "an adequate factual assertion of actual economic harm."  Sequin LLC v. Renk, No. 20-62 (WES), 2021 WL 124250, at *10 (D.R.I. Jan. 13, 2021) adopted by, 2021 WL 391519 (Feb. 4, 2021).  Here, the AC includes an ad damnum clause seeking $75 million, (ECF No. 7 at 30), but lacks any detail concerning the basis for this figure, tabulation of the Flynns' decreased income, or any losses or expenses they have incurred as a result of the February 3 Report.  Jack asserts that he "is afraid that he will be terminated," but does not allege that he has in fact suffered any negative employment effect since the February 3 Report.  (Id. ¶ 8).  Similarly, the Flynns' conclusory allegations that they suffered "special damages" (id. ¶ 21), is insufficient under Rhode Island law.  See Sequin, 2021 WL 124250, at *10 (rejecting a "conclusory and speculative allegation" for failure to constitute "an adequate factual assertion of actual economic harm").[9]

Because the February 3 Report did not constitute defamation per se, and the Flynns were required to, but failed to, plead special damages, they have failed to state a defamation claim under Rhode Island law.

---

[8] The Flynns' citation to cases from other states finding that statements associating the plaintiff with extremist groups were defamatory per se, (ECF No. 36 at 2), does not alter the Court's conclusion that a Rhode Island court would not deem CNN's statements to fall under one of the established categories of defamation per se.

[9] In support of their argument that they have adequately alleged special damages, the Flynns point to three cases for the proposition that special damages need only "give notice" as to the damages sustained. (ECF Nos. 7 ¶¶ 21, 24, 29; 36 at 2).  None of these cases involved a defamation claim under Rhode Island law, however, and therefore do not contradict the Court's decision to follow clear Rhode Island precedent requiring "an adequate factual assertion of actual economic harm."  Sequin, 2021 WL 124250, at *10.  The Flynns' conclusory allegations fail to satisfy that requirement.

### E.   **False Light**

#### 1.   **Legal standard**

Rhode Island General Law § 9-1-28.1 "creates the right to privacy and a cause of action

for false light," <u>Alves</u>, 857 A.2d at 751:

> (a)    **Right to privacy created**.  It is the policy of this state that every person in
> this state shall have a right to privacy which shall be defined to include any of the
> following rights individually:
> . . .
>> (4) The right to be secure from publicity that reasonably places another in a
>> false light before the public;
>>> (i) In order to recover for violation of this right, it must be established that:
>>>> (A) There has been some publication of a false or fictitious fact which
>>>> implies an association which does not exist;
>>>> (B) The association which has been published or implied would be
>>>> objectionable   to   the   ordinary   reasonable   man   under   the
>>>> circumstances;
>>> (ii) The fact which was disclosed need not be of any benefit to the discloser.

R.I. Gen. L. § 9-1-28.1.

To prevail on a false light claim, "a plaintiff must prove that '[t]here has been some

publication of a false or fictitious fact which implies an association which does not exist; [and]

[t]he association which has been published or implied would be objectionable to the ordinary

reasonable [person] under the circumstances." <u>Alves</u>, 857 A.2d at 752 (quoting <u>Cullen</u>, 809 A.2d

at 1112).  A false light claim "requires that a plaintiff be 'given unreasonable and highly

objectionable publicity that attributes to him [or her] characteristics, conduct or beliefs that are

false, and so is placed before the public in a false position.'" <u>Cullen</u>, 809 A.2d at 1112 (quoting

<u>Swerdlick</u>, 721 A.2d at 861).  Thus, a false claim plaintiff must prove that "there is such a major

misrepresentation of his [or her] character, history, activities or beliefs that a serious offense may

reasonably be expected to be taken by a reasonable [person] in his [or her] position." <u>Id.</u> (citing

the same).  "[T]he question [] whether a statement portrays an individual in a false light under [§] 9-1-28.1(a)(4) is a matter of law to be determined by the court."  Alves, 857 A.2d at 751.

### 2. Application

The Flynns allege that, "[b]y publishing the false statements on TV, online, and via social media, and by causing the republication of the statements by third-parties, CNN generated substantial publicity about the false statements of or concerning" them.  (ECF No. 7 ¶ 26).  The Flynns assert that "CNN ascribed to [them] actions and associations that did not exist and beliefs [they] have never held."  (Id.)  "By associating [them] with QAnon — a domestic violence extremist group — CNN placed [them] in a false light that would be offensive to any reasonable person."  (Id.)  The Flynns allege that as a result of CNN placing them in a false light, they "were universally condemned and threatened on Twitter by political operatives . . ."  (Id. ¶ 27).

Having found that the Flynns failed to plausibly allege that CNN made a substantially false, defamatory statement, the Court similarly concludes that they have not adequately alleged a false light claim under Rhode Island law.  See Ferreira v. Child & Fam. Servs., 222 A.3d 69, 76 (R.I. 2019) (holding that plaintiff's "claim for false light was properly dismissed for the same reason as his claim for defamation: The amended complaint does not allege that [defendant] made any false statements about him.").  Given their own statements sharing and following the opinions of QAnon, the Flynns cannot plausibly allege that the February 3 Report "implie[d] an association which does not exist[,]" which is a required element of a false light claim under Rhode Island law. See Santagata v. MinLuxe, Inc., No. 18 Civ. 428 (WES), 2020 WL 2322851, at *6 (D.R.I. May 11, 2020) (quoting R.I. Gen. Laws § 9-1-28.1(a)(4)(i)(A) and granting motion to dismiss false light claim where plaintiff failed to allege "'major misrepresentation of his [or her] character, history,

activities or beliefs" that a reasonable person might take "serious offense") (quoting <u>Cullen</u>, 809 A.2d at 1112).

F.  **Fees and Costs**

CNN asks the Court to award its fees, costs, and expenses for the Motion pursuant to 28 U.S.C. § 1927 and the Court's inherent authority based on the assertion that the Flynns filed a "plainly frivolous [AC] [that] multiplied the proceedings unreasonably and vexatiously."  (ECF No. 18 at 32).  The Court disagrees and respectfully recommends denying this portion of the Motion.

As set forth above, the Court has found that the Flynns adequately alleged certain elements of their claims — including that CNN's statements were "of and concerning them" and that Jack is a private figure — although others were deficient.  The Court also finds that the arguments advanced by the Flynns in opposition to the Motion and at oral argument were not frivolous.  Courts have found falsely implied associations with violent extremist groups to be defamatory.  <u>See, e.g.</u>, <u>Boulger</u>, 917 F.3d at 483 (ruling that the tweet at issue, which implied that Plaintiff was giving a Nazi salute, was reasonably susceptible to a defamatory meaning); <u>Liberty Lobby, Inc. v. Anderson</u>, No. 81-2240, 1991 WL 186998, at * 9 (D.D.C. 1991) ("The Court finds that the implication that Carto emulates Hitler in appearance or action is defamatory").  Although the Court has concluded here that CNN's statement was not substantially false and therefore not defamatory, that conclusion was not foregone and required full briefing, oral argument, and supplemental submissions before the Court was able to complete its analysis.

Because the Flynns' claims were not frivolous, unreasonable, or without any foundation, an award of fees, costs, and expenses is not appropriate here.  <u>See</u> <u>Carter v. Inc. Village of Ocean</u>

Beach, 759 F.3d 159, 163 (2d Cir. 2014) (noting that "'a district court may in its discretion award attorney's fees to a prevailing defendant' only 'upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation'") (quoting Christiansburg Garment Co. v. Equal Emp't Opportunity Comm'n., 434 U.S. 412, 421 (1978)).  "[A] court may grant to a defendant only those fees 'that the defendant would not have incurred but for the frivolous claims.'"  Id. (quoting Fox v. Vice, 563 U.S. 826, 829 (2011)).  The Court therefore recommends that CNN's request for fees, costs, and expenses be denied.

### V. CONCLUSION

For the reasons set forth above, the Court respectfully recommends that CNN's Motion be GRANTED IN PART and DENIED IN PART as follows:

(1)  CNN's Motion seeking dismissal of the defamation and false light claims should be GRANTED; and

(2)  CNN's request for fees, costs, and expenses should be DENIED.

Dated:      New York, New York
            October 22, 2021


SARAH L. CAVE
United States Magistrate Judge

*                  *                  *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Woods.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).