```
                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                          Docket #21cv2587
 FLYNN, et al.,                     :

                   Plaintiffs,      :

  - against -                       :

 CABLE NEWS NETWORK, INC.,          : New York, New York
                                      October 28, 2022
                   Defendants.      :

------------------------------------ :


                     PROCEEDINGS BEFORE
              THE HONORABLE SARAH L. CAVE,
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Flynn Plaintiffs:    LAW OFFICE OF STEVEN S. BISS
                         BY:  STEVEN BISS, ESQ.
                         300 West Main Street, Suite 102
                         Charlottesville, Virginia 22903


For Defendant CNN:       DAVIS WRIGHT TREMAINE LLP
                         BY:  KATHERINE BOLGER, ESQ.
                         1251 Avenue of the Americas
                         New York, New York 10020

                         THOMAS & LOCICERO PL
                         BY:  DEANNA SHULLMAN, ESQ.
                         8461 Lake Wolih Road, Suite 114
                         Lake Worth, Florida 33467


Transcription Service:   Carole Ludwig, Transcription Services
                         155 East Fourth Street #3C
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

```
 1                        PROCEEDINGS                    3

 2              THE CLERK:  Your Honor, this is in the matter

 3    of Flynn, et al. v. Cable News Network, Inc., 21cv2587.

 4    Counsel, please state your appearance for the record.

 5              MR. STEVEN BISS:   Good afternoon, Your Honor,

 6    I'm Steven Biss, I represent the Flynns.

 7              THE COURT:   Good afternoon, nice to see you

 8    again.

 9              MS. KATE BOLGER:   Good afternoon, Your Honor,

10    Kate Bolger on behalf of CNN.

11              THE COURT:   Okay, good afternoon.

12              MS. DEANNA SHULLMAN:   Good afternoon, Your

13    Honor, Deanna Shullman also on behalf of CNN.

14              THE COURT:   Okay. All right, nice to see you

15    all again.  Okay, so we have a few discovery issues to

16    work through today.  Mr. Biss, since you're sitting at

17    the front, I'll start with the issues raised in your

18    letter.  So it looks like there are three issues:  the

19    information about the clip of the video, telephone calls

20    by Mr. O'Sullivan, and then the privilege log.  Is that

21    right?

22              MR. BISS:  Yes, Your Honor.

23              THE COURT:   And those are all still open

24    issues?

25              MR. BISS:  They're all still open issues,
```

```
 1                        PROCEEDINGS                4

 2   Judge.  I'm counselled also by my colleague's response

 3   to my, to the letter motion.  So I'll start in the order

 4   that they appear.

 5              THE COURT:  Okay, that's fine.

 6              MR. BISS:  I understand counsel's response to

 7   the truncated clip.  I fully understand that.  They're

 8   still searching for it.

 9              THE COURT:  Okay.

10              MR. BISS:  Your Honor knows from watching that

11   video that there's about a two or three-second clip in

12   the middle of that video in which my clients are

13   displayed on the screen with the cryon (phonetic)

14   beneath it.

15              THE COURT:  Exactly.

16              MR. BISS:  So what we're looking for there

17   specifically is who created that little two or three-

18   second production, but I do understand that counsel's

19   saying we're looking for it.  And, of course, maybe

20   they'll find it at some point.  But at some point in

21   time we have to sort of close that issue out, and we

22   have to say nobody has it, nobody knows, and then I can

23   use that information for whatever it's worth in front of

24   a jury.

25              THE COURT:  And you want to know that, the CNN
```

1

2  employee who did that, because you want to ask some

3  questions or you just want to know who it was?

4           MR. BISS:   Well, again, I do want to ask him

5  questions about how and why they produced it and the way

6  they produced it.  Because obviously they produced it in

7  a way that they feel was important to the overall

8  context of the report.  So, yeah, it is something that I

9  want to ask questions about the creator.  And it could

10 be Mr. O'Sullivan was the creator.

11          THE COURT:   Sure.

12          MR. BISS:   It could be that one of the

13 producers created it for the report and they inserted

14 it.  We just don't know.  So I would just request on

15 that issue that there be some cutoff date.

16          THE COURT:   And so it's really just the

17 identity of the person, that's what you're looking for.

18          MR. BISS:   Yeah, it's --

19          THE COURT:   I wasn't sure if, for example, you

20 were looking for like metadata of the clip or anything

21 like that.  You just want to know who created it.

22          MR. BISS:   I just want to know who created it

23 so that I could ask that person some questions, and I

24 may have no questions.  It may be that it's Mr.

25 O'Sullivan, and I'm going to take his deposition anyway.

```
 1                         PROCEEDINGS              6

 2   So --

 3              THE COURT:   Okay.

 4              MR. BISS:    On the – and on that, Judge, the

 5   other thing I want to say about that is in CNN's

 6   response to my letter motion, they say that there are no

 7   other documents.  They make a reference to no other

 8   documents.  I just want to be clear with the Court,

 9   there have been no doc, this has been an issue for a

10   long time, there's been no documents that have shown who

11   did it.  It's there, there's no question, it shows up in

12   the documents, but the question is who did it because

13   there's a whole bunch of other parts of this production

14   that get compiled together to make the report.

15              THE COURT:   Understand.

16              MR. BISS:    So I just want to be clear about

17   that.  On the telephone records, Your Honor, I'm not

18   going to repeat what's in the letter.  I think they're

19   relevant for, to, and probative of a number of issues in

20   the case.  We have a protective order in place, and the

21   only thing I would say with regard to the telephone

22   records is counsel has submitted that there's a sort of

23   a burdensome issue.  It's going to take somebody time to

24   look through the phone records.  I do a lot of work with

25   phone records and a lot of discovery on phone records.
```

1                           PROCEEDINGS                    7

2    The timeframe that we're looking for is a limited

3    timeframe, and that is the date that the reporting

4    began, and I don't know what that date is.  But there is

5    a date, some date in probably 2020 at some point Mr.

6    O'Sullivan decided he wanted to report on this, and I

7    can sort of indicate some of what those dates are.

8             In October of 2020 they had that QAnon

9    conference, and that's where all the video, a lot of the

10   video is taken from.  There's a QAnon conference.  I

11   think it occurs in October of 2020.  Mr. O'Sullivan

12   attended that, and he was there.  So maybe that's when

13   he started reporting for this particular piece.  But the

14   timeframe is from the date of reporting to the date that

15   it was published on February 4 of 2021.  That is I would

16   say roughly at most six months of phone records.

17            I will say I understand counsel's position that

18   some of the phone calls are irrelevant.  I'm not

19   interested in Mr. O'Sullivan's calls to his family for

20   Christmas.  And, Your Honor, I think that's probably

21   obvious.  The thing that is not obvious and is an issue

22   that we kind of need to figure out how to resolve, and I

23   understand when they say Mr. O'Sullivan's reporting on a

24   whole bunch of different things, okay, some of which are

25   totally unrelated to the Flynns and QAnon and what we're

```
1                            PROCEEDINGS                    8
2    here for in this case.  I'm not interested in those
3    phone calls.
4            Now, somebody's got to go through the records
5    to say, well, that phone call to 404-606, that's related
6    to something, that's irrelevant, that's unrelated.  And
7    in CNN's document production to date, they have
8    fastidiously done that.  They have gone through and they
9    have redacted out and they've said redacted, irrelevant,
10   or redacted, unrelated.  And we're not challenging any
11   of that.  They have to make that call, and Mr.
12   O'Sullivan will know if he made a phone call to
13   somebody, he will know from that phone call that it
14   doesn't relate to this report or CNN, or the QAnon or
15   the Flynns.
16           THE COURT:  So it's just the calls related to
17   this reporting.
18           MR. BISS:  It really is, and I think if that
19   narrows things.  Now, that's going to be – there's no
20   question looking at phone records is, I mean it's a
21   burdensome issue.
22           THE COURT:  I've done it myself.
23           MR. BISS:  There's way to get around that, and
24   I will say this, but I'll say it's nowhere near as
25   burdensome looking at the Facebook files of let's say a
```

```
 1                        PROCEEDINGS                    9
 2   General Flynn.  There are - it's terabytes of
 3   information.
 4           So when I compare the burden of looking at the
 5   phone records to come up with relevant information or to
 6   come up with responsive information compared to the
 7   social media, some of these social media accounts are
 8   massive --
 9           THE COURT:   People post a lot.
10           MR. BISS:   Yeah, well, there's a lot of
11   adorable babies.  I would submit to Your Honor those are
12   not going to be introduced into evidence in this case no
13   matter how good looking those babies are.
14           So that's all I would say is that --
15           THE COURT:   That's helpful.  I appreciate you
16   sort of informing me about what it is you're focused on.
17   It's helpful to understand.
18           MR. BISS:   And then, Judge, on the privilege -
19   or on the telephone records, let me just say this about
20   the issue of the newsman's or the reporter's privilege
21   because they've raised that in the response.  So I
22   found, there's one case that I found that is, that
23   discusses the reporter's privilege under Rhode Island
24   law, and it's the case of Capuano v. Outlet Company, and
25   that can be found at 579 Atlantic 2d 469.  And I'll just
```

1                          PROCEEDINGS                    10

2    briefly say this, the Rhode Island Supreme Court has

3    said that there is no First Amendment or constitutional

4    reporter's privilege.  Some states do hold that there's

5    a privilege under the United States Constitution such

6    that reporters are able to protect or guard their

7    sources and guard their news gathering materials.  Not

8    so in Rhode Island.  In fact, you'll see this *Capuano*

9    case addresses that.

10          Rhode Island does have a statutory newsman's

11   privilege, and that privilege appears at Section 9-19.1-

12   2 of the Rhode Island code or Rhode Island statutes.

13   And there's an exception obviously to that, and, by the

14   way, that particular statute relates to the non-

15   disclosure of confidential information, except as

16   provided on 9-19.1-3.  No person shall be required by

17   any court to disclose any confidential information or to

18   disclosure the source of any confidential information

19   received or obtained by him in his capacity as a

20   reporter directly engaged in the gathering or

21   presentation of news for any accredited newspaper.

22          So really I would submit that the phone records

23   really are information, his phone records really are

24   information that are received or obtained by Mr.

25   O'Sullivan in his capacity as a reporter.  They're

```
 1                      PROCEEDINGS              11

 2  records of phone calls.  What the statute is really

 3  getting at is the information that a source has provided

 4  or the identity of a source, and I would submit to Your

 5  Honor the phone records really don't get into

 6  information that Mr. Sullivan [sic] has received or

 7  obtained.

 8            THE COURT:   Sure.

 9            MR. BISS:   So I would say the statute doesn't

10  apply, but even if it does apply, the exception to the

11  statute is in 9-19.1-3(b)(1), and that says that the

12  privilege conferred by 9-19.1-2 shall not apply to the

13  source of any allegedly defamatory information in any

14  case where the defendant in a civil action for

15  defamation asserts a defense based on the source of such

16  information.  And so we look at the words that are used

17  in that particular statute, and it clearly uses the word

18  defamation.  It doesn't use false light.

19            Okay, now the question is, and I could not find

20  a case unfortunately, could not find a case where they

21  applied this particular statute to a false light case.

22  So the question is did the Rhode Island general assembly

23  intend to limit the exception solely to defamation cases

24  or, as in many different instances, defamation and false

25  light are kind of viewed as being the same species of
```

2   tort.  So I would submit to Your Honor that they're the

3   same species of tort even though they have different

4   elements, they're the same species of tort.  That would

5   be my argument to that even though I do certainly

6   recognize that in Rhode Island, unlike many states,

7   Rhode Island has a statutory false light claim as

8   opposed to a common law tort claim.

9           That's obviously, if Your Honor rules that the

10  phone records are confidential information that is

11  privileged from disclosure such that it becomes an

12  absolute shield, that's, then I don't get the phone

13  records.  But I would submit to Your Honor that the

14  statute ought to be, as the *Capuano* case clearly

15  informs, when Your Honor takes a look at the *Capuano*

16  case, you'll see the Rhode Island Supreme Court

17  advocates and espouses a very flexible view of the

18  reporter's or the newsman's privilege because there are

19  issues in these cases such as actual malice, such as

20  falsity that can only be obtain when you obtain the

21  identity of the source or any source materials that are

22  presented.  Because, for instance, oftentimes there's an

23  allegation that the source either doesn't exist or the

24  source reported something totally different to the

25  newsman than the newsman reported something false.

```
 1                        PROCEEDINGS               13
 2              So the phone records are important in my view
 3    because what the phone records may show is that Mr.
 4    Sullivan made a phone call to a source who informed him
 5    that Jack and Leslie Flynn are the most decent people in
 6    the whole world.  These people have nothing to do with
 7    QAnon at all.  And I don't say that as a purely
 8    speculative endeavor.  News reporters often call
 9    multiple sources to check a background on who the people
10    are, you know, do you know them, what're they like, that
11    type of thing, part of his reporting or investigation.
12    And so the phone records may lead me to the discovery of
13    a very probative witness, somebody who can testify to
14    the fact that the Flynns are not QAnon followers as
15    Judge Woods has clarified.
16              THE COURT:  Right, well, I mean I'll ask this
17    question of Ms. Bolger and Ms. Shullman in a minute, but
18    you're assuming that Mr. O'Sullivan even had any
19    telephone conversations with anybody about this
20    reporting.  So I'll get into that a little bit with them
21    and see if we know the answer to that question because
22    that may make the whole issue irrelevant.
23              MR. BISS:  Well, again --
24              THE COURT:  And, again, something you can
25    explore with him in his deposition too.  Okay, I know
```

```
 1                          PROCEEDINGS            14

 2   where you're coming from on the telephone records.  I

 3   haven't looked at Capuano so I'll need to look at that

 4   separately, but I think there are some threshold issues

 5   before I even get to the reporter's privilege in any

 6   event.  So I'd like to move on just in the interests of

 7   time to the privilege issues if we could.

 8           MR. BISS:   Sure, so the issue of these

 9   redactions, I brought to the Court's attention because

10   the privilege log and the redactions I can't, some of

11   them I can't figure out whether or not there's a – and I

12   brought a couple of examples that I want to show you.

13           THE COURT:   Okay, yeah.

14           MR. BISS:   Because I don't think you've seen -

15   -

16           THE COURT:   I have not.

17           MR. BISS:   -- what the redactions looks like.

18           THE COURT:   I have the log, I don't have any

19   documents.

20           MR. BISS:   Right, so on the privilege log,

21   number 9, I'll just use number 9 as an example on the

22   privilege log, this is a --

23           THE COURT:   Hold on, hold on, let me just to 9

24   on the log.

25           MR. BISS:   So this is a document, there's many
```

```
 1                         PROCEEDINGS            15
 2  like this, and we've identified those in our letter, the
 3  ones that are like number 9.  Number 9 doesn't involve
 4  Mr. Kiel who is the putative attorney.  He's not
 5  anywhere on this document.  And so we got a copy of
 6  that, it's CNN178 through 187, and what the concern is
 7  from our standpoint, Mr. Kiel's not on here, so there's
 8  no way for me to determine at all whether there's any
 9  attorney-client protection on this document at all.  But
10  the more concerning issue that we've brought to Your
11  Honor's attention is the fact that it's redacted pages
12  after pages after pages of redactions.  And obviously
13  the attorney-client privilege is owned, as everybody
14  knows, solely relates to the confidential communications
15  between an attorney and a client.
16          That's just one example, number 9, where Mr.
17  Kiel is not involved at all on the face of the document,
18  and there's just no way for me to determine what if
19  anything is privileged.  This could be a communication
20  about the article or about the Flynns for all we know.
21  And the last thing I want to do, Your Honor, believe me,
22  the last thing is to have you review these in camera.
23          THE COURT:  I have a feeling I'm going to have
24  to.
25          MR. BISS:  I understand, so I just wanted to -
```

```
 1                        PROCEEDINGS                16
 2  so that's an example of the communications where Kiel is
 3  not involved, 9, and in our letter we cite to Your Honor
 4  all the other ones.  They're all cited in there.  I just
 5  want --
 6            THE COURT:  At the bottom of page 2 of your
 7  letter, those are the ones?
 8            MR. BISS:  Yeah, it's on page 2, and you'll
 9  see it begins at 9 and it goes through 90.  And it's not
10  a small number of documents.  It's a fair number of
11  documents.
12            THE COURT:  Trust me, I've had to review more.
13  So this is actually not too bad.
14            MR. BISS:  So that's the first category of
15  documents that Kiel is not involved in at all.  The
16  second category of documents are documents that on their
17  face don't seem to involve Kiel but rather they have
18  limited redactions.  An example is number 88, and this
19  is CNN1052 to 1055, and, again, I've got, I'm going to
20  hand this little package up to Your Honor so you'll see
21  the redactions.
22            On this document, Judge, there's nothing
23  redacted excepted a tiny box, and it says redacted
24  privileged, and it's, and when I say tiny box, I mean
25  it's just a tiny little box, you'll see that.  There's
```

1                          PROCEEDINGS                    17

2  no way for me to figure out if in that box there's some

3  attorney-client privilege.

4          The next category is exemplified by plaintiffs

5  or privilege log exhibit 4, and this is the category of

6  documents where Mr. Kiel is indicated as one of the

7  recipients, one of many recipients.  Now, there's lots

8  of reasons that an attorney might be copied on a

9  document, he might be a cc, just to inform him that the

10 events are happening.  I mean there's any number of

11 scenarios.  So, again, the concern on number 4 is

12 everything is redacted, even Mr. Kiel's name doesn't

13 appear on number 4.  That's an example of the categories

14 in the second full paragraph on page 3 of our letter.

15         The third category of concern is where Mr. Kiel

16 is simply reflected as a cc.  That's exemplified by

17 privilege log exhibit 17, and, again, Judge, this is

18 just an example.  We've broken the privilege log down

19 into all of its constituents parts.  You'll see when you

20 take a look at this, every page is redacted, totally

21 redacted out.

22         And counsel for CNN could be totally right

23 here, but I don't know that.  There's no way for me to

24 determine it or to challenge it based on what we have

25 received.

```
 1                         PROCEEDINGS                    18
 2            The last, and this is my last point and I'll
 3  sit down, the last one is the category where Mr. Kiel
 4  authored a few of the documents.  This is number 6 as an
 5  example.  Now, I'm not really challenging that because
 6  if an attorney offers a document there's a sort of a
 7  prime facie argument that could be made that it has to
 8  include legal advice that the attorney is giving.  I'm
 9  not challenging that.  I think that's a practical,
10  that's a practical reality, except that I just want Your
11  Honor to know, it's the same as all the other documents.
12  It's a withheld privilege with, it doesn't even tell me
13  that Mr. Kiel drafted it because I can't see that at all
14  on here.
15            We're really seeking guidance on that, and I
16  would like to hand up to Your Honor these documents that
17  I've referred to if that's okay.
18            THE COURT:   Yes.  Are there any documents on
19  the log that you're not challenging at all?
20            MR. BISS:   I'm not challenging, Judge, just to
21  be clear, I'm not challenging the ones that Mr. Kiel
22  authored.
23            THE COURT:   Authored, okay.
24            MR. BISS:   I – he's an attorney, there's no
25  question about that, and you'll see those appear on page
```

```
 1                        PROCEEDINGS                19
 2  3 of the – so I'm not challenging those.  I think
 3  there's a legitimate basis for believing that he was
 4  communicating with members of CNN in a way that would
 5  sort of lead one to conclude that they are privileged.
 6  So that is, those are the issues that the plaintiffs
 7  have.
 8            THE COURT:   Okay.
 9            MR. BISS:    Thank you.
10            THE COURT:   I appreciate that, thank you, Mr.
11  Biss.  I will have you probably stand back up when I
12  address CNN's letters, but let's go through each of
13  these issues first.  So, Ms. Bolger, let me ask this, do
14  we know at this point who created the two-second clip
15  that Mr. Biss is focused on?
16            MS. BOLGER:   No.
17            THE COURT:   Okay.
18            MS. BOLGER:   There are no documents, I mean to
19  start with, Your Honor, CNN has produced every document
20  related to the creation of the report, the text
21  messages, the emails, the internal documents, internal
22  metadata files.  Mr. Biss has everything that we have
23  found with the exception of other things that we found
24  and we're going to produce to him shortly.  So we are
25  doing our level best --
```

1

2          THE COURT:   Slow down, slow down.

3          MS. BOLGER:   Sorry.  We've produced everything

4    we know of.  We think we probably will have testimony as

5    to the identity of that person, but we do not have a

6    document.  So --

7          THE COURT:   I understand.

8          MS. BOLGER:   -- to the extent that we find

9    one, we'll give it over.  To the extent that there's a

10   person with a name, that will be something we disclose

11   to Mr. Biss when and if we figure it out, we know who

12   requested the clip, we don't know who did the physical

13   editing.  So we'll be able to tell him that.  We're not

14   saying we won't.

15         THE COURT:   Okay.  Do we know, was it Mr.

16   O'Sullivan or was it somebody other than Mr. O'Sullivan?

17         MS. BOLGER:   We know that Mr. O'Sullivan

18   instructed on when to edit the clip, but who made the --

19         THE COURT:   I understand.

20         MS. BOLGER:   -- there's the mechanical

21   process, right.

22         THE COURT:   I understand.  So Mr. Sullivan

23   [sic] was not the one to physically make the clip of a

24   video, of the video?

25         MS. BOLGER:   He did not physically make the

```
 1                         PROCEEDINGS              21
 2  clip.
 3             THE COURT:   That's helpful, so it's somebody
 4  other than him, and presumably we could ask him and he
 5  could tell us.
 6             MS. BOLGER:   Not necessarily, Your Honor, so
 7  it's a 24-hour news network, right.
 8             THE COURT:   Okay.
 9             MS. BOLGER:   So reporter correspondent writes
10  the story, selects the assets for the story, the SOTs,
11  the sound on tape, for the story.  It gets processed
12  through a machine, people get instructed to do things,
13  and things get cut.  I think the process is just a
14  little bit hard to --
15             THE COURT:   I understand.
16             MS. BOLGER:   To parse.
17             THE COURT:   Okay, is that a process that
18  happens, is there a document that shows that process or
19  an email or just Mr. O'Sullivan would've said I want
20  this clip, and then somebody like in the bowels of CNN
21  is the one to generate the actual clip?
22             MS. BOLGER:   There's no particular standard
23  way of doing things, so I can't tell you there's a
24  standard way.  But I can tell you that in this case Mr.
25  O'Sullivan picked the thoughts that went into the story.
```

```
 1                      PROCEEDINGS              22

 2              THE COURT:   Okay, SOT, that's what you're

 3  referring to.

 4              MS. BOLGER:   Yes, sound on tape.

 5              THE COURT:   Okay. All right, I appreciate

 6  that, so it sounds like that's ongoing.  Do we know when

 7  you'll have sort of exhausted what you can, where you

 8  can check short of asking Mr. O'Sullivan to testify?

 9              MS. BOLGER:   No, but I mean I --

10              THE COURT:   All right, how about I give you

11  two more weeks.

12              MS. BOLGER:   Sure.

13              THE COURT:   Okay.  And do you have a date for

14  Mr. O'Sullivan's deposition yet or that's something

15  that's still in the works?  Okay.  So we'll say two

16  weeks from today, and it is what it is, and depending on

17  what Mr. O'Sullivan says, there may be follow-up --

18              MS. BOLGER:   Mr. O'Sullivan won't ever know

19  which is --

20              THE COURT:   I understand, and let's just not

21  talk over each other if we can.  We're recording this so

22  that you can do a transcript, and so the less we talk

23  over each other, the clearer transcript that you'll

24  have.  He will be able to say what he did, and then

25  we'll see whether that gives us any breadcrumbs to
```

```
 1                        PROCEEDINGS                    23
 2   actually finding the person.  Maybe it turns out that if
 3   it sort of some unknowable or unknown minion within CNN,
 4   that it's really irrelevant at the end of the day.
 5           MS. BOLGER:  Your Honor, I would actually just
 6   mention that under New York Times v. Sullivan standard,
 7   actual malice needs to be homed, the person who actually
 8   communicates the message.  So really what's relevant is
 9   who directs the choice of things rather than the
10   mechanical process which is why it's a little bit harder
11   to run down the mechanical process than the actual
12   editorial judgment.
13           THE COURT:   I understand.  Okay.  All right,
14   so two more weeks to sort of exhaust what we can on this
15   point, and then we'll take it from there as to whatever
16   else Mr. O'Sullivan has to say about the creation of the
17   clip.
18           Okay, let's move on to the telephone records.
19   So the question that I was alluding, the sort of
20   threshold question that I was alluding to when I was
21   talking to Mr. Biss is do we know if Mr. O'Sullivan had
22   any phone calls with anyone about this reporting and the
23   Flynns, do we know that?
24           MS. BOLGER:  So can I answer that question
25   just with a little bit of background?
```

```
 1                        PROCEEDINGS               24

 2             THE COURT:   Sure.

 3             MS. BOLGER:   So we have provided to Mr. Biss

 4   all of Mr. O'Sullivan's text messages and emails related

 5   to the report.   The report was published in February of

 6   2021, and that's when the report was put together.   In

 7   October of 2020 Mr. O'Sullivan went to a QAnon

 8   conference.   All of the video of that QAnon conference

 9   was not taken by Mr. O'Sullivan or by CNN.   It was taken

10   by the QAnon conference.   So there was no ongoing news

11   gathering.   There was news gathering related to Mr.

12   O'Sullivan's decision to go in October and the report in

13   February.

14             So to the extent that Mr. Biss suggests that

15   there's a six-month timeframe of reporting, that's

16   inaccurate.

17             THE COURT:   Do we know when he decided to

18   actually put this into a report?   Sometime before

19   February, but do we know how far back?

20             MS. BOLGER:   Days.   A mere couple of days in

21   which he put together the report.

22             THE COURT:   Okay.

23             MS. BOLGER:   So now to answer more directly

24   your question about telephone calls, I don't know that

25   Mr. O'Sullivan remembers.   I don't know that that was a
```

1
2  major part of the reporting.  Mr. Biss has the component
3  parts.  Mr. O'Sullivan could be asked who he spoke to as
4  his sources.  But that is all we know.

5          Can I just say two things about the reporter's
6  privilege?  First of all, reporter's privilege would
7  never apply here.  Mr. O'Sullivan lives and works in New
8  York, and courts in New York have been clear that when
9  you have to access privilege, it's a different
10 assessment than the choice of law of the underlying
11 case.  So even if choice of law would be that Ryan law
12 applies, New York law, because it is the privilege that
13 Mr. O'Sullivan expected because he was a reporter
14 working in New York, would apply.

15         This court just held just similarly in a case
16 called *Jacob v. New York Times* which is actually about a
17 choice of law question.  There's a Court of Appeals case
18 called *Holmes v. Winter* where the court talks about what
19 the reporter in New York expects.  So the reporter in
20 New York expects New York law.  So the Rhode Island
21 privilege is wholly irrelevant here.  It is only the New
22 York privilege.

23         So the New York privilege, which honestly, Your
24 Honor, I'm not sure you need to get to, would apply, and
25 I'm happy to talk about it, but I can tell you why I

```
1                        PROCEEDINGS                    26
2   don't think you need it.
3              THE COURT:   Well, I guess my other hesitation
4   is I have zero briefing on this issue, so what I can
5   tell you is I am not ruling on the reporter's privilege
6   today because I don't have the background to be able to.
7              MS. BOLGER:   I don't think you need it, Your
8   Honor --
9              THE COURT:   Okay.
10             MS. BOLGER:   -- because there's nothing in
11  these telephone records that's going to be probative of
12  anything.  The burden of going through a reporter's
13  telephone records is, of course, astronomical because it
14  would require a reporter to review their news gathering
15  for every story they were doing and would only be
16  telephone numbers.  Right?  And I don't know if you know
17  who you, if you could look at a telephone log from
18  February 2021 and identify every number.  These are just
19  numbers.
20             The better question would be, hey, Mr.
21  O'Sullivan, who did you call, and then he can answer
22  that question.  So this information, which would be
23  unbelievably burdensome to produce, would hit upon core
24  First Amendment privilege materials and be not
25  particularly probative.  It just doesn't seem relevant
```

```
 1                        PROCEEDINGS              27
 2  here when you can just ask Mr. O'Sullivan who he called.
 3          THE COURT:   Well, I guess, I mean does Mr.
 4  O'Sullivan still work for CNN?
 5          MS. BOLGER:   He does.
 6          THE COURT:   So I guess one thing would be
 7  helpful to know, since he's your witness, for you to
 8  just ask him in the course of discovery so that we would
 9  know whether phone records are relevant or not.  Did you
10  have any phone calls with anyone about this reporting
11  during the, you know, week leading up to the report, and
12  if the answer to that is no, then that's more persuasive
13  from my, for a finding that the telephone records don't
14  even need to be reviewed let alone produced.  But I
15  didn't know that we, it doesn't sound like we have the
16  answer to that question --
17          MS. BOLGER:   The answer to that question is
18  probably I don't know, Your Honor, but I'm happy to get
19  you that answer if that --
20          THE COURT:   I think that would be, I think I
21  would like to know since Mr. O'Sullivan is available to
22  you to have you - obviously it's unsworn and so it's
23  subject to be tested by Mr. Biss at his deposition, but
24  if the answer is I don't know or I don't recall, I think
25  I would be more likely to deny Mr. Biss's request
```

1

2  without prejudice to taking Mr. O'Sullivan's deposition

3  and seeing if anything else is remembered.

4         But I – if we're only talking about a week of

5  phone records, I think the burden issue is sort of, is a

6  lot less troublesome, but I also see your point, Ms.

7  Bolger, that looking at a week's worth of phone records

8  from two years ago and whether any of those jump out to

9  Mr. O'Sullivan as phone numbers that related to this

10  report is sort of going at it the backwards way.  As you

11  said, I think asking, if he spoke to anybody, who those

12  people were, and then we can check the phone records and

13  see if those people's numbers are in the phone records.

14  And then I would say, yes, we would produce the record

15  showing the date and time that he spoke to that

16  particular person.  But I guess before I make a ruling

17  on this issue, I would like to know the answer to that

18  question.

19         MS. BOLGER:   I can give you that in the same

20  two weeks, Your Honor.  Do it all at one time.

21         THE COURT:   Okay.  All right.  That's good.

22  So you'll ask Mr. O'Sullivan if he spoke by phone with

23  anyone, let's say the seven days before the report.

24         MS. BOLGER:   Your Honor, it was not – he did

25  not put the report together for seven days.  It was more

PROCEEDINGS                    29

1
2  like three.  So could we settle on five days?

3          THE COURT:  Well, he might've been thinking

4  about it for a few days before he actually started doing

5  anything, so that's why I think seven is reasonable.  So

6  seven days before the report, and you can let me know

7  that.

8          MS. BOLGER:  Sure.

9          THE COURT:  Okay.  All right, so next,

10  privilege.

11          MS. BOLGER:  First of all, Your Honor,

12  although Mr. Biss quibbles with my privilege log, I note

13  he has not given me one.

14          THE COURT:  Okay, well, we'll talk about that

15  when we get to his issues.

16          MS. BOLGER:  And so, first of all, I genuinely

17  don't know what more one could have done to disclosure

18  the communications.  So Mr. Kiel is an attorney --

19          THE COURT:  Yeah, but it doesn't tell me when

20  - if one of these that you withheld, one of these on the

21  log that you withheld because it contains advice from

22  Mr. Kiel, it doesn't tell me that unless he was a

23  recipient or a cc.  So the description could be redacted

24  portion of email reflecting the provision of legal

25  advice concerning the report from Steven Kiel, for

```
 1                          PROCEEDINGS                    30
 2  example.  I'm just looking at item number one.  That
 3  might --
 4          MS. BOLGER:   He's the only lawyer we --
 5          (interposing)
 6          THE COURT:   Okay, I mean --
 7          MS. BOLGER:   Sorry.
 8          THE COURT:   -- we know that now, but when you
 9  produced this log to Mr. Biss, he didn't know that.
10  See, I don't know if he knew that or if that only came
11  out in the meet and confers.  But I disagree with your
12  point about more - I think more could've been said in
13  the descriptions that might have headed off some of
14  this, but I'll let you go first and then I'll stop
15  interrupting you.
16          MS. BOLGER:   Okay.  So, Your Honor, Mr. Kiel
17  is an attorney.  The way that CNN works is that there's
18  an email distribution, an attorney grabs it and
19  responds.  First of all, Your Honor, you should know
20  we're not asserting an advice of counsel defense, so
21  what Mr. Kiel said or didn't say is not going to be
22  something that's relied on in this case.  These are
23  simply communications.  It was pre-pubbed by a team.
24  Mr. Kiel was the lawyer on that team.
25          What is reflected in the fully redacted pages
```

```
 1                      PROCEEDINGS                31
 2  are correspondence with him directly giving attorney-
 3  client advice, what's reflected under the redactions,
 4  the small redactions.  And I also brought examples.  So
 5  I'll show you, this is a script, right.
 6              THE COURT:  Okay.
 7              MS. BOLGER:  And if you'll see, I could hand
 8  this up to Your Honor, there is one little line redacted
 9  as privileged on the very last page, and that's because
10  it's the journalists telling each other what Mr. Kiel
11  said.
12              THE COURT:  Okay.
13              MS. BOLGER:  And I can show that to you in
14  these several examples if that's helpful.
15              THE COURT:  Well, I want to talk about a
16  process for reviewing them in camera at the end.  So why
17  don't you kind of go through the different categories or
18  is it easier --
19              MS. BOLGER:  So the first, as I said, the
20  redactions, Your Honor, they're literally – to the
21  extent that a document contains a redaction, as
22  reflected in the log, it contains a redaction that
23  includes Mr. Kiel's legal advice that the journalists
24  are talking to each other about.  Right?  He said do
25  this, he said do this.  Right?  That's what that one is.
```

1

2          When there are things that he's cc'd, as I

3  said, Your Honor, there's sort of a team, right, so when

4  there's replies, he's part of the team.  That's why he's

5  a cc.  His only role is a legal one, so unlike other

6  circumstances where attorneys have two or three hats,

7  he's part of the legal team.  He's only there in his

8  legal capacity.

9          For the documents that are wholly redacted, we

10 just tried to describe this in the letter.  I think this

11 is one of those things that you know as an email user

12 but can't describe.  So those are email threads, right.

13 So let's say document 1 through 2 is the first email

14 thread, then document 3 through 6 is that first email

15 thread plus the next email thread on it.  So those

16 withheld documents are the email threads exchanging

17 legal information.  That's what they are.

18          THE COURT:  But don't they – then they should

19 have the to, from, cc in each of the strings so that we

20 know – do we have that?

21          MS. BOLGER:  They're all in the log.

22          THE COURT:  Okay.

23          MS. BOLGER:  So I can't remember – I don't

24 have what you have, Your Honor, so I --

25          THE COURT:  So I have 9, 88, 4, 17, and 6.  So

```
 1                        PROCEEDINGS                    33
 2  6, for example, is one where Mr. Biss held it up, it
 3  doesn't even have header, to, from, cc on it.
 4           MS. BOLGER:   In the log you'll see it's from
 5  Mr. Kiel to the distribution.
 6           THE COURT:   So is this a Word document or
 7  something?
 8           MS. BOLGER:   Email.
 9           THE COURT:   But why doesn't it even have the
10  header, the email subject and date and everything?
11           MS. BOLGER:   We put it in the log.
12           THE COURT:   Well, I just - well.  That's not
13  how I would've done it, frankly, and I think it's raised
14  more questions than we need to be having, but I think
15  the easier thing, there's only - there's only 90
16  documents.
17           MS. BOLGER:   There's actually a subsequent
18  log.
19           THE COURT:   Okay.  How many are on that one?
20           MS. BOLGER:   I don't know, Your Honor.
21           THE COURT:   Okay.  All right, how about I
22  review - and Mr. Biss is not challenging five of them,
23  so there's only 85.  So we will provide you with
24  instructions.  We have an FTP site where you can upload
25  the documents --
```

MS. BOLGER:   Your Honor, if it would make more

sense - obviously, Your Honor, this is such a tempest in

a teapot, I promise you that an officer of the court we

did our best to do this right.  We're not trying to hide

anything.  I think maybe some of the tempest in the

teapot is caused by not, by redacting the to's and

froms.  I could put that back in the documents if that's

- just, it's a lot of paper, Your Honor.

THE COURT:   I think Mr. Biss is still going to

have questions.  So honestly it's not going to take me

that long to review 85 documents.  So we'll give you an

FTP link where you can upload the 85.  Please just make

sure that they correspond to the numbers on the, that

they're labeled according to the numbers on the

privilege log.  And at the next conference I will, you

know, have reviewed them and tell you what my decisions

are.  And then even if there's a subsequent log, my

rulings as to these will inform you as to what needs to

be done to the others.

I appreciate your trying to save me time, but I

think Mr. Biss, I don't mean to speak for him, I think

he's still going to have the same questions even if the

headers are unredacted.

MS. BOLGER:   Okay, this is perhaps one of the

1                          PROCEEDINGS                 35

2  most straightforward privilege calls I've ever made,

3  Your Honor.  That's why I'm a little surprised --

4           THE COURT:  Okay.  I'm not suggesting that

5  it's complicated.  I just think in fairness to Mr. Biss

6  probably the easiest way to resolve it as opposed to,

7  you know, the other thing I could do I could make you

8  revise the log and --

9           MS. BOLGER:  Right, okay.

10           THE COURT:  -- but just send them to me and

11  we'll review them, and then we'll have another

12  conference to talk about it.  Okay?

13           All right, Mr. Biss, any points you want to

14  make on reply before we sort of shift to the other

15  focus?

16           MR. BISS:  No, Your Honor, thank you.

17           THE COURT:  All right, so, Ms. Bolger, let's

18  shift to your letters.  Let me just get those in front

19  of me.  Okay, so the first issue seems to be the review

20  of the Flynns' documents and whether that needs to be

21  done in a different way.  Correct?

22           MS. BOLGER:  In terms of, Your Honor, in a

23  couple of ways.  First of all, it does not appear that

24  Mr. Biss actually collected these documents himself.  It

25  appears that Mr. Biss just called his clients and said,

2   hey, give me this stuff.  And we think he had an

3   obligation to review for both relevance and privilege

4   rather than just to have the client do themselves.  A

5   good case on that case is the *Pratt v. Adolin*

6   (phonetic), in which it said that the counsel has to

7   diligently search and review records and document

8   repositories, which Mr. Biss doesn't seem to have done

9   that.

10          The second thing, Your Honor, is that Mr. Biss

11  hasn't given me a very clear answer on whether he

12  himself searched his clients' emails and text messages.

13  And, in fact, Your Honor, we have reason to believe that

14  the production is incomplete because of other documents

15  produced either belatedly by Mr. Biss or by third

16  parties.  I can hand them up, Your Honor.  We didn't

17  file them because Mr. Biss marked them with

18  confidential.  So here, for — and highly confidential as

19  the case may be – so here, for example, are some text

20  messages.  One text message that implies the existence

21  of others.  I'm happy to hand it up, Your Honor.

22          THE COURT:   Yeah, please do.  That's fine.

23          MS. BOLGER:   And then the other is an email

24  from a third party with the plaintiffs which would be

25  directly responsive but we didn't get from the

```
 1                      PROCEEDINGS                37
 2  plaintiffs.
 3          THE COURT:   Okay, all right, go ahead, hand
 4  this up.  Thank you.
 5          MS. BOLGER:   Steven, do you want copies?
 6          THE COURT:   Just give me one second to see
 7  what it is you handed me.  Valerie and Leslie Flynn, you
 8  got these through the coordination with the Florida
 9  litigation, is that right?
10          MS. BOLGER:   We did.  And you'll see that it's
11  a text message, they're clearly friendly texters, and it
12  talks about CNN has the video again.  Then she says I'll
13  record, kind of implies they've been talking about this,
14  and it references a recording, and we don't have
15  anything else other than this one text message.  And
16  then the second is an email we got from Sidney Powell
17  which is an email – and there's a bunch of them.  This
18  is an example.  There's like several.  You'll see it
19  from Ms. Powell to three of the Flynns, four of the
20  Flynns, and it talks, it has the words WWGIWGA which is
21  the allegedly defamatory affiliation.  Right?
22          So particularly given Mr. Biss's kind of
23  refusal to give me a straight answer on whether he's
24  searched for these and the fact that he said he let his
25  clients do it themselves, it just feels like we're not
```

```
 1                       PROCEEDINGS                  38

 2  getting what we need, and we would ask that Mr. Biss be

 3  required to do that.

 4            THE COURT:   Okay.

 5            MS. BOLGER:   And also, Your Honor, of course,

 6  as I mentioned, we don't have a privilege log.

 7            THE COURT:   Did you get – so Jack Flynn at

 8  Mariner's Seafood, did you get other emails from that

 9  address?

10            MS. BOLGER:   I've gotten very few emails and

11  one text message.  We just don't have the stuff we think

12  we should have, Your Honor.

13            THE COURT:   Is Jflynn064@gmail.com, is that

14  Mr. Flynn in this case or is that a different person?

15            MS. BOLGER:   There is a Jack Flynn and a Joe

16  Flynn, and, Your Honor, I just don't, I have so little

17  information that I don't know.

18            THE COURT:   Okay.

19            MS. BOLGER:   And then in addition, at times

20  Mr. Biss produced documents that are inauthentic or

21  manipulated or lacking in portions, and we need to know

22  what those are.  So I'll just give you an example.  This

23  is a – I'll give you a couple of examples.  The first

24  two are Twitter messages or this one, the text message,

25  maybe I don't know, that are produced but they're
```

```
 1                        PROCEEDINGS                  39
 2  missing, they're missing images, right, so if this case
 3  is about sharing QAnon memes and images, then
 4  affiliation with QAnon, the fact that I can't see where
 5  it says we have an army of digital soldiers, and I can't
 6  see if the rest of it is relevant.  I can't hand these
 7  up to you.
 8            THE COURT:  You only got those in a sort of
 9  paper or PDF?  You didn't get a (indiscernible) version
10  of those?
11            MS. BOLGER:  Right, and as you can see, Your
12  Honor, I got them with handwriting on them.
13            THE COURT:  Okay.
14            MS. BOLGER:  These are, this is another
15  document, Your Honor, where it's cut off, has the wrong
16  date, and this is one that just seems to be a screenshot
17  of the computer screen.  May I hand these up?
18            THE COURT:  Yes.
19            MS. BOLGER:  So we're not just getting
20  authentic documents, Your Honor, and I actually had a
21  situation like this before in a case called *Blatty v.*
22  *BuzzFeed* and the court ordered that authentic documents
23  be produced rather than these sort of manipulated
24  documents.
25            So we're just asking Mr. Biss to supervise
```

```
 1                         PROCEEDINGS            40
 2  production in the way he's supposed to to check the
 3  emails, check the text messages, and give us these
 4  authentic documents.
 5          THE COURT:   Okay, do you know how one - so are
 6  you asking them basically to download these to some
 7  digital file and produce them that way instead or --
 8          MS. BOLGER:   Sure.
 9          THE COURT:   Okay.
10          MS. BOLGER:   And then the last issue I have,
11  Your Honor, is about providing (indiscernible) for
12  Parler.  So I don't know how much you know about Parler,
13  Your Honor, but Parler is sort of a, bills itself as a
14  right wing social media platform.  It was kind of
15  created for people who were driven off Twitter after the
16  January 6 Capitol riot.  And we know that the Flynns all
17  had accounts on Parler, and to get that information from
18  Parler, we need notarized consents.  Mr. Biss has
19  provided them for some people, but he has not provided
20  them for Leslie Flynn, Laurie Flynn, or Joseph Flynn.
21  Leslie Flynn he says never used her account, but that
22  doesn't mean we can't question that.  Right?  We should
23  be entitled to inquire of Parler whether the plaintiff,
24  for example, liked a message or didn't like a message.
25  That would be I think something we would be entitled to
```

PROCEEDINGS                    41

1    know.

2          Laurie Flynn he said never had an account, but

3    it looks to us like she did, so we should feel like we

4    should be entitled to inquire of Parler.  And then,

5    finally, he says Joseph Flynn barely used his Parler

6    account, but barely used isn't didn't use, and we think

7    we should have access to those.  So all we're asking for

8    is those notarized consents so we can inquire into

9    whether the representations the parties are making are

10   actually (inaudible).

11         THE COURT:   Okay, can I even deal with Leslie,

12   Laurie, and Joseph though here?  Don't you have to --

13         MS. BOLGER:   Actually, we have - Mr. Biss and

14   I kind of agreed we would try to coordinate this, so I

15   think by agreement you can, Mr. Biss can tell me if I'm

16   wrong, but I think we agreed to that.

17         MR. BISS:   We did, Judge.  I want to be clear,

18   we are, these are issues that we both agree I think Your

19   Honor can address.

20         THE COURT:   All right, all right, I just want

21   to make sure because I don't want to exercise

22   jurisdiction over somebody who doesn't want it.  Okay.

23         MS. BOLGER:   And my last thing, Your Honor, is

24   that there are certain categories of documents that Mr.

```
 1                        PROCEEDINGS                42
 2  Biss has told me he's going to produce, and, of course,
 3  the question of a privilege log.  I just need a
 4  timeline.  So if we're going to put everything in a
 5  bucket, Your Honor, I have a list of sort of four
 6  categories plus a log.  So if we could add those to my
 7  list of things, a timeline would be helpful.
 8             THE COURT:   What are those four things?
 9             MS. BOLGER:   Okay, so the first is Laurie
10  Flynn's Facebook page.  Then General Flynn's Facebook
11  and Instagram page.  Michael Flynn's Facebook,
12  Instagram, and Twitter page.  Junior, sorry, there's
13  Michael Flynn and Michael Flynn, Jr.
14             THE COURT:   Okay.
15             MS. BOLGER:   Your Honor, as an Irish person,
16  my people need to change, get better, get different
17  names.  Which is my son's name, by the way.  And the
18  last one is Joseph Flynn, his Facebook, Instagram, and
19  Twitter pages.
20             THE COURT:   Okay, thank you.  All right, Mr.
21  Biss, so let's start with nature of the review, the
22  collection and review that you've done of your clients'
23  documents.
24             MR. BISS:   Sure.  So I follow the same
25  protocol in every case in terms of initially
```

1                          PROCEEDINGS                    43

2    identifying, initially giving the clients instructions.

3    So here – and I don't want to get into too much

4    attorney-client privilege --

5              THE COURT:   Of course not.

6              MR. BISS:   -- but I will tell Your Honor that

7    we have a protocol for initially identifying all

8    repositories for potentially responsive information.

9    When I say repository, I mean telephones, computers, and

10   then a subcategory of those repositories would be, of

11   course, email accounts, whether they have one, whether

12   they have more than one, and I'll – Your Honor talked

13   about Mariner Seafood.  Obviously you see what we put in

14   our footnote in response.

15             So we went through the protocol of identifying

16   the repositories, that's number one; identifying sub-

17   repositories, that's number two; and then I provided, of

18   course, the discovery requests.  The discovery requests

19   came in two categories.  Number one were party requests

20   for production of documents.  Number two were non-party

21   subpoenas for documents.  We treated them exactly the

22   same.  We didn't treat them in any different way.

23             The clients were, and, again, I don't want to

24   get into attorney-client privilege, but I will say that

25   it's customary I believe in this kind of litigation to

1                          PROCEEDINGS                    44

2   give clients instructions on what to search for and

3   those search terms were exactly what CNN had indicated

4   in its discovery requests.  The CNN had - the CNN's

5   social media request is everything in social media back

6   to November of 2016 I think.  It went all the way back.

7   And so, and I'll get to the, to what they did on the

8   social media in a second.

9           And then there were another category of search

10  terms that were provided by CNN of people that the

11  Flynns might have had communications with.  For

12  instance, somebody by the name of - the first one I

13  remember because her name is Cynthia Acbug [six], and no

14  one ever heard of Cynthia Acbug.  And there's a list of

15  20 or 30 names, and they go all the way down to, these

16  people were all identified and they're in the discovery

17  request, both the request for production of documents

18  and the subpoenas.

19          And then there were another, a third category

20  of search terms that were employed on things.  For

21  instance, you'll recall from the video, the report

22  itself, they talk about something called Forchan and

23  Accoun (phonetic).  Your Honor may remember Accoun

24  because it's a bizarre thing.  I never heard of it till

25  this.  So the search was performed on those things,

2  whether there were any communications with anybody that

3  had the term Accoun in it.  One of the search terms that

4  CNN asked us to run was on the, what I considered to be

5  a fairly unremarkable hashtag, a whole bunch of hashtags

6  we had to run on too.  Hashtag bread.  We searched every

7  single term for, that they provided on every single

8  device that the Flynns had, and I could tell you that's

9  the process that we employed in terms of trying to

10 locate responsive documents.

11         I think that CNN believes in their heart, they

12 believe it that there, the Flynns are QAnon followers,

13 and there's going to be a thousand emails and a thousand

14 documents that say where we go one, we go all.  They

15 just don't exist, and --

16         THE COURT:  I guess I'm more interested in

17 knowing, I appreciate that you gave your clients

18 instructions and that you gave them the search terms.

19 What did you do to make sure that they executed that

20 properly and downloaded it and gave it all to you?

21         MR. BISS:  Well, I mean I did everything that

22 I could reasonably and practically do.  I didn't fly

23 down to Florida to watch them do, watch them run the

24 searches.  I mean, in fact, I have never in 30 or more

25 years done that in a single case.  I mean there is a

PROCEEDINGS                        46

1

2   practical aspect to document production where the client

3   is excepted to follow the attorney's advice and

4   instructions and search the media that the attorney says

5   to search and search it in the way the attorney says to

6   search which is search for everything.  Run a search on

7   every single one of these terms.  If you get any hits,

8   you produce every document to me that relates to that.

9        THE COURT:   Did they represent to you that

10  they had done that?

11       MR. BISS:   And that's what I was just going to

12  say, and the clients followed up by confirming that they

13  had followed my advice.  They sent the documents to me,

14  and I'll get to some of the authenticity issues in a

15  second.  They sent the documents to me, I scanned those

16  documents, Bates stamped them, and produced them both in

17  this litigation and also in the Florida litigation, and

18  sometimes, Judge, somebody finds a document they missed.

19  And so the text message that Your Honor has been handed

20  is a document that Leslie Flynn, it's a text message

21  between Leslie Flynn and Valerie Flynn, and it's a

22  document that Leslie Flynn did not have but Valerie had.

23  And so Valerie produced that document to me, and I

24  immediately produced it, supplemented pursuant to Rule

25  26(e).

```
 1                        PROCEEDINGS                    47
 2           But that happens in every case, I mean it's
 3    not, there shouldn't be any surprise.  This is not an
 4    effort, this one text message, with great respect to my
 5    colleague, should not be viewed as any kind of effort on
 6    the Flynns to hide document or to obscure the record.
 7    Rather, they produced the document that Valerie Flynn
 8    didn't find on her first go-round.  She missed it, and -
 9    -
10           THE COURT:   Okay, I mean – I'm willing to take
11    your representation as an officer of the court, Mr.
12    Biss, I mean the risk that this sort of thing opens you
13    up to though is your clients could be presented in a
14    deposition with a document that they should've produced
15    but didn't produce, and then we're starting all this
16    over.  So, you know, how confident are you in what – Ms.
17    Bolger, I can see your facial reactions.  It's really
18    obvious.  So just save your responses please until I've
19    made a ruling, until I've given you a chance to respond.
20           So, you know, my concern is that, you know, we
21    want to do this once and be confident that we've caught
22    everything.  So the fact that there is something that
23    was found, you know, undermine the confidence in the
24    search that was actually done.  So did you then go back
25    and ask, I'm sorry, I forget if it was Leslie or
```

PROCEEDINGS                    48

1

2    Valerie, to ask them to doublecheck and make sure that

3    they had captured everything?

4            MR. BISS:   I went over it with them the first

5    time when these concerns were raised initially by Ms.

6    Bolger.  I went over with them again.  I asked them you

7    need to make sure you have searched everything and

8    produce everything that you have.  Go back and make up.

9    I've done it a couple of times.  I've gone through this,

10   you need to make sure because I need to certify on your

11   behalf that you have conducted a thorough review, a

12   complete review, and you've produced all the documents

13   that are being asked of you in this litigation.  Judge,

14   I've done it a couple of times.

15           Am I confident in the client?  Yes, I'm

16   confident in the client.  I'll say this, Jack Flynn, for

17   instance, is a seasoned businessman.  He's been in the

18   seafood business for over 20 plus years.  No one has

19   indicated any inability to failure to understand my

20   admonitions.  They all fully understand.  Leslie Flynn

21   is a housewife who used to be involved in business but

22   is not involved in business.  I've had conversations

23   with every single one of the people, every single one of

24   the Flynns.  Joe Flynn is, again, a seasoned

25   businessman, Joseph Flynn.  His wife Valerie sometimes

1                              PROCEEDINGS                    49

2  helps out with business, sometimes doesn't, mostly stays

3  at home and plays pickleball as far as I can tell --

4            THE COURT:  Okay, well, in the interest of

5  time, I do have another matter starting at 1 o'clock, so

6  I just want to make sure we get through all these

7  issues.  But I guess my question for you is there

8  anythign that we can do to doublecheck that each of the

9  Flynns has checked their texts, their emails, their

10 social media to make sure – I guess I'm asking you to go

11 back and ask them to doublecheck and do that for each

12 one of them.

13           MR. BISS:  I will go back and ask them to do

14 it again.

15           THE COURT:  Okay.

16           MR. BISS:  Because I think that's a, that much

17 is fair.  The --

18           MS. BOLGER:  May I ask for one --

19           THE COURT:  Just a minute.

20           MR. BISS:  The documents that Jack Flynn

21 produced to me, again, I indicate he was trying to be

22 helpful with the handwriting.  So when Ms. Bolger raised

23 the issue of the handwriting and the fact that some of

24 them appear to be cut off and some of them appear not to

25 have images, I explained to Ms. Bolger that these

```
 1                         PROCEEDINGS              50
 2  documents were printed off of the Wayback machine, and
 3  this is as is.  This is an exact copy of what was
 4  printed off.  So what I told Jack Flynn is go back,
 5  forget the handwriting, you print off everything that's
 6  on the Wayback machine as it, FedEx it to me, and I will
 7  produce that to show that this is an exact copy of what
 8  the Wayback machine - we did that.
 9            THE COURT:  Just pause for one second.  Let me
10  hear from Ms. Bolger.  Go ahead.
11            MS. BOLGER:  So these are gmail addresses on
12  the email that's sent to Sidney Powell, and gmail
13  addresses can be searched remotely by Mr. Biss from his
14  office in Charlottesville.
15            THE COURT:  Right.
16            MS. BOLGER:  It seems to me that just relying
17  on the parties to do their own discovery is inconsistent
18  with the case law I cited in the letter, but at a
19  minimum, Your Honor, we ought to know what they're
20  searching.  We don't know what these sources are, we
21  don't know if Mr. Biss has ever searched these gmail
22  addresses.  They're taking it on faith, but I'm not even
23  relying on Mr. Biss, right, I'm relying on the
24  plaintiffs in this litigation who have an incentive to
25  hide things from me.  Mr. Biss is an officer of the
```

1                          PROCEEDINGS                    51

2  court, but I don't know about the Flynns.  And these

3  resources, like the gmail accounts, are searchable

4  remotely as I did with CNN.  Right, Your Honor?  I took

5  in CNN's emails myself, worked with - it just seems to

6  me that Mr. Biss should be required to do that as well.

7          Short of that, Your Honor, there's got to be

8  some sort of certification about what accounts were

9  searched with what terms --

10         THE COURT:  Okay, that hasn't been disclosed.

11 I thought he said that you gave him the search terms

12 that you wanted used.

13         MS. BOLGER:  No, Your Honor, he used search

14 terms from our document requests.  I didn't give him

15 search terms.  But there's been no certification, I

16 mean, Your Honor, we are fully relying on Mr. Biss

17 telling us what his clients represented to him about

18 sources we don't know using terms we don't know.  I'm

19 not concerned that they're going to get a document they

20 didn't produce; I'm concerned they're not giving me

21 documents, and there's no reason to believe that they've

22 done anything to satisfy that.

23         THE COURT:  Okay, it's helpful to me to know

24 that the sources have not been disclosed.  So, Mr. Biss,

25 can you ask each of your clients which sources they

| | PROCEEDINGS | 52 |

1

2  searched and what search terms they used and provide

3  that information to Ms. Bolger.

4          MR. BISS:  I can, Your Honor.

5          THE COURT:  And then with respect to the, like

6  gmail or any remotely accessible account, I would like

7  you to run the search terms yourself.

8          MR. BISS:  I don't know how to do that, but

9  somebody will tell me how to do that.

10         THE COURT:  I'm sure it's pretty easy.  Even I

11 think gmail makes it very easy.  So whether it's gmail

12 or whatever gmail, Hotmail, aol, whatever they have, so,

13 first, you need to get from each of them what are those

14 accounts and have them tell you how to access it, and

15 then you or somebody from your office to run the search

16 terms.  It might be helpful if you can tell Ms. Bolger

17 what search terms you've already run, and, Ms. Bolger,

18 you can confirm those are the terms that you want run so

19 that --

20         MS. BOLGER:  I can write them for him, Your

21 Honor, I'm happy to provide search terms.  It's just

22 that I --

23         THE COURT:  Okay.  Well --

24         MR. BISS:  And, Judge, I have no problem doing

25 the search of gmail.  I just, I've never done it --

```
 1                         PROCEEDINGS                   53

 2              THE COURT:   Understand.

 3              MR. BISS:   -- and I don't know how to do it --

 4              THE COURT:   That's fine.

 5              MR. BISS:   -- but I'll figure that out.

 6    That's easy.

 7              THE COURT:   That's fine.  All right, so first

 8    step, Mr. Biss, is to find out what it is your clients

 9    have searched.  [problem with recording] whatever

10    accounts he got to doublecheck.  Some of these images

11    that have the, some of these documents that have the

12    images missing --

13              MR. BISS:   We've produced them as is.  They're

14    not there, I mean the images are not there.  It's not

15    like we're not producing an image.  They're not there.

16    When we make a photocopy of the document, there's no

17    image there.  It has a representation that there's an

18    image, but the image itself is not present on the

19    documents.

20              THE COURT:   When you look at the Tweet on a

21    device, does it show the image or not?

22              MR. BISS:   No, it doesn't.  Because these

23    documents are being pulled up on the Wayback machine

24    which for whatever reason, and I don't know why, but the

25    Wayback machine only captures certain things.  It
```

PROCEEDINGS                    54

1

2   doesn't capture everything.  It just captures – and we

3   produced everything that it captured.

4           THE COURT:   Okay --

5           MS. BOLGER:   Can I just say one thing, Your

6   Honor?

7           THE COURT:   Let's go to the consents.

8           MS. BOLGER:   He said captured.

9   (indiscernible) download the images, that's my point.

10          THE COURT:   But I'm going to get you the

11  consents on Twitter.  So can't we just get these from

12  Twitter.  Do we need to do that part of it over again?

13  I mean let me hear from Mr. Biss, I really don't see

14  that the consents should be an issue.  They should be

15  getting those.

16          MR. BISS:   I understand exactly what Your

17  Honor's saying.

18          THE COURT:   I think the cases are pretty clear

19  that consents are, if the entity is requiring consent

20  under the Stored Communications Act that the plaintiffs

21  have to provide those.  They can't withhold them.  I

22  don't see any reasonable basis for that.

23          MR. BISS:   Well, their position, very, very

24  quickly, their position is, look, we did this already

25  ourselves.  And Twitter said we're not in a position to

1                          PROCEEDINGS                55

2   disclose anything to you, that's number one.   Twitter

3   already told us they're not going to give us anything,

4   so why would, are they going to give CNN something?

5          THE COURT:   We're going to get it one way or

6   the other and the Flynns are going to get to see it too.

7   So it's not like only one side is going to get this

8   evidence.   Everybody's going to have it.   And it may

9   help or hurt or neither, may cancel each other out, but

10  everybody should be getting it.

11         MR. BISS:   I'm not going to argue, Judge, I

12  agree, thank you.

13         THE COURT:   The last issue that Ms. Bolger

14  raised is your privilege log and the production date for

15  the Facebooks and Instagrams for the four individuals,

16  what's the timeframe on that?

17         MR. BISS:   So, one, we're not withholding any

18  documents on grounds of privilege, that's number one,

19  and I say that other than communications between me and

20  my clients or between me and the third party who are

21  also my clients after this litigation was filed.   So it

22  would be emails and things like that, text messages, and

23  we sort of have a tacit agreement that you don't have to

24  produce stuff like that.

25         On the remaining social media accounts, these

```
 1                         PROCEEDINGS                    56
 2  are just enormous massive files.  Some of them it takes
 3  a week to review them.  I have a paralegal who's
 4  reviewing, who's finishing up General Flynn's.  We
 5  should have that done in about a month.  Judge, we're --
 6           THE COURT:   Okay.
 7           MR. BISS:   Judge, it's 34 files that are each
 8  like 10 gigabytes large, I mean and CNN –
 9           (interposing)
10           MR. BISS:   And as I said before, CNN requested
11  every piece of data in those files.  And I will say
12  this, after you've looked at 150 to 200 pictures of
13  babies and things like that, it takes so long to, or
14  videos of Joe Biden, videos of various other people.
15  These people have exchanged in the ordinary course of
16  their lives on Facebook data that has no bearing on this
17  case, but it's been requested.  It just takes a long
18  time.  We're doing our best to get that.  I would say,
19  Judge, 30 days.  It's just, it's so massive.  I want to
20  be clear with Your Honor.  It's not like we're dragging
21  our feet.
22           I've produced, just to let you know, I've
23  produced already Instagram accounts, Facebook accounts,
24  Twitter accounts from multiple of theses people.  It
25  just takes so long.
```

```
 1                      PROCEEDINGS                    57
 2            THE COURT:   All right, I'm sorry, Ms.
 3   Shullman, I skipped over you on the other consents, but
 4   I sort of dealt with --
 5            (interposing)
 6            THE COURT:   Okay, but Ms. Bolger's comments I
 7   think sort of applied equally to you and my ruling is
 8   the same as to --
 9            MS. SHULLMAN:   If I may just, Your Honor, ask
10   for one points of clarification.  We foresought these
11   requests in late June/early July.  I would appreciate a
12   deadline --
13            THE COURT:   We're going to have a deadline for
14   everything.
15            MS. SHULLMAN:   Thank you.
16            THE COURT:   Okay, Ms. Bolger, anythign else
17   you wanted to add before we --
18            MS. BOLGER:   One question, Your Honor, was
19   whether we could all go through it again and make sure -
20   -
21            THE COURT:   That's what I was going to do.  I
22   just wanted to make sure I hadn't skipped anythign that
23   everybody wanted to cover.  All right, so I have on the
24   CNN side, within two weeks, Ms. Bolger, you're going to
25   speak to Mr. O'Sullivan about whether he had any calls
```

1                              PROCEEDINGS                    58

2   with anyone about the reports within seven days of the

3   date of the report.  I guess in the first instance to

4   share that information with Mr. Biss.  And then the

5   second that I'd give you two weeks on --

6              MS. BOLGER:   I think, Your Honor, that it's

7   whether we could exhaust who cut the clip.

8              THE COURT:   Who cut the clip, yes, thank you.

9   I'm glad your notes are clearer than mine.  And then I'm

10  going to have you, we'll give you instructions about how

11  to upload the 85 documents on the first privilege log so

12  that I can do an in camera review of those.

13             Mr. Biss, in terms of getting – I'll start with

14  the say one, the consents.  Could we do that within a

15  week?

16             MR. BISS:   That's easy to do, Judge.  Oh, with

17  one exception, Jack Flynn and Leslie Flynn are on

18  vacation out of the country at this – I don't know when

19  they're coming back specifically.  But I can --

20             THE COURT:   Ten days from today is the, I'll

21  say, well, November 8 is election.  November 9.  Okay?

22  November 9 for the consents for Parler and Twitter.  The

23  information, Mr. Biss, that you agreed to collect about

24  what your clients have searched, what search terms they

25  used.  Could you provide that information to Ms. Bolger

```
 1                        PROCEEDINGS                  59
 2  within two weeks?
 3            MR. BISS:   Yes, Your Honor.
 4            THE COURT:   Okay.  And then what I need you to
 5  then do is share that information with Ms. Bolger, and,
 6  Ms. Bolger, can you and Mr. Biss meet and confer about
 7  which of those accounts you want him to search and with
 8  which search terms.
 9            MS. BOLGER:   Certainly.
10            THE COURT:   Okay.
11            MS. BOLGER:   I think the answer will probably
12  be, Your Honor, that I want him to search all of them.
13            THE COURT:   Okay.  Well, let's have you see if
14  we can work together first and narrow it down, and then
15  if you can't agree, we'll talk in a second about another
16  conference.
17            And then, Ms. Bolger, for the Facebook and
18  Instagram accounts for the four, Facebook, Instagram,
19  and Twitter I guess for the four individuals, I'm
20  inclined to give, I understand what Mr. Biss is saying
21  about the volume, so I'm inclined to give you 30 days,
22  and then I think at our next conference we may be
23  talking about - the discovery deadline is December 16.
24  I think we may need to obviously push that back because
25  we haven't even gotten the depositions yet.  So I'm
```

```
 1                         PROCEEDINGS              60
 2   inclined to leave that fact discovery deadline where it
 3   is, and we're certainly going to be having another
 4   conference in the next month or so, and we can figure
 5   out how much more time we need.  But you can live with
 6   30 days --
 7             MS. BOLGER:   I can, Your Honor.  At this
 8   point, you know, CNN has all but finished their document
 9   production --
10             THE COURT:   Okay.
11             MS. BOLGER:   It feels like we're at the
12   beginning of the plaintiffs' document production.  I
13   wouldn't mind that 30 days be real, but other than that
14   I think it's okay, Your Honor.
15             THE COURT:   Understand.  Okay.  The 28th of
16   November, that's the day after the Thanksgiving holiday.
17   So just to make it a little bit more comfortable,
18   November 30 for the social media productions.  And then
19   for another conference with me.  If we did it by
20   telephone, could we do it on the morning of November 23?
21   That's the Wednesday before Thanksgiving.  Mr. Biss.
22             MR. BISS:   Judge, I did not bring my phone
23   with me.
24             THE COURT:   Okay.
25             MR. BISS:   Knowing I couldn't bring it in the
```

```
 1                          PROCEEDINGS                   61

 2   courthouse.

 3              THE COURT:   That's fine.

 4              MR. BISS:   But I can provisionally agree to

 5   that.

 6              THE COURT:   Okay.  All right, Ms. Bolger.

 7              MS. BOLGER:   Do you mind if I check?

 8              THE COURT:   Go right ahead.  That's all right.

 9              MS. SHULLMAN:   Your Honor, while she's

10   checking, can I get a point of clarification from Mr.

11   Biss.  One of the people - I may have to amend my

12   Twitter subpoena (indiscernible).  We don't know whether

13   Mr. Biss, we have not gotten an answer on whether Mr.

14   Biss represents that particular Flynn.

15              THE COURT:   Do you --

16              MR. BISS:   At this time I do not.

17              THE COURT:   Do not, okay.

18              MS. SHULLMAN:   Thank you.

19              THE COURT:   All right, thank you.

20              MS. BOLGER:   The 23rd's fine, Your Honor.

21              THE COURT:   Okay, so why don't we do 10 a.m.

22   on the 23rd.  Mr. Biss, if that's a problem, just let us

23   know.

24              MR. BISS:   I will, Judge, I'll doublecheck

25   that.
```

```
 1                      PROCEEDINGS                 62
 2          THE COURT:   Just call us this afternoon or
 3  send us an email.   Okay, anything else I should clarify?
 4  We'll obviously be doing a post-conference order that
 5  will lay all this out, and then I think what I'll ask
 6  from you is if I could just get a joint letter from the
 7  parties on what the issues are that you need me to
 8  address at the conference on the 23rd by 5 o'clock on the
 9  21st.
10          And I will have reviewed the privileged
11  documents in camera by then, so we'll be able to discuss
12  those during the conference.
13          MS. BOLGER:   Your Honor, I'm sorry to ask
14  about this.   Just to be helpful to you, do you want us
15  to label them per the log rather than per the Bates
16  number?
17          THE COURT:   Yeah, the log entry number is the
18  most helpful way to, because then I could have the log
19  next to me while I'm reviewing them.
20          MS. BOLGER:   Gotcha.
21          THE COURT:   Okay, great.   Super.   Mr. Biss,
22  anything else?
23          MR. BISS:   No, Your Honor, thank you.
24          THE COURT:   Thank you very much.   Thank you
25  all for coming in today.   Ms. Bolger, anything further?
```

```
 1                    PROCEEDINGS                63

 2          MS. BOLGER:    Thank you.

 3          THE COURT:    Ms. Shullman.   Thank you very

 4  much, everyone, have a good afternoon.   We're adjourned.

 5          (Whereupon, the matter is adjourned to November

 6  23, 2022, at 10 a.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                                              64

2

3                      C E R T I F I C A T E

4

5          I, Carole Ludwig, certify that the foregoing

6    transcript of proceedings in the case of FLYNN, et al.

7    v. CABLE NEWS NETWORK, Docket #21cv2587, was prepared

8    using digital transcription software and is a true and

9    accurate record of the proceedings.

10

11

12

13   Signature_____*Carole Ludwig*_____

14                    Carole Ludwig

15   Date:     October 31, 2022

16

17

18

19

20

21

22

23

24

25