```
                     UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK

In re:                               :
                                           Docket #21cv2587
 FLYNN, et al.,                      :

                    Plaintiffs,      :

   - against -                       :

 CABLE NEWS NETWORK, INC.,           : New York, New York
                                       November 23, 2022
                    Defendant.       :

------------------------------------ :


                        PROCEEDINGS BEFORE
                   THE HONORABLE SARAH L. CAVE,
                  UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Flynn Plaintiffs:    LAW OFFICE OF STEVEN S. BISS
                         BY:  STEVEN BISS, ESQ.
                         300 West Main Street, Suite 102
                         Charlottesville, Virginia 22903


For Defendant CNN:       DAVIS WRIGHT TREMAINE LLP
                         BY:  KATHERINE BOLGER, ESQ.
                              LINDSEY CHERNER, ESQ.
                         1251 Avenue of the Americas
                         New York, New York 10020

                         DAVIS WRIGHT TREMAINE LLP
                         BY:  MEENAKSHI KRISHNAN, ESQ.
                         1301 K Street N.W., Suite 500 East
                         Washington, D.C.  20005



Transcription Service:   Carole Ludwig, *Transcription Services*
                         155 East Fourth Street #3C
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

## <u>INDEX</u>

### <u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

### <u>E X H I B I T S</u>

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                        PROCEEDINGS                    3

 2            THE COURT:  Good morning, this is Magistrate

 3   Judge Cave.  We're here for a conference in Flynn v.

 4   CNN, case number 21cv2587.  May I have appearances

 5   starting with the plaintiff please.

 6            MR. STEVEN BISS:  Judge Cave, good morning,

 7   and Happy Thanksgiving.  This is Steve Biss, I represent

 8   the Flynns.

 9            THE COURT:  Okay, good morning, and same to

10   you.

11            MS. KATE BOLGER:  Good morning, Judge Cave,

12   and Happy Thanksgiving.  This is Kate Bolger on behalf

13   of CNN, and the other two people on the line are my

14   colleagues Meena Krishnan and Lindsey Cherner who

15   actually do most of the real work, and so I wanted them

16   to have the chance --

17            THE COURT:  Great, well, we're always thankful

18   for the people who do the real work.  All right, so a

19   few discovery issues today.  I'd like to start with the

20   privilege, CNN's privilege log as the parties had

21   provided me with a privilege log and then CNN had

22   submitted to me for in camera review some of the

23   documents that are listed on that log.  So, Ms. Bolger,

24   I've had a few follow-up questions for you after now

25   reviewing the log alongside the documents.
```

```
 1                        PROCEEDINGS                    4
 2            And so one question is there's a reference to,
 3   I think it's in, and I'll go by the document number, the
 4   numbering on the log, not the Bates numbers, as I refer
 5   to these documents.  Document number 10 refers to the
 6   row, the document says it's notes from the row.  What is
 7   the row?
 8            MS. BOLGER:   The row is generally a kind of a
 9   nickname (indiscernible) given to people who review
10   content for editorial purposes.  Generally, when things
11   are sent to be, sent for attorney-client review, they're
12   all reviewed simultaneously with attorney-client review
13   standards and editorial.  So they all input their
14   information on the same email exchange.
15            THE COURT:   Okay, understood.  I wasn't show
16   it was a show or --
17            MS. BOLGER:   Understood, Your Honor.
18            THE COURT:   Okay.  All right, and then there
19   is another reference to, on document number 83, it's T-
20   R-A-I-D, Traid or Triad (phonetic), I'm not sure.
21            MS. BOLGER:   TRIAD is a nickname given to, as
22   I said, the process of people reviewing is sort of
23   iterative, and TRIAD is those three groups, the
24   attorneys, the (indiscernible), and the row.  It goes at
25   once and they kind of iterate on top of each other, but
```

```
 1                         PROCEEDINGS                5

 2   TRIAD is the shorthand term given to those three groups.

 3           THE COURT:   Okay, great.  And then document

 4   number 82 refers to someone named Richard Davis.  Is he

 5   an attorney?

 6           MS. BOLGER:   I don't know the answer to that,

 7   Your Honor.

 8           THE COURT:   Okay.  Maybe if that's something

 9   that your helpful colleagues might be able to check

10   while we're talking, I'll move on to something else, you

11   know, another sort of more categorical question.  And

12   that is obviously each of the documents is an email

13   chain, and the log, it appears to me, to be referring

14   each entry on the log is just the top email in the

15   chain.  Am I interpreting the log correctly?

16           MS. BOLGER:   Yes.  Yes, Your Honor, although

17   we produced every, endeavored to produce every email in

18   the chain, if that makes any sense.  And so every email

19   should be logged even if every email is not logged in

20   each square.

21           THE COURT:   Right, right, okay.  That seemed

22   to me to be correct.  But let's just say, you know, some

23   of these I think I'm going to have an issue with the

24   privilege, and I can explain to you, you know, some

25   examples of that.  But if I were to direct you to
```

```
 1                          PROCEEDINGS                      6

 2   produce let's just say entry number 4, and that entry

 3   number 4 refers to just the top email from Ashley

 4   (indiscernible) to Donie O'Sullivan, will you understand

 5   that I'm just referring, you know, what I'm calling for

 6   is the production of that email specifically, and it's

 7   on the same piece of paper with other documents as to

 8   which there's no dispute about the privilege.  I guess

 9   it's just a matter of redacting, so things that are

10   privileged and producing the rest.  Does that make

11   sense?

12          MS. BOLGER:   That does make sense.  Your

13   Honor, I will tell you that we made those calls because

14   it was the producer and the news gatherer in that case

15   doing the instruction of the attorney-client, of the

16   attorney, which is why we thought (indiscernible)

17   iterative.  They are all building on each other's ideas,

18   and they all are modifying the report as reflected in

19   the comments from (indiscernible).  So I do think it's

20   privileged, and that was the basis of our assertion, but

21   I do understand what you're saying, Your Honor.  But the

22   theory behind the privilege was that everybody was

23   commenting on what Mr. Keel was saying rather than just

24   discussing in the abstract without him.

25          THE COURT:   Right, but I guess to push back on
```

1
2   that a little bit, it seems to me like there's sort of

3   multiple threads in this chain, and there's certainly

4   Mr. Keel's comments and then there are very clearly -

5   which are, there's no dispute about Mr. Keel's comments

6   being privileged, and then there are people responding

7   to Mr. Keel directly.  But then there do seem to be

8   separate threads where someone else is making a

9   different comment that doesn't relate to what Mr. Keel

10  said, and then there may be two or three responses to

11  that non-Keel comment.  And those to me don't seem to be

12  privileged.

13          MS. BOLGER:  Although, in general, they were

14  often on a version of the script that included Mr.

15  Keel's comments.

16          THE COURT:  Okay.

17          MS. BOLGER:  So in other words if you were to

18  disclose that document, you might be, you would disclose

19  Mr. Keel's comments below.

20          THE COURT:  Okay.  All right, and then another

21  one of the documents, I think is 47, is labeled,

22  quote/unquote, "the final script."  It seems to me if

23  it's the final script, then that's what was used, that

24  that should be produced.  Right?

25          MS. BOLGER:  It's the final script that's

```
 1                          PROCEEDINGS                8
 2  being sent for review.  We did produce the final script,
 3  so Mr. Biss has what was aired.  That is the final
 4  script that was reviewed.
 5            THE COURT:   All right.
 6            MS. BOLGER:   So, in other words, it is a
 7  document seeking legal advice is how we perceive it.
 8            THE COURT:   Okay, well, there seem to be two.
 9  So document number 4 is what appears to be sort of the
10  first draft that everybody comments on, and then there's
11  comments, comments, comment, and revisions, and then
12  document 47 is labeled, quote, "the final script," and
13  there don't appear to be any comments after that.
14  That's what I'm asking.
15            MS. BOLGER:   Yes, but that document is to
16  legal asking them to review it one last time.  It's not,
17  that's not – that document is sent specifically for
18  final legal review, not for publication.
19            THE COURT:   Okay, I see.  All right, and --
20            MS. BOLGER:   And just to answer your question,
21  Mr. Davis is in standard and practices, so he's that
22  third row editorial, legal is legal, and standard and
23  practices is what Mr. Davis is.  He's not a lawyer, he's
24  a standards guy.
25            THE COURT:   Okay.  And then on document number
```

```
 1                        PROCEEDINGS                    9
 2  87 is a text chain I think between, well, I'm not sure.
 3  I guess (indiscernible) and Ms. Sansant (phonetic), and
 4  according to the privilege log, this was produced
 5  redacted or portions of it were redacted for privilege?
 6          MS. BOLGER:   Yes.
 7          THE COURT:   Okay.  All right.  And are you
 8  able to tell me which portions were redacted?  I only
 9  have the full version.  So is it, I think the third text
10  bubble, is that the one that was redacted?
11          MS. BOLGER:   I think so, Meena or Lindsey, can
12  you just tell me that?  We only redacted the portion
13  discussing legal advice and, Meena, it's the third
14  bubble, right?
15          MS. KRISHNAN:   Yes, the third bubble is the
16  one that mentions legal.
17          MS. BOLGER:   Yeah.  Yes, that's right, it's
18  the third bubble.
19          THE COURT:   Okay, great, thank you.  Okay,
20  well, like I said, I never view the documents twice.  I
21  think in light of what Ms. Bolger's has told me today, I
22  just need to do a final pass through these.  So I don't
23  think I'll be able to get you my final, I'm certainly
24  not going to be able to give you my final ruling on the
25  documents during this conference, but you'll have it
```

1                          PROCEEDINGS                    10

2   very shortly after the holiday.  But that's helpful, and

3   just so that I have a full record, I am going to ask the

4   parties to order a transcript of today's proceeding so

5   that I can have that alongside my final review of the

6   documents.

7           MS. BOLGER:   And, Judge Cave, I'm happy to

8   answer any questions or have Meena who knows more than

9   me answer any questions if offline or however it's

10  helpful.  I will tell you that these were not like easy

11  parsing.  We were trying very hard to parse them as

12  carefully as possible, and we feel very comfortable that

13  we were, you know, in good faith trying to make sure

14  that the comments were iterative of each other or

15  directly seeking legal advice like 47.

16          THE COURT:   Right, I guess I just, without

17  disclosing the contents of any of them, I think there

18  are some that are very clearly not, don't have anything

19  to do with legal advice.  And so I think there are a few

20  that can --

21          MS. BOLGER:   As long as you would please watch

22  out for the script at the bottom which has --

23          THE COURT:   I understand, yes.  I understand,

24  I understand.  Okay, all right, that's all very helpful,

25  thank you.

```
 1                        PROCEEDINGS              11

 2            Okay, so, Mr. Biss, thank you for your patience

 3   while I worked through all those questions, and like I

 4   said, I'll have a decision for you hopefully next week.

 5   So I know that your letter came in second, but I'll pick

 6   through your issues first which CNN responded to last

 7   night, and I guess maybe there are some questions about

 8   whether any of these issues are, in fact, ripe.

 9            But I guess the first issue, Mr. Biss, is the

10   ratings documents, and it looks like from CNN's response

11   that CNN is still working on that issue.  So is there

12   anything you need to discuss on that?

13            MR. BISS:  No, Your Honor, I'm willing to keep

14   working with them on that.  I mean Ms. Bolger has

15   indicated in the past on various requests, as Your Honor

16   is aware, that they're working on it, and they've

17   supplemented where possible or she's told me we don't

18   have any documents, and I think that would end the

19   matter.  So, number one, I think I'm comfortable

20   continuing to work with counsel on that.

21            THE COURT:  Okay, same for viewership?  It

22   looks like that's in progress.  Some things have been

23   produced, and if there's anything else, they'll produce

24   it.  Is there anything else you need to discuss on that,

25   Mr. Biss?
```

| 1 | PROCEEDINGS | 12 |

2          MR. BISS:  Judge, I think, again, I think I

3   can work with counsel on that.  They can just point me

4   to what they produced.  I just don't recall that I got

5   anything on viewership, but it may be that it's there

6   because there's been a lot produced by them.  So if they

7   could just point that out to me, I think we can handle

8   that, counsel can handle that and resolve that.

9          THE COURT:  Okay.

10          MS. BOLGER:  There in footnote 1 in the

11   letter.

12          MR. BISS:  Pardon me?

13          MS. BOLGER:  We listed them in footnote 1 for

14   you.

15          MR. BISS:  Okay.

16          THE COURT:  All right, the next on your list,

17   Mr. Biss, is dossiers and research.  Is this issue ripe

18   today?

19          MR. BISS:  I think it is.  We did have a meet

20   and confer on this back I think on October 4 is when we

21   had a meet and confer on this.  Our last meet and

22   confer.  And, again, I addressed it subsequently in an

23   email as well.  So I do think it's ripe.

24          THE COURT:  Okay.  All right, Ms. Bolger, do

25   you want to expand on your response in your letter?

```
 1                       PROCEEDINGS              13
```

```
 2              MS. BOLGER:   Sure.   The question asked broadly
 3   for any dossiers and research related to Trump, General
 4   Flynn, or QAnon.   It is not limited to the reported
 5   issue here.   And just a reminder, Your Honor, that we
 6   have produced all responsive non-privileged documents
 7   related to the report, and we are continuing to make
 8   sure we've covered all our bases on that.   So to the
 9   extent that we have documents about Trump, General
10   Flynn, or QAnon related to this report, we've produced
11   them.   This is (indiscernible) focused on
12   (indiscernible), well, focused on the publication of
13   those statements, and, you know, we're entitled to
14   provide information related to those statements.

15              Anything else would be, one, outrageously
16   burdensome.   I would remind you that Donald Trump was
17   the President, General Flynn was the National Security
18   Advisor, and there's millions of stories that have been
19   done about them over time, as there have been millions
20   of stories been done about QAnon.

21              And, second, to the extent that it seeks
22   explicit news data and materials unrelated to those
23   stories, that information would be privileged.   And we
24   talked about this briefly at the last conference, but it
25   would be privileged under New York law because their
```

1

2 journalists expected New York privilege. *Homer v.*

3 *Winter* in the Court of Appeals, millions of cases

4 talking about how when a journalists expects the

5 privilege, that's the privilege that you apply.  So that

6 means if there's confidential information in there, it's

7 absolutely privileged, and if there's non-confidential

8 information in there, Mr. Biss would have to make a

9 showing that this information was highly material and

10 necessary, critical and relevant, and not available from

11 another source.  And there's no way that he would ever

12 be able to make a showing that some document somewhere

13 that may or may not exist, by the way, about Donald

14 Trump or General Flynn or QAnon is critical and

15 necessary to defense of this action.  So it's overbroad,

16 one, and, two, it calls from protected news gathering

17 material.

18          And, Your Honor, if you are contemplating

19 asking for the production of our news gathering

20 materials related to this piece, I would ask the

21 opportunity to brief that.  Reverse privilege is

22 obviously incredible important to news organization, and

23 compelling the disclosure of this information over which

24 they have rights guaranteed to them by the First

25 Amendment, the New York State Constitution, and New York

```
 1                        PROCEEDINGS              15
 2   State law is really serious business for a news
 3   organization.  So I would ask that if we're really going
 4   to talk about that, I'd be permitted to file briefing on
 5   this.  But to me this is a no-brainer.  It is so
 6   overbroad and so irrelevant that I don't think you
 7   (indiscernible).
 8            THE COURT:  Right, right.  Okay.  I'm not
 9   going to compel any production of dossiers and research
10   on former President Trump, General Flynn, or QAnon or
11   communications with January 6 committee regarding
12   General Flynn or QAnon.  As it's been represented to me
13   by defendant's counsel, they've produced all responsive,
14   non-privileged documents relating to this report, and
15   obviously there's ongoing efforts to make sure that that
16   production is complete.  But anything, you know, this
17   case is about one specific report, and even more so of
18   two or three second clip.  And so the production the
19   plaintiffs are calling for are overly broad and would be
20   unduly burdensome and would be calling for things that
21   are just simply not relevant to this case.  So that
22   request is denied.
23            Next, Mr. Biss, is documents about General
24   Flynn promoting a QAnon slogan.
25            MR. BISS:  Yes, and, Judge, if I just may be
```

 1
 2  heard briefly on the, obviously it's relevant to the
 3  clip because the clip definitely shows a picture of
 4  Donald Trump and General Flynn at a podium, and it says,
 5  and I haven't listened to it in a week or so, but it
 6  says words to the effect of General Flynn promoting a
 7  QAnon slogan, Where We Go One, We Go All.  So we want to
 8  see any documents that would support that assertion in
 9  the report, and it sort of goes along with number 6.
10          Obviously, it's our position that CNN targeted
11  my clients because of their familial relationship with
12  General Flynn.  In discovery in this case there are zero
13  documents, no documents whatsoever that have been
14  produced that support the statement that's at issue in
15  the case.  And so we want to know why the Flynn family
16  was targeted.  Was it just gross negligence or was it
17  intentional?  And why is General Flynn being targeted?
18          So what the Court – and so that's why I think
19  it's relevant, and it goes to the issue of why the
20  plaintiffs are, were introduced into this video.  And
21  the broader question though is it also calls for the
22  discovery of information that would support why the, why
23  General Flynn was put into the report, why the report
24  was constructed the way it was, why the clip of
25  President Trump and General Flynn at a podium and flags

```
 1                        PROCEEDINGS                    17
 2  of Where We Go One, We Go All were all put together for
 3  purposes of supporting this theme that these are all
 4  QAnon followers, like the people in, like the QAnon
 5  shaman and the others who were identified in the clip.
 6            And, more importantly, it's consistent with
 7  CNN's discovery, and I guess what the Court doesn't know
 8  is that CNN is, has issued multiple subpoenas to third
 9  parties requesting any and all documents relating to
10  General Flynn for a period going back to November of
11  2016, just extremely broad and expansive.  And they're
12  clearly, I guess they're clearly looking for some
13  documents that tie my clients to conferences that
14  General Flynn either spoke at or didn't speak at.  But
15  they have, you know, the latest subpoena they issued is
16  to the, is to something called the Digital Soldiers
17  Conference.  And I guess what's going on is that
18  somebody's Googling over at either counsel's office or
19  CNN, Googling to determine where General, what
20  conferences General Flynn went to, and then they
21  subpoena every one of those conferences.  And --
22            THE COURT:   Well, respectfully, Mr. Biss,
23  those subpoenas are not before me today, and so nobody
24  has moved to quash those, but, you know, this issue goes
25  to the truth of the matter asserted.  So this is an
```

```
 1                          PROCEEDINGS                    18
 2  affirmative defense for CNN.  So if General Flynn and
 3  the Flynns were, had promoted QAnon, then I assume what
 4  CNN will be arguing is that the statement they made
 5  about the Flynns was truthful, and, therefore, they're
 6  not liable.  So that's why that discovery is going in
 7  that direction.
 8            MR. BISS:   Right, and then by the same token
 9  my discovery is designed to show the falsity of it.  My
10  discovery is to show that General Flynn didn't promote
11  any QAnon slogans and that General Flynn is not a QAnon
12  follower, and guilt by association, neither are any of
13  his family members.
14            THE COURT:   Well, then your document request
15  should be for any documents that show that General Flynn
16  did not promote any QAnon slogans, not that he did.
17  That would be an accurate request for what you're going
18  at.  So that to me seems like a more appropriate
19  request.  If CNN had a document showing that General
20  Flynn did not promote QAnon, then that would be
21  responsive.
22            MR. BISS:   But, Your Honor, that's like trying
23  to prove a double negative.  I mean he's not a QAnon
24  follower, and he never promoted QAnon slogans, and as
25  many times as they want to say it, it's not true.  And
```

1                          PROCEEDINGS                    19

2  so I just requested show me the evidence, show me where

3  he's a QAnon follower.  And they - that's really what

4  I'm trying to get at.  I want to make sure that when I

5  argue to the jury that General Flynn is not a QAnon

6  follower and he didn't promote QAnon slogans, and

7  everything that CNN put in that report is false, I want

8  to make sure that they can't pop up and say, yeah, but

9  we got a video over here showing him at a conference

10 with --

11         THE COURT:   That would be problematic for

12 other reasons.  Because if they rely - there's no way

13 they are relying on something at trial that they haven't

14 produced in discovery.  So that's your protection there.

15         MR. BISS:   And I understand that, but I just

16 want to make sure that I get a full and fair opportunity

17 to see all their evidence before I have to go to trial

18 because I don't want to take any chances that --

19         THE COURT:   But you will, Mr. Biss, so that's

20 the rules, that's what we're doing.  We're doing fact

21 discovery.  So if CNN has something that they're going

22 to use to support their case at trial, they have to be

23 producing it to you now whether you ask for it or not.

24 So you're sort of - you're mixing things a little bit.

25 Your protection is that if you're going to use it at

```
 1                        PROCEEDINGS                 20
 2   trial, it has to be produced in fact discovery.  So -
 3   but - so let me ask Ms. Bolger, has CNN produced any
 4   documents about General Flynn promoting the QAnon
 5   slogan?
 6            MS. BOLGER:   So CNN produced the documents
 7   relevant to this report.  In the report Mr. Flynn uses
 8   QAnon slogans, and he speaks at conferences for QAnon.
 9   He is the coiner of the phrase Digital Soldiers, Your
10   Honor.  He is the person who coined that term.  That's
11   in the report.  We've given you things in the report
12   that show that Mr. Flynn not only affiliated himself
13   with QAnon but actually raised the money off of QAnon.
14   That's how he paid his lawyers.  Right?  So the report
15   has that information.
16            There's no information that we would ever rely
17   on at trial that we didn't produce in discovery.  We
18   clearly know the rules, Your Honor.  And this material
19   is, which is, again, a massive amount of information,
20   right, General Flynn and his connections to QAnon have
21   been written about on every news organization across the
22   globe forever.  It's a massive request.  We gave what we
23   had related to the report.  We're going to try to, as
24   you say, Your Honor, establish the substantial truth of
25   our report by subpoenaing other people, and I would add
```

PROCEEDINGS                    21

1
2  that Mr. Flynn's siblings have spoken at some of those

3  conferences.  General Flynn's siblings, including one of

4  the plaintiffs here.  So that's why we're seeking that

5  discovery, Your Honor.

6            But it's not the same for us, right.  What he

7  can seek discovery about us is what we used to put

8  together the report.  We've given him that.  If we were

9  going to rely on something else at trial, we would give

10 him that.  But this is a hugely overbroad request, and,

11 you know, it's such a hugely overbroad request that

12 would, again, call upon news gathering materials for

13 other reports.

14            THE COURT:  Okay.  All right, well, for the

15 same reason as to number 3 and 4, I'm going to deny any

16 request to compel CNN to search for all documents that

17 show General Flynn promoted any QAnon slogan.  It sounds

18 like CNN has produced documents relating to the specific

19 report that's at issue in this case and obviously has an

20 ongoing obligation to produce any additional documents

21 that clients related to this report, and then obviously

22 to the extent it has any other documents that it intends

23 to rely on at trial, those must be produced before the

24 end of fact discovery.  But that should alleviate any

25 concerns that Mr. Biss was expressing.

```
 1                          PROCEEDINGS                  22
 2              Number 6 I guess kind of addresses the same
 3     issue, right, Mr. Biss?
 4              MR. BISS:   I think it does, Judge.  Again, for
 5     purposes of my pretrial preparation, I just want to make
 6     sure that I see all evidence that Jack Flynn is a QAnon
 7     follower, all evidence that Leslie Flynn is a QAnon
 8     follower, and all evidence that General Flynn's a QAnon
 9     follower.  And the time period that's relevant in my
10     view is the time period before they published the report
11     because obviously if they had no evidence, they
12     would've, they obviously were acting maliciously if they
13     had no evidence in their possession.
14              So, again, I do think that evidence that
15     General Flynn was a QAnon promoter or a QAnon follower
16     is relevant.  He's featured in the report.  He is, he's
17     in the lineup with the other members of the Flynn
18     family.  They're all accused of being QAnon followers.
19     So I think it's fair game to ask them to produce any
20     evidence they have that anybody in that lineup is a
21     QAnon follower.  So that's the basis of number 6.
22              THE COURT:   Go ahead, Ms. Bolger.
23              MS. BOLGER:   Just one housekeeping matter
24     which is I thought this was number 5.  So I think I'm
25     confused, and I just don't want to - we are talking
```

```
 1                    PROCEEDINGS              23
 2   about the documents that support that General Flynn is a
 3   QAnon follower, right, that's what we're talking about?
 4            THE COURT:   Well, 5 and 6, well, number 5, I'm
 5   going off of Mr. Biss's letter.  Number 5 is all
 6   documents that show --
 7            MS. BOLGER:   I'm sorry, I'm looking at my old
 8   letter which would explain my confusion.
 9            THE COURT:   Your letter has different
10   numbering, so I was going with Mr. Biss's --
11            MS. BOLGER:   I'm sorry --
12            (interposing)
13            THE COURT:   That's all right.
14            MS. BOLGER:   But, Your Honor, first of all,
15   General Flynn is not a plaintiff here.  If General Flynn
16   were a plaintiff here, I can see maybe another
17   conversation, although I would still say it was limited
18   to the report.  But I would remind you that this sudden
19   interest in what CNN has on General Flynn is in no way
20   relevant to this lawsuit because he's not a plaintiff
21   here, and, in addition, this call is for (indiscernible)
22   for something not related to this report, and as a third
23   thing, is massively overbroad.
24            THE COURT:   Okay, well, for the same reasons I
25   denied the requests to compel for the production related
```

1

2 to (indiscernible), I'm going to deny number 6.

3         Tell me about number 7, Anderson Cooper's

4 documents, Mr. Biss.

5         MR. BISS:   So the Anderson Cooper's

6 involvement in this QAnon promotion by CNN is mentioned

7 in paragraph, beginning in paragraph 2.  Anderson Cooper

8 was involved in multiple broadcasts at or around the

9 time that the report at issue in this case was produced

10 in which he talked about QAnon and how dangerous and

11 extremist he was and cultist and various other words.

12 And so in discovery we want to learn whether Mr. Cooper

13 has any documents that mention Jack Flynn or Leslie

14 Flynn or any member of the Flynn family, again, to

15 determine whether they, whether CNN has or had any

16 evidence that they were QAnon followers at the time that

17 they labeled them QAnon followers.

18         So Mr. Cooper is clearly somebody who was

19 involved in CNN's QAnon production, and so it would be

20 logical for him, if he has any documents, to have

21 documents that would show that Jack Flynn is a QAnon

22 follower and Leslie Flynn or Valeria Flynn or Laurie

23 Flynn or any other plaintiff, party.  And I don't think

24 it matters that General Flynn is not a party in this

25 case because CNN has treated him as a party through its

```
 1                        PROCEEDINGS                25
 2   various subpoenas.  So that's the nature of number 7.
 3              THE COURT:   Did Anderson Cooper make any
 4   statements about any of the Flynns?
 5              MR. BISS:   No, he didn't make any statements
 6   about the Flynns at all, but that wouldn't mean that he
 7   wasn't in communications with Donie O'Sullivan or
 8   others.  It just wouldn't mean that at all, the fact
 9   that he didn't talk about the Flynns.  The fact is he
10   talked extensively about QAnon and various, and sundry
11   people associated with QAnon, and we just want to know
12   if he ever talked about the Flynns, if he ever had
13   communications with third parties about the Flynns.
14   Because he could have a document in his possession that
15   says, well, they're not really QAnon followers, and
16   that's why I'm not going to feature them in any of my
17   reports.
18              So, again, I think it's, he's a logical person
19   to subpoena --
20              THE COURT:   If he didn't say anything about
21   the Flynns and if he didn't think they were QAnon
22   followers, how does that help your claim?
23              MR. BISS:   Well, I don't know what he thought
24   or did.  That's why I issued the document request.  I
25   don't know what his views are.  He could have a treasure
```

```
 1                    PROCEEDINGS                26
 2   trove of documents in there, communications with third
 3   parties talking about the Flynn family, and he could
 4   have questioned why did you put them in this report?
 5   They don't --
 6            THE COURT:   So what?  He didn't say anything
 7   about the Flynns though.
 8            MR. BISS:   I don't know that - Judge, no one
 9   knows if he said anything --
10            THE COURT:   There's a lot of people, there may
11   be a lot of people who thought things about the Flynns
12   but never said anything.  You're not, it's not a First
13   Amendment violation to think something.
14            MR. BISS:   Judge, I know, but he might've
15   written something.  He might've emailed something.  He
16   might have done, might've put a memo together.
17            THE COURT:   But he didn't say it publicly.
18   There's no defamation or false like claim for anything
19   that Anderson Cooper did.  Ms. Bolger, let me ask you
20   this, you searched Mr. O'Sullivan's communications.  Did
21   that search encompass any communications he might have
22   had with Anderson Cooper about the Flynns?
23            MS. BOLGER:   We searched Mr. O'Sullivan's
24   communications related to this report.  There's no - and
25   all of Donie's emails actually.  There's no
```

```
 1                      PROCEEDINGS                27
 2   communications with Anderson Cooper.  Anderson Cooper
 3   had no role in the report.  We have no reason to believe
 4   that Donie O'Sullivan and Anderson Cooper ever spoke at
 5   all about this report or about the Flynns, you know,
 6   Anderson Cooper wasn't involved in this report.  This is
 7   purely speculative.  And I would add, again, it would be
 8   news gathering materials related to a segment not at
 9   issue, and the reporter's privilege would be implicated.
10   But just genuinely, Your Honor, Anderson Cooper had
11   nothing to do with this report.  It's apples and
12   oranges.
13           THE COURT:  All right, well, obviously, Mr.
14   Biss, you can ask, when you depose Mr. O'Sullivan, you
15   can ask him to confirm what Ms. Bolger just said, but
16   aside from that I'm not going to require any further
17   search by CNN on number 7.
18           Number 8 is two other reports, Mr. Biss.
19           MR. BISS:  Yes, Your Honor, they're mentioned
20   in the amended complaint, and I have requested copies of
21   them.
22           THE COURT:  Okay.
23           MR. BISS:  And they're in paragraphs 2 and 15.
24           THE COURT:  Okay, Ms. Bolger.
25           MS. BOLGER:  I mean they're publicly available
```

1                           PROCEEDINGS                    28

2   on the CNN website, but if we have copies, we'll – I

3   don't see – we would provide the (indiscernible), I'm

4   sorry.  We haven't met and conferred on these, Your

5   Honor, for the fifth request for production and the

6   fifth request for production there's been no meet and

7   confer.  But I didn't understand whether Mr. Biss wanted

8   news gathering materials or the published content.  If

9   CNN has a copy to give Mr. Biss, it would be of the

10  published content, we would do that as a courtesy even

11  though I don't think it's relevant.  But the news

12  gathering I would feel differently about.  So we would

13  agree to produce the published content to the extent

14  that we have that.

15              THE COURT:  Okay.  All right, if you could

16  please.  Just that, not the, not all the backstory.

17              All right, number 9 is all Mr. O'Sullivan's

18  social media accounts.  Why is that, Mr. Biss?

19              MR. BISS:  Well, it's obviously, he's the one

20  who published and republished the report and the

21  accusations that the, my clients are QAnon followers.

22  They have requested all of our social media accounts to

23  show that we are Q, I guess to show we are QAnon

24  followers.  And I want to see if Mr. O'Sullivan has any

25  evidence at all anywhere that, to support his

1                        PROCEEDINGS                    29

2  accusation.  That's the purpose of requesting all of his

3  social media accounts.  Not only may there be evidence

4  in there of further publications to other third parties

5  and direct messages and things like that, but, again, it

6  goes to the question of malice, whether he has any

7  documents to support the accusation.

8              THE COURT:   Ms. Bolger, has Mr. Flynn searched

9  his social media or have you searched Mr. Flynn's –

10 sorry – Mr. O'Sullivan's social media for anything

11 related to the Flynns or the report?

12             MS. BOLGER:   We have, Your Honor.  We'd just

13 like to mention that talking to a Bolger about a Flynn

14 and an O'Sullivan is a little bit confusing.  But we

15 have, Your Honor.  Mr. O'Sullivan did not use his social

16 media to news gather at all for this piece, and we did

17 check that.  He does for other stories he has used it,

18 so his social media accounts and his direct messages

19 include privileged materials that wouldn't be relevant

20 here, but we have asked and we have searched and he does

21 not have material that is relevant to this report.

22             THE COURT:   Okay, but aside from the report,

23 anything else about the Flynns?

24             MS. BOLGER:   I'm sure there's stuff in there

25 about General Flynn for sure.  He reports on QAnon,

```
 1                        PROCEEDINGS                    30
 2   that's his, one of his beats, right.  I don't know that
 3   we have asked him specifically about Jack and Leslie
 4   Flynn.  I can go make sure we have asked that specific
 5   question.  But the question about General Flynn would
 6   necessarily implicate all kinds of news gathering
 7   materials for all kinds of other stories that Donie has
 8   done, and so that's very overbroad, but we can go back
 9   and ask about Jack and Leslie.
10            THE COURT:  Yes, that's fine.  If you can just
11   doublecheck that, as you searched, that his social media
12   for Jack and Leslie Flynn has been searched.
13            Okay, number 10.  Mr. Biss.
14            MR. BISS:  So in number 10, Judge, I went back
15   and I did some research on prior reports that CNN has
16   published where the phrase QAnon follower has been used.
17   And in these series of requests, and there's a number of
18   them, and I can't tell you how many, but there's a
19   series of requests that all relate to the same subject
20   matter, and that is what is CNN's definition of QAnon
21   follower.  And, again, I think it's relevant to the
22   question of what a QAnon follower is.  Judge Woods, I
23   think Judge Woods has probably defined it, so I don't
24   know this is relevant.  But I want to know whether they
25   disagree with Judge Woods's definition and how they
```

```
 1                     PROCEEDINGS              31

 2  define QAnon follower when they've produced this report.

 3           THE COURT:   Okay, but according to your

 4  letter, number 10 asked about prior reports.  So --

 5           MR. BISS:   Right, and so their prior course of

 6  dealing, if you will, is obviously relevant to their

 7  intent when they published the report on February 4,

 8  2021.  So I mean if they're using the same definition of

 9  QAnon follower and that definition doesn't fit the

10  Flynns, that's really, that's kind of where I'm going

11  here is I want to know --

12           THE COURT:   It semes to me the only definition

13  that matters is Judge Woods's definition.

14           MR. BISS:   I agree with that.

15           THE COURT:   (indiscernible) defines it.  So

16  whether CNN defined it differently or defined the word

17  follower of any other group differently doesn't seem to

18  me to matter.  And is potentially very overly broad.

19  You know, as you said, Judge Woods's interpretation is

20  what really matters here.  CNN could very well be wrong,

21  but that's up to Judge Woods.  So I guess I'm not sure

22  why documents about CNN's statements in other contexts

23  would be helpful at all to that.

24           MR. BISS:   Well, again, they might admit they

25  agree with Judge Woods's definition, in which case, you
```

```
1                         PROCEEDINGS                    32
2    know, they would be estopped at trial to really sort of
3    question the definition of QAnon follower.  So, again,
4    there's multiple reasons why you would want to know the
5    position that a party has taken in the past on a
6    particular subject, and that's really, that's what the
7    series of document requests go to.
8              Again, I mean it's just a matter of covering
9    all bases on what is an important issue in this case,
10   and that is the phrase that they chose to use which is
11   QAnon follower.
12             THE COURT:   Okay, let me ask, Ms. Bolger, is
13   it readily acceptable to search other public reports
14   that CNN has done that use the word QAnon follower?
15             MS. BOLGER:   No, that would be impossible.
16   Two things, Your Honor.  One is I don't have the
17   requests that Mr. - Mr. Biss and I have not conferred
18   about this.  This is the first minute I understand this
19   number 10 to be about more than one request.  Right?  He
20   just said it's many requests, a series of requests.  I
21   don't know what they are.  They haven't talked about it.
22             The only person whose definition of QAnon
23   follower matters for the purposes of the state of mind
24   of the speaker is Donie O'Sullivan.  None of those
25   reports in the document requests were Donie O'Sullivan
```

1               PROCEEDINGS                33

2   reports.  Right?  It's what Donie knows.  So to answer

3   the question, ask the question of Donie O'Sullivan, what

4   is a QAnon follower, one would ask that question of

5   Donie O'Sullivan, and he would answer it.  But what

6   other people said a QAnon follower was, unless you can

7   bring that home to Donie, as a matter of law, it doesn't

8   impact Donie's state of mind.  (indiscernible) *New York*

9   *Times v. Sullivan*, you have to home it to the speaker.

10  Right?

11          So the request is not relevant to the matter of

12  defamation law.  It's hugely overbroad.  I wouldn't even

13  know how to search it and calls for all kinds of news

14  gathering materials again which is very, very

15  significant and a huge privilege protected by the First

16  Amendment, New York State Constitution, and New York

17  statutory law.  So these requests are really overbroad

18  and irrelevant because all that matters is Donie, and

19  Mr. Biss can ask Donie.

20          THE COURT:  Okay, I need to move along because

21  I do have another matter on at 11 o'clock, and I know we

22  haven't even gotten to CNN's issues yet.  So I'm going

23  to deny that without prejudice.  Mr. Biss, you can

24  certainly ask Mr. O'Sullivan in his deposition if, you

25  know, what he understood the term QAnon follower to be

1

2   and what his sources of information about that were, and

3   if it turns out that it was other people at CNN or other

4   reports at CNN that informed that, then we can revisit

5   this issue.  But for now I'm going to deny that one

6   without prejudice, also for the additional issue that

7   sounds like there may not even be an actual document

8   request for this one.

9        Just quickly, number 11, the tax returns.

10  According to Ms. Bolger's letter, Mr. Biss, she's

11  provided you with CNN's net worth.  Is anything further

12  needed on this at this time?

13        MR. BISS:  Well, Judge, she provided me with

14  somebody's statement of book value as the statement of

15  net worth, and I'm entitled to know what the support is

16  for that.  I'm entitled to the tax returns, I'm entitled

17  to financial information.  I mean they can come up with

18  any number they want.  They can just, oh, here's the

19  book value.  And I don't even know if that's a proper

20  accounting methodology.  But they've given me a

21  document, and the document is book value.  I just want

22  the underlying support for it, that's all.

23        THE COURT:  Well, Ms. Bolger, are CNN's

24  financial results publicly reported anywhere?

25        MS. BOLGER:  So the CNN net worth number is,

1
2   did not exist in the world until this year when it was
3   calculated as part of actually a litigation, it was
4   calculated.  It is not public otherwise.  It didn't
5   exist until this net worth calculation.  And Mr. Biss is
6   certainly not entitled to know anything more than net
7   worth.  Not only would CNN's value not be relevant until
8   punitive damages, but you cannot disgorge profits in a
9   defamation or (indiscernible) claim.  Right?  It's only
10  relative to punitive.  To open up CNN's accounting
11  because of the possibility that you might have
12  hypothetically get punitive damages would be
13  unbelievably burdensome, and it would be unbelievably
14  stressful in the company.  And it's not necessary.
15          If Mr. Biss wants to come back to this later,
16  maybe we can do it later, but right now net worth is all
17  he needs if he wants punitive damages because you can't
18  disgorge profits in a defamation or a falsehood action.
19          THE COURT:   Right, and --
20          MR. BISS:   Judge, I'm not asking --
21          THE COURT:   -- CNN's not good for, I mean it's
22  not like there's any concerns about their ability to pay
23  a judgment in this case.
24          MS. BOLGER:   Exactly, and we've also provided
25  our insurance agreement.  So he has our insurance

```
 1                          PROCEEDINGS                36
 2   agreement and our net worth, and that's all he needs.
 3           THE COURT:   Okay, Mr. Biss.
 4           MR. BISS:   Well, my position, Judge, is they
 5   can tell me a number, but obviously what matters is the
 6   truth.  And so that's what discovery to me is all about
 7   is searching for what the truth is here.  And so yeah --
 8           THE COURT:   There's lots of things that we
 9   care about the truth in, that we care about the truth
10   of.  But in this case CNN is insured so that you have
11   that information, and you have their net worth, and
12   obviously there's no risk that they're not going to be
13   able to pay a judgment.  It would be different if we
14   were concerned about their ability to pay a judgment.  I
15   don't think you have expressed any concern about that.
16           MR. BISS:   Judge, and, again, I agree with Ms.
17   Bolger on that, I have no concern, given the document
18   that they've provided me, that they would be able to pay
19   any judgment awarded.
20           THE COURT:   Okay.
21           MR. BISS:   But that's not, as I think I tried
22   to articulate, that's not really, I mean to me that's
23   not really the standard or shouldn't be the standard.
24   Rather the standard should be what's the truth here, and
25   so when I, when you make arguments to a jury, obviously
```

```
 1                          PROCEEDINGS                37
 2  you want to have the right, you want to have the truth,
 3  you want to be telling the truth, not what CNN said
 4  because it's good enough.
 5           THE COURT:   All right, well, I agree with you,
 6  the standard is always the truth, but I'm not concerned
 7  about there being any question about the truth of this.
 8  And every person on the jury is going to refer to CNN
 9  and make their inferences about its ability to pay any
10  damages to the plaintiff in this case if that's
11  appropriate.
12           Last issue is Mr. O'Sullivan's employment
13  agreement.
14           MR. BISS:   I'm not sure what the objection is.
15  Obviously, in other CNN cases they've been ordered to
16  produce the agreements.  They relate to his, relate to
17  malice obviously, his incentive to lie, and they're
18  relevant for other reasons as well.  But --
19           THE COURT:   How is it they're on his incentive
20  to lie?
21           MR. BISS:   Well, he might be getting bonuses,
22  he might be getting perks, and this was addressed in the
23  Dershowitz case directly.  And in the Dershowitz case
24  the relevance was that the anchors or the reporters,
25  whoever the people were involved or whatever their
```

PROCEEDINGS                    38

1

2  correct term was, they might be making these scandalous

3  statements about the Flynns and about General Flynn and

4  about Trump because to increase ratings.  And if they

5  increase ratings by X amount, they get a bonus at the

6  end of the year.  We don't know any of that without

7  looking at Mr. O'Sullivan's pay structure and how he was

8  compensated by CNN.  Dershowitz court said it's relevant

9  for that purpose, and it would be the same rationale

10 here.

11          THE COURT:   All right, have you served a

12 request for this, Mr. Biss?

13          MR. BISS:   Yes, I've served it, but in all

14 fairness we really haven't talked about it.  I've

15 emailed my concerns --

16          THE COURT:   Then I'm not deciding it today.

17 The parties can meet and confer on this issue, and if

18 you're not able to resolve it, you can raise it with me

19 again.  But we need to move along.

20          MR. BISS:   All right.

21          THE COURT:   Okay, Ms. Bolger, I'm sorry that

22 I'm just now getting to all the issues raised in your

23 letter about the plaintiffs' production, but let's try

24 to move as efficiently as possible.  So the first is

25 there are other social media accounts that you think the

```
 1                    PROCEEDINGS              39
 2  plaintiffs need to be searching.
 3          MS. BOLGER:  Email accounts.  My number one is
 4  that we have four email accounts that we have discovered
 5  mostly through correspondence with third parties that we
 6  have subpoenaed, and we would, and they happen to be
 7  QAnon figures that we'd like Mr. Biss to search those
 8  email addresses, and Steven hasn't told me whether he
 9  would agree to do that.
10          THE COURT:  Okay.
11          MR. BISS:  Yes, Judge, we agreed to do that.
12  I've already started that process.  For instance, with
13  Joe Flynn, I got a response from him already saying
14  that's an old employer's email.  He doesn't know where
15  it came from, I don't know where it came from.  But,
16  again, I'm doing that with regard to I think four or
17  five or six maybe emails that Ms. Bolger identified.
18  The process has already started.  I think there's one
19  account, as I recall, Joe Flynn, there was either a
20  General Flynn account that doesn't exist, the
21  mailsol.net account as I remember.  But we agreed to do
22  that.
23          THE COURT:  Okay.
24          MS. BOLGER:  We know those exist because we've
25  seen people send them emails to those accounts.
```

```
 1                        PROCEEDINGS                40
 2            THE COURT:   Okay, great.  Next, Ms. Bolger.
 3            MS. BOLGER:   The next for us, Your Honor, is
 4    that at the last conference you directed the plaintiffs
 5    to run search terms himself on any remotely accessible
 6    email accounts.  Steven had not done that when we met
 7    and conferred last week, and you ordered him to do that.
 8    So I would like him to do that by a date certain.
 9            THE COURT:   You mean plaintiffs' counsel.
10            MR. BISS:   And we agree to do that.  Ms.
11    Bolger or I think Ms. Cherner I think had suggested that
12    I get the passwords for the account and just pretend I'm
13    them, sign on to their Google accounts, and run it.  So
14    I'm going to do that.  The reason that I haven't done it
15    to date, Judge, is because of a summary judgment
16    deadline in the Northern District of Iowa which the
17    defendant's summary judgment motion included 200 and
18    some odd exhibits.  So it was just a massive
19    undertaking.  I haven't had any time to do it, but I
20    agree to do that, and I'm going to do that.  I've run
21    the search for I can't remember if it's Laurie Flynn or
22    Valerie Flynn.  It's one of the plaintiffs in the
23    Florida part of this case.  So which returned nothing
24    other than what we've produced.  But I'll do that for
25    all the other accounts as well.  I'll personally sign on
```

| | PROCEEDINGS 41 |
|---|---|

1    at my computer here in Charlottesville and search.

2          THE COURT:   All right, well, have fun with

3    that.

4          MR. BISS:   Yeah.

5          THE COURT:   Next, Ms. Bolger.

6          MS. BOLGER:   We would like - you had

7    instructed plaintiffs' counsel to advise us about what

8    search terms were used, and you actually explicitly at

9    the hearing just telling us that search terms from the

10   document productions wasn't enough.  And we haven't

11   heard from Mr. Biss as to what search terms he used

12   other than to reference the document productions which

13   is what you had said not to do.  And in addition, Your

14   Honor, we served additional requests that have

15   additional search terms.

16          So all I want Mr. Biss to do is sit down and

17   type up the search terms and what he told his clients to

18   do and what the date range was so we know what he's

19   doing.  I mean we, our concern all along is that Mr.

20   Biss just said to his clients, hey, run a few search

21   terms, and we have no sense that Mr. Biss is really

22   controlling the process.  So we'd like to know, we'd

23   like Mr. Biss to sit down and type out what the search

24   terms were, type out how he did, how they were doing the

```
 1                          PROCEEDINGS              42
 2   search, and give us the date range so we know what
 3   search terms were used against what account.
 4              THE COURT:   Mr. Biss.
 5              MR. BISS:   So, Your Honor, start with the date
 6   range thing.  So the date range is, as I advised Ms.
 7   Bolger, the date range that we ran is, or that I
 8   instructed them to run is the date range on the document
 9   requests.  It's so broad that sometimes they request
10   documents that don't exist because the companies that
11   they're looking for information on weren't created until
12   like 2020 but they go all the way back to 2016.  So I
13   used their date range, I used their search terms, and in
14   my email to Ms. Bolger, I said, you know, we ran the
15   same search terms as are stated in your request for
16   production of documents 13 and 14 or whatever the
17   numbers are, and it's a long list of search terms.  It
18   begins with, and I just always remember this, it begins
19   with somebody by the name of Acbug (phonetic) [sic], and
20   I think I just remember that because it's a very unique
21   last name.  I never heard of it before, and none of my
22   clients had ever heard of it before.  So ran --
23              (interposing)
24              MS. BOLGER:   Those aren't all the search terms
25   though.  Those were the people we asked you search for.
```

```
 1                          PROCEEDINGS                 43
 2  I just --
 3              MR. BISS:   Right, so --
 4              (interposing)
 5              MS. BOLGER:   Wait, there's other codes that I
 6  would ask you to run.
 7              THE COURT:   Guys, guys, if you talk over each
 8  other, it's not going to come up on the transcript.  Go
 9  ahead.
10              MR. BISS:   So we not only ran the search terms
11  on these various people, but we also ran the search
12  terms on various hash tag concepts beginning with Acun
13  and Forchan and Take the Oath and WWG whatever.  We ran
14  all those search terms.  And one thing that Ms. Bolger
15  raised in our meet and confer on the 14th was, well, did
16  you search for all of the conferences that we
17  subpoenaed, like the QCon Live and Reawaken Tour and all
18  that, and there's a whole big list of these conferences
19  that they searched for.  And, by the way, we've
20  responded to their discovery requests on all these
21  conference, we produced two documents which is all that
22  the Flynn, and any Flynn has.
23              So I agreed with Ms. Bolger I would expand the
24  search terms to include the names of all those
25  conferences that they've identified, like the latest one
```

```
 1                         PROCEEDINGS               44
 2   being the Digital Soldiers Conference.  And just so the
 3   Court understands what Digital Soldiers is, General
 4   Flynn, you can't say he invented the term --
 5             THE COURT:   Honestly, I can't get a full - I
 6   understand, you've mentioned it before --
 7             MR. BISS:   Okay.
 8             THE COURT:   -- and I don't' have time.  I have
 9   other parties dialing in in eight minutes, and we have a
10   lot to get through.  So can you just simply provide,
11   send to Ms. Bolger, as I told you to do at the last
12   conference, a list of the search terms that you plugged
13   in.  It sounds like you've taken them from a couple of
14   different places, just put it all in one email, and send
15   it to her --
16             (interposing)
17             MR. BISS:   I can do that.
18             THE COURT:   Okay.
19             MR. BISS:   Yes, Your Honor.
20             THE COURT:   All right.  Okay, next.
21             MS. BOLGER:   Next is Mr. Biss needs to provide
22   us with an email and a home number for Laurie Flynn for
23   her Parler consent.  He said he would do it, and he
24   hasn't.  Your Honor, for all of these things I'm just
25   hoping we can get like a date certain by which we're
```

PROCEEDINGS                45

1
2  going to get this information, but I understand, Mr.
3  Biss, you have agreed to give me that.  He just hasn't.
4          THE COURT:   Okay.  All right --
5          MR. BISS:   Judge, here's the problem on this
6  Parler is that she didn't have a Parler account.  So I
7  can't give her what email was used or what phone number
8  was used because she never did it.  And so --
9          MS. BOLGER:   So we see evidence – we see
10 evidence of a Parler account in her name.  If the email
11 accounts and the telephone number don't match, then we
12 won't get the information.  If they match, we will.  We
13 see some evidence of it.  So if we can have the email
14 address and the telephone number, and it's wrong, then
15 we don't use it; and if it's right, we get the
16 information.
17         THE COURT:   When – what is the date of the
18 Parler account that you see?
19         MS. BOLGER:   Parler's fairly new, Your Honor.
20 I'm not sure I know the approximate date, but it would
21 be in this relevant time period.  We don't have a date.
22         THE COURT:   Because what I'm trying to do is
23 if you know when – I'm trying to get at what the
24 information you have tells you when she had a Parler
25 account because what Mr. Biss can do is find out what

```
 1                        PROCEEDINGS                46
 2  Ms. Leslie Flynn's email and phone number were at that
 3  approximate time and that's the information you can give
 4  to Parler.
 5           MS. BOLGER:   The Parler account has her photo
 6  on it, but it doesn't not seem to have a date.
 7           THE COURT:   Okay.
 8           MS. BOLGER:   But we gave him the handle, but
 9  we know the handle.  So if we just get the email address
10  and the telephone number, then hopefully we'll get the
11  handle.
12           THE COURT:   Okay.  Can you provide that to Ms.
13  Bolger please, Mr. Bass?
14           MR. BISS:   I will, Your Honor.
15           THE COURT:   Okay, thank you.  All right --
16           MS. BOLGER:   The next thing, Your Honor, I'm
17  sorry, I didn't mean to talk over you, I was trying to
18  help.  I apologize.  The next thing for us is that Mr.
19  Biss provided us with a list of email accounts and
20  social media accounts he has searched.  But we had also
21  understood that Your Honor ordered, asked him to check
22  their text messages.  I asked Mr. Biss if he checked
23  their text messages and could provide me with those
24  phone numbers.  He has not done so.  I think that's
25  within the scope of your original order and would ask
```

```
 1                       PROCEEDINGS                 47
 2   that he do so by a date certain.
 3            THE COURT:   Okay, Mr. Biss.
 4            MR. BISS:   Judge, my response to that was I'd
 5   have to fly down to Florida and check their phones or
 6   ask them to send their phones to me to do this.  I've
 7   never done that, and I think that's grossly overbroad.
 8   I mean it's just completely unnecessary.  I mean they've
 9   run that search.  I don't have the resources to make
10   these trips and get their phones or have – and they
11   can't be without their telephones.
12            THE COURT:   I asked you to – you're really,
13   just the hyperbole is getting nauseating.  I asked you
14   to confirm that your clients had checked their texts.
15   That doesn't require you to get on a plane.  It requires
16   you to get on the phone or on a videoconference with
17   your client and ask, explain to them what searching for
18   text messages means and ask them if they did that.
19            MR. BISS:   I've done that.
20            THE COURT:   Okay.  All right.
21            MS. BOLGER:   And can we have the telephone
22   numbers that you searched along with mail accounts?
23   Because, Your Honor, we did have to search email
24   accounts, we did provide text messages.  And, by the
25   way, Mr. Biss did belatedly produce us one text message
```

```
 1                          PROCEEDINGS                 48
 2   that's certainly implies the existence of a bunch of
 3   other texts.  So it would be helpful at least for us to
 4   have some understanding of what devices were checked for
 5   texts.
 6             THE COURT:  Mr. Biss, can you provide Ms.
 7   Bolger with the list of phone numbers for which the
 8   texts were search?
 9             MR. BISS:  Yeah, I can do that, Your Honor.
10             THE COURT:  Okay, thank you.  All right, Ms.
11   Bolger --
12             (interposing)
13             MS. BOLGER:  Next is the client's computers,
14   laptops.  We don't have any idea whether that was done.
15             THE COURT:  Okay --
16             MR. BISS:  It was done.  It was done.  All
17   repositories were done, Judge, because that's broad
18   enough to answer all those questions.
19             THE COURT:  Okay.  And then third-party
20   subpoenas.
21             MS. BOLGER:  This was just a weird semantic
22   thing, Your Honor, that in the, his responses, in the
23   third-party and the party's responses to - actually,
24   Your Honor, can I list of devices that were searched?
25             THE COURT:  Sorry?
```

```
 1                        PROCEEDINGS                  49
 2          MS. BOLGER:   Sorry, I interrupted myself.
 3   Going back to the one we just talked about, the devices,
 4   could we also ask Mr. Biss to tell us what he was
 5   searched, what he searched, what list he searched?
 6          THE COURT:   No, no.  You can ask them at their
 7   depositions.
 8          MS. BOLGER:   Okay.  So in response to some of
 9   our requests, Mr. Biss said, provided the answer none
10   recalled.  And I don't know what none recalled means.
11   None recalled would mean I can't remember, not I
12   searched and I didn't find anything.  And it's just not
13   totally clear to me whether there was any actual
14   searching done or whether the answer was none recalled.
15   And given the fact that we don't know what search terms
16   were used, what dates range was used, what numbers were
17   used, that kind of stuff, that answer makes me nervous.
18          So I guess I'd just like some representation
19   from Mr. Biss that none recalled doesn't mean none
20   recalled.  It means I did the search and didn't find
21   anything because those are two very different things.
22          THE COURT:   Mr. Biss.
23          MR. BISS:   So, Your Honor, I explained how I
24   did the search, and when they say none recalled, people
25   like General Flynn or Joe Flynn, they might've had
```

PROCEEDINGS                    50

1
2  thousands and thousands of social media tweets and

3  retweets and what have you.  I mean they don't remember

4  how many.  But if somebody, if for some reason they

5  retweeted something by Cynthia Acbug [sic], they don't

6  remember doing it, but they don't want to be trapped

7  into saying none and then have CNN say gotcha, you

8  really did do it.  Here's one we found.  That's why they

9  were cautious.  They were just careful and said we don't

10  remember ever doing it.

11        So I mean I think that's the cautious and

12  prudent approach rather than saying, you know, we never

13  had any communications.  So I think there's a material

14  difference between saying none and saying, you know, I

15  might've communicated with them, but I don't have any

16  recollection of that.

17        THE COURT:  Okay, let me just interrupt you

18  for a second.  If any of the parties on the Trombetta

19  matter, which I have one – this is Magistrate Judge Cave

20  speaking, if you called in for that matter, you can hang

21  up and call back into this line at 11:10.  Sorry about

22  that.

23        Okay, so, Ms. Bolger, with that explanation, is

24  this something that you can just follow up in the

25  depositions about this?

```
 1                      PROCEEDINGS                51
 2          MS. BOLGER:   It doesn't to me answer the
 3   question, Your Honor.   I'm obviously going to be guided
 4   by you, and maybe it makes sense to you.   But none
 5   recalled, even the way Mr. Biss articulates it, they
 6   don't remember doing it, but did they look, did they
 7   check?   Right?   So you can remember a tweet, but you can
 8   also go onto your Twitter account and look, and I don't
 9   have a sense of whether they ever did that.   And since
10   we're relying on their searching and Mr. Biss says he's
11   not doing the searching, I have no understanding of
12   whether they actually looked for these things or like,
13   yeah, I don't remember whether I did it, I may have.   So
14   that's all I'm asking.
15          THE COURT:   It sounds like you're getting the
16   latter answer to me.   So I thought you were getting
17   Twitter authorizations.
18          MS. BOLGER:   We did get Twitter
19   authorizations, yes --
20          THE COURT:   You're going to get the contents
21   of their Twitter accounts.
22          MS. BOLGER:   Well, we haven't gotten them yet,
23   but --
24          (interposing)
25          MS. BOLGER:   Can I come back to this one if I
```

```
 1                       PROCEEDINGS                52
 2   need it, Your Honor?
 3           THE COURT:   Yes.  That's fine.  All right, so,
 4   Mr. Biss, you have, I guess CNN has a couple of items
 5   that it's following up on.  One is any published content
 6   for paragraphs 2 and 15 of the complaint, and Mr.
 7   O'Sullivan's social media for anything about Jack or
 8   Leslie Flynn.  And then Mr. Biss is working on the
 9   various searches.  What are the parties thoughts about
10   timing of getting this done?  Let me start with you, Mr.
11   Biss, because you have more work to do at the moment.
12           MR. BISS:   Yeah, Judge, as I mentioned before,
13   this summary judgment experience, I call it an
14   experience because it was, I spent about 21 days having
15   to respond to, put my opposition together.  So I'm back
16   up for air.  I left the office at about midnight
17   yesterday.  I'm back up for air.  But it's going to take
18   me some time to obviously do this.  I've already
19   initiated the process, and I've already, the Flynns have
20   already responded, many of them have responded.  Not all
21   of them but many of them have responded.  So I'll be
22   able to, I would just ask till December 15.  Just gives
23   me, because I just, you know, obviously I don't have the
24   luxury of, you know, people who, you know, can assist me
25   with all this stuff.
```

```
 1                        PROCEEDINGS                 53
 2              THE COURT:   Okay.
 3              MR. BISS:   So I'm not asking for any sympathy
 4    or pity for that.  I'm just saying that I just need some
 5    time as a human being to get all this done together with
 6    other responsibilities.
 7              THE COURT:   Okay.  Ms. Bolger, that's
 8    reasonable to me.  Obviously we're going to have to
 9    extend the deadline because we're supposed to be ending
10    fact discovery by December 15.  Obviously that's not
11    going to happen.  But I think that's a reasonable amount
12    of time.
13              MS. BOLGER:   Your Honor, if we extend the
14    discovery, obviously then I'd have no reason to push,
15    but this is just the plaintiffs' discovery, Your Honor.
16    You know, we haven't gotten anything.  We really need to
17    have a sense of what's happening.  So I would just, you
18    know, I was going to ask if we wanted to talk about
19    extending deadlines, that was my last question for you.
20    And we've been really diligent from CNN's point of view,
21    but we're just not getting much.  So I was going to ask
22    if we could extend deadlines like six months or so to
23    take the pressure off, and if we did that, then the
24    December 15 date obviously wouldn't (indiscernible).
25              THE COURT:   I don't think, six months seems
```

```
 1                        PROCEEDINGS                  54
 2  like a lot.  I was thinking like three --
 3            MS. BOLGER:   Well, Your Honor, if I'm not
 4  getting his stuff until December 15 --
 5            THE COURT:   But how many depositions do you
 6  have to take?  Jack and Leslie --
 7            MS. BOLGER:   Well, we served 28 third-party
 8  subpoenas, and we're going to have to move to compel on
 9  a couple of those.  So I have a trial in late January
10  also, so I was hoping to avoid that, and it's Christmas
11  in December.  I don't always find people to be
12  responsive which was kind of the thinking behind the six
13  months.  But four months, something like that would be
14  fine.
15            THE COURT:   We'll do April.  Six months seems
16  to me to be too long, and if I give you that much time,
17  you'll use it.  So miraculously things always seem to
18  get done in the amount of time that we have.  So I'll
19  extend it until around April 15.  We'll figure out like
20  a reasonable day of the week that week for the extension
21  of the fact discovery deadline, and we'll move
22  everything else accordingly.  Is that all right with
23  you, Mr. Biss?
24            MR. BISS:   It is, Judge.
25            THE COURT:   Okay.  Great.  So December 15 for
```

```
 1                      PROCEEDINGS                  55
 2  all the things that we listed for the plaintiffs to do
 3  today, and I'll make the same deadline for CNN on their
 4  couple of follow-up items.  We'll extend the fact
 5  discovery deadline to April, around April 15, and the
 6  other deadlines accordingly.  And I will do my best to
 7  get a ruling to you on the privilege documents by next
 8  week or so.
 9            Is there anything else, Mr. Biss, on your
10  agenda?
11            MR. BISS:  No, Your Honor, thank you.
12            THE COURT:  All right, Ms. Bolger.
13            MS. BOLGER:  Just one question which is in the
14  last order, Your Honor, you had ordered Mr. Biss to
15  produce something about social media accounts by
16  November 30.
17            THE COURT:  Okay.
18            MS. BOLGER:  I guess is that deadline now the
19  15th, changed to December 15?
20            THE COURT:  I don't remember --
21            MR. BISS:  Judge, I can do, I can get that to
22  Ms. Bolger by the 30th.  However, I don't see any reason
23  why if I can do it all by the 15th, that'll, I would
24  request that.  That would be - but --
25            MS. BOLGER:  I don't disagree.  That's fine
```

```
 1                       PROCEEDINGS                56
 2  with me.  I just didn't know, I just wanted to not be
 3  confused.  So that's fine with me.
 4            THE COURT:   Let's make it all the cleanup by
 5  December 15 of anything from last time and this time.
 6  Okay?  Good, thank you all.  Have a nice Thanksgiving.
 7  Thanks for working with me so efficiently today, and
 8  have a nice holiday.  We'll be adjourned.
 9            MR. BISS:   You too, Your Honor, thank you.
10            MS. BOLGER:   Happy Thanksgiving, everybody.
11  Bye.
12            MR. BISS:   Bye bye.
13            (Whereupon, the matter is adjourned.)
14
15
16
17
18
19
20
21
22
23
24
25
```

1                                                          57

2

3                    C E R T I F I C A T E

4

5          I, Carole Ludwig, certify that the foregoing

6    transcript of proceedings in the case of FLYNN, et al.

7    v. CABLE NEWS NETWORK, Docket #21cv2587, was prepared

8    using digital transcription software and is a true and

9    accurate record of the proceedings.

10

11

12                    *Carole Ludwig*

13   Signature_____

14                    Carole Ludwig

15   Date:     November 29, 2022

16

17

18

19

20

21

22

23

24

25