# EXHIBIT 118

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF NEW YORK

 3     _____

 4     JOHN P. "JACK" FLYNN, ET AL,

 5              Plaintiffs,

 6         v.                              Index No.

 7     CABLE NEWS NETWORK, INC.,          1:21cv02587

 8              Defendant.                 GHW

 9     _____

10                  VIDEOTAPED DEPOSITION OF

11                      JESSE BINNALL

12     DATE:          Monday, June 26, 2023

13     TIME:          10:03 a.m.

14     LOCATION:      Remote Proceeding

15                    Washington, D.C. 20005

16     REPORTED BY:   Matthew Yancey, Notary Public

17     JOB NO.:       5974792

18

19

20

21

22
```

Page 2

```
1        A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF JOHN P. "JACK" FLYNN:
3     STEVEN S. BISS, ESQUIRE (by videoconference)
4     Steven S. Biss Law Offices
5     300 West Main Street, Suite 102
6     Charlottesville, VA 22903
7     stevenbiss@earthlink.net
8     (804) 501-8272
9
10  ON BEHALF OF DEFENDANT CABLE NEWS NETWORK, INC.:
11     KATHERINE M. BOLGER, ESQUIRE (by
12     videoconference)
13     Davis Wright Tremaine, LLP
14     1251 Avenue of the Americas, 21st Floor
15     New York, NY 10020
16     katebolger@dwt.com
17     (212) 402-4068
18
19
20
21
22
```

Page 3

```
1        A P P E A R A N C E S (Cont'd)
2  ON BEHALF OF DEFENDANT CABLE NEWS NETWORK, INC.:
3     MEENAKSHI KRISHNAN, ESQUIRE (by
4     videoconference)
5     Davis Wright Tremaine, LLP
6     1301 K Street, Northwest, Suite 500
7     Washington, D.C. 20005
8     meenakshikrishnan@dwt.com
9     (202) 973-4239
10
11  ALSO PRESENT:
12     David Campbell, Videographer (by
13     videoconference)
14     Alexa Pastor, Technician (by videoconference)
15
16
17
18
19
20
21
22
```

Page 4

```
1           I N D E X
2  EXAMINATION:              PAGE
3     By Ms. Bolger       8
4
5         E X H I B I T S
6  NO.      DESCRIPTION           PAGE
7  Exhibit 430
          Jesse Binnall Expert Report   10
8  Exhibit 431
          Tracy Diaz Objection Letter
9         Re Flynn v. CNN       21
10  Exhibit 432
          Binnall Tweet 4/30/2020    29
11  Exhibit 433
          Binnall Tweet 1/24/2023    33
12  Exhibit 434
          Binnall Tweet 3/3/2023     36
13  Exhibit 435
          Binnall Tweet 3/3/2023 -
14        Tweet From General Flynn
15        Dated March 3rd        38
16  Exhibit 436
          Binnall Tweet 9/28/2020    40
17  Exhibit 437
          Binnall Tweet 7/3/2021     41
18  Exhibit 438
          Binnall Tweet 5/16/2022 -
19        Dan Rather           43
20  Exhibit 439
          Binnall Tweet 3/26/2022    45
21  Exhibit 440
          In Re Steven Scott Biss,
22        2022 WL 1097470 (3/9/2022)   67
```

Page 5

```
1         E X H I B I T S (Cont'd)
2  NO.       DESCRIPTION          PAGE
3  Exhibit 441
          Lokhova v. Halper, 441 F.
4         Supp. 3d 238 (E.D. Va. 2020) 70
5  Exhibit 442
          Anderson v. School Board
6         Gloucester County, 2020 WL
7         4719091            73
8  Exhibit 443
          Lokhova v. Halper, 995 F.3d
9         134 (4th Cir 2021)        86
10
11      D O C U M E N T S   R E Q U E S T E D
12  NO.      DESCRIPTION          PAGE
13  1        Summaries          79
14
15
16
17
18
19
20
21
22
```

2 (Pages 2 - 5)

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  We are going on the
3 record at 10:03 a.m. on June 26, 2023.  This is Media
4 unit number 1 of the videorecorded deposition of Jesse
5 Binnall.  This is taken in the matter of John P.
6 "Jack" Floyd [sic] -- John P. "Jack" Flynn, et al, vs.
7 Cable News Network, Inc.  This is a remote Zoom video
8 deposition in the Eastern time zone.
9          My name is David Campbell representing
10 Veritext, and I am the videographer.  The court
11 reporter today is Matt Yancey, also with Veritext.
12          Counsel, at this time will you please
13 announce yourselves for the record after which the
14 court reporter will please swear in the witness and we
15 can proceed.
16          MS. BOLGER:  Katherine Bolger and Meena
17 Krishnan from Davis Wright Tremaine on behalf of CNN.
18          MR. BISS:  I'm Steve Biss.  I represent
19 the plaintiffs.
20          MS. BOLGER:  I think that's it.
21          THE REPORTER:  All right.  Good
22 morning, everyone.  Again, my name is Matt Yancey; I

1 am a reporter assigned by Veritext to take the record
2 of this proceeding.
3          I am a notary authorized to take
4 acknowledgments and administer oaths in the District
5 of Columbia.  Parties agree that I will swear in the
6 witness remotely.
7          Additionally, absent any objection on
8 the record before the witness is sworn, all parties
9 and the witness understand and agree that any
10 certified transcript produced from the recordings of
11 this proceeding:
12          - is intended for all uses permitted
13 under applicable procedural and evidentiary rules and
14 laws in the same manner as a deposition recorded by
15 stenographic means; and
16          - shall constitute written stipulation
17 of such.
18          Thank you.  Hearing no objection, I
19 will now swear in the witness.
20          Mr. Binnall, please raise your right
21 hand.
22 WHEREUPON,

1          JESSE BINNALL,
2 called as a witness, and having been first duly sworn
3 to tell the truth, the whole truth, and nothing but
4 the truth, was examined and testified as follows:
5          THE REPORTER:  All right.  Thank you.
6          You may proceed.
7          EXAMINATION
8 BY MS. BOLGER:
9     Q    So I say Mr. Binnall but I've heard Mr.
10 Binnall and I want to get it right.  So how should I
11 refer to you, sir?
12     A    Binnall is -- is correct.
13     Q    Okay.  Great.  So Mr. Binnall, as I said,
14 I'm Kate Bolger.  I'm a lawyer; I represent CNN in
15 this litigation.  I know this is not your first rodeo
16 when it comes to depositions.  Have you actually ever
17 been a deponent before?
18     A    I was thinking about that, and I believe I
19 have had my deposition taken at least once.  Of
20 course, I've taken many depositions and there was a
21 proceeding that I was a witness in that I believe I
22 gave a deposition for at least once.

1     Q    And what was that proceeding?
2     A    It had to do with 4600 Duke Street, which it
3 was a condominium complex in Alexandria, Virginia.  I
4 do not remember the exact caption.
5     Q    Okay.  Well, I don't need to give you the
6 usual instructions because I know you know about
7 depositions.  But I will give you one that's sort of
8 the Kate Bolger warning, which is that I do tend to
9 speak very quickly.  It is a function of being from
10 New York, I think.  So if I get to quick, you want to
11 slow me down, I will.  Give it, you know, the old
12 college try to slow it down.
13          So what did you do to prepare for today's
14 deposition?
15     A    I reviewed my -- my report.  And I also
16 looked at the amended complaint in the case.  I did
17 have a brief conversation with counsel for the
18 plaintiffs as well.
19     Q    Mr. Biss that is?
20     A    That's correct.
21     Q    Okay.  Then you're here today to give expert
22 testimony at the Plaintiff's request, right?

Page 10

1    A   That's correct.

2    Q   Okay.  I'm going to ask -- just show you

3 your report so we can just identify it for the record

4 and then I'm going to ask you some questions about it.

5 I can leave those portions of the report relevant to

6 my questions on the screen or we can talk generally

7 about it, however we feel it works.  The purpose

8 really is just to mark the exhibit.

9        MS. BOLGER:  So Alexa, can you put tab

10 1 up?

11        MS. PASTOR:  Just a moment --

12 BY MS. BOLGER:

13    Q   For the record, this is the Plaintiff's Rule

14 26(a)(s) Expert Disclosure dated January 3, 2023, and

15 it attaches your expert report.

16        (Exhibit 430 was marked for

17        identification.)

18        MS. BOLGER:  Alexa, if you just scroll

19 down to the third page, you'll see the front of his --

20 top of his expert report -- fourth page.  Sorry.

21 There it is.

22 BY MS. BOLGER:

Page 11

1    Q   And just for record purposes, Mr. Binnall,

2 this is your expert report; correct?

3    A   It appears to be so, yes.  Just the first

4 page, but yeah.

5    Q   Right.  Take my word for it, please, that

6 the rest of it is there.  And what were you asked to

7 opine on?

8    A   I was -- I was asked to opine on the

9 reasonableness of the attorneys' fees incurred by the

10 plaintiffs in this case, Jack and Leslie Fynn.  And

11 for the -- the attorneys' fees that they have incurred

12 and will incur in the process of this litigation.

13    Q   Great.  And what was your expert conclusion?

14    A   My expert conclusion is that the arrangement

15 that the plaintiffs have with their counsel, Mr. Biss,

16 is reasonable -- is a reasonable agreement that it's

17 to my reasonable degree of professional certainty.

18    Q   And what is that conclusion based on?

19    A   That is based on everything that I put in

20 the report.  And, of course, the report goes into more

21 detail than -- than I can, despite memory sitting

22 right here with everything in the report.

Page 12

1        But I -- I certainly looked at the factors that

2 are applicable in -- in Rhode Island law, and I also

3 based it on my -- my own experience litigating cases,

4 whether it be defamation cases or other cases.  And

5 what is -- is reasonable to incur as far as attorneys'

6 fees and what is reasonable as far as the work that

7 needs to be done in order to litigate a case like

8 this.

9    Q   And you're not admitted to the Bar in Rhode

10 Island; right?

11    A   No, ma'am.  I am not.

12    Q   Okay.  And what facts did you base your

13 conclusion on?

14    A   The facts as -- as fully described in my

15 report.  I certainly did look at the complaint.  I did

16 review parts of the docket.  I looked at some of the

17 facts that were available that needed to be litigated,

18 the motions that had to be litigated, and that in

19 addition to everything else that's in my report.

20    Q   And did you review any depositions in this

21 case?

22    A   No, I did not.

Page 13

1    Q   Do you, as you sit here, know what documents

2 CNN looked at in publishing your report at issue here?

3    A   Do I -- I'm sorry.  I'm going to ask you to

4 rephrase that question.  Specifically it has to do

5 with the report at issue here.

6    Q   So this is a defamation lawsuit as you know.

7    A   Yes.

8    Q   Sorry, it's a false light lawsuit.  As you

9 know, it was a defamation lawsuit.  It is now a false

10 light lawsuit and it's about a report on CNN that

11 aired in February of 2021.  Have you seen that report?

12    A   I -- I am aware of the report.  I believe

13 I've actually seen the video of it.  I have also seen

14 the -- the text and the chyron and what not involved

15 in that, yes.

16    Q   Where did you see that?

17    A   I saw images of it, I believe, in the

18 complaint and, you know, I don't -- I honestly don't

19 remember sitting here today if I've -- if I've seen

20 the video.  I've certainly seen a lot of similar

21 things on social media and that's just in the -- in

22 the public domain.  So I believe I saw it, but I don't

Page 14

1  remember, and I don't remember where I saw it if I
2  did.
3    Q   Okay. Do you remember what happens in it?
4    A   I -- I mean, if you're discussing the video
5  itself of the report and the chyron, I can't give you
6  a word for description. I'm sure there's something I
7  could -- review to refresh my recollection on it
8  exactly but I wouldn't want to. And I don't think
9  there would be any beneficial -- benefit to me trying
10 to recite it from memory.
11   Q   Okay. I don't need you to recite it from
12 memory. I was just wondering on a high level if you
13 remember what happened in the report at issue in this
14 litigation?
15   A   At a high level, there was a video report
16 and a chyron that accused members of the Flynn family
17 of being supporters of QAnon based on a video.
18   Q   Okay. Do you know -- this was my original
19 question, which I think caused this foray into the
20 report. Do you know what documents CNN looked at
21 before they published the report?
22   A   No, I do not.

Page 15

1    Q   Okay. So you're not here to express any
2  opinion on the meaning of the report; right?
3    A   Of CNN's report, no, I'm not.
4    Q   And you're not here to express an opinion on
5  the truth of CNN's report; right?
6    A   No, ma'am, I'm not.
7    Q   Nor are you here to express an opinion on
8  CNN's intent in publishing the report; right?
9    A   No, ma'am.
10   Q   Okay. So as I understand it, you are here
11 just to talk about the reasonableness of Mr. Biss's
12 fees; is that correct?
13   A   That's correct.
14   Q   No other expert conclusions; right?
15   A   That's correct.
16   Q   Okay. Have you ever been an expert before?
17   A   I have.
18   Q   In what circumstances?
19   A   As I -- as I told you, I think earlier, I
20 was an expert in a dispute regarding a condominium
21 complex at 4600 Duke Street in Alexandria. That was
22 around about 2009, 2010, I believe. And on that, I

Page 16

1  gave expert opinion -- expert opinion on parliamentary
2  procedure issues.
3    I also have given expert testimony on the rules
4  of the Republican National Committee before as well.
5    Q   And both of those circumstances -- I'm
6  sorry, I hadn't realized that the testimony you gave
7  about the Duke Street apartment was expert opinions,
8  so I apologize if I asked that question twice.
9    So in both of those circumstances, were you
10 giving an expert opinion on parliamentary procedures?
11   A   Effectively, yes. The -- the Duke Street on
12 was certainly on parliamentary procedure and I think
13 effectively, the Republican National Committee one was
14 -- was also based on my -- my knowledge as a
15 parliamentarian in addition to my -- my knowledge of -
16 - of party rules. So I would say effectively, yes,
17 that it was as a professional parliamentarian.
18   Q   Mr. Binnall, in another world you and I have
19 similarities. I was one a parliamentarian at the
20 University of Virginia, so there you go.
21   A   Oh.
22   Q   So Mr. Binnall, in your expertise as a

Page 17

1  parliamentarian has nothing to do with today's expert
2  report; right?
3    A   No, ma'am. It does not.
4    Q   Okay. In your report, and I can show you
5  it's on page 4 of your report, you reference
6  litigating many attorneys' fees disputes. What were
7  those?
8    A   Let's see. I have -- most recently, I've
9  been involved in litigating of attorney's fee dispute
10 involving sanctions in Virginia where our client has
11 asked for, and actually received at this point,
12 sanctions. And so, the issue of reasonableness of
13 attorneys' fees was at stake.
14   I've also litigated attorneys' fees issues on a
15 number of matters that have -- that have settled. And
16 there's -- yeah, I -- much of my practice involves
17 Civil Rights actions, such as Section 1983 where
18 attorneys' fees can be awarded pursuant to 18 -- 42
19 USC 1988. And so, the attorneys' fee issue comes up
20 substantially.
21   There was, you know, an issue in recent years
22 that comes to mind where we successfully defeated a

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 18

1 claim of a defendant for attorneys' fees under section
2 1988. Those are -- are ones that come to mind right
3 now.
4 Q What is the name of the first litigation you
5 discussed which has an ongoing sanctions question?
6 A Bella Gravida vs. Evans, I believe is the
7 name of it -- the caption. I -- yeah.
8 Q Okay. Where is it pending?
9 A Fairfax County Circuit Court.
10 Q All right. How did you come to be retained?
11 A Plaintiff for counsel, Mr. Biss, reached out
12 and asked if I could be engaged as a expert in this
13 matter and I agreed.
14 Q And your rate is $650 an hour?
15 A Yes, ma'am.
16 Q How much have you been paid?
17 A I have not sent a bill in this case yet. I
18 have not done anything so far.
19 Q Okay. How much do you expect to charge?
20 A I -- I don't know. So far, other than
21 preparing for this deposition, I've -- I have expended
22 less than ten hours on this case, and I have not

Page 19

1 totaled my hours for preparing for this deposition
2 today. And of course, there's the taking of the
3 deposition today.
4 Q Okay. And the preparation time for the
5 deposition, do you expect to be more or less than ten
6 hours?
7 A For the preparation time it will be less.
8 Q Okay.
9 A And I certainly hope the taking --
10 Q Sorry. Certainly, what?
11 A And I hope the taking of the deposition as
12 well, so --
13 Q You know, I'm known for my long depositions
14 Mr. Binnall, but I don't think I've got that much for
15 you today, so I'm sorry to disappoint.
16 So you have a colleague named Jason Greaves;
17 right?
18 A Yes, that's right.
19 Q Okay. And how many folks are in your law
20 firm?
21 A Nine.
22 Q All partners --

Page 20

1 A I should say -- should say nine lawyers that
2 we engage in one way or another.
3 Q Okay. And is Mr. Greaves an associate, a
4 partner, or of counsel?
5 A He's a -- he's a partner.
6 MS. BOLGER: Okay. You can put --
7 you can take down Exhibit 1.
8 BY MS. BOLGER:
9 Q Mr. Binnall, are you aware that
10 Mr. Greaves represented a third-party in
11 this very matter?
12 A You know, I -- I don't know that
13 off the top of my head. That's something
14 that I could check on, but I don't know
15 that.
16 MS. BOLGER: Okay. Alexa, can you put
17 up tab 58 for me, please?
18 MS. PASTOR: Just a --
19 BY MS. BOLGER:
20 Q This is the -- as you'll see, I'm going to
21 mark as Exhibit 431, a letter I received on October
22 10, 2022, which as you see is from Jason Greaves Of

Page 21

1 Counsel in the top right corner from the Binnall Law
2 Group. The subject line is "Objection to subpoena
3 duces tecum issued to Tracy Diaz, Flynn vs. CNN, No.
4 1:21-cv-2587 (S.D.N.Y.)." And it begins: "Dear
5 Ms. Bolger, I represent Tracy Diaz regarding the
6 unhinged subpoena you have issued to her in the above-
7 captioned case. The purpose of this letter is to raise
8 legal objections to the vastly overbroad and invasive
9 third-party discovery requests - over 200 in total -
10 that you seek to impose on Ms. Diaz. She will not be
11 responding to those requests as written." Do you see
12 that?
13 (Exhibit 431 was marked for
14 identification.)
15 A Yes, I see that.
16 Q Okay. Were you aware that this letter was
17 sent to me?
18 A I -- I was aware that we represent -- and
19 Jason specifically, represents Tracy Diaz. And I -- I
20 believe that I -- I knew about this specific
21 representation. I did not review this letter.
22 Q Okay. Sorry. I thought about it a minute

6 (Pages 18 - 21)

1 ago, you said you didn't remember it.  Has this

2 refreshed your memory?

3     A   This is -- this has refreshed my

4 recollection of course.  A minute ago, you said a

5 third-party.  Now that that  third-party has been

6 identified, it has refreshed my recollection.

7     Q   Okay.  Does your firm represent Ms. Diaz in

8 a bunch of contexts?  In other words, is she a regular

9 client?

10     A   I believe we -- we represent her in more

11 than one matter.

12         MS. BOLGER:  Okay.  You can -- Alexa,

13 take that down, please.  Thank you very much.

14 BY MS. BOLGER:

15     Q   You also represent General Glynn; correct?

16     A   Yes, ma'am.

17     Q   And how long have you done that?

18     A   Since June of 2019.

19     Q   And obviously without revealing any client

20 communications, which I'm not interested in at all,

21 how did it come to pass that you ended up representing

22 General Flynn?

1     A   I was engaged to help him regarding the case

2 that was ultimately -- the Department of Justice

3 ultimately moved to dismiss the case against him and

4 where President Trump then pardoned him on -- brought

5 by the special counsel.

6     Q   So you were engaged to represent General

7 Flynn in the actual criminal prosecution; correct?

8     A   Correct, yes.  In the criminal case.

9     Q   And you were engaged -- and forgive me if

10 I've got my timing wrong -- after General Flynn took

11 the plea deal; right?

12     A   That -- it was after the -- the plea and so

13 we represented him -- yes, after that point.  The plea

14 was something that was handled by Covington and

15 Burling.  And once he ended the representation of

16 Covington and Burling, that's when we brought in.

17     Q   Okay.  And the "we" you're referring to is -

18 - I'm sorry, Mr. Binnall, I'm in between glasses.  So

19 I apologize for making weird head bobbing noise at

20 you.

21       Your co-counsel were Sidney Powell; is that

22 right?  Your co-counsel was Sidney Powell?

1     A   Yes.  Sidney was lead counsel in the case.

2     Q   Okay.  And Molly McCann?

3     A   Yes, ma'am.

4     Q   And Ms. McCann used to work at Ms. Powell's

5 shop and now works at yours; correct?

6     A   Yeah.  That's correct.  She's an Of Counsel

7 in my shop.

8     Q   And what is your opinion of General Flynn?

9     A   He's a great American.

10     Q   And have you met members of his family?

11     A   Yes, I have.

12     Q   Who have you met?

13     A   I've met a number of members of his family.

14 Over four years, I've met a number of them.  So rather

15 than just give you a laundry list, who specifically

16 are you wondering about?

17     Q   Well, I would take the laundry list.  But

18 have you met Joe Flynn?

19     A   Yes.

20     Q   Have you met Barbara Flynn Redgate?

21     A   Yes.

22     Q   Have you met Jack Flynn?

1     A   Yes.

2     Q   Have you met Leslie Flynn?

3     A   Yes, I believe so.

4     Q   Have you met Valerie Flynn?  It's Joe

5 Flynn's wife among other --

6     A   Yes.  Yes.  Yes.  That's right.  I've met

7 Valerie, yes.

8     Q   And how about Lori Flynn?

9     A   Yes.

10     Q   And where have you met the Flynns?

11     A   I've met them at my office.  I have met them

12 at other locations.  I have met them at political

13 events.  I've seen them on a number of occasions over

14 the last four years.

15     Q   And you've mentioned at your office.  And

16 again, I'm not looking to intrude on attorney client

17 communications, but have you represented any of the

18 individual Flynn family members I just mentioned?

19     A   I -- I would say that we have an attorney

20 client relationship with Lori Flynn.  And I do not

21 believe, sitting here today, that we have had an

22 attorney client relationship with any of those other

Page 26

1 individuals, certainly not in their individual
2 capacity.
3    Q    What do you mean by that?  What do you mean
4 by "certainly not in their capacity"?  They are
5 individuals.  You represent some Flynn family
6 something?  You know, some kind of business or
7 non-profit and you're saying that you don't represent
8 them personally, but you do represent the non-profit?
9    A    I'm saying, you know, whether I have --
10 without doing a full conflict search right now and so,
11 answering your question as truthfully, what I'm trying
12 to -- to think specifically in my head is whether we
13 have an attorney client relationship with any entities
14 on which they may be a client representative.  And I
15 don't know that sitting here today whether that would
16 be the case.
17    But I -- as far as my memory right here without
18 thinking of any particular matters, I do not think
19 that other than General Flynn and Lori Flynn, that we
20 have an attorney client relationship with any other
21 Flynn family member.
22    Q    Okay.  And when did President Trump pardon

Page 27

1 General Flynn to the best of your memory?
2    A    About Thanksgiving of 2020.
3    Q    Okay.  So you represented him from June of
4 2019 to about Thanksgiving of 2020 in the criminal
5 litigation; correct?
6    A    I believe that the judge in that case
7 formerly dismissed the matter after the pardon on
8 about December 8th of 2020.  And so, it was at that
9 point that I would say that matter concluded after the
10 -- the order dismissing the case was -- was entered.
11    There may have been some -- and I can almost
12 guarantee that there was probably follow on work that
13 probably needed to be done to wind down that
14 litigation, but that was the effective end day.  It
15 was when the -- when the order of dismissal was
16 entered.
17    Q    Okay.  Were you paid for that work?
18    A    Yes, ma'am.
19    Q    And were you paid from the legal defense
20 fund that General Flynn established?
21    A    I believe so.  I think that's -- I was paid
22 primarily through lead counsel, and I believe that

Page 28

1 that money was coming through -- my understanding
2 without guessing, but my understanding is that --
3 well, actually, you know, what?  I'm not going to
4 guess.  I'll just say that the checks came from lead
5 counsel in that case.
6    Q    Okay.  And lead counsel in the case was
7 Sidney Powell?
8    A    Yes, ma'am.
9    Q    And how much was your law firm paid?
10    A    Oh, I don't know, ma'am.  I couldn't tell
11 you sitting here today how much the total bills were
12 in that case.
13    Q    Can you give me a ballpark figure?  Was it
14 more than $50?
15    A    It certainly was more than $50.  There --
16 there was a lot --
17    Q    Was it more than half --
18    A    I'm sorry?
19    Q    Was it more than half a million dollars?
20    A    I do not believe so, no.
21    Q    Okay.  Somewhere between 250 and 500?
22    A    Don't know.  Don't know as I'm sitting here

Page 29

1 today.  I'd have to -- I'd have to look at our
2 billing, of course, to tell you how much it was.
3    Q    And you billed Ms. Powell directly?
4    A    We sent the invoices to her, and she paid
5 them.
6    Q    Okay.  Are you still in touch with Ms.
7 Powell?
8    A    I have not talked to Ms. Powell in over a
9 year.
10    Q    Again, without getting into attorney client
11 communications, any particular reason you haven't
12 spoken to Ms. Powell?
13    A    No, ma'am.
14         MS. BOLGER:  Alexa, would you mind
15 putting up tab 42 for me?
16         MS. PASTOR:  Just a --
17 BY MS. BOLGER:
18    Q    Just the next page, please.  Just for the
19 record, Exhibit 432 is a printout of a tweet you made.
20         (Exhibit 432 was marked for
21         identification.)
22    I creeped on your tweeting, Mr. Binnall.  And

8 (Pages 26 - 29)

1 you'll see that here's a tweet that -- the initial
2 tweet is from the President saying "What happened to
3 General Michael Glynn, a war hero, should never be
4 allowed to happen to a citizen of the United States
5 again!"
6     And you retweeted it and said -- or I guess your
7 quote tweeted it and said: "The President knows that
8 General Flynn is one of the finest men that you'll
9 ever meet in your life.  He always put his country
10 before himself.  That he and his family should have
11 been put through this hell is an infuriating disgrace.
12 It should never happen again."  Do you see that?
13     A   It should never ever happen again, yes.
14     Q   Sorry.  I forgot the "ever."  I apologize.
15 I creeped wrongly on your tweeting, Mr. Binnall.  I
16 apologize.
17     A   No worries.
18     Q   Do you agree with that sentiment?
19     A   Yes, I do.
20     Q   Why did you include his family in the tweet?
21     A   I included his family in that -- in that
22 tweet because what he and his family went through was

1 -- was quite incredible.  There's specific things in
2 the litigation that involved his family and what the
3 Special Counsel's Office did inappropriately with his
4 family.
5     Q   Can you tell me more about that, please?
6     A   Sure.  The Special Counsel's Office
7 threatened to prosecute his son.  And overtly, they --
8 it was very clear that they -- did that to convince
9 General Flynn to give them a proffer.  And within the
10 course of our representation, it came out that the
11 Special Counsel's Office and the -- General Flynn's
12 counsel had a handshake agreement to not prosecute
13 Michael Flynn Jr., if General Flynn would -- would
14 plead guilty to the one count under 18 USC 1001.
15     Handshake deals, things that aren't put out in a
16 plea agreement are absolutely inappropriate.  It's
17 something that the Special Counsel's Office knew,
18 Covington and Burling knew.  It was something that was
19 -- that was absolutely inappropriate for them to do
20 that.
21     So that's a -- I think, one of the biggest
22 examples of what his family had to endure with them

1 trying to leverage him against his -- against his
2 family.
3     Q   Okay.
4     A   Very sorry.
5     Q   Your firm also represented General Flynn in
6 a defamation lawsuit against a person named Everett
7 Stern; correct?
8     A   That's correct.
9     Q   And what was that defamation lawsuit about?
10     A   And to be -- to be sure that I am clear on
11 this, my firm represented him in the Flynn vs. Stern
12 case.  I, myself, was not counsel of record in that
13 case.  But it had to -- it had to do with defamatory
14 statements made by Mr. Stern against General Flynn,
15 accusing him of a number of things.  And I don't -- I
16 couldn't tell you based on my memory alone and what
17 the averments were in that complaint.  I could
18 certainly refresh my recollection.
19     Q   Okay.
20         MS. BOLGER:  Alexa, would you mind
21 please putting up tab 49?
22         It's very exciting waiting for the

1 exhibits to load.  It's like a, you know, on the edge
2 of your seat kind of thing.
3 BY MS. BOLGER:
4     Q   Okay.  This is Exhibit 433.  It
5 is another printout of a tweet.
6         (Exhibit 433 was marked for
7         identification.)
8         MS. BOLGER:  If you can look at the
9 next -- go to the next page, Alexa.
10 BY MS. BOLGER:
11     Q   Okay.  So here is the -- your tweet was:
12 "Note to the left: the days of being free to impugn
13 General Flynn's good character are over.  Today,
14 @GenFlynn settled his defamation lawsuit against
15 Everett Stern for $150K.  From here forward, if you
16 want to defame an American her, have your checkbook
17 ready."
18     And General Flynn quotes you saying: "@jbinnall
19 You're right, those days are over.  Thank you and your
20 entire team of warriors willing to wage these
21 necessary legal battles."  Do you see that?
22     A   Yes.

1    Q   Okay.  Did you have a agreement with the
2  Plaintiff's counsel that you guys were allowed to
3  tweet about the dollar amount?
4    A   There -- actually, there was a specific
5  agreement that there would not be a confidentiality
6  agreement in that -- in that settlement.
7    Q   And you don't remember what the alleged
8  defamatory claims were?
9    A   I could refresh my recollection on it.  If
10  you give me moment, I'd be happy to.
11    Q   I can do that too.  I just wondered if you
12  remembered it at the top of your head.  Okay.
13        MS. BOLGER:  Alexa, you can put that
14  one down.
15  BY MS. BOLGER:
16    Q   Okay.  So you also represent General Flynn
17  in his current lawsuit against The United States;
18  right?
19    A   Yes, ma'am.
20    Q   Are you involved in that personally or is it
21  just your colleagues?
22    A   I am not counsel of record on that case.

1  And whether or not I will make an appearance in that
2  case, pro hac vice has not been determined yet.  I
3  certainly am aware of that case.
4    Q   And what's that case about?
5    A   That case is about the wrongful actions
6  taken by the Department of Justice in the Crossfire
7  Hurricane and Crossfire Razor investigations against
8  General Flynn and continuing on into the Special
9  Counsel investigation and the wrongful prosecution of
10  him.
11    Q   You all filed that in Florida; right?
12    A   Yes, ma'am.
13    Q   And who's the judge?  Do you know?
14    A   I would -- I would not want to off the top
15  of my head try to remember the names.  I'm notoriously
16  bad at remembering names and even worse at repeating
17  them accurately.  So I'd want to refresh my
18  recollection on that rather than say it from memory.
19    Q   Okay.
20        MS. BOLGER:  Alexa, would you mind
21  putting up tab 50?
22        I may have just given you the wrong

1  tab.  Can you see what the next page is just to make
2  sure I got this right?  Yeah.  That's right.
3  BY MS. BOLGER:
4    Q   Okay.  So for the record, Exhibit 434 is
5  another tweet of yours, Mr. Binnall, which says "The
6  Binnall Law Group (@BinnallLaw) just filed a $50
7  million lawsuit to hold the government accountable for
8  their politically motivated persecution of an American
9  hero, @GenFlynn."  And then it says, "Read it here."
10        And then if you see, you then reply to your tweet
11  saying:  "What the Deep State did to General Flynn
12  should never be done to another American, ever. 'As a
13  result of this unjustifiable, outrageous, and
14  malicious prosecution of General Flynn and the abuse
15  of process engaged in to carry it out by FBI agents,
16  FBI leadership," the next tweet, "Justice Department
17  prosecutors, and the highest-ranking[] officials in
18  the Obama administration, punitive damages are not
19  only warranted but essential.' Accountability is
20  coming."  Correct?  And you tweeted that out?
21        (Exhibit 434 was marked for
22        identification.)

1    A   Yeah.  And that's -- the -- a bunch of that
2  is from the "As a result" until "essential" is a
3  partial quote from the lawsuit.
4    Q   I'm sorry.  You're right.  I should have put
5  the quotes in there.  Okay.  What is the status of
6  that litigation?
7    A   There was a motion to transfer venue by the
8  government.  That motion was denied.  We are not
9  waiting for the government's response to that lawsuit.
10    Q   Okay.
11        MS. BOLGER:  And Alexa, you can close
12  that one down.  And if you wouldn't mind putting up
13  tab 51.
14  BY MS. BOLGER:
15    Q   Okay.  For the record, tab 51, which is
16  Exhibit --
17        MS. BOLGER:  Can you go -- sorry,
18  Alexa.  What exhibit number?
19  BY MS. BOLGER:
20    Q   435 is a tweet from General
21  Flynn dated March 3rd.  It says: "This is
22  a timely, precise and important filing for

Page 38

1 all Americans.  This level of corruption
2 and understanding [sic] of our rule of law
3 cannot stand.  On behalf of the entire
4 Flynn family, we thank you @jbinnall law
5 group and team for your exceptional work.
6 #FightLikeAFlynn."  Do you see that?
7          (Exhibit 435 was marked for
8          identification.)
9    A   Yes, ma'am.
10   Q   Okay.  Did you know he was going tweet that?
11   A   No, ma'am.
12   Q   Okay.
13         MS. BOLGER:  All right.  You can put
14 that one down.
15 BY MS. BOLGER
16   Q   Okay.  Hold on.  You also --- at least were
17 defending Sidney Powell in the Dominion lawsuit
18 against defending the Republic; correct?
19   A   Actually, no.  That's not correct.  I never
20 represented Sidney.  I briefly represented defending
21 the Republic as an entity in that case.
22   Q   Sorry.  I apologize.  So what was your

Page 39

1 representation of defending the Republic?
2    A   I -- briefly entered a notice of appearance
3 in that case.  I never actually did any substantive
4 work that I can remember in that case.
5    I was replaced by other counsel in that case that
6 have been litigating it for a couple years now.
7    Q   What counsel?
8    A   I think Larry Joseph was a lawyer for that
9 case.  I don't know if he still is, and I don't know
10 what other lawyers are involved.
11   Q   I'm sorry.
12   A   No, you're fine.
13   Q   You're not the biggest fan of CNN to put it
14 bluntly; correct?
15   A   Actually, it -- it depends.  It depends
16 when.  I think CNN has -- has improved substantially
17 in -- in recent years.  I -- I certainly didn't like a
18 number of the coverage that was coming from CNN in --
19 in past years.  But I think there's an effort to -- to
20 correct course at least somewhat in the light.
21    I may very well agree with many of the opinions
22 that come down on some of the issues they -- they

Page 40

1 decide are important to talk about.  I'd probably do
2 that with -- treat that the same as -- as most other
3 news organizations.
4    Q   Okay.
5         MS. BOLGER:  Alexa, can you put up tab
6 43 for me?
7 BY MS. BOLGER:
8    Q   This is Exhibit 436.  It is, again, a
9 printout of a tweet.  The tweet, which is dated
10 September 28, 2020, reads "Ha!  I love it when #Biden
11 is, three flames, by a freshman in college (but
12 obviously not to one to mess with, just ask Fake News
13 CNN and the Amazon Washington Post)."  Do you see
14 that?
15         (Exhibit 436 was marked for
16         identification.)
17   A   Yes, ma'am.
18   Q   Okay.  Do you often call other news
19 organizations "Fake News," or just CNN?
20   A   Oh, I've -- I'm sure I've referred to other
21 news organizations as "Fake News."  Now, I actually
22 don't remember what -- oh, that was in regards to

Page 41

1 Nicholas Sandmann.  Yeah.
2    Q   Okay.
3         MS. BOLGER:  Can we put up tab 44,
4 please?
5 BY MS. BOLGER:
6    Q   Okay.  This is Exhibit 437, tab 44 in the
7 folder, which is a tweet from Mr. Binnall dated July
8 3, 2021, which is a quote tweet.  I think that's the
9 terminology.
10        (Exhibit 437 was marked for
11        identification.)
12    The LivePDDave tweeted out "Vernon Jones
13 absolutely destroys hack CNN Reporter! Laughing crying
14 face".  And you say "This is how conservatives need to
15 handle CNN.  I'm sold.  @RepVernonJones is the real
16 deal."  Do you see that?
17   A   Yes.
18   Q   And you did tweet that out?
19   A   Yeah.  And I -- you need to actually, I
20 believe, watch the video to -- to understand the
21 context there.  But -- and of course, the context is
22 important.  But yes, that's -- that's right.

11 (Pages 38 - 41)

1   Q   Why is the context important in this case?

2   A   You know, I don't remember exactly off the

3   top of my head what Vernon Jones did there, but I

4   remember it was something along the lines of not

5   accepting the premise of a -- of a question that was

6   -- that was posed to him where the premise was

7   incorrect.

8   Q   Okay.

9   A   And so, it was -- he was very succinct in

10   that way he -- he -- and I think, effective in the way

11   that he handled a particular question, especially

12   still in that era of CNN.

13   Q   Okay.

14       MS. BOLGER:  You can close that tab

15   now.  And then if you wouldn't mind putting up tab 48.

16   BY MS. BOLGER:

17   Q   And Exhibit 438 is another tweet of yours

18   and it's about Dan Rather tweets something about:

19   "Good for the @washingtonpost and @farhip for being

20   direct about where this vile hatred can be found, and

21   who was spewing it.  More of this candor by the press,

22   please."  And then it has a link to the Washington

1   Post article.  To which you responded "It makes

2   since," but I think you meant, sense --

3   A   Yeah.

4   Q   -- "that a guy whose open bias led to him

5   being fired for disseminating fake news would praise

6   biased fake news. @DanRather you are - and always will

7   be - a consistent liberal hack.  You were never a

8   'news man.'"  Do you see that?

9       (Exhibit 438 was marked for

10       identification.)

11   A   Yes, ma'am.

12   Q   Do you remember tweeting that out?

13   A   Vaguely, yes.  I am not a fan of -- of Dan

14   Rather in my personal politics.  So yes, I remember,

15   vaguely, doing that.

16   Q   Okay.

17       MS. BOLGER:  You can take that down.

18   BY MS. BOLGER:

19   Q   So you are currently a -- I guess, would you

20   describe yourself as the founder of Binnall Law Group?

21   A   Yes, ma'am.

22   Q   Okay.  And you were formerly affiliated with

1   Harvey and Binnall; is that right?

2   A   Yes, ma'am.

3   Q   Okay.  What was Harvey and Binnall?

4   A   It was a law firm.

5   Q   Who was the Harvey?

6   A   Phillip Harvey.

7   Q   Are you still -- is he still a partner of

8   yours?

9   A   He is not a partner of mine.  He is still a

10   good friend and a co-tenant of mine.

11   Q   And when did you guys split up for lack of a

12   better term?

13   A   The firm split in March 1st of 2021.

14   Q   Okay.

15       MS. BOLGER:  I'm going to ask Alexa to

16   put up tab 47.

17   BY MS. BOLGER:

18   Q   Tab 47, which is Exhibit 439 is a tweet,

19   also by Mr. Binnall, which is dated March 26, 2022,

20   which says:  "Our firm is growing!  If you are or you

21   know an America First paralegal with experience in

22   litigation, willing to work in the DC area, please

1   send me a DM.  Come work with the best MAGA lawyers in

2   the business! @BinnallLaw."

3       (Exhibit 439 was marked for

4       identification.)

5   What is an America First paralegal?

6   A   I think specifically I was talking there

7   about a paralegal who believes in the America First

8   agenda.

9   Q   What is the America First agenda?

10   A   Oh, I mean, it's -- there's a number of

11   aspects to the America First agenda, but it I think

12   boils down to putting America first.

13   Q   Would you agree with my assertion that it is

14   an agenda that is sort of created and propagated by

15   President Trump?

16   A   I don't know that you would say that it was

17   created by President Trump, but I would -- I would

18   certainly say that -- that he is the leader in the

19   America First movement now.

20   Q   Do you consider the Flynn family to be part

21   of the America First movement?

22   A   You'd have to ask them, but I would -- yeah.

1 I suspect --

2   Q   Well, I can't ask them what you would think.

3 I'm just asking what you would think --

4   A   I would suspect the answer to be, yes.

5       MS. BOLGER:  Okay.  You can take that

6 down, Alexa.

7 BY MS. BOLGER:

8   Q   Why only an America First paralegal?  It's a

9 real specific request.

10   A   Yeah.  Well, I mean, that was during a

11 period when law firms were specifically refusing to

12 hire people associated with the America First movement

13 for bigger law firms.  That provided us an excellent

14 opportunity to take advantage of the fact that big

15 firms were effectively discriminating against people

16 on -- on that basis.  And so, we -- we could and quite

17 frankly we did hire some really great people as result

18 of that.

19   Q   What was in 2022 that tweet.  What big firm

20 --

21   A   '22 or 2021.

22   Q   I believe it was --

1   A   Can you put it back up just to verify?

2   Q   Yup.

3       MS. BOLGER:  Put it back up.

4 BY MS. BOLGER:

5   Q   Yeah.  It was March 2022.

6   A   Okay.

7   Q   So I'm wondering what law firm  --

8   A   Yeah, so, still -- still the same.  That was

9 -- that was still an era on, like I said, where, I

10 mean, I think that's continuing today, I think, as

11 well after the new congress came into session and

12 firms realized, I think, that they had a lack of

13 people with connections to the new majority and the

14 House of Representatives, that may have changed

15 somewhat.

16       But at that point, nothing can change and big law

17 had still refused to hire -- was still refusing to

18 hire people on the basis of politics.  And certainly,

19 they were refusing -- still refuse today to accept

20 clients associated with the -- with the American First

21 movement.

22       The other aspect that -- that I'm not shy about

1 is that being in Washington, D.C., especially when it

2 comes to staff, we have to be careful about who we

3 hire.  And while we do hire, you know, people of

4 various political beliefs, we have to be very careful

5 that we don't have leaks.  And so, that's another

6 thing that we take into consideration for our hiring

7 decisions.

8   Q   You think people who aren't consistent with

9 your political agenda would more likely leak?

10   A   Yes, ma'am.

11   Q   Because they're not America First, you're a

12 big liar and a cheat?

13   A   No, ma'am.  I didn't say that.

14   Q   Why is it that you think they're more likely

15 to leak then?

16   A   Because Washington, D.C. is very politically

17 polarized.  We represent people that -- that polarize

18 people and emotions run high.  And that is something

19 that I would be foolish if I was not concerned about.

20 And I wouldn't -- I would not be doing my clients a

21 fair service.  Because of course, when it comes to

22 paralegals, they're not licensed professionals.  You

1 can't pull their license like you could if an attorney

2 were to go out and leak.  So yeah.  That is -- that is

3 a concern that I have, and I think that would not be a

4 unique concern.

5   Q   I printed out some of your Federal Court

6 cases.  And it appears not to be not to -- point out

7 that you often represent former President Trump;

8 correct?

9   A   Yes.

10   Q   Okay.  I'm just going to ask you about a

11 couple of the litigations.  What was the -- well, the

12 Donald Trump vs. Hillary Clinton, what was that one?

13   A   We were -- that is an appeal case that we

14 represent President Trump and his attorneys on that

15 have to do with sanctions.  That would be another

16 example of litigating attorneys' fees, where we came

17 in after sanctions -- or after the case was dismissed

18 to litigate the case on appeal.

19   Q   Okay.  Was someone sanctioned in that case?

20   A   Yes, ma'am.

21   Q   Who was sanctioned?

22   A   President Trump and his attorneys.

1    Q   And was that -- his attorney, Alina Hobba in
2   that one?
3    A   She -- she is one of the -- one of the
4   appellants in that case, yes.
5    Q   Okay.  What was the Conrad Smith vs. Donald
6   Trump litigation?
7    A   That was ongoing litigation in the United
8   States District Court for the District of Columbia
9   where you have a number of plaintiffs who are suing
10   President Trump and -- and other defendants.  And the
11   issue that -- that issue is also before the D.C.
12   Circuit Court of Appeals right now on a constitutional
13   issue.  Specifically the issue of presidential
14   immunity.
15    Q   Okay.  Is that related to January 6?
16    A   Yes, ma'am.
17    Q   And then you represented, I think, President
18   Trump is Garza vs. Trump?
19    A   Yes.
20    Q   What was that one?
21    A   The Garza vs. Trump matter is -- has to do
22   with a -- it's another case that is similar to the

1   Smith litigation and is also going to litigate the
2   issue of presidential immunity.
3    Q   You also represent, I assume, Alina Hobba,
4   in the Charles Dolan litigation.  And I realize that
5   that's not President Trump, but is that Dolan as in
6   the guy who owns the New York Knicks, do you know?
7    A   So I believe you're actually talking about
8   the case that we already discussed, the Trump vs.
9   Clinton case.
10    Q   I have a separate listing for Hobba vs.
11   Dolan.  It doesn't matter that much.  I'm interested
12   in --
13    A   I'm not -- I'm not -- I'm not aware of a
14   case styled as Hobba vs. Dolan.  And the only -- the
15   only case that's coming to mind that I represent Ms.
16   Hobba in is the -- is the Clinton -- Trump vs. Clinton
17   case.
18    Q   As you may know, or may not know, Mr.
19   Binnall, Charles Dolan keeps kicking people out of
20   Madison Square Garden who he doesn't like based on
21   facial recognition technology, and I wondered if that
22   was that case.

1    A   Understand.
2    Q   Anyway, that was purely a lawyerly question.
3   Michigan Welfare Rights Organization vs. Trump, what's
4   that one?
5    A   That is a case that was filed, I believe in
6   November of 2020 against President Trump.  That is
7   pending -- well, actually, that one is also on appeal
8   for absolute immunity issues as well.
9    Q   That one also related to January 6th?
10    A   Actually, no.  That one's not related to
11   January 6.  It is related to the 2020 election, but
12   not specifically January 6th.  It was filed well
13   before January 6th.
14       They did file another amended complaint in that
15   case, I believe, a second amended complaint.  And
16   whether that second amended complaint mentions January
17   6th is not something I could tell you off of memory,
18   because the primary issue that we are litigating in
19   that case is presidential immunity.  And so, I
20   couldn't tell you off the top of my head if in the
21   most recent iteration of that complaint it discusses
22   January 6th.

1    Q   Okay.  There seems to be two affiliated
2   cases, Marcus Moore and Bobby Tabron. but I think they
3   may all be the same cases about the 2020 election; is
4   that right?
5    A   Those are actually January 6th related cases
6   that are currently being held in advance in the D.C.
7   Circuit, while the D.C. Circuit considers the
8   Blassingame case, which is consolidated with a couple
9   other cases on that presidential immunity issue.
10    Q   And what is the allegation of the
11   Blassingame case?
12    A   You know, the allegations speak for
13   themselves.  But I'd say the -- the overall issue is
14   the President of the United States absolute immune
15   from a civil lawsuit based on a speech of public
16   importance?
17    Q   Okay.  And you take a position that he is?
18    A   Yes, ma'am.
19    Q   Okay.  What was the Bennie Thompson
20   litigation?  Benni Thompson vs. Donald Trump?
21    A   Okay.  So Thompson vs. Trump is one of the
22   cases that is consolidated with Blassingame, and it's

Page 54

1 actually no longer Thompson because once -- once
2 Bennie Thompson was appointed Chairman of the January
3 6th Committee, he dismissed his claims with prejudice
4 in that case, so the caption is now something
5 different. I don't remember who the second plaintiff
6 on that was, but I couldn't tell you who it is. But
7 regardless, that again, is January 6th related.
8     Q   That's related to getting to access to Trump
9 -- President Trump's documents; correct?
10    A   No, ma'am. That is -- that is a different
11 case. That's why I made very clear to make the
12 distinction between Thompson vs. Trump as opposed to
13 Trump vs. Thompson.
14    Q   Okay. And Trump vs. Thompson is the one
15 that was related to blocking the disclosure of
16 President Trump's documents; right?
17    A   Yeah. That was an executive privilege
18 lawsuit and had to do with executive privilege and the
19 Presidential Records Act.
20    Q   Are either of the Thompson litigations
21 concluded?
22    A   The -- the Trump vs. Thompson case regarding

Page 55

1 the executive privilege and the Presidential Records
2 act is concluded.
3     Q   Okay. And what was the conclusion?
4     A   The Supreme Court of the United States
5 denied our application for emergency relief and
6 subsequently denied suit.
7     Q   And so the documents were turned over;
8 right?
9     I'm sorry. I didn't hear you. Can you answer
10 again?
11    A   Correct.
12    Q   Okay. Sorry. For some reason, Mr. Binnall,
13 sometimes there's a delay in your answer, so I
14 apologize.
15    And the Bennie Thompson vs. Trump matter is still
16 going on; correct? With a different name.
17    A   Without Bennie Thompson, yes.
18    Q   Okay. What is the Erik Swalwell vs. Donald
19 Trump matter?
20    A   That's another case that has been
21 consolidated with the Blassingame case and is
22 currently under submission at the D.C. Circuit on that

Page 56

1 issue of presidential immunity.
2     Q   What is representative Swalwell and others
3 accused Trump of doing?
4     A   I think he's a lone plaintiff in that, but
5 it's also -- you know, the issue before the court is
6 the same as whether a speech of public importance is
7 entitled to -- by the President of the United States
8 is entitled to absolute immunity.
9     Q   Okay. And what about -- I'm almost done --
10 Kirkland vs. Trump?
11    A   Kirkland vs. Trump, I believe, is one of the
12 other cases that is currently being held in advance
13 until the Blassingame decision comes down.
14    Q   And what's the allegation?
15    A   Same allegation.
16    Q   So the --
17    A   All those are -- are the same issue, and --
18 which is, I mean, effectively, there -- there might be
19 some factual distinctions that the D.C. Circuit may
20 have to consider depending on which way that it goes,
21 but I wouldn't want to guess as at what that might be
22 right now. They're -- these are all -- all cases that

Page 57

1 have to do with whether a speech of public importance
2 by the President of the United State is entitled to
3 absolute immunity.
4     Q   Okay. The docket reads defendants -- that
5 the allegation is "Defendant's wrongful conduct
6 inciting a riot by his followers in attempt to
7 overturn the results of the 2020 presidential
8 election." That's how the court characterizes the
9 allegations. Does that seem a correct way to
10 characterize the allegations? I understand you
11 disagree with them.
12    A   I wouldn't want to characterize the
13 allegations. I think they speak for themselves. So
14 if that's the way that the docket reads, I'll take
15 your word for it.
16    Q   Okay. And you were involved in litigations
17 on behalf of the Trump campaign in Nevada; correct?
18    A   Yes, ma'am.
19    Q   And what were those litigations about?
20    A   I was involved in a number of allegation --
21 a number of litigations in Nevada. One had to do with
22 access to poll watchers, and that was brought before

1 the election to try to ensure that there would be the
2 ability of poll watchers to -- to actually see ballots
3 through the entire process to try to avoid a situation
4 where the results couldn't be relied on.
5     And another case was post-election. And we
6 brought forward a number of allegations of misconduct
7 including -- including the bribing of individuals on
8 Native American reservations to vote and brought that
9 up in addition to other issues.
10     We also litigated during that case leaving the
11 polls open a little bit later because the machines in
12 certain precincts on election day did not work for
13 hours when the polls were opened. And we were
14 successful on getting the polls open for some amount
15 of time after they were supposed to -- they were
16 supposed to close.
17     I believe there may have been one or two other
18 cases I was involved in. I was in Nevada for about an
19 eight week period.
20     Q   How did it come to be that you were in
21 Nevada? Were you sort of designated as the Trump
22 campaign guy in Nevada? I'm sure there's a more

1 formal way of saying that, but was that your role?
2     A   Yeah. No, I mean, that's -- that's right.
3 I was -- I was engaged by the -- by the Trump
4 campaign. Nevada was, of course, a swing state, and
5 so I was engaged by the Trump campaign as outside
6 counsel.
7     Q   How did you come to be engaged by the Trump
8 campaign? Was it before or after you were retained by
9 General Flynn?
10     A   So I was engaged by the Trump campaign in
11 2016 for the first time. And so, that was on
12 parliamentary procedure matters primarily. But I was
13 engaged going back to 2016. And then I was engaged
14 for the 2020 campaign October of 2020, so that was
15 sometimes after I had been working for General Flynn.
16     Q   And I looked it up on the Federal Election
17 Committee. You got paid about 2.2 million dollars for
18 representing the President in litigation related
19 lawsuits; right?
20     A   During what period? Over --
21     Q   I guess from 20 -- shame on me for not -- I
22 was just trying to cut down on time -- basically from

1 November 2020 through December 2022.
2     A   If -- if that's -- I mean, I -- I couldn't
3 sit here right now and tell you the exact dollar
4 amount. If that's what the numbers show and it's
5 correctly added, I have no reason to -- to disagree
6 with that, subject to me, of course, adding up the
7 totals myself.
8     Q   Okay. Well, Mr. Binnall, I did go to law
9 school, so who knows if I know my math, but I did
10 genuinely try.
11     A   Yeah.
12     Q   Okay. Who were your local counsel in that
13 case?
14     A   In what case?
15     Q   Sorry. In Nevada.
16     A   Local counsel was Shana Weir.
17     Q   You also testified in congress about
18 election irregularities, to put it mildly; correctly?
19     A   Yes, ma'am. I did.
20     Q   I took a look at the -- at your testimony.
21 I just have a question for you which is that you say,
22 and the thing you say "Our team began chasing down

1 every lead and here's what we found." I can put it up
2 on the screen, but my question is going to be who was
3 your team? Was that your -- in your law firm or
4 another team that you had assembled?
5     A   That was the Nevada Election Day operations
6 team. And there was a number of volunteers that were
7 on that team. There was -- there was some staff,
8 local counsel, other counsel that had volunteered or
9 otherwise engaged. And so, there were -- there were a
10 number of people. You know, most of them just hard
11 working Americans who believe in what they were doing,
12 but they came out and volunteered their time.
13     Q   Okay. Was Mr. Biss involved in any of that?
14     A   I do not believe he was involved in Nevada
15 at all.
16     Q   Okay. Do you think he was involved
17 somewhere else?
18     A   I wouldn't know.
19     Q   Okay. All right. Can we just take five
20 minutes while I just run to the bathroom and check on
21 my -- my son's cut? He injured his foot this morning.
22 And I'll be right back. Give me five minutes, I'll be

Page 62

1 right back.

2    A   Thank you.

3        THE VIDEOGRAPHER:  Okay.  Going off the

4 record at 11:05.

5        (Off the record.)

6        THE VIDEOGRAPHER:  We are back on the

7 record at 11:12.

8 BY MS. BOLGER:

9    Q   Mr. Binnall, when did you first meet Mr.

10 Biss?

11   A   First time I remember talking to him on the

12 phone is September of last year, but that might not be

13 right.  It's very possible that our -- paths crossed

14 before that.  But that's from my recollection now, was

15 actually, I think, August of last year.

16   Q   And what do you recall about that first

17 conversation?

18   A   It was an unrelated matter.  We had a

19 privileged conversation.

20   Q   Sorry, you were co-counsel of some kind?

21   A   No, ma'am.  It was -- it was a discussion

22 that was -- that was privileged.  We were -- we never

Page 63

1 entered our appearances as co-counsel and never --

2 but it was -- it was a privileged -- privileged

3 conversation.

4    Q   Okay.  And how many conversations have you

5 had with Mr. Biss since then?

6    A   A handful.  I would venture to say less than

7 ten.

8    Q   Have you guys met in person?

9    A   I don't think so.

10   Q   When I went to the University of Virginia,

11 there was a big difference between Alexandria and

12 Charlottesville.  Not necessarily geographically, but

13 in spheres, those were different places.  So you've

14 never been Mr. Biss's co-counsel in anything?

15   A   No, ma'am.

16   Q   In your expert report, you say "There are a

17 few attorneys in the country with the skills requisite

18 to properly perform the legal services in a high

19 profile false light case, such as this.  Mr. Biss is

20 one of those lawyers."

21        What was your basis for saying that?

22   A   Mr. Biss is well known.  And I certainly was

Page 64

1 aware of the work that he had done, and I had read a

2 number of his cases.  He's handled these cases like

3 these all over the country.  And where it's -- it's

4 reputational harm cases.  Most times, of course, is

5 defamation, but false light is another way that you

6 can bring those cases.  Other states have other torts.

7    Q   When you reached that conclusion, were you

8 aware that on November 26, 2008, the Circuit Court of

9 the County of Chesterfield had suspended Mr. Biss's

10 law license for one year and one day?

11   A   Yes, ma'am.

12   Q   That didn't change your expert opinion of

13 his?

14   A   No, ma'am.  He's -- he's -- since that time,

15 he has continued to practice law and has practiced all

16 over the country with good results.  And so, no.  That

17 didn't -- that didn't affect my -- my analysis --

18 negatively affect my analysis on that.

19   Q   Were you aware that on November 3, 2019

20 [sic], the disciplinary board of the Virginia State

21 Bar Disciplinary Board extended a sanction -- I just

22 want to make sure I say it correctly -- suspending

Page 65

1 Mr. Biss's license for 30 days to commence at the end

2 of his, then, one year suspension?

3    A   I'm sorry.  The date was --

4    Q   I'll do it again, 2009 is what I meant.  I

5 apologize, so 2009.

6    A   The 2009, I was aware of.

7    Q   Okay.  Were you aware in 2010 the Virginia

8 State Bar Disciplinary Board --

9        MR. BISS:  I heard 2019.

10 BY MS. BOLGER:

11   Q   Right.  And then I correct --

12   A   I heard 2019 originally as well.

13   Q   Yes.  And then I meant to correct it to

14 2009.  It was certainly not intentional.

15        Okay.  Did you know that the Virginia State Bar

16 Disciplinary Board on October 19, 2010, had said that

17 Stevens Biss need to receive a public reprimand for

18 his misconduct?

19   A   That was in -- in 2010?

20   Q   Yes, sir.

21   A   You know, I don't remember if I knew about

22 that one or not.  I did know that there was a couple

17 (Pages 62 - 65)

Page 66

1 back in that time frame. I don't remember if I knew
2 about that one or not.
3     Regardless, it -- whether there was past
4 reprimand, and he still is, you know, now, as far as I
5 know, properly licensed to practice law properly,
6 entitled to receive a fee for doing so. And one of
7 the -- one of the few people that -- that does this
8 and does this effectively. So it does not -- it does
9 not affect my analysis that I laid out in my report.
10     Q   Okay. Did you know that on March 9, 2022,
11 the Seventh District Subcommittee of the Virginia
12 State Bar, again, agreed -- ordered a public reprimand
13 of Mr. Biss?
14     A   I don't think I -- I knew about that one.
15 That one I don't think I did see. And you'd have to
16 tell me a little bit more about that if -- if -- to
17 ask me whether it would affect my -- my analysis.
18     Q   Okay. It is a -- actually, you know, what?
19         MS. BOLGER:  This is tab 26. Can you,
20 Alexa and Matt, would you mind putting it up and
21 turning to the third page?
22         MS. PASTOR:  Just a moment.

Page 67

1 BY MS. BOLGER:
2     Q   The third stipulation of fact, which I think
3 is relevant here is: "On July 17, 2019, Garrison and
4 Respondent," who is Mr. Biss, "signed an engagement
5 agreement. The agreement stated that Respondent would
6 charge a flat fee of $10,000, plus a contingency fee
7 of twenty thousand [sic] of any settlement or verdict.
8 The agreement did not identify an hourly rate, nor did
9 it identify any benchmarks at which Respondent would
10 earn all or part of the flat fee." Do you see that?
11         (Exhibit 440 was marked for
12          identification.)
13     A   Yes.
14     Q   That's similar to the fee arrangement here;
15 right?
16     A   I believe it is, yes.
17     Q   The fee arrangement here is $20,000 flat fee
18 plus 20 percent --
19     A   The -- the issue at stake is a little bit
20 different, ethically and legally speaking. And I can
21 explain more if you would like.
22     Q   Sure.

Page 68

1     Q   So if -- if the issue is whether somebody --
2 the Virginia Bar has opined on this recently about
3 when you can take money out of a trust account, based
4 on when its earned. And that is a different issue
5 about whether or not you have to put benchmarks in a
6 engagement agreement, which you do not. It just has
7 to deal with when you -- can take money out of a trust
8 agreement.
9     And that's actually something that there's been
10 quite a bit of debate about in the Bar in Virginia.
11 You know, and lawyers that are well versed and the
12 ethical issues come down on different sides of that
13 issue.
14     So if that in fact is the issue at stake in this,
15 it would not change my -- my analysis at all. And
16 certainly, it wouldn't affect whether Mr. Biss was --
17 was qualified to handle a reputational harm case such
18 as this one.
19     Q   For the record, that actually was not the
20 issue. If you turn to the fourth page, you'll see
21 that the Nature of Misconduct charged -- scroll down -
22 - is that it was "A lawyer shall act with reasonable

Page 69

1 diligence and promptness in representing a client,"
2 and a conclusion that Mr. Biss had not done so.
3     Does that change your opinion?
4     A   No. No. That doesn't change my opinion.
5 And, again, I'm only being shown -- parts of this
6 right now. I'll tell you that it doesn't change my --
7 my opinion because even if there is an agreement in
8 this part, Mr. Biss is still licensed to practice law.
9 So properly practicing the law and handles these
10 reputational harm cases on a -- on a regular basis and
11 is -- he's very qualified to do that.
12     Q   Okay. So then --
13         MS. BOLGER:  You can close that down.
14 BY MS. BOLGER:
15     Q   Do you know who Svetlana Lokhova is?
16     A   Yes.
17     Q   And who is Ms. Lokhova?
18     A   Ms. Lokhova is a individual who I believe at
19 one point, I don't know if she still is a Russian
20 national, but she has -- she was -- her name was
21 sullied in the Mueller investigation and the Crossfire
22 Razor investigation when it was falsely alleged that

18 (Pages 66 - 69)

Page 70

1 she had an inappropriate relationship with General
2 Flynn.
3          MS. BOLGER:  Alexa, I'm sorry, but can
4 you put up tab 28 and we're going to look at page 267.
5          And I should mark this as an Exhibit,
6 so Exhibit 441 is the decision in Lokhova vs. Halper,
7 in the United States District Court for the Eastern
8 District of Virginia.
9          (Exhibit 441 was marked for
10          identification.)
11          Can you turn to page 267?  Okay.  And
12 can you make that -- so the paragraph that I'm going
13 to focus on begins "The record is clear," if you can
14 just scroll down a little.
15 BY MS. BOLGER:
16     Q    So it says:  "The record is clear that Biss
17 filed an excessively long complaint and amended
18 complaint on Lokhova's behalf directing unprofessional
19 ad hominem attacks at Halper and others.  For example,
20 the complaint calls Halper a," assuming we can -- this
21 says, "a ratfucker and refers to the media defendant
22 as 'stooges.' Such language adds nothing but

Page 71

1 unnecessary heat to this litigation.  Moreover, the
2 complaint exaggerates the nature and the content of
3 the allegedly defamatory statements.  In addition,
4 Biss and Lokhova have to have known that most of her
5 claims were   time-barred, as she had previously
6 filed an unrelated defamation in the United Kingdom,
7 which was dismissed as untimely under the one-year
8 statute of limitations applicable in that
9 jurisdiction." Do you see that?
10     A    Yes.
11     Q    Did you know about that?
12     A    Yes.
13     Q    Okay.  And it did not change your opinion
14 here?
15     A    No, it doesn't.  And part of that is because
16 that case raised a rather interesting -- some rather
17 interesting issues in defamation law that are open
18 questions about republication that I think are
19 important.
20          And quite frankly, because of my knowledge of
21 defamation law in the United Kingdom, quite frankly, I
22 think the judge's conclusion there was wrong.

Page 72

1     Q    What is the basis of your understanding of
2 defamation law in the United Kingdom?
3     A    I've advised clients in regards to that and
4 I have otherwise have knowledge from friends and
5 colleagues about defamation law and the Defamation Act
6 in the United Kingdom, and it's -- the law on that
7 issue is -- is not as clear as that judge who I know
8 and respect, says and I would just very respectively
9 disagree with her.
10     Q    Which judge was it?
11     A    I believe it was Judge Brinkema.
12     Q    Oh, this judge.  I'm sorry.  I thought you
13 meant the English judge.  Yes, this was Judge
14 Brinkema.
15     A    No, no, no.  I mean, it's -- I have no doubt
16 that she accurately described that the case in the UK
17 -- not that I don't -- I don't know for sure what the
18 status of the UK litigation was.  But to say that --
19 that the UK, that the Defamation Act is -- is quite as
20 clear cut, is that is -- it's never simplification of
21 the law there.
22     Q    Okay.

Page 73

1          MS. BOLGER:  You can put that one down
2 if you don't mind.  And if you'll put up tab 31.
3 BY MS. BOLGER:
4     Q    This is Exhibit 442.  It is the decision in
5 the Anderson vs. School Board of Gloucester County
6 litigation in the Eastern District of Virginia, dated
7 August 2020.
8          (Exhibit 442 was marked for
9          identification.)
10          MS. BOLGER:  And if you will please
11 turn to the fifth page of the exhibit.  Scroll down
12 just a smidge more.  Thanks.  You'll see -- just a
13 smidge more.
14 BY MS. BOLGER:
15     Q    Okay.  You'll see that the final paragraph
16 on the page reads: "Counsel for Plaintiff's," that's
17 Mr. Biss, "objections contrary to settled law are
18 particularly troubling given this Court's previous
19 admonishment, in its May 29, 2020 memorandum opinion,
20 that Mr. Biss 'ensure that all positions, including
21 those in briefing and in support of discovery, 'are
22 warranted by existing law or by a nonfrivolous

Page 74

1 argument for extending, modifying, or reversing
2 existing law or for establishing new law'.[f]ailure to
3 do so would result in sanctions.'" Do you see that?
4    A   Yes, ma'am.
5    Q   Are you aware of that one?
6    A   No. I'm not. I'm not aware of that
7 particular case.
8    Q   Does it change your opinion here?
9    A   That paragraph? No, it does not change my
10 opinion.
11    Q   Why not?
12    A   I mean, most -- most importantly, there's --
13 there's no actual findings in that paragraph, one way
14 or another.
15    And second of all, just because a judge used --
16 might use sharp language in -- in writing an -- an
17 opinion on something, doesn't tell me what the actual
18 allegations and issues particularly may be.
19    And most importantly, it does not tell me
20 regarding the factors that have to be considered, that
21 whether this is a -- how that would affect this
22 specific case, and the reasonableness of rates -- for

Page 75

1 instance, in the particular market at stake and how an
2 attorney is expected to -- to make a living.
3    Q   Isn't it the case though that making
4 frivolous arguments for extending, modifying, or
5 reversing existing law would mean that you -- the
6 lawyer charged hourly rates for something that was --
7 according to this judge's opinion, inappropriate?
8        MR. BISS:  Object to the form.
9        THE WITNESS: I don't -- I don't see
10 that in that particular paragraph.  If you could point
11 me to the exact language that would suggest that I'll
12 look at it.  But I don't -- I don't see that there.
13 BY MS. BOLGER:
14    Q   Oh, I didn't suggest that it was there.  I'm
15 asking a question.  I'm saying this says, essentially,
16 that you shouldn't go ahead and file -- that Mr. Biss
17 was supposed to ensure that all positions, including
18 those in briefing and in support of discovery are
19 warranted; right?  That's what it says?  My question
20 to you is --
21    A   Okay.
22    Q   My question to you is wouldn't the

Page 76

1 reasonable multiplication of proceedings by doing
2 things like, advancing positions that are unwarranted,
3 run up the bill and make the charges unreasonable?
4    A   Not necessarily. I mean, it could.  There's
5 certainly cases where that -- that does happen.  But
6 that doesn't necessarily mean that that's what
7 happened in that case.
8    Q   I'm not asking about that case.  I'm
9 asking generally.
10    A   Generally, it's -- it would be improper for
11 me to guess as to whether such allegations would make
12 litigation -- make the -- the bills higher if billed
13 hourly.  There's no way to know with just somebody
14 citing the text Rule 11, whether that's indeed the
15 case.
16    And in fact -- in fact, if that was the case, I
17 wouldn't expect a Rule 11 citation.  I'd expect a
18 Section 1927 citation.
19    Q   So of course you're here as an expert today.
20 So you're not here as Jesse Binnall.  You're here as
21 an expert on reasonable attorneys' fees and you just
22 said you didn't want to guess.

Page 77

1    I'm not asking you to guess. I'm asking you a
2 hypothetical.
3    A   Yes.
4    Q   And you have to answer those as an expert;
5 right?
6    A   That's right.
7    Q   Hypothetically, isn't it the case that if a
8 attorney takes positions, including those in briefing
9 in support of discovery that are unwarranted by
10 existing law or by nonfrivolous argument for
11 extending, modifying, or reversing existing law, that
12 those actions would necessarily be multiplicative of a
13 bill for no warranted reason?
14    A   No, that's not correct.
15    Q   Why not?
16    A   Because you said "would necessarily." Could
17 they be?  Perhaps.  It would -- it would determine on
18 a number of -- other factors.  But would it
19 necessarily result in that?  No, not necessarily.
20    Q   Well, if you were going to opine on whether
21 someone's attorneys' fees were reasonable, wouldn't
22 you like to know if they took positions including

20 (Pages 74 - 77)

1 those in briefing in support of discovery that were
2 unwarranted by existing law or nonfrivolous law
3 extending, modifying, or revising existing law?
4    A   I mean, certainly in the litigation at
5 issue, that's something that you would look at that
6 would be proper for a court to consider in -- in a
7 particular case.
8    But if you're looking at some sort of character
9 evidence on that, just because a court found -- found
10 that in another case, it would not necessarily impact
11 the reasonableness in this case.  And, like I said,
12 especially when you say it wouldn.t necessarily result
13 in -- in higher bills.  So that's something that in
14 every particular case, you would have to look at the
15 individual facts and see.
16    Q   Did you do that here?
17    A   I -- I've seen the litigation.  I haven't
18 seen anything that I think has been duplicative or has
19 needlessly increased the cost of litigation.  Matter
20 of fact, I think there's, you know, a number of issues
21 that have gone before the court that -- that
22 Plaintiffs have -- have won.

1    So if -- if there are specific issues, I'd be
2 happy to -- to be asked about those.  But from what
3 I've seen, there's been no unnecessary or duplicative
4 litigation here.
5    Q   Have you seen Mr. Biss's bills?
6    A   I've been -- I -- previously, I think I've
7 been given a summary.  But no.  I have not seen all of
8 his bills to date.  I anticipate when that -- we'll
9 see something more specific as the litigation
10 continues.
11    Q   Have you seen time entries?  Mr. Biss's time
12 entries?
13    A   I have only seen a summary at this point,
14 which is -- is not -- is not inconsistent with a case
15 such as this, that is mostly -- you know, this blend
16 flat fee contingency type arrangement for where you're
17 at at this stage in a case like this.
18    Q   So where did you get those summaries?
19    A   From Mr. Biss.
20    Q   I think those documents, which would be
21 documents you relied on in reaching your expert
22 opinion should have been produced to me, so I will

1 call for their production.
2    A   Let me -- and I don't -- I don't want to
3 misspeak.  I believe -- it may have been an oral
4 summary that I was given.  I want to double check that
5 and -- given that this was about six months ago, I
6 will -- I'll be very clear to -- to let you know
7 whether it was a oral summary or some sort of written
8 summary.
9    Q   That's fine.  Well obviously, if it was a
10 written summary, I'm obviously entitled to it.
11    A   Okay.
12    Q   Okay.  Wouldn't you like to know before you
13 opined -- as I think you just did -- that Mr. Biss's
14 behavior in this litigation was reasonable because you
15 said that the Plaintiffs want a couple things.  Before
16 you reached the conclusion that that conduct was
17 reasonable, wouldn't you have liked to have seen how
18 long he took on it?
19    A   I mean, when you -- when you look at the
20 docket itself, there's a lot that an experienced
21 attorney can see about how much work that goes into it
22 and how much value the client is getting out of it.

1    And at the end of the day, that's really what
2 we're looking at is how much effort, what is being put
3 in, what is the value to the client?  Is this
4 something that is -- that is helping advance the case?
5 And that's especially important in a contingency fee
6 arrangement where you have to take into consideration
7 things like opportunity cost and the fact that while
8 lawyers working on that case and has risk involved in
9 advancing that case, a lawyer can be working on other
10 matters as -- as well.
11    So -- so I looked at the information that I
12 thought was necessary in order to render an expert
13 opinion.  And to the extent, as litigation continues,
14 in a case like this, it certainly is going to be a
15 case where -- where litigation is continuing.  And I -
16 - I anticipate it would be for those reasons -- to
17 supplement my report as time goes on.  And of course,
18 should that be necessary, I will do that.
19    Q   Just to be clear, as of right now you have
20 not seen or have any understanding of how long Mr.
21 Biss did or did not spend on any portion of this
22 litigation; correct?

21 (Pages 78 - 81)

Page 82

1    A   As far as time entries, no.
2    Q   Okay.  In your expert report, you say that
3  "Mr. Biss projects that he will devote well over
4  20,000 hours to this litigation."  It's on page 7 of
5  your report.  Do you remember writing that?
6    A   Can I -- can I see that report?
7    Q   Of course you can.  That was Exhibit 430,
8  potentially 431.
9        Alexa will keep me honest.
10       MS. PASTOR:  Exhibit 430.  Just a
11 moment.
12       MS. BOLGER:  Okay.  It's the 7 out of
13 10.  Sorry, keep going.  Keep going to where it says
14 at the top left, page 7 out of 10.  Sorry, Alexa.
15 Okay.  Perfect.
16 BY MS. BOLGER:
17   Q   You'll see there's a paragraph right there,
18 Mr. Binnall.  In which you say:  "Fifth, the time
19 limitation imposed by the client and circumstances are
20 substantial.  This case has almost taken two years to
21 prosecute.  Thousands of hours have been put in by Mr.
22 Biss to date.  Ultimately, Mr. Biss projects that he

Page 83

1  will devote well over twenty thousand (20,000) hours
2  to the litigation."  Do you see that?
3    A   I do see that.  And that was an estimate I
4  got, I believe, from Mr. Biss.  And obviously, it will
5  be -- we'll need to see exactly how many hours
6  actually are litigated.  But that was the estimate
7  that Mr. Biss gave me.  I -- I anticipate that that
8  includes 20,000 timekeeper hours.  That may include
9  other support personnel, other attorneys, et cetera,
10 et cetera.
11   Q   As you sit here, have you ever litigated a
12 false light claim that took 20,000 hours to litigate?
13   A   No, I have not.
14   Q   Are you aware of anybody who has ever
15 litigated a defamation claim that took over 20,000
16 hours to litigate?
17   A   Yeah.  Probably.  I can -- I can think of
18 some high profile defamation cases where the -- the
19 total staff, timekeeper billing almost certainly
20 exceeds 20,000 hours.
21   Q   Who were those?  What are those litigations?
22   A   I would anticipate that in the Dominion Fox

Page 84

1  case, very -- very possibly could have exceeded 20,000
2  hours.  And some of the other Dominion cases that are
3  out there.  And again, that's not just form one -- one
4  timekeeper, but from all timekeepers combined from --
5  for instance, doc reviewers combined and if it's a
6  document heavy case, for instance, it would not be
7  unusual for the amount of hours to be, you know, in
8  the five digits when you -- when you look at -- at all
9  that.
10   Q   And did you -- are you aware of whether Mr.
11 Biss has any other timekeepers, as you put them, in
12 his shop that work on this litigation?
13   A   Sitting here now, I -- I don't know that.
14 And that's something that, again, when I actually do
15 review the actual time records, will -- will have an
16 impact on the actual effort, you know, taken in this
17 case.  And -- but as of right now, I've just been
18 given that summary.  And I believe so far, the summary
19 is mostly Mr. Biss's time, and my memory is not clear
20 enough to say if there are any other support personnel
21 that are working on that.
22       Which, on a contingency fee case, you know, may

Page 85

1  or may not include people that are -- are actually
2  entering time into some sort of platform.
3    Q   Who else would be paid?  Who else would be
4  working on the case if he wasn't entering time into
5  some kind of platform?  I don't understand --
6    A   Oh, I'm just saying, for instance, on a
7  contingency fee case, paralegals, law clerks, legal
8  assistants would not necessarily be expected to enter
9  time into a timekeeping platform.  Summaries from them
10 are something that would be appropriate in that case
11 of, you know, what different work that they worked on
12 and when.  That would be something that would be fully
13 appropriate when you're looking at contingency or in
14 flat fee arrangements and hybrid agreements.
15   Q   But as you sit here, you don't know if any
16 people other than Mr. Biss actually have ever worked
17 on this case; right?
18   A   No, no I do not.
19   Q   I'm sorry?
20   A   I do not.
21   Q   And you don't know how many hours Mr. Biss
22 has spent on this case?

22 (Pages 82 - 85)

Page 86

1   A   Yeah.  Today, I -- I could not tell you as
2   of today how many.
3   Q   Okay.
4       MS. BOLGER:  Finally -- will you put
5   up, please -- Alexa, you can take that down.  Thank
6   you very much.  And put up tab 33, please.
7   BY MS. BOLGER:
8   Q   Okay.  Tab 33, which is Exhibit 443, is the
9   decision of the Fourth Circuit Court of Appeals in the
10  Lokhova vs. Halper matter.  We looked earlier at a
11  decision in the District Court; this is the Fourth
12  Circuit.
13      (Exhibit 443 was marked for
14      identification.)
15      MS. BOLGER:  Alexa, if you wouldn't
16  mind, go to the ninth page of the exhibit.
17  BY MS. BOLGER:
18  Q   Okay.  If you'll scroll down a little
19  there's "D," see "Appellee Halper's Motion for
20  Sanctions" and it reads "Appellee Halper contends the
21  district court abused its discretion in denying his
22  motion for sanctions against Appellant and attorney

Page 87

1   Biss."
2       And if you look at the top, if you scroll up to
3   the top of the ninth page, you'll see the paragraph
4   that begins:  "Of note, this is not the first time
5   attorney Biss's litigation conduct has earned
6   reprimand.  His history of unprofessional conduct is
7   long."  And it cites the Nunes case and the Steele
8   case, which we actually hadn't talked about, and says:
9   "In fact, attorney Biss had his license suspended in
10  2009 for unprofessional conduct including breaching
11  fiduciary duties and violating federal securities law.
12  And, even during his suspension period, attorney Biss
13  failed to be forthright about his suspension status
14  with an opposing party when engaged in negotiations on
15  behalf of the client, resulting in an additional 30
16  day suspension of his license."
17      MS. BOLGER:  It goes on if you scroll
18  down.  Keep going.
19  BY MS. BOLGER:
20  Q   "The district court chastised attorney Biss
21  for 'directing unprofessional ad hominem attacks at
22  [Appellee] Halper and others,' noting that such

Page 88

1   behavior 'adds nothing but unnecessary heat to this
2   litigation.'  But in the end, the district court
3   elected not to sanction Biss at this point and denied
4   the motion to sanction without prejudice.  We agree
5   with the district court's observations and endorse the
6   court's reprimands citing inappropriate ad hominem
7   attacks.  We conclude, however, that the district
8   court acted within its discretion because we are not
9   'left with the definite and firm conviction that a
10  mistake had been committed.'"  And it remands the case
11  to decide if the district court wants there to be
12  sanctions.  Were you aware of this decision when you
13  drafted your expert opinion?
14  A   Yes.
15  Q   And I assume it didn't change your opinion?
16  A   It did not.
17  Q   Why not?
18  A   Same reason that I've -- I've already said.
19  It's, you know, first of all, they actually affirm the
20  decision if I -- memory serves right in reading this.
21  They affirm the decision not to sanction Mr. Biss.
22      And so, affirming a decision not to sanction

Page 89

1   someone, certainly wouldn't affect my -- my decision
2   on that.
3       Whether they thought that the language used was
4   appropriate and whether that was helpful for the
5   litigation, might be helpful if this attorneys' fee
6   dispute was in that case in that litigation.  But it
7   tells me nothing about the issues in this case and
8   whether they were litigated through -- through similar
9   conduct.
10      And so, it just says as character evidence, it
11  would -- it would not mean that those -- that the
12  attorneys' fees were unreasonable because that court
13  opined.  And what is, I think, quite frankly, dicta,
14  about Mr. Biss's conduct in another case.
15  Q   Have you talked to Mr. Biss about this
16  decision?
17  A   No, ma'am.
18  Q   Wouldn't you have liked to have asked him a
19  couple questions, like, "Hey, what did you say there?
20  Have you said anything like that here?"
21  A   Well, I don't think that would be
22  particularly helpful.  I mean, what I -- what I did

23 (Pages 86 - 89)

1  look at and what I did talk to him about was
2  specifically about this case. And this case is what
3  I'm opining on. You know, this isn't -- I wasn't
4  writing a -- a biography on his legal career; I was
5  writing about the appropriateness of legal fees in
6  this case. And on that, I didn't see anything that
7  would -- would raise my -- raise my attention that I
8  would need to question anything further.
9      Q   But wouldn't you want to say in words or
10 substance, "Hey, you know, Mr. Biss, I know that this
11 court in the Fourth Circuit said that your behavior
12 was -- there were allegations of improper behavior and
13 that you should have been chastised." They
14 specifically say "We agree with the district court's
15 observation and endorse the court's reprimands
16 concerning inappropriate ad hominem attacks." Right?
17 So that's not dicta.
18      "We agree with the court's observation and
19 endorse the court's reprimands concerning
20 inappropriate ad hominem attacks." Wouldn't you want
21 to say, "Hey, Steve, I know you got in trouble for
22 this once before, have you made any inappropriate ad

1  hominem attacks here," before opining that you thought
2  his fees were reasonable?
3      A   So first of all, it would still probably
4  take issue that it's dicta because endorsing a
5  reprimand is not something that's necessary to the
6  court's ultimate holding. And so, that's why I think
7  that it's -- it is dicta.
8      Nevertheless, like I said, this is -- this was
9  not an art in either character support or character
10 assassination. It's looking at the reasonableness of
11 attorneys' fees in this case. And whether or not
12 there were phrasing used in another case that a court
13 had disagreed with is not helpful for me as an expert
14 in opining whether there was reasonableness of fees in
15 this case.
16      MS. BOLGER:  Okay. Just go to the next
17 page of this one, Alexa.
18 BY MS. BOLGER:
19      Q   You'll see that the very top it says "We
20 leave it to the district court whether it will
21 ultimately join the chorus in sanctioning attorney
22 Biss." Do you see that?

1      A   Yes.
2      Q   And were you aware of that when you wrote
3  your expert opinion?
4      A   I read the opinion.
5      Q   Okay. If you give me two seconds, I think
6  I'm done. So just give me -- let's go off the records
7  for two minutes and then we'll come back on.
8      A   Yes, ma'am.
9      Q   Thanks.
10      THE VIDEOGRAPHER:  Okay. Going off the
11 record at 11:47.
12      (Off the record.)
13      THE VIDEOGRAPHER:  Back on the record
14 at 11:49.
15      MS. BOLGER:  Mr. Binnall, I have no
16 further questions this morning and I thank you for
17 your time.
18      THE WITNESS:  Thank you, ma'am.
19      MR. BISS:  No questions. He'll read.
20      THE VIDEOGRAPHER:  Okay. If that is
21 everything -- I'm sorry. Go ahead, Counsel.
22      MS. BOLGER:  I said that was it. I was

1  just going to say, thank you, again, Mr. Binnall.
2      THE WITNESS:  Thank you very much.
3  Have a wonderful day.
4      THE VIDEOGRAPHER:  Okay. That is
5  everything. We are going off the record on June 26,
6  2023, at 11:49 a.m. Eastern time zone.
7      (Signature reserved.)
8      (Whereupon, at 11:49 a.m., the
9       proceeding was concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 94

1      CERTIFICATE OF DEPOSITION OFFICER
2          I, MATTHEW YANCEY, the officer before whom
3   the foregoing proceedings were taken, do hereby
4   certify that any witness(es) in the foregoing
5   proceedings, prior to testifying, were duly sworn;
6   that the proceedings were recorded by me and
7   thereafter reduced to typewriting by a qualified
8   transcriptionist; that said digital audio recording of
9   said proceedings are a true and accurate record to the
10  best of my knowledge, skills, and ability; that I am
11  neither counsel for, related to, nor employed by any
12  of the parties to the action in which this was taken;
13  and, further, that I am not a relative or employee of
14  any counsel or attorney employed by the parties
15  hereto, nor financially or otherwise interested in the
16  outcome of this action.

17                  MATTHEW YANCEY
18            Notary Public in and for the
19                  State of New York
20
21  [X] Review of the transcript was requested.
22

Page 95

1      CERTIFICATE OF TRANSCRIBER
2          I, BRITTANY-TIANA AMOROSO, do hereby certify
3   that this transcript was prepared from the digital
4   audio recording of the foregoing proceeding, that said
5   transcript is a true and accurate record of the
6   proceedings to the best of my knowledge, skills, and
7   ability; that I am neither counsel for, related to,
8   nor employed by any of the parties to the action in
9   which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise interested in the outcome of this action.
13
14
15            BRITTANY-TIANA AMOROSO
16
17
18
19
20
21
22

Page 96

1   Flynn, John P. "Jack" Et Al v. Cable News Network Inc.
2              Jesse Binnall
3      INSTRUCTIONS TO THE WITNESS
4          Please read your deposition over
5   carefully and make any necessary corrections.
6   You should state the reason in the
7   appropriate space on the errata sheet for any
8   corrections that are made.
9          After doing so, please sign the errata
10  sheet and date it.
11          You are signing same subject to the
12  changes you have noted on the errata sheet,
13  which will be attached to your deposition.
14          It is imperative that you return the
15  original errata sheet to the deposing
16  attorney within thirty (30) days of receipt
17  of the deposition transcript by you.  If you
18  fail to do so, the deposition transcript may
19  be deemed to be accurate and may be used in
20  court.
21
22  5974792

Page 97

1   Flynn, John P. "Jack" Et Al v. Cable News Network Inc.
2              Jesse Binnall
3          E R R A T A
4          - - - - -
5   PAGE   LINE   CHANGE
6   ___ ___ ___   _____
7   Reason:_____
8   ___ ___ ___   _____
9   Reason:_____
10  ___ ___ ___   _____
11  Reason:_____
12  ___ ___ ___   _____
13  Reason:_____
14  ___ ___ ___   _____
15  Reason:_____
16  ___ ___ ___   _____
17  Reason:_____
18  ___ ___ ___   _____
19  Reason:_____
20  ___ ___ ___   _____
21
22  5974792

25 (Pages 94 - 97)

Page 98

1  Flynn, John P. "Jack" Et Al v. Cable News Network Inc.

2         Jesse Binnall

3    ACKNOWLEDGMENT OF DEPONENT

4       I, _____, do

5  hereby certify that I have read the foregoing

6  pages and that the same is a correct

7  transcription of the answers given by

8  me to the questions therein propounded,

9  except for the corrections or changes in form

10 or substance, if any, noted in the attached

11 Errata Sheet.

12

13 _____    _____

14 DATE          SIGNATURE

15

16

17

18

19

20

21

22  5974792

26 (Page 98)

**[1 - 45]**

| 1 | 2 |
|---|---|

**1**  5:13 6:4
  10:10 20:7
**1/24/2023**  4:11
**10**  4:7 20:22
  82:13,14
**10,000**  67:6
**1001**  31:14
**10020**  2:15
**102**  2:5
**1097470**  4:22
**10:03**  1:13 6:3
**11**  76:14,17
**11:05**  62:4
**11:12**  62:7
**11:47**  92:11
**11:49**  92:14
  93:6,8
**1251**  2:14
**1301**  3:6
**134**  5:9
**150k**  33:15
**17**  67:3
**18**  17:18 31:14
**19**  65:16
**1927**  76:18
**1983**  17:17
**1988**  17:19
  18:2
**1:21**  21:4
**1:21cv02587**
  1:7
**1st**  44:13

**2.2**  59:17
**20**  59:21 67:18
**20,000**  67:17
  82:4 83:1,8,12
  83:15,20 84:1
**200**  21:9
**20005**  1:15 3:7
**2008**  64:8
**2009**  15:22
  65:4,5,6,14
  87:10
**2010**  15:22
  65:7,16,19
**2016**  59:11,13
**2019**  22:18
  27:4 64:19
  65:9,12 67:3
**202**  3:9
**2020**  5:4,6 27:2
  27:4,8 40:10
  52:6,11 53:3
  57:7 59:14,14
  60:1 73:7,19
**2021**  5:9 13:11
  41:8 44:13
  46:21
**2022**  4:22
  20:22 44:19
  46:19 47:5
  60:1 66:10
**2023**  1:12 6:3
  10:14 93:6
**21**  4:9

**212**  2:17
**21st**  2:14
**22**  46:21
**22903**  2:6
**238**  5:4
**250**  28:21
**2587**  21:4
**26**  1:12 6:3
  10:14 44:19
  64:8 66:19
  93:5
**267**  70:4,11
**28**  40:10 70:4
**29**  4:10 73:19
**29511**  94:16
**29712**  95:14

| 3 |
|---|

**3**  10:14 41:8
  64:19
**3/26/2022**  4:20
**3/3/2023**  4:12
  4:13
**3/9/2022**  4:22
**30**  65:1 87:15
  96:16
**300**  2:5
**31**  73:2
**33**  4:11 86:6,8
**36**  4:12
**38**  4:15
**3d**  5:4
**3rd**  4:15 37:21

| 4 |
|---|

**4**  17:5
**4/30/2020**  4:10
**40**  4:16
**402-4068**  2:17
**41**  4:17
**42**  17:18 29:15
**43**  4:19 40:6
**430**  4:7 10:16
  82:7,10
**431**  4:8 20:21
  21:13 82:8
**432**  4:10 29:19
  29:20
**433**  4:11 33:4,6
**434**  4:12 36:4
  36:21
**435**  4:13 37:20
  38:7
**436**  4:16 40:8
  40:15
**437**  4:17 41:6
  41:10
**438**  4:18 42:17
  43:9
**439**  4:20 44:18
  45:3
**44**  41:3,6
**440**  4:21 67:11
**441**  5:3,3 70:6
  70:9
**442**  5:5 73:4,8
**443**  5:8 86:8,13
**45**  4:20

**[4600 - agree]** Page 2

| | | | |
|---|---|---|---|
| **4600** 9:2 15:21 | **86** 5:9 | **accused** 14:16 | 71:3 |
| **47** 44:16,18 | **8th** 27:8 | 56:3 | **additional** |
| **4719091** 5:7 | **9** | **accusing** 32:15 | 87:15 |
| **48** 42:15 | **9** 66:10 | **acknowledg...** | **additionally** |
| **49** 32:21 | **9/28/2020** 4:16 | 98:3 | 7:7 |
| **4th** 5:9 | **973-4239** 3:9 | **acknowledg...** | **adds** 70:22 |
| **5** | **995** 5:8 | 7:4 | 88:1 |
| **5/16/2022** 4:18 | **a** | **act** 54:19 55:2 | **administer** 7:4 |
| **50** 28:14,15 | **a.m.** 1:13 6:3 | 68:22 72:5,19 | **administration** |
| 35:21 36:6 | 93:6,8 | **acted** 88:8 | 36:18 |
| **500** 3:6 28:21 | **ability** 58:2 | **action** 94:12,16 | **admitted** 12:9 |
| **501-8272** 2:8 | 94:10 95:7 | 95:8,12 | **admonishment** |
| **51** 37:13,15 | **above** 21:6 | **actions** 17:17 | 73:19 |
| **58** 20:17 | **absent** 7:7 | 35:5 77:12 | **advance** 53:6 |
| **5974792** 1:17 | **absolute** 52:8 | **actual** 23:7 | 56:12 81:4 |
| 96:22 97:22 | 53:14 56:8 | 74:13,17 84:15 | **advancing** 76:2 |
| 98:22 | 57:3 | 84:16 | 81:9 |
| **6** | **absolutely** | **actually** 8:16 | **advantage** |
| **6** 50:15 52:11 | 31:16,19 41:13 | 13:13 17:11 | 46:14 |
| **650** 18:14 | **abuse** 36:14 | 28:3 34:4 | **advised** 72:3 |
| **67** 4:22 | **abused** 86:21 | 38:19 39:3,15 | **affect** 64:17,18 |
| **6th** 52:9,12,13 | **accept** 47:19 | 40:21 41:19 | 66:9,17 68:16 |
| 52:17,22 53:5 | **accepting** 42:5 | 51:7 52:7,10 | 74:21 89:1 |
| 54:3,7 | **access** 54:8 | 53:5 54:1 58:2 | **affiliated** 43:22 |
| **7** | 57:22 | 62:15 66:18 | 53:1 |
| **7** 82:4,12,14 | **account** 68:3 | 68:9,19 83:6 | **affirm** 88:19,21 |
| **7/3/2021** 4:17 | **accountability** | 84:14 85:1,16 | **affirming** |
| **70** 5:4 | 36:19 | 87:8 88:19 | 88:22 |
| **73** 5:7 | **accountable** | **ad** 70:19 87:21 | **agenda** 45:8,9 |
| **79** 5:13 | 36:7 | 88:6 90:16,20 | 45:11,14 48:9 |
| **8** | **accurate** 94:9 | 90:22 | **agents** 36:15 |
| **8** 4:3 | 95:5 96:19 | **added** 60:5 | **ago** 22:1,4 80:5 |
| **804** 2:8 | **accurately** | **adding** 60:6 | **agree** 7:5,9 |
| | 35:17 72:16 | **addition** 12:19 | 30:18 39:21 |
| | | 16:15 58:9 | 45:13 88:4 |

90:14,18
**agreed**  18:13
   66:12
**agreement**
   11:16 31:12,16
   34:1,5,6 67:5,5
   67:8 68:6,8
   69:7
**agreements**
   85:14
**ahead**  75:16
   92:21
**ailure**  74:2
**aired**  13:11
**al**  1:4 6:6 96:1
   97:1 98:1
**alexa**  3:14 10:9
   10:18 20:16
   22:12 29:14
   32:20 33:9
   34:13 35:20
   37:11,18 40:5
   44:15 46:6
   66:20 70:3
   82:9,14 86:5
   86:15 91:17
**alexandria**  9:3
   15:21 63:11
**alina**  50:1 51:3
**allegation**
   53:10 56:14,15
   57:5,20
**allegations**
   53:12 57:9,10
   57:13 58:6

74:18 76:11
90:12
**alleged**  34:7
   69:22
**allegedly**  71:3
**allowed**  30:4
   34:2
**amazon**  40:13
**amended**  9:16
   52:14,15,16
   70:17
**america**  44:21
   45:5,7,9,11,12
   45:19,21 46:8
   46:12 48:11
**american**  24:9
   33:16 36:8,12
   47:20 58:8
**americans**  38:1
   61:11
**americas**  2:14
**amoroso**  95:2
   95:15
**amount**  34:3
   58:14 60:4
   84:7
**analysis**  64:17
   64:18 66:9,17
   68:15
**anderson**  5:5
   73:5
**announce**  6:13
**answer**  46:4
   55:9,13 77:4

**answering**
   26:11
**answers**  98:7
**anticipate**  79:8
   81:16 83:7,22
**anybody**  83:14
**anyway**  52:2
**apartment**  16:7
**apologize**  16:8
   23:19 30:14,16
   38:22 55:14
   65:5
**appeal**  49:13
   49:18 52:7
**appeals**  50:12
   86:9
**appearance**
   35:1 39:2
**appearances**
   63:1
**appears**  11:3
   49:6
**appellant**  86:22
**appellants**  50:4
**appellee**  86:19
   86:20 87:22
**applicable**  7:13
   12:2 71:8
**application**
   55:5
**appointed**  54:2
**appropriate**
   85:10,13 89:4
   96:7

**appropriaten...**
   90:5
**area**  44:22
**argument**  74:1
   77:10
**arguments**
   75:4
**arrangement**
   11:14 67:14,17
   79:16 81:6
**arrangements**
   85:14
**art**  91:9
**article**  43:1
**asked**  11:6,8
   16:8 17:11
   18:12 79:2
   89:18
**asking**  46:3
   75:15 76:8,9
   77:1,1
**aspect**  47:22
**aspects**  45:11
**assassination**
   91:10
**assembled**  61:4
**assertion**  45:13
**assigned**  7:1
**assistants**  85:8
**associate**  20:3
**associated**
   46:12 47:20
**assume**  51:3
   88:15

| | | | |
|---|---|---|---|
| **assuming** 70:20 | **avoid** 58:3 | **battles** 33:21 | **better** 44:12 |
| **attached** 96:13 | **awarded** 17:18 | **began** 60:22 | **bias** 43:4 |
| 98:10 | **aware** 13:12 | **begins** 21:4 | **biased** 43:6 |
| **attaches** 10:15 | 20:9 21:16,18 | 70:13 87:4 | **biden** 40:10 |
| **attacks** 70:19 | 35:3 51:13 | **behalf** 2:2,10 | **big** 46:14,19 |
| 87:21 88:7 | 64:1,8,19 65:6 | 3:2 6:17 38:3 | 47:16 48:12 |
| 90:16,20 91:1 | 65:7 74:5,6 | 57:17 70:18 | 63:11 |
| **attempt** 57:6 | 83:14 84:10 | 87:15 | **bigger** 46:13 |
| **attention** 90:7 | 88:12 92:2 | **behavior** 80:14 | **biggest** 31:21 |
| **attorney** 25:16 | | 88:1 90:11,12 | 39:13 |
| 25:19,22 26:13 | **b** | **beliefs** 48:4 | **bill** 18:17 76:3 |
| 26:20 29:10 | **b** 4:5 5:1 | **believe** 8:18,21 | 77:13 |
| 49:1 50:1 75:2 | **back** 47:1,3 | 13:12,17,22 | **billed** 29:3 |
| 77:8 80:21 | 59:13 61:22 | 15:22 18:6 | 76:12 |
| 86:22 87:5,9 | 62:1,6 66:1 | 21:20 22:10 | **billing** 29:2 |
| 87:12,20 91:21 | 92:7,13 | 25:3,21 27:6 | 83:19 |
| 94:14 95:10 | **bad** 35:16 | 27:21,22 28:20 | **bills** 28:11 |
| 96:16 | **ballots** 58:2 | 41:20 46:22 | 76:12 78:13 |
| **attorney's** 17:9 | **ballpark** 28:13 | 51:7 52:5,15 | 79:5,8 |
| **attorneys** 11:9 | **bar** 12:9 64:21 | 56:11 58:17 | **binnall** 1:11 |
| 11:11 12:5 | 65:8,15 66:12 | 61:11,14 67:16 | 4:7,10,11,12,13 |
| 17:6,13,14,18 | 68:2,10 | 69:18 72:11 | 4:16,17,18,20 |
| 17:19 18:1 | **barbara** 24:20 | 80:3 83:4 | 6:5 7:20 8:1,9 |
| 49:14,16,22 | **barred** 71:5 | 84:18 | 8:10,12,13 |
| 63:17 76:21 | **base** 12:12 | **believes** 45:7 | 11:1 16:18,22 |
| 77:21 83:9 | **based** 11:18,19 | **bella** 18:6 | 19:14 20:9 |
| 89:5,12 91:11 | 12:3 14:17 | **benchmarks** | 21:1 23:18 |
| **audio** 94:8 95:4 | 16:14 32:16 | 67:9 68:5 | 29:22 30:15 |
| **august** 62:15 | 51:20 53:15 | **beneficial** 14:9 | 36:5,6 41:7 |
| 73:7 | 68:3 | **benefit** 14:9 | 43:20 44:1,3 |
| **authorized** 7:3 | **basically** 59:22 | **benni** 53:20 | 44:19 51:19 |
| **available** 12:17 | **basis** 46:16 | **bennie** 53:19 | 55:12 60:8 |
| **avenue** 2:14 | 47:18 63:21 | 54:2 55:15,17 | 62:9 76:20 |
| **averments** | 69:10 72:1 | **best** 27:1 45:1 | 82:18 92:15 |
| 32:17 | **bathroom** | 94:10 95:6 | 93:1 96:2 97:2 |
| | 61:20 | | |

98:2

**binnalllaw** 36:6
45:2

**biography** 90:4

**biss** 2:3,4 4:21
6:18,18 9:19
11:15 18:11
61:13 62:10
63:5,19,22
65:9,17 66:13
67:4 68:16
69:2,8 70:16
71:4 73:17,20
75:8,16 79:19
81:21 82:3,22
82:22 83:4,7
84:11 85:16,21
87:1,9,12,20
88:3,21 89:15
90:10 91:22
92:19

**biss's** 15:11
63:14 64:9
65:1 79:5,11
80:13 84:19
87:5 89:14

**bit** 58:11 66:16
67:19 68:10

**blassingame**
53:8,11,22
55:21 56:13

**blend** 79:15

**blocking** 54:15

**bluntly** 39:14

**board** 5:5
64:20,21 65:8
65:16 73:5

**bobbing** 23:19

**bobby** 53:2

**boils** 45:12

**bolger** 2:11 4:3
6:16,16,20 8:8
8:14 9:8 10:9
10:12,18,22
20:6,8,16,19
21:5 22:12,14
29:14,17 32:20
33:3,8,10
34:13,15 35:20
36:3 37:11,14
37:17,19 38:13
38:15 40:5,7
41:3,5 42:14
42:16 43:17,18
44:15,17 46:5
46:7 47:3,4
62:8 65:10
66:19 67:1
69:13,14 70:3
70:15 73:1,3
73:10,14 75:13
82:12,16 86:4
86:7,15,17
87:17,19 91:16
91:18 92:15,22

**breaching**
87:10

**bribing** 58:7

**brief** 9:17

**briefing** 73:21
75:18 77:8
78:1

**briefly** 38:20
39:2

**bring** 64:6

**brinkema**
72:11,14

**brittany** 95:2
95:15

**brought** 23:4
23:16 57:22
58:6,8

**bunch** 22:8
37:1

**burling** 23:15
23:16 31:18

**business** 26:6
45:2

**c**

**c** 2:1 3:1 5:11
6:1

**cable** 1:7 2:10
3:2 6:7 96:1
97:1 98:1

**call** 40:18 80:1

**called** 8:2

**calls** 70:20

**campaign**
57:17 58:22
59:4,5,8,10,14

**campbell** 3:12
6:9

**candor** 42:21

**capacity** 26:2,4

**caption** 9:4
18:7 54:4

**captioned** 21:7

**career** 90:4

**careful** 48:2,4

**carefully** 96:5

**carry** 36:15

**case** 9:16 11:10
12:7,21 18:17
18:22 21:7
23:1,3,8 24:1
26:16 27:6,10
28:5,6,12
32:12,13 34:22
35:2,3,4,5
38:21 39:3,4,5
39:9 42:1
49:13,17,18,19
50:4,22 51:8,9
51:14,15,17,22
52:5,15,19
53:8,11 54:4
54:11,22 55:20
55:21 58:5,10
60:13,14 63:19
68:17 71:16
72:16 74:7,22
75:3 76:7,8,15
76:16 77:7
78:7,10,11,14
79:14,17 81:4
81:8,9,14,15
82:20 84:1,6

84:17,22 85:4
85:7,10,17,22
87:7,8 88:10
89:6,7,14 90:2
90:2,6 91:11
91:12,15
**cases** 12:3,4,4
49:6 53:2,3,5,9
53:22 56:12,22
58:18 64:2,2,4
64:6 69:10
76:5 83:18
84:2
**caused** 14:19
**certain** 58:12
**certainly** 12:1
12:15 13:20
16:12 19:9,10
26:1,4 28:15
32:18 35:3
39:17 45:18
47:18 63:22
65:14 68:16
76:5 78:4
81:14 83:19
89:1
**certainty** 11:17
**certificate** 94:1
95:1
**certified** 7:10
**certify** 94:4
95:2 98:5
**cetera** 83:9,10
**chairman** 54:2

**change** 47:16
64:12 68:15
69:3,4,6 71:13
74:8,9 88:15
97:5
**changed** 47:14
**changes** 96:12
98:9
**character**
33:13 78:8
89:10 91:9,9
**characterize**
57:10,12
**characterizes**
57:8
**charge** 18:19
67:6
**charged** 68:21
75:6
**charges** 76:3
**charles** 51:4,19
**charlottesville**
2:6 63:12
**chasing** 60:22
**chastised** 87:20
90:13
**cheat** 48:12
**check** 20:14
61:20 80:4
**checkbook**
33:16
**checks** 28:4
**chesterfield**
64:9

**chorus** 91:21
**chyron** 13:14
14:5,16
**cir** 5:9
**circuit** 18:9
50:12 53:7,7
55:22 56:19
64:8 86:9,12
90:11
**circumstances**
15:18 16:5,9
82:19
**citation** 76:17
76:18
**cites** 87:7
**citing** 76:14
88:6
**citizen** 30:4
**civil** 17:17
53:15
**claim** 18:1
83:12,15
**claims** 34:8
54:3 71:5
**clear** 31:8
32:10 54:11
70:13,16 72:7
72:20 80:6
81:19 84:19
**clerks** 85:7
**client** 17:10
22:9,19 25:16
25:20,22 26:13
26:14,20 29:10
69:1 80:22

81:3 82:19
87:15
**clients** 47:20
48:20 72:3
**clinton** 49:12
51:9,16,16
**close** 37:11
42:14 58:16
69:13
**cnn** 4:9 6:17
8:14 13:2,10
14:20 21:3
39:13,16,18
40:13,19 41:13
41:15 42:12
**cnn's** 15:3,5,8
**colleague** 19:16
**colleagues**
34:21 72:5
**college** 9:12
40:11
**columbia** 7:5
50:8
**combined** 84:4
84:5
**come** 18:2,10
22:21 39:22
45:1 58:20
59:7 68:12
92:7
**comes** 8:16
17:19,22 48:2
48:21 56:13
**coming** 28:1
36:20 39:18

51:15

**commence** 65:1

**committed**
88:10

**committee** 16:4
16:13 54:3
59:17

**communicati...**
22:20 25:17
29:11

**complaint** 9:16
12:15 13:18
32:17 52:14,15
52:16,21 70:17
70:18,20 71:2

**complex** 9:3
15:21

**concern** 49:3,4

**concerned**
48:19

**concerning**
90:16,19

**conclude** 88:7

**concluded** 27:9
54:21 55:2
93:9

**conclusion**
11:13,14,18
12:13 55:3
64:7 69:2
71:22 80:16

**conclusions**
15:14

**condominium**
9:3 15:20

**conduct** 57:5
80:16 87:5,6
87:10 89:9,14

**confidentiality**
34:5

**conflict** 26:10

**congress** 47:11
60:17

**connections**
47:13

**conrad** 50:5

**conservatives**
41:14

**consider** 45:20
56:20 78:6

**consideration**
48:6 81:6

**considered**
74:20

**considers** 53:7

**consistent** 43:7
48:8

**consolidated**
53:8,22 55:21

**constitute** 7:16

**constitutional**
50:12

**cont'd** 3:1 5:1

**contends** 86:20

**content** 71:2

**context** 41:21
41:21 42:1

**contexts** 22:8

**contingency**
67:6 79:16

81:5 84:22
85:7,13

**continued**
64:15

**continues**
79:10 81:13

**continuing**
35:8 47:10
81:15

**contrary** 73:17

**conversation**
9:17 62:17,19
63:3

**conversations**
63:4

**conviction** 88:9

**convince** 31:8

**corner** 21:1

**correct** 8:12
9:20 10:1 11:2
15:12,13,15
22:15 23:7,8
24:5,6 27:5
32:7,8 36:20
38:18,19 39:14
39:20 49:8
54:9 55:11,16
57:9,17 65:11
65:13 77:14
81:22 98:6

**corrections**
96:5,8 98:9

**correctly** 60:5
60:18 64:22

**corruption**
38:1

**cost** 78:19 81:7

**counsel** 6:12
9:17 11:15
18:11 20:4
21:1 23:5,21
23:22 24:1,6
27:22 28:5,6
31:12 32:12
34:2,22 35:9
39:5,7 59:6
60:12,16 61:8
61:8 62:20
63:1,14 73:16
92:21 94:11,14
95:7,10

**counsel's** 31:3
31:6,11,17

**count** 31:14

**country** 30:9
63:17 64:3,16

**county** 5:6 18:9
64:9 73:5

**couple** 39:6
49:11 53:8
65:22 80:15
89:19

**course** 8:20
11:20 19:2
22:4 29:2
31:10 39:20
41:21 48:21
59:4 60:6 64:4
76:19 81:17

82:7

**court** 1:1 6:10
6:14 18:9 49:5
50:8,12 55:4
56:5 57:8 64:8
70:7 78:6,9,21
86:9,11,21
87:20 88:2,8
88:11 89:12
90:11 91:12,20
96:20

**court's** 73:18
88:5,6 90:14
90:15,18,19
91:6

**coverage** 39:18

**covington**
23:14,16 31:18

**created** 45:14
45:17

**creeped** 29:22
30:15

**criminal** 23:7,8
27:4

**crossed** 62:13

**crossfire** 35:6,7
69:21

**crying** 41:13

**current** 34:17

**currently** 43:19
53:6 55:22
56:12

**cut** 59:22 61:21
72:20

**cv** 21:4

**d**

**d** 4:1 5:11,11
6:1 86:19

**d.c.** 1:15 3:7
48:1,16 50:11
53:6,7 55:22
56:19

**damages** 36:18

**dan** 4:19 42:18
43:13

**danrather** 43:6

**date** 1:12 65:3
79:8 82:22
96:10 98:14

**dated** 4:15
10:14 37:21
40:9 41:7
44:19 73:6

**david** 3:12 6:9

**davis** 2:13 3:5
6:17

**day** 27:14
58:12 61:5
64:10 81:1
87:16 93:3

**days** 33:12,19
65:1 96:16

**dc** 44:22

**deal** 23:11
41:16 68:7

**deals** 31:15

**dear** 21:4

**debate** 68:10

**december** 27:8
60:1

**decide** 40:1
88:11

**decision** 56:13
70:6 73:4 86:9
86:11 88:12,20
88:21,22 89:1
89:16

**decisions** 48:7

**deemed** 96:19

**deep** 36:11

**defamation**
12:4 13:6,9
32:6,9 33:14
64:5 71:6,17
71:21 72:2,5,5
72:19 83:15,18

**defamatory**
32:13 34:8
71:3

**defame** 33:16

**defeated** 17:22

**defendant** 1:8
2:10 3:2 18:1
70:21

**defendant's**
57:5

**defendants**
50:10 57:4

**defending**
38:17,18,20
39:1

**defense** 27:19

**definite** 88:9

**degree** 11:17

**delay** 55:13

**denied** 37:8
55:5,6 88:3

**denying** 86:21

**department**
23:2 35:6
36:16

**depending**
56:20

**depends** 39:15
39:15

**deponent** 8:17
98:3

**deposing** 96:15

**deposition** 1:10
6:4,8 7:14 8:19
8:22 9:14
18:21 19:1,3,5
19:11 94:1
96:4,13,17,18

**depositions**
8:16,20 9:7
12:20 19:13

**describe** 43:20

**described**
12:14 72:16

**description** 4:6
5:2,12 14:6

**designated**
58:21

**despite** 11:21

**destroys** 41:13

detail 11:21
determine
77:17
determined
35:2
devote 82:3
83:1
diaz 4:8 21:3,5
21:10,19 22:7
dicta 89:13
90:17 91:4,7
difference
63:11
different 54:5
54:10 55:16
63:13 67:20
68:4,12 85:11
digital 94:8
95:3
digits 84:8
diligence 69:1
direct 42:20
directing 70:18
87:21
directly 29:3
disagree 57:11
60:5 72:9
disagreed
91:13
disappoint
19:15
disciplinary
64:20,21 65:8
65:16

disclosure
10:14 54:15
discovery 21:9
73:21 75:18
77:9 78:1
discretion
86:21 88:8
discriminating
46:15
discussed 18:5
51:8
discusses 52:21
discussing 14:4
discussion
62:21
disgrace 30:11
dismiss 23:3
dismissal 27:15
dismissed 27:7
49:17 54:3
71:7
dismissing
27:10
dispute 15:20
17:9 89:6
disputes 17:6
disseminating
43:5
distinction
54:12
distinctions
56:19
district 1:1,2
7:4 50:8,8
66:11 70:7,8

73:6 86:11,21
87:20 88:2,5,7
88:11 90:14
91:20
dm 45:1
doc 84:5
docket 12:16
57:4,14 80:20
document 84:6
documents
13:1 14:20
54:9,16 55:7
79:20,21
doing 26:10
43:15 48:20
56:3 61:11
66:6 76:1 96:9
dolan 51:4,5,11
51:14,19
dollar 34:3
60:3
dollars 28:19
59:17
domain 13:22
dominion
38:17 83:22
84:2
donald 49:12
50:5 53:20
55:18
double 80:4
doubt 72:15
drafted 88:13
duces 21:3

duke 9:2 15:21
16:7,11
duly 8:2 94:5
duplicative
78:18 79:3
duties 87:11
dwt.com 2:16
3:8

**e**

e 2:1,1 3:1,1 4:1
4:5 5:1,11,11
5:11,11 6:1,1
97:3
e.d. 5:4
earlier 15:19
86:10
earn 67:10
earned 68:4
87:5
earthlink.net
2:7
eastern 6:8
70:7 73:6 93:6
edge 33:1
effective 27:14
42:10
effectively
16:11,13,16
46:15 56:18
66:8
effort 39:19
81:2 84:16
eight 58:19
either 54:20
91:9

elected  88:3

election  52:11
53:3 57:8 58:1
58:5,12 59:16
60:18 61:5

emergency
55:5

emotions  48:18

employed
94:11,14 95:8
95:11

employee  94:13
95:10

ended  22:21
23:15

endorse  88:5
90:15,19

endorsing  91:4

endure  31:22

engage  20:2

engaged  18:12
23:1,6,9 36:15
59:3,5,7,10,13
59:13 61:9
87:14

engagement
67:4 68:6

english  72:13

ensure  58:1
73:20 75:17

enter  85:8

entered  27:10
27:16 39:2
63:1

entering  85:2,4

entire  33:20
38:3 58:3

entities  26:13

entitled  56:7,8
57:2 66:6
80:10

entity  38:21

entries  79:11
79:12 82:1

era  42:12 47:9

erik  55:18

errata  96:7,9
96:12,15 98:11

es  94:4

especially
42:11 48:1
78:12 81:5

esquire  2:3,11
3:3

essential  36:19
37:2

essentially
75:15

established
27:20

establishing
74:2

estimate  83:3,6

et  1:4 6:6 83:9
83:10 96:1
97:1 98:1

ethical  68:12

ethically  67:20

evans  18:6

events  25:13

everett  32:6
33:15

evidence  78:9
89:10

evidentiary
7:13

exact  9:4 60:3
75:11

exactly  14:8
42:2 83:5

exaggerates
71:2

examination
4:2 8:7

examined  8:4

example  49:16
70:19

examples  31:22

exceeded  84:1

exceeds  83:20

excellent  46:13

except  98:9

exceptional
38:5

excessively
70:17

exciting  32:22

executive  54:17
54:18 55:1

exhibit  4:7,8,10
4:11,12,13,16
4:17,18,20,21
5:3,5,8 10:8,16

20:7,21 21:13
29:19,20 33:4
33:6 36:4,21
37:16,18 38:7
40:8,15 41:6
41:10 42:17
43:9 44:18
45:3 67:11
70:5,6,9 73:4,8
73:11 82:7,10
86:8,13,16

exhibits  33:1

existing  73:22
74:2 75:5
77:10,11 78:2
78:3

expect  18:19
19:5 76:17,17

expected  75:2
85:8

expended
18:21

experience  12:3
44:21

experienced
80:20

expert  4:7 9:21
10:14,15,20
11:2,13,14
15:14,16,20
16:1,1,3,7,10
17:1 18:12
63:16 64:12
76:19,21 77:4
79:21 81:12

82:2 88:13
91:13 92:3
**expertise** 16:22
**explain** 67:21
**express** 15:1,4
15:7
**extended** 64:21
**extending** 74:1
75:4 77:11
78:3
**extent** 81:13

**f**

**f** 5:3 74:2
**f.3d** 5:8
**face** 41:14
**facial** 51:21
**fact** 46:14 67:2
68:14 76:16,16
78:20 81:7
87:9
**factors** 12:1
74:20 77:18
**facts** 12:12,14
12:17 78:15
**factual** 56:19
**fail** 96:18
**failed** 87:13
**fair** 48:21
**fairfax** 18:9
**fake** 40:12,19
40:21 43:5,6
**false** 13:8,9
63:19 64:5
83:12

**falsely** 69:22
**family** 14:16
24:10,13 25:18
26:5,21 30:10
30:20,21,22
31:2,4,22 32:2
38:4 45:20
**fan** 39:13 43:13
**far** 12:5,6
18:18,20 26:17
66:4 82:1
84:18
**farhip** 42:19
**fbi** 36:15,16
**february** 13:11
**federal** 49:5
59:16 87:11
**fee** 17:9,19 66:6
67:6,6,10,14,17
67:17 79:16
81:5 84:22
85:7,14 89:5
**feel** 10:7
**fees** 11:9,11
12:6 15:12
17:6,13,14,18
18:1 49:16
76:21 77:21
89:12 90:5
91:2,11,14
**fiduciary** 87:11
**fifth** 73:11
82:18
**fightlikeaflynn**
38:6

**figure** 28:13
**file** 52:14 75:16
**filed** 35:11 36:6
52:5,12 70:17
71:6
**filing** 37:22
**final** 73:15
**finally** 86:4
**financially**
94:15 95:11
**findings** 74:13
**fine** 39:12 80:9
**finest** 30:8
**fired** 43:5
**firm** 19:20 22:7
28:9 32:5,11
44:4,13,20
46:19 47:7
61:3 88:9
**firms** 46:11,13
46:15 47:12
**first** 8:2,15
11:3 18:4
44:21 45:5,7,9
45:11,12,19,21
46:8,12 47:20
48:11 59:11
62:9,11,16
87:4 88:19
91:3
**five** 61:19,22
84:8
**flames** 40:11
**flat** 67:6,10,17
79:16 85:14

**floor** 2:14
**florida** 35:11
**floyd** 6:6
**flynn** 1:4 2:2
4:9,14 6:6
14:16 21:3
22:22 23:7,10
24:8,18,20,22
25:2,4,8,18,20
26:5,19,19,21
27:1,20 30:8
31:9,13,13
32:5,11,14
33:18 34:16
35:8 36:11,14
37:21 38:4
45:20 59:9,15
70:2 96:1 97:1
98:1
**flynn's** 25:5
31:11 33:13
**flynns** 25:10
**focus** 70:13
**folder** 41:7
**folks** 19:19
**follow** 27:12
**followers** 57:6
**follows** 8:4
**foolish** 48:19
**foot** 61:21
**foray** 14:19
**foregoing** 94:3
94:4 95:4 98:5
**forgive** 23:9

**forgot** 30:14
**form** 75:8 84:3
  98:9
**formal** 59:1
**former** 49:7
**formerly** 27:7
  43:22
**forthright**
  87:13
**forward** 33:15
  58:6
**found** 42:20
  61:1 78:9,9
**founder** 43:20
**four** 24:14
  25:14
**fourth** 10:20
  68:20 86:9,11
  90:11
**fox** 83:22
**frame** 66:1
**frankly** 46:17
  71:20,21 89:13
**free** 33:12
**freshman**
  40:11
**friend** 44:10
**friends** 72:4
**frivolous** 75:4
**front** 10:19
**full** 26:10
**fully** 12:14
  85:12
**function** 9:9

**fund** 27:20
**further** 90:8
  92:16 94:13
  95:9
**fynn** 11:10

**g**

**g** 6:1
**garden** 51:20
**garrison** 67:3
**garza** 50:18,21
**general** 4:14
  22:15,22 23:6
  23:10 24:8
  26:19 27:1,20
  30:3,8 31:9,11
  31:13 32:5,14
  33:13,18 34:16
  35:8 36:11,14
  37:20 59:9,15
  70:1
**generally** 10:6
  76:9,10
**genflynn** 33:14
  36:9
**genuinely**
  60:10
**geographically**
  63:12
**getting** 29:10
  54:8 58:14
  80:22
**ghw** 1:8
**give** 9:5,7,11,21
  14:5 24:15
  28:13 31:9

34:10 61:22
  92:5,6
**given** 16:3
  35:22 73:18
  79:7 80:4,5
  84:18 98:7
**giving** 16:10
**glasses** 23:18
**gloucester** 5:6
  73:5
**glynn** 22:15
  30:3
**go** 16:20 33:9
  37:17 49:2
  60:8 75:16
  86:16 91:16
  92:6,21
**goes** 11:20
  56:20 80:21
  81:17 87:17
**going** 6:2 10:2
  10:4 13:3
  20:20 28:3
  38:10 44:15
  49:10 51:1
  55:16 59:13
  61:2 62:3 70:4
  70:12 77:20
  81:14 82:13,13
  87:18 92:10
  93:1,5
**good** 6:21
  33:13 42:19
  44:10 64:16

**government**
  36:7 37:8
**government's**
  37:9
**gravida** 18:6
**great** 8:13
  11:13 24:9
  46:17
**greaves** 19:16
  20:3,10,22
**group** 21:2
  36:6 38:5
  43:20
**growing** 44:20
**guarantee**
  27:12
**guess** 28:4 30:6
  43:19 56:21
  59:21 76:11,22
  77:1
**guessing** 28:2
**guilty** 31:14
**guy** 43:4 51:6
  58:22
**guys** 34:2 44:11
  63:8

**h**

**h** 4:5 5:1
**ha** 40:10
**hac** 35:2
**hack** 41:13
  43:7
**half** 28:17,19
**halper** 5:3,8
  70:6,19,20

86:10,20 87:22
halper's 86:19
hand 7:21
handful 63:6
handle 41:15
  68:17
handled 23:14
  42:11 64:2
handles 69:9
handshake
  31:12,15
happen 30:4,12
  30:13 76:5
happened
  14:13 30:2
  76:7
happens 14:3
happy 34:10
  79:2
hard 61:10
harm 64:4
  68:17 69:10
harvey 44:1,3,5
  44:6
hatred 42:20
he'll 92:19
head 20:13
  23:19 26:12
  34:12 35:15
  42:3 52:20
hear 55:9
heard 8:9 65:9
  65:12
hearing 7:18

heat 71:1 88:1
heavy 84:6
held 53:6 56:12
hell 30:11
help 23:1
helpful 89:4,5
  89:22 91:13
helping 81:4
hereto 94:15
  95:11
hero 30:3 36:9
hey 89:19
  90:10,21
high 14:12,15
  48:18 63:18
  83:18
higher 76:12
  78:13
highest 36:17
hillary 49:12
hire 46:12,17
  47:17,18 48:3
  48:3
hiring 48:6
history 87:6
hobba 50:1
  51:3,10,14,16
hold 36:7 38:16
holding 91:6
hominem 70:19
  87:21 88:6
  90:16,20 91:1
honest 82:9
honestly 13:18

hope 19:9,11
hour 18:14
hourly 67:8
  75:6 76:13
hours 18:22
  19:1,6 58:13
  82:4,21 83:1,5
  83:8,12,16,20
  84:2,7 85:21
house 47:14
hurricane 35:7
hybrid 85:14
hypothetical
  77:2
hypothetically
  77:7

i

identification
  10:17 21:14
  29:21 33:7
  36:22 38:8
  40:16 41:11
  43:10 45:4
  67:12 70:10
  73:9 86:14
identified 22:6
identify 10:3
  67:8,9
images 13:17
immune 53:14
immunity
  50:14 51:2
  52:8,19 53:9
  56:1,8 57:3

impact 78:10
  84:16
imperative
  96:14
importance
  53:16 56:6
  57:1
important
  37:22 40:1
  41:22 42:1
  71:19 81:5
importantly
  74:12,19
impose 21:10
imposed 82:19
improper 76:10
  90:12
improved
  39:16
impugn 33:12
inappropriate
  31:16,19 70:1
  75:7 88:6
  90:16,20,22
inappropriately
  31:3
inciting 57:6
include 30:20
  83:8 85:1
included 30:21
includes 83:8
including 58:7
  58:7 73:20
  75:17 77:8,22
  87:10

inconsistent
  79:14
incorrect  42:7
increased
  78:19
incredible  31:1
incur  11:12
  12:5
incurred  11:9
  11:11
index  1:6
individual
  25:18 26:1
  69:18 78:15
individuals
  26:1,5 58:7
information
  81:11
infuriating
  30:11
initial  30:1
injured  61:21
instance  75:1
  84:5,6 85:6
instructions
  9:6 96:3
intended  7:12
intent  15:8
intentional
  65:14
interested
  22:20 51:11
  94:15 95:12
interesting
  71:16,17

intrude  25:16
invasive  21:8
investigation
  35:9 69:21,22
investigations
  35:7
invoices  29:4
involved  13:14
  17:9 31:2
  34:20 39:10
  57:16,20 58:18
  61:13,14,16
  81:8
involves  17:16
involving  17:10
irregularities
  60:18
island  12:2,10
issue  13:2,5
  14:13 17:12,19
  17:21 50:11,11
  50:13,13 51:2
  52:18 53:9,13
  56:1,5,17
  67:19 68:1,4
  68:13,14,20
  72:7 78:5 91:4
issued  21:3,6
issues  16:2
  17:14 39:22
  52:8 58:9
  68:12 71:17
  74:18 78:20
  79:1 89:7

iteration  52:21

**j**

jack  1:4 2:2 6:6
  6:6 11:10
  24:22 96:1
  97:1 98:1
january  10:14
  50:15 52:9,11
  52:12,13,16,22
  53:5 54:2,7
jason  19:16
  20:22 21:19
jbinnall  33:18
  38:4
jesse  1:11 4:7
  6:4 8:1 76:20
  96:2 97:2 98:2
job  1:17
joe  24:18 25:4
john  1:4 2:2 6:5
  6:6 96:1 97:1
  98:1
join  91:21
jones  41:12
  42:3
joseph  39:8
jr  31:13
judge  27:6
  35:13 72:7,10
  72:11,12,13,13
  74:15
judge's  71:22
  75:7
july  41:7 67:3

june  1:12 6:3
  22:18 27:3
  93:5
jurisdiction
  71:9
justice  23:2
  35:6 36:16

**k**

k  3:6
kate  8:14 9:8
katebolger
  2:16
katherine  2:11
  6:16
keep  82:9,13,13
  87:18
keeps  51:19
kicking  51:19
kind  26:6 33:2
  62:20 85:5
kingdom  71:6
  71:21 72:2,6
kirkland  56:10
  56:11
knew  21:20
  31:17,18 65:21
  66:1,14
knicks  51:6
know  8:15 9:6
  9:6,11 13:1,6,9
  13:18 14:18,20
  17:21 18:20
  19:13 20:12,12
  20:14 26:6,9
  26:15 28:3,10

28:22,22 33:1
35:13 38:10
39:9,9 42:2
44:21 45:16
48:3 51:6,18
51:18 53:12
56:5 60:9
61:10,18 65:15
65:21,22 66:4
66:5,10,18
68:11 69:15,19
71:11 72:7,17
76:13 77:22
78:20 79:15
80:6,12 84:7
84:13,16,22
85:11,15,21
88:19 90:3,10
90:10,21
**knowledge**
16:14,15 71:20
72:4 94:10
95:6
**known** 19:13
63:22 71:4
**knows** 30:7
60:9
**krishnan** 3:3
6:17

**l**

**lack** 44:11
47:12
**laid** 66:9
**language** 70:22
74:16 75:11

89:3
**larry** 39:8
**laughing** 41:13
**laundry** 24:15
24:17
**law** 2:4 12:2
19:19 21:1
28:9 36:6 38:2
38:4 43:20
44:4 46:11,13
47:7,16 60:8
61:3 64:10,15
66:5 69:8,9
71:17,21 72:2
72:5,6,21
73:17,22 74:2
74:2 75:5
77:10,11 78:2
78:2,3 85:7
87:11
**laws** 7:14
**lawsuit** 13:6,8
13:9,10 32:6,9
33:14 34:17
36:7 37:3,9
38:17 53:15
54:18
**lawsuits** 59:19
**lawyer** 8:14
39:8 68:22
75:6 81:9
**lawyerly** 52:2
**lawyers** 20:1
39:10 45:1
63:20 68:11

81:8
**lead** 24:1 27:22
28:4,6 61:1
**leader** 45:18
**leadership**
36:16
**leak** 48:9,15
49:2
**leaks** 48:5
**leave** 10:5
91:20
**leaving** 58:10
**led** 43:4
**left** 33:12 82:14
88:9
**legal** 21:8
27:19 33:21
63:18 85:7
90:4,5
**legally** 67:20
**leslie** 11:10
25:2
**letter** 4:8 20:21
21:7,16,21
**level** 14:12,15
38:1
**leverage** 32:1
**liar** 48:12
**liberal** 43:7
**license** 49:1
64:10 65:1
87:9,16
**licensed** 48:22
66:5 69:8

**life** 30:9
**light** 13:8,10
39:20 63:19
64:5 83:12
**liked** 80:17
89:18
**likely** 48:9,14
**limitation**
82:19
**limitations**
71:8
**line** 21:2 97:5
**lines** 42:4
**link** 42:22
**list** 24:15,17
**listing** 51:10
**litigate** 12:7
49:18 51:1
83:12,16
**litigated** 12:17
12:18 17:14
58:10 83:6,11
83:15 89:8
**litigating** 12:3
17:6,9 39:6
49:16 52:18
**litigation** 8:15
11:12 14:14
18:4 27:5,14
31:2 37:6
44:22 50:6,7
51:1,4 53:20
59:18 71:1
72:18 73:6
76:12 78:4,17

78:19 79:4,9
80:14 81:13,15
81:22 82:4
83:2 84:12
87:5 88:2 89:5
89:6
**litigations**
49:11 54:20
57:16,19,21
83:21
**little**  58:11
66:16 67:19
70:14 86:18
**livepddave**
41:12
**living**  75:2
**llp**  2:13 3:5
**load**  33:1
**local**  60:12,16
61:8
**location**  1:14
**locations**  25:12
**lokhova**  5:3,8
69:15,17,18
70:6 71:4
86:10
**lokhova's**
70:18
**lone**  56:4
**long**  19:13
22:17 70:17
80:18 81:20
87:7
**longer**  54:1

**look**  12:15 29:1
33:8 60:20
70:4 75:12
78:5,14 80:19
84:8 87:2 90:1
**looked**  9:16
12:1,16 13:2
14:20 59:16
81:11 86:10
**looking**  25:16
78:8 81:2
85:13 91:10
**lori**  25:8,20
26:19
**lot**  13:20 28:16
80:20
**love**  40:10

**m**

**m**  2:11 5:11
**ma'am**  12:11
15:6,9 17:3
18:15 22:16
24:3 27:18
28:8,10 29:13
34:19 35:12
38:9,11 40:17
43:11,21 44:2
48:10,13 49:20
50:16 53:18
54:10 57:18
60:19 62:21
63:15 64:11,14
74:4 89:17
92:8,18

**machines**  58:11
**made**  29:19
32:14 54:11
90:22 96:8
**madison**  51:20
**maga**  45:1
**main**  2:5
**majority**  47:13
**make**  35:1 36:1
54:11 64:22
70:12 75:2
76:3,11,12
96:5
**makes**  43:1
**making**  23:19
75:3
**malicious**
36:14
**man**  43:8
**manner**  7:14
**march**  4:15
37:21 44:13,19
47:5 66:10
**marcus**  53:2
**mark**  10:8
20:21 70:5
**marked**  10:16
21:13 29:20
33:6 36:21
38:7 40:15
41:10 43:9
45:3 67:11
70:9 73:8
86:13

**market**  75:1
**math**  60:9
**matt**  6:11,22
66:20
**matter**  6:5
18:13 20:11
22:11 27:7,9
50:21 51:11
55:15,19 62:18
78:19 86:10
**matters**  17:15
26:18 59:12
81:10
**matthew**  1:16
94:2,17
**mccann**  24:2,4
**mean**  14:4 26:3
26:3 45:10
46:10 47:10
56:18 59:2
60:2 72:15
74:12 75:5
76:4,6 78:4
80:19 89:11,22
**meaning**  15:2
**means**  7:15
**meant**  43:2
65:4,13 72:13
**media**  6:3
13:21 70:21
**meena**  6:16
**meenakshi**  3:3
**meenakshikri...**
3:8

meet  30:9 62:9
member  26:21
members  14:16
   24:10,13 25:18
memorandum
   73:19
memory  11:21
   14:10,12 22:2
   26:17 27:1
   32:16 35:18
   52:17 84:19
   88:20
men  30:8
mentioned
   25:15,18
mentions  52:16
mess  40:12
met  24:10,12
   24:13,14,18,20
   24:22 25:2,4,6
   25:10,11,11,12
   63:8
michael  30:3
   31:13
michigan  52:3
mildly  60:18
million  28:19
   36:7 59:17
mind  17:22
   18:2 29:14
   32:20 35:20
   37:12 42:15
   51:15 66:20
   73:2 86:16

mine  44:9,10
minute  21:22
   22:4
minutes  61:20
   61:22 92:7
misconduct
   58:6 65:18
   68:21
misspeak  80:3
mistake  88:10
modifying  74:1
   75:4 77:11
   78:3
molly  24:2
moment  10:11
   34:10 66:22
   82:11
monday  1:12
money  28:1
   68:3,7
months  80:5
moore  53:2
morning  6:22
   61:21 92:16
motion  37:7,8
   86:19,22 88:4
motions  12:18
motivated  36:8
moved  23:3
movement
   45:19,21 46:12
   47:21
mueller  69:21
multiplication
   76:1

multiplicative
   77:12

**n**

n  2:1 3:1 4:1
   5:11 6:1
name  6:9,22
   18:4,7 55:16
   69:20
named  19:16
   32:6
names  35:15,16
national  16:4
   16:13 69:20
native  58:8
nature  68:21
   71:2
necessarily
   63:12 76:4,6
   77:12,16,19,19
   78:10,12 85:8
necessary
   33:21 81:12,18
   91:5 96:5
need  9:5 14:11
   41:14,19 65:17
   83:5 90:8
needed  12:17
   27:13
needlessly
   78:19
needs  12:7
negatively
   64:18
negotiations
   87:14

neither  94:11
   95:7
network  1:7
   2:10 3:2 6:7
   96:1 97:1 98:1
nevada  57:17
   57:21 58:18,21
   58:22 59:4
   60:15 61:5,14
never  30:3,12
   30:13 36:12
   38:19 39:3
   43:7 62:22
   63:1,14 72:20
nevertheless
   91:8
new  1:2 2:15
   9:10 47:11,13
   51:6 74:2
   94:19
news  1:7 2:10
   3:2 6:7 40:3,12
   40:18,19,21,21
   43:5,6,8 96:1
   97:1 98:1
nicholas  41:1
nine  19:21 20:1
ninth  86:16
   87:3
noise  23:19
non  26:7,8
nonfrivolous
   73:22 77:10
   78:2

**northwest** 3:6
**notary** 1:16 7:3
  94:18
**note** 33:12 87:4
**noted** 96:12
  98:10
**notice** 39:2
**noting** 87:22
**notoriously**
  35:15
**november** 52:6
  60:1 64:8,19
**number** 6:4
  17:15 24:13,14
  25:13 32:15
  37:18 39:18
  45:10 50:9
  57:20,21 58:6
  61:6,10 64:2
  77:18 78:20
**numbers** 60:4
**nunes** 87:7
**ny** 2:15

**o**

**o** 5:11 6:1
**oaths** 7:4
**obama** 36:18
**object** 75:8
**objection** 4:8
  7:7,18 21:2
**objections** 21:8
  73:17
**observation**
  90:15,18

**observations**
  88:5
**obviously**
  22:19 40:12
  80:9,10 83:4
**occasions** 25:13
**october** 20:21
  59:14 65:16
**office** 25:11,15
  31:3,6,11,17
**officer** 94:1,2
**offices** 2:4
**officials** 36:17
**oh** 16:21 28:10
  40:20,22 45:10
  72:12 75:14
  85:6
**okay** 8:13 9:5
  9:21 10:2
  12:12 14:3,11
  14:18 15:1,10
  15:16 17:4
  18:8,19 19:4,8
  19:19 20:3,6
  20:16 21:16,22
  22:7,12 23:17
  24:2 26:22
  27:3,17 28:6
  28:21 29:6
  32:3,19 33:4
  33:11 34:1,12
  34:16 35:19
  36:4 37:5,10
  37:15 38:10,12
  38:16 40:4,18

41:2,6 42:8,13
43:16,22 44:3
44:14 46:5
47:6 49:10,19
50:5,15 53:1
53:17,19,21
54:14 55:3,12
55:18 56:9
57:4,16 60:8
60:12 61:13,16
61:19 62:3
63:4 65:7,15
66:10,18 69:12
70:11 71:13
72:22 73:15
75:21 80:11,12
82:2,12,15
86:3,8,18
91:16 92:5,10
92:20 93:4
**old** 9:11
**once** 8:19,22
  23:15 54:1,1
  90:22
**one's** 52:10
**ones** 18:2
**ongoing** 18:5
  50:7
**open** 43:4
  58:11,14 71:17
**opened** 58:13
**operations** 61:5
**opine** 11:7,8
  77:20

**opined** 68:2
  80:13 89:13
**opining** 90:3
  91:1,14
**opinion** 15:2,4
  15:7 16:1,1,10
  24:8 64:12
  69:3,4,7 71:13
  73:19 74:8,10
  74:17 75:7
  79:22 81:13
  88:13,15 92:3
  92:4
**opinions** 16:7
  39:21
**opportunity**
  46:14 81:7
**opposed** 54:12
**opposing** 87:14
**oral** 80:3,7
**order** 12:7
  27:10,15 81:12
**ordered** 66:12
**organization**
  52:3
**organizations**
  40:3,19,21
**original** 14:18
  96:15
**originally**
  65:12
**outcome** 94:16
  95:12
**outrageous**
  36:13

[outside - politics]                                          Page 19

| | | | |
|---|---|---|---|
| **outside**  59:5 | **pardon**  26:22 | **pastor**  3:14 | **plaintiff's**  9:22 |
| **overall**  53:13 | 27:7 | 10:11 20:18 | 10:13 34:2 |
| **overbroad**  21:8 | **pardoned**  23:4 | 29:16 66:22 | 73:16 |
| **overtly**  31:7 | **parliamentari...** | 82:10 | **plaintiffs**  1:5 |
| **overturn**  57:7 | 16:15,17,19 | **paths**  62:13 | 6:19 9:18 |
| **own**  12:3 | 17:1 | **pending**  18:8 | 11:10,15 50:9 |
| **owns**  51:6 | **parliamentary** | 52:7 | 78:22 80:15 |
| **p** | 16:1,10,12 | **people**  46:12,15 | **platform**  85:2,5 |
| **p**  1:4 2:1,1,2 | 59:12 | 46:17 47:13,18 | 85:9 |
| 3:1,1 6:1,5,6 | **part**  45:20 | 48:3,8,17,18 | **plea**  23:11,12 |
| 96:1 97:1 98:1 | 67:10 69:8 | 51:19 61:10 | 23:13 31:16 |
| **page**  4:2,6 5:2 | 71:15 | 66:7 85:1,16 | **plead**  31:14 |
| 5:12 10:19,20 | **partial**  37:3 | **percent**  67:18 | **please**  6:12,14 |
| 11:4 17:5 | **particular** | **perfect**  82:15 | 7:20 11:5 |
| 29:18 33:9 | 26:18 29:11 | **perform**  63:18 | 20:17 22:13 |
| 36:1 66:21 | 42:11 74:7 | **period**  46:11 | 29:18 31:5 |
| 68:20 70:4,11 | 75:1,10 78:7 | 58:19 59:20 | 32:21 41:4 |
| 73:11,16 82:4 | 78:14 | 87:12 | 42:22 44:22 |
| 82:14 86:16 | **particularly** | **permitted**  7:12 | 73:10 86:5,6 |
| 87:3 91:17 | 73:18 74:18 | **persecution** | 96:4,9 |
| 97:5 | 89:22 | 36:8 | **plus**  67:6,18 |
| **pages**  98:6 | **parties**  7:5,8 | **person**  32:6 | **point**  17:11 |
| **paid**  18:16 | 94:12,14 95:8 | 63:8 | 23:13 27:9 |
| 27:17,19,21 | 95:11 | **personal**  43:14 | 47:16 49:6 |
| 28:9 29:4 | **partner**  20:4,5 | **personally**  26:8 | 69:19 75:10 |
| 59:17 85:3 | 44:7,9 | 34:20 | 79:13 88:3 |
| **paragraph** | **partners**  19:22 | **personnel**  83:9 | **polarize**  48:17 |
| 70:12 73:15 | **parts**  12:16 | 84:20 | **polarized**  48:17 |
| 74:9,13 75:10 | 69:5 | **phillip**  44:6 | **political**  25:12 |
| 82:17 87:3 | **party**  16:16 | **phone**  62:12 | 48:4,9 |
| **paralegal**  44:21 | 20:10 21:9 | **phrasing**  91:12 | **politically**  36:8 |
| 45:5,7 46:8 | 22:5,5 87:14 | **places**  63:13 | 48:16 |
| **paralegals** | **pass**  22:21 | **plaintiff**  2:2 | **politics**  43:14 |
| 48:22 85:7 | **past**  39:19 66:3 | 18:11 54:5 | 47:18 |
| | | 56:4 | |

poll  57:22 58:2
polls  58:11,13
  58:14
portion  81:21
portions  10:5
posed  42:6
position  53:17
positions  73:20
  75:17 76:2
  77:8,22
possible  62:13
possibly  84:1
post  40:13 43:1
  58:5
potentially
  82:8
powell  23:21
  23:22 28:7
  29:3,7,8,12
  38:17
powell's  24:4
practice  17:16
  64:15 66:5
  69:8
practiced  64:15
practicing  69:9
praise  43:5
precincts  58:12
precise  37:22
prejudice  54:3
  88:4
premise  42:5,6
preparation
  19:4,7

prepare  9:13
prepared  95:3
preparing
  18:21 19:1
present  3:11
president  23:4
  26:22 30:2,7
  45:15,17 49:7
  49:14,22 50:10
  50:17 51:5
  52:6 53:14
  54:9,16 56:7
  57:2 59:18
presidential
  50:13 51:2
  52:19 53:9
  54:19 55:1
  56:1 57:7
press  42:21
previous  73:18
previously  71:5
  79:6
primarily
  27:22 59:12
primary  52:18
printed  49:5
printout  29:19
  33:5 40:9
prior  94:5
privilege  54:17
  54:18 55:1
privileged
  62:19,22 63:2
  63:2

pro  35:2
probably  27:12
  27:13 40:1
  83:17 91:3
procedural
  7:13
procedure  16:2
  16:12 59:12
procedures
  16:10
proceed  6:15
  8:6
proceeding
  1:14 7:2,11
  8:21 9:1 93:9
  95:4
proceedings
  76:1 94:3,5,6,9
  95:6
process  11:12
  36:15 58:3
produced  7:10
  79:22
production
  80:1
professional
  11:17 16:17
professionals
  48:22
proffer  31:9
profile  63:19
  83:18
profit  26:7,8
projects  82:3
  82:22

promptness
  69:1
propagated
  45:14
proper  78:6
properly  63:18
  66:5,5 69:9
propounded
  98:8
prosecute  31:7
  31:12 82:21
prosecution
  23:7 35:9
  36:14
prosecutors
  36:17
provided  46:13
public  1:16
  13:22 53:15
  56:6 57:1
  65:17 66:12
  94:18
published
  14:21
publishing  13:2
  15:8
pull  49:1
punitive  36:18
purely  52:2
purpose  10:7
  21:7
purposes  11:1
pursuant  17:18
put  10:9 11:19
  20:6,16 30:9

30:11 31:15
34:13 37:4
38:13 39:13
40:5 41:3
44:16 47:1,3
60:18 61:1
68:5 70:4 73:1
73:2 81:2
86:4,6
**putting** 29:15
32:21 35:21
37:12 42:15
45:12 66:20

### q

**qanon** 14:17
**qualified** 68:17
69:11 94:7
**question** 13:4
14:19 16:8
18:5 26:11
42:5,11 52:2
60:21 61:2
75:15,19,22
90:8
**questions** 10:4
10:6 71:18
89:19 92:16,19
98:8
**quick** 9:10
**quickly** 9:9
**quite** 31:1
46:16 68:10
71:20,21 72:19
89:13

**quote** 30:7 37:3
41:8
**quotes** 33:18
37:5

### r

**r** 2:1 3:1 5:11
6:1 97:3,3
**raise** 7:20 21:7
90:7,7
**raised** 71:16
**ranking** 36:17
**rate** 18:14 67:8
**rates** 74:22
75:6
**ratfucker** 70:21
**rather** 4:19
24:14 35:18
42:18 43:14
71:16,16
**razor** 35:7
69:22
**reached** 18:11
64:7 80:16
**reaching** 79:21
**read** 36:9 64:1
92:4,19 96:4
98:5
**reading** 88:20
**reads** 40:10
57:4,14 73:16
86:20
**ready** 33:17
**real** 41:15 46:9
**realize** 51:4

**realized** 16:6
47:12
**really** 10:8
46:17 81:1
**reason** 29:11
55:12 60:5
77:13 88:18
96:6 97:7,9,11
97:13,15,17,19
**reasonable**
11:16,16,17
12:5,6 68:22
76:1,21 77:21
80:14,17 91:2
**reasonableness**
11:9 15:11
17:12 74:22
78:11 91:10,14
**reasons** 81:16
**recall** 62:16
**receipt** 96:16
**receive** 65:17
66:6
**received** 17:11
20:21
**recent** 17:21
39:17 52:21
**recently** 17:8
68:2
**recite** 14:10,11
**recognition**
51:21
**recollection**
14:7 22:4,6
32:18 34:9

35:18 62:14
**record** 6:3,13
7:1,8 10:3,13
11:1 29:19
32:12 34:22
36:4 37:15
62:4,5,7 68:19
70:13,16 92:11
92:12,13 93:5
94:9 95:5
**recorded** 7:14
94:6
**recording** 94:8
95:4
**recordings**
7:10
**records** 54:19
55:1 84:15
92:6
**redgate** 24:20
**reduced** 94:7
**refer** 8:11
**reference** 17:5
**referred** 40:20
**referring** 23:17
**refers** 70:21
**refresh** 14:7
32:18 34:9
35:17
**refreshed** 22:2
22:3,6
**refuse** 47:19
**refused** 47:17
**refusing** 46:11
47:17,19

**regarding**
15:20 21:5
23:1 54:22
74:20
**regardless** 54:7
66:3
**regards** 40:22
72:3
**regular** 22:8
69:10
**related** 50:15
52:9,10,11
53:5 54:7,8,15
59:18 94:11
95:7
**relationship**
25:20,22 26:13
26:20 70:1
**relative** 94:13
95:10
**relevant** 10:5
67:3
**relied** 58:4
79:21
**relief** 55:5
**remands** 88:10
**remember** 9:4
13:19 14:1,1,3
14:13 22:1
34:7 35:15
39:4 40:22
42:2,4 43:12
43:14 54:5
62:11 65:21
66:1 82:5

**remembered**
34:12
**remembering**
35:16
**remote** 1:14 6:7
**remotely** 7:6
**render** 81:12
**repeating**
35:16
**rephrase** 13:4
**replaced** 39:5
**reply** 36:10
**report** 4:7 9:15
10:3,5,15,20
11:2,20,20,22
12:15,19 13:2
13:5,10,11,12
14:5,13,15,20
14:21 15:2,3,5
15:8 17:2,4,5
63:16 66:9
81:17 82:2,5,6
**reported** 1:16
**reporter** 6:11
6:14,21 7:1 8:5
41:13
**represent** 6:18
8:14 21:5,18
22:7,10,15
23:6 26:5,7,8
34:16 48:17
49:7,14 51:3
51:15
**representation**
21:21 23:15

31:10 39:1
**representative**
26:14 56:2
**representatives**
47:14
**represented**
20:10 23:13
25:17 27:3
32:5,11 38:20
38:20 50:17
**representing**
6:9 22:21
59:18 69:1
**represents**
21:19
**reprimand**
65:17 66:4,12
87:6 91:5
**reprimands**
88:6 90:15,19
**republic** 38:18
38:21 39:1
**republican**
16:4,13
**republication**
71:18
**reputational**
64:4 68:17
69:10
**repvernonjones**
41:15
**request** 9:22
46:9
**requested**
94:21

**requests** 21:9
21:11
**requisite** 63:17
**reservations**
58:8
**reserved** 93:7
**respect** 72:8
**respectively**
72:8
**responded** 43:1
**respondent**
67:4,5,9
**responding**
21:11
**response** 37:9
**rest** 11:6
**result** 36:13
37:2 46:17
74:3 77:19
78:12
**resulting** 87:15
**results** 57:7
58:4 64:16
**retained** 18:10
59:8
**return** 96:14
**retweeted** 30:6
**revealing** 22:19
**reversing** 74:1
75:5 77:11
**review** 12:16
12:20 14:7
21:21 84:15
94:21

reviewed  9:15
reviewers  84:5
revising  78:3
rhode  12:2,9
right  6:21 7:20
  8:5,10 9:22
  11:5,22 12:10
  15:2,5,8,14
  17:2 18:2,10
  19:17,18 21:1
  23:11,22 25:6
  26:10,17 33:19
  34:18 35:11
  36:2,2 37:4
  38:13 41:22
  44:1 50:12
  53:4 54:16
  55:8 56:22
  59:2,19 60:3
  61:19,22 62:1
  62:13 65:11
  67:15 69:6
  75:19 77:5,6
  81:19 82:17
  84:17 85:17
  88:20 90:16
rights  17:17
  52:3
riot  57:6
risk  81:8
rodeo  8:15
role  59:1
rule  10:13 38:2
  76:14,17

rules  7:13 16:3
  16:16
run  48:18
  61:20 76:3
russian  69:19

s

s  2:1,3,4 3:1 4:5
  5:1,11,11 6:1
  10:14
s.d.n.y.  21:4
sanction  64:21
  88:3,4,21,22
sanctioned
  49:19,21
sanctioning
  91:21
sanctions  17:10
  17:12 18:5
  49:15,17 74:3
  86:20,22 88:12
sandmann  41:1
saw  13:17,22
  14:1
saying  26:7,9
  30:2 33:18
  36:11 59:1
  63:21 75:15
  85:6
says  36:5,9
  37:21 44:20
  70:16,21 72:8
  75:15,19 82:13
  87:8 89:10
  91:19

school  5:5 60:9
  73:5
scott  4:21
screen  10:6
  61:2
scroll  10:18
  68:21 70:14
  73:11 86:18
  87:2,17
search  26:10
seat  33:2
second  52:15
  52:16 54:5
  74:15
seconds  92:5
section  17:17
  18:1 76:18
securities  87:11
see  10:19 13:16
  17:8 20:20,22
  21:11,15 30:1
  30:12 33:21
  36:1,10 38:6
  40:13 41:16
  43:8 58:2
  66:15 67:10
  68:20 71:9
  73:12,15 74:3
  75:9,12 78:15
  79:9 80:21
  82:6,17 83:2,3
  83:5 86:19
  87:3 90:6
  91:19,22

seek  21:10
seem  57:9
seems  53:1
seen  13:11,13
  13:13,19,20
  25:13 78:17,18
  79:3,5,7,11,13
  80:17 81:20
send  45:1
sense  43:2
sent  18:17
  21:17 29:4
sentiment
  30:18
separate  51:10
september
  40:10 62:12
serves  88:20
service  48:21
services  63:18
session  47:11
settled  17:15
  33:14 73:17
settlement  34:6
  67:7
seventh  66:11
shame  59:21
shana  60:16
sharp  74:16
sheet  96:7,10
  96:12,15 98:11
shop  24:5,7
  84:12
show  10:2 17:4
  60:4

| | | | |
|---|---|---|---|
| **shown**  69:5 | **smith**  50:5 51:1 | 74:22 79:1,9 | **status**  37:5 |
| **shy**  47:22 | **social**  13:21 | **specifically** | 72:18 87:13 |
| **sic**  6:6 38:2 | **sold**  41:15 | 13:4 21:19 | **statute**  71:8 |
| 64:20 67:7 | **somebody**  68:1 | 24:15 26:12 | **steele**  87:7 |
| **sides**  68:12 | 76:13 | 45:6 46:11 | **stenographic** |
| **sidney**  23:21,22 | **someone's** | 50:13 52:12 | 7:15 |
| 24:1 28:7 | 77:21 | 90:2,14 | **stern**  32:7,11 |
| 38:17,20 | **somewhat** | **speech**  53:15 | 32:14 33:15 |
| **sign**  96:9 | 39:20 47:15 | 56:6 57:1 | **steve**  6:18 |
| **signature**  93:7 | **son**  31:7 | **spend**  81:21 | 90:21 |
| 94:16 95:14 | **son's**  61:21 | **spent**  85:22 | **steven**  2:3,4 |
| 98:14 | **sorry**  10:20 | **spewing**  42:21 | 4:21 |
| **signed**  67:4 | 13:3,8 16:6 | **spheres**  63:13 | **stevenbiss**  2:7 |
| **signing**  96:11 | 19:10,15 21:22 | **split**  44:11,13 | **stevens**  65:17 |
| **similar**  13:20 | 23:18 28:18 | **spoken**  29:12 | **stipulation** |
| 50:22 67:14 | 30:14 32:4 | **square**  51:20 | 7:16 67:2 |
| 89:8 | 37:4,17 38:22 | **staff**  48:2 61:7 | **stooges**  70:22 |
| **similarities** | 39:11 55:9,12 | 83:19 | **street**  2:5 3:6 |
| 16:19 | 60:15 62:20 | **stage**  79:17 | 9:2 15:21 16:7 |
| **simplification** | 65:3 70:3 | **stake**  17:13 | 16:11 |
| 72:20 | 72:12 82:13,14 | 67:19 68:14 | **styled**  51:14 |
| **sir**  8:11 65:20 | 85:19 92:21 | 75:1 | **subcommittee** |
| **sit**  13:1 60:3 | **sort**  9:7 45:14 | **stand**  38:3 | 66:11 |
| 83:11 85:15 | 58:21 78:8 | **state**  36:11 | **subject**  21:2 |
| **sitting**  11:21 | 80:7 85:2 | 57:2 59:4 | 60:6 96:11 |
| 13:19 25:21 | **southern**  1:2 | 64:20 65:8,15 | **submission** |
| 26:15 28:11,22 | **space**  96:7 | 66:12 94:19 | 55:22 |
| 84:13 | **speak**  9:9 53:12 | 96:6 | **subpoena**  21:2 |
| **situation**  58:3 | 57:13 | **stated**  67:5 | 21:6 |
| **six**  80:5 | **speaking**  67:20 | **statements** | **subsequently** |
| **skills**  63:17 | **special**  23:5 | 32:14 71:3 | 55:6 |
| 94:10 95:6 | 31:3,6,11,17 | **states**  1:1 30:4 | **substance** |
| **slow**  9:11,12 | 35:8 | 34:17 50:8 | 90:10 98:10 |
| **smidge**  73:12 | **specific**  21:20 | 53:14 55:4 | **substantial** |
| 73:13 | 31:1 34:4 46:9 | 56:7 64:6 70:7 | 82:20 |

**substantially**
17:20 39:16
**substantive**
39:3
**successful**
58:14
**successfully**
17:22
**succinct** 42:9
**suggest** 75:11
75:14
**suing** 50:9
**suit** 55:6
**suite** 2:5 3:6
**sullied** 69:21
**summaries**
5:13 79:18
85:9
**summary** 79:7
79:13 80:4,7,8
80:10 84:18,18
**supp** 5:4
**supplement**
81:17
**support** 73:21
75:18 77:9
78:1 83:9
84:20 91:9
**supporters**
14:17
**supposed** 58:15
58:16 75:17
**supreme** 55:4
**sure** 14:6 31:6
32:10 36:2

40:20 58:22
64:22 67:22
72:17
**suspect** 46:1,4
**suspended** 64:9
87:9
**suspending**
64:22
**suspension**
65:2 87:12,13
87:16
**svetlana** 69:15
**swalwell** 55:18
56:2
**swear** 6:14 7:5
7:19
**swing** 59:4
**sworn** 7:8 8:2
94:5

**t**

**t** 4:5 5:1,11,11
97:3
**tab** 10:9 20:17
29:15 32:21
35:21 36:1
37:13,15 40:5
41:3,6 42:14
42:15 44:16,18
66:19 70:4
73:2 86:6,8
**tabron** 53:2
**take** 7:1,3 11:5
20:7 22:13
24:17 43:17
46:5,14 48:6

53:17 57:14
61:19 68:3,7
81:6 86:5 91:4
**taken** 6:5 8:19
8:20 35:6
82:20 84:16
94:3,12 95:9
**takes** 77:8
**talk** 10:6 15:11
40:1 90:1
**talked** 29:8
87:8 89:15
**talking** 45:6
51:7 62:11
**team** 33:20
38:5 60:22
61:3,4,6,7
**technician** 3:14
**technology**
51:21
**tecum** 21:3
**tell** 8:3 28:10
29:2 31:5
32:16 52:17,20
54:6 60:3
66:16 69:6
74:17,19 86:1
**tells** 89:7
**ten** 18:22 19:5
63:7
**tenant** 44:10
**tend** 9:8
**term** 44:12
**terminology**
41:9

**testified** 8:4
60:17
**testifying** 94:5
**testimony** 9:22
16:3,6 60:20
**text** 13:14
76:14
**thank** 7:18 8:5
22:13 33:19
38:4 62:2 86:5
92:16,18 93:1
93:2
**thanks** 73:12
92:9
**thanksgiving**
27:2,4
**thing** 33:2 48:6
60:22
**things** 13:21
31:1,15 32:15
76:2 80:15
81:7
**think** 6:20 9:10
14:8,19 15:19
16:12 19:14
26:12,18 27:21
31:21 39:8,16
39:19 41:8
42:10 43:2
45:6,11 46:2,3
47:10,10,12
48:8,14 49:3
50:17 53:2
56:4 57:13
61:16 62:15

63:9 66:14,15
67:2 71:18,22
78:18,20 79:6
79:20 80:13
83:17 89:13,21
91:6 92:5
**thinking** 8:18
26:18
**third** 10:19
20:10 21:9
22:5,5 66:21
67:2
**thirty** 96:16
**thompson**
53:19,20,21
54:1,2,12,13,14
54:20,22 55:15
55:17
**thought** 21:22
72:12 81:12
89:3 91:1
**thousand** 67:7
83:1
**thousands**
82:21
**threatened**
31:7
**three** 40:11
**tiana** 95:2,15
**time** 1:13 6:8
6:12 19:4,7
58:15 59:11,22
61:12 62:11
64:14 66:1
71:5 79:11,11

81:17 82:1,18
84:15,19 85:2
85:4,9 87:4
92:17 93:6
**timekeeper**
83:8,19 84:4
**timekeepers**
84:4,11
**timekeeping**
85:9
**timely** 37:22
**times** 64:4
**timing** 23:10
**today** 6:11 9:21
13:19 19:2,3
19:15 25:21
26:15 28:11
29:1 33:13
47:10,19 76:19
86:1,2
**today's** 9:13
17:1
**told** 15:19
**took** 23:10
60:20 77:22
80:18 83:12,15
**top** 10:20 20:13
21:1 34:12
35:14 42:3
52:20 82:14
87:2,3 91:19
**torts** 64:6
**total** 21:9 28:11
83:19

**totaled** 19:1
**totals** 60:7
**touch** 29:6
**tracy** 4:8 21:3,5
21:19
**transcriber**
95:1
**transcript** 7:10
94:21 95:3,5
96:17,18
**transcription**
98:7
**transcriptionist**
94:8
**transfer** 37:7
**treat** 40:2
**tremaine** 2:13
3:5 6:17
**trouble** 90:21
**troubling** 73:18
**true** 94:9 95:5
**trump** 23:4
26:22 45:15,17
49:7,12,14,22
50:6,10,18,18
50:21 51:5,8
51:16 52:3,6
53:20,21 54:8
54:12,13,14,22
55:15,19 56:3
56:10,11 57:17
58:21 59:3,5,7
59:10
**trump's** 54:9
54:16

**trust** 68:3,7
**truth** 8:3,3,4
15:5
**truthfully**
26:11
**try** 9:12 35:15
58:1,3 60:10
**trying** 14:9
26:11 32:1
59:22
**turn** 68:20
70:11 73:11
**turned** 55:7
**turning** 66:21
**tweet** 4:10,11
4:12,13,14,16
4:17,18,20
29:19 30:1,2
30:20,22 33:5
33:11 34:3
36:5,10,16
37:20 38:10
40:9,9 41:7,8
41:18 42:17
44:18 46:19
**tweeted** 30:7
36:20 41:12
**tweeting** 29:22
30:15 43:12
**tweets** 42:18
**twenty** 67:7
83:1
**twice** 16:8
**two** 53:1 58:17
82:20 92:5,7

type 79:16
typewriting
94:7

**u**

u 5:11,11
uk 72:16,18,19
ultimate 91:6
ultimately 23:2
23:3 82:22
91:21
under 7:13
18:1 31:14
55:22 71:7
understand 7:9
15:10 41:20
52:1 57:10
85:5
understanding
28:1,2 38:2
72:1 81:20
unhinged 21:6
unique 49:4
unit 6:4
united 1:1 30:4
34:17 50:7
53:14 55:4
56:7 57:2 70:7
71:6,21 72:2,6
university
16:20 63:10
unjustifiable
36:13
unnecessary
71:1 79:3 88:1

unprofessional
70:18 87:6,10
87:21
unreasonable
76:3 89:12
unrelated
62:18 71:6
untimely 71:7
unusual 84:7
unwarranted
76:2 77:9 78:2
usc 17:19 31:14
use 74:16
used 24:4 74:15
89:3 91:12
96:19
uses 7:12
usual 9:6

**v**

v 1:6 4:9 5:3,5
5:8 96:1 97:1
98:1
va 2:6 5:4
vaguely 43:13
43:15
valerie 25:4,7
value 80:22
81:3
various 48:4
vastly 21:8
venture 63:6
venue 37:7
verdict 67:7
verify 47:1

veritext 6:10,11
7:1
vernon 41:12
42:3
versed 68:11
vice 35:2
video 6:7 13:13
13:20 14:4,15
14:17 41:20
videoconfere...
2:3,12 3:4,13
3:14
videographer
3:12 6:2,10
62:3,6 92:10
92:13,20 93:4
videorecorded
6:4
videotaped
1:10
vile 42:20
violating 87:11
virginia 9:3
16:20 17:10
63:10 64:20
65:7,15 66:11
68:2,10 70:8
73:6
volunteered
61:8,12
volunteers 61:6
vote 58:8
vs 6:6 18:6 21:3
32:11 49:12
50:5,18,21

51:8,10,14,16
52:3 53:20,21
54:12,13,14,22
55:15,18 56:10
56:11 70:6
73:5 86:10

**w**

wage 33:20
waiting 32:22
37:9
want 8:10 9:10
14:8 33:16
35:14,17 56:21
57:12 64:22
76:22 80:2,4
80:15 90:9,20
wants 88:11
war 30:3
warning 9:8
warranted
36:19 73:22
75:19 77:13
warriors 33:20
washington
1:15 3:7 40:13
42:22 48:1,16
washingtonp...
42:19
watch 41:20
watchers 57:22
58:2
way 20:2 42:10
42:10 56:20
57:9,14 59:1
64:5 74:13

76:13
**week** 58:19
**weir** 60:16
**weird** 23:19
**welfare** 52:3
**went** 30:22
63:10
**west** 2:5
**wife** 25:5
**willing** 33:20
44:22
**wind** 27:13
**witness** 6:14
7:6,8,9,19 8:2
8:21 75:9
92:18 93:2
94:4 96:3
**wl** 4:22 5:6
**won** 78:22
**wondered**
34:11 51:21
**wonderful** 93:3
**wondering**
14:12 24:16
47:7
**word** 11:5 14:6
57:15
**words** 22:8
90:9
**work** 12:6 24:4
27:12,17 38:5
39:4 44:22
45:1 58:12
64:1 80:21
84:12 85:11

**worked** 85:11
85:16
**working** 59:15
61:11 81:8,9
84:21 85:4
**works** 10:7
24:5
**world** 16:18
**worries** 30:17
**worse** 35:16
**wouldn.t** 78:12
**wright** 2:13 3:5
6:17
**writing** 74:16
82:5 90:4,5
**written** 7:16
21:11 80:7,10
**wrong** 23:10
35:22 71:22
**wrongful** 35:5
35:9 57:5
**wrongly** 30:15
**wrote** 92:2

**x**

**x** 4:1,5 5:1
94:21

**y**

**yancey** 1:16
6:11,22 94:2
94:17
**yeah** 11:4
17:16 18:7
24:6 36:2 37:1
41:1,19 43:3

45:22 46:10
47:5,8 49:2
54:17 59:2
60:11 83:17
86:1
**year** 29:9 62:12
62:15 64:10
65:2 71:7
**years** 17:21
24:14 25:14
39:6,17,19
82:20
**york** 1:2 2:15
9:10 51:6
94:19
**yup** 47:2

**z**

**zone** 6:8 93:6
**zoom** 6:7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.