# EXHIBIT B

## IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA
## CIVIL DIVISION

MICHAEL T. FLYNN,

      *Plaintiff*,

v.

JIM STEWARTSON; RICK WILSON;
AND MEIDASTOUCH, LLC,

      *Defendants*.

_____/

Case No. 2023-CA-004264 NC

Division C Circuit

## RICK WILSON'S MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT PURSUANT TO SECTION 786.265 FLORIDA STATUTES

      Defendant, Rick Wilson (hereinafter "Defendant Wilson" or "Mr. Wilson"), by and through the undersigned counsel, moves to dismiss this lawsuit *with* prejudice pursuant to Section 768.295, Florida Statutes (Florida's Anti SLAPP statute) or in the alternative, moves for Summary Judgment pursuant to Section 768.295, Florida Statutes and for an award of attorneys' fees and costs as is provided under Florida Law.  In support thereof, Mr. Wilson states as follows:

### *Introduction*

      Plaintiff's second amended complaint is barred under Florida's Anti SLAPP law.  Plaintiff alleges defamation and injurious falsehood against Defendant because he was called a "Putin employee" on Twitter and Defendant reposted another tweet that called Plaintiff "Q".  (¶ 134 of Plaintiff's second amended complaint).  The second amended complaint (within its four corners) is not a viable legal action.  Moreover, this court may look beyond the four corners of the complaint at Mr. Wilson's affidavit and may take judicial notice of court filings and newspaper articles concerning Plaintiff pursuant to Florida's Anti-SLAPP law (section 768.295, Florida Statutes).  Plaintiff was a senior government official and achieved public notoriety because he pled guilty to

serious federal crimes, and because he then recanted his plea and was ultimately pardoned.[1] Furthermore, Plaintiff's subsequent political activity establish that the statements in question, "Putin employee" and "Q" are not actionable because they are statements of opinion that cannot be proven true or false. The second amended complaint is frivolous, politically motivated and is plainly designed to punish and retaliate against Mr. Wilson's free speech. This complaint should be dismissed *with* prejudice pursuant to section 768.295, Florida Statutes and this Court should tax reasonable attorneys' fees and costs against Plaintiff.

### Procedural Background

Plaintiff filed his original complaint on May 3, 2023, against co-defendant Jim Stewartson. On July 13, 2023, Plaintiff filed his amended complaint, adding claims against Defendant, Rick Wilson to the claims originally asserted against Mr. Stewartson. On November 3, 2023, Plaintiff moved for Leave to Amend the Amended Complaint for a second time, now to add Defendant MeidasTouch LLC. On December 19, 2023, this Court granted Plaintiff's Motion for Leave to Amend the Amended Complaint adding MeidasTouch LLC as a party.

### Factual Background (from the Second Amended Complaint)

Plaintiff alleges that he served as the 18th Director of the Defense Intelligence Agency (¶ 18 of the second amended complaint), and that he advocates for his values and began a social welfare organization called the America Project (¶ 19 of the second amended complaint). The second amended complaint alleges that Mr. Wilson is a former strategist and consultant for the Republican Party, (¶ 33 of the second amended complaint), who engages in political speech (¶ 33-35 of the second amended complaint) and founded the Lincoln Project, (¶ 8 of the second amended

---

[1] Plaintiff's acceptance of the pardon is tantamount to a confession of guilt. See, *Burdick v. U.S.*, 236 U.S. 79, 94 (1915).

complaint).  Plaintiff alleges defamation and injurious falsehood against Defendant because he was called a "Putin employee" on Twitter and Defendant reposted another tweet that called Plaintiff "Q".  (See ¶ 48 of Plaintiff's second amended complaint).

In terms of Mr. Wilson's "Putin employee" statement, ¶ 67 of Plaintiff's second amended complaint, provides context.  Mr. Wilson reposted a tweet that was originally authored by a non-party that stated:

> "Retired Lt. Gen. Michael Flynn just issued a statement blaming Biden because he "ignored and laughed at Putin's legitimate security concerns, and legitimate ethnic problems in Ukraine," while continuing to demonize Russia."

Attached to the tweet that Mr. Wilson reposted, (¶ 67 of Plaintiff's second amended complaint) is a written statement by Plaintiff that states:

> Anyone who questions these rotten foreign and domestic policies are called racist and demonized. We see the unleashing of the federal government on citizens who are simply exercising their constitutional rights and the media covers all this incompetence with a fake smile due to their own deep levels of corruption [sic[2]]
>
> Our president rarely entertains questions or takes responsibility for his tone deafness and failures. **The WH ignored and laughed** at **Putin's _legitimate_ security concerns**, and _legitimate_ **ethnic problems in the Ukraine**.
>
> We have yet to hear from the President of the United States an explanation of U.S. national security interests, instead **we continue to demonize Russia**, similar to the fake Russia collusion hysteria we all know was perpetrated against the Trump Administration by elements of the Clinton campaign and the Obama administration. President **Putin calculated this strategic, historic, and geographic play and made the decision to move, and he did**.  All that stated above, there will never be justification for this invasion.  However, never forget that war results when diplomacy fails.

---

[2] Plaintiff's statement omitted a period at the end of the first paragraph.

May God watch over and protect those in harm's way and may God continue to protect the United States of America.  (e.s., see ¶ 67 of Plaintiff's second amended complaint).

The second amended complaint also notes that the tweet written by the Plaintiff was sent on February 24, 2022.  The Court can take judicial notice of the fact that Russia invaded Ukraine on February 24, 2022[3].

### Statement of Undisputed Material Facts.

1.)   In November 2016, The New York Times Editorial Board addressed Plaintiff's appointment as National Security Advisor, "Michael Flynn: An Alarming Pick for National Security Advisor." [4], wrote:

> "…General Flynn took on questionable consulting work, including speaking at a forum hosted by the state broadcaster Russia Today, which is infamous for its propaganda and serves as a mouthpiece for President Vladimir Putin. He also runs a consulting firm that has lobbied for a company with connections to Turkey's authoritarian president. Just last week, he wrote an article urging the extradition of a Turkish cleric whom the Turkish government said was the mastermind of the attempted coup in July."

2.)   Plaintiff served as National Security Advisor to President Trump for 22 days[5];

3.)   Plaintiff resigned as National Security Advisor because according to Plaintiff, he briefed the vice president-elect and others with incomplete information regarding phone calls with the Russian ambassador to the United States[6];

4.)   Plaintiff admitted to making "material false statements and omissions", which impeded what was then an FBI counterintelligence investigation[7], that he served an agent of the Government of Turkey ***and*** that he failed to report the same as required under the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 *et seq* [8];

---

[3] See Mr. Wilson's Request for Judicial Notice in the Court file.
[4] See, **Ex. 1** New York Times Editorial, November 18, 2016.
[5] See, **Ex. 2**, Michael Flynn Resigns as national security advisor, The New York Times, Feb. 13, 2017.
[6] See, **Ex. 2.**
[7] See, **Ex. 3**, the Statement of Offense in United States of America v. Michael T. Flynn.
[8] See, **Ex. 3**, the Statement of Offense in United States of America v. Michael T. Flynn. See also, **Ex. 4,** Michael Flynn Failed to Disclose Income From Russia-Linked Entities. The New York Times, April 1, 2017.

5.)   In 2018, Defendant Wilson published a New York Times Bestseller entitled, "Everything Trump Touches Dies: A Republican Strategist Gets Real About the Worst President Ever" At page 163 of the book, Defendant describes Plaintiff as follows:

> Capo of *l'afaire russe* MAGA Crew Mike Flynn, a disgraced former army general was so outrageously in bed with the Russians that even Trump was forced to fire him. A predecessor to Flynn as the Defense Intelligence Agency Director told me once that the Russophilic anti-Muslim general was "the most dangerous asshole ever to head a three letter."[9]

6.)   On November 8, 2016, Plaintiff published an article in The Hill, concerning the interests of the Government of Turkey and the potential extradition of a person seeking political asylum[10].  After Plaintiff acknowledged that he was an agent of the Turkish government and filed appropriate papers disclosing the same, The Hill issued the following editors note to Plaintiff's article:

> On March 8, 2017, four months after this article was published, General Flynn filed documents with the Federal government indicating that he earned $530,000 last fall for consulting work that might have aided the government of Turkey. In the filings, Flynn disclosed that he had received payments from Inovo BV, a Dutch company owned by a Turkish businessman with ties to Turkey's president and that Inovo reviewed the draft before it was submitted to The Hill. Neither General Flynn nor his representatives disclosed this information when the essay was submitted.

7.)   According to the New York Times on December 18, 2018, a federal judge expressed "disgust" at Plaintiff's efforts to mislead federal investigators and dismissed suggestions he had been treated unfairly[11]. The article quotes U.S. District Court Judge Emmet Sullivan stating, "This is a very serious offense,". "A high-ranking senior official of the government making false statements to the Federal Bureau of Investigation while on the physical premises of the White House."[12] According to the article, "Some of Judge Sullivan's sharpest rebukes involved Mr. Flynn's lies about his lobbying work for the Turkish government."[13]

---

[9]  See, **Ex. 5**, the Affidavit of Rick Wilson and **Ex. 6**, an except of page 163 of "Everything Trump Touches Dies: A Republican Strategist Gets Real About the Worst President Ever."

[10] See **Ex 7**, Our Ally Turkey is in crisis and needs our support. The Hill, November 8, 2016 and modified on March 8, 2017.  See also, **Ex. 8**, The Hill publishes editor's note on Michael Flynn op-ed regarding Turkey. The Washington Post, March 10, 2017.

[11] See, **Ex. 9**, 'Not Hiding My Disgust': Judge Rebukes Flynn, Then Delays Sentencing. The New York Times. December 18, 2018.

[12] See, **Ex. 9**.

[13] See, **Ex. 9**.

Judge Sullivan explicitly warned Plaintiff that even if he could show further evidence of how much he had helped the special counsel's office and the Justice Department, he might still sentence him to prison[14].

8.)    Plaintiff retained new counsel, attempted to withdraw his guilty plea and then asserted his innocence, claiming prosecutorial misconduct[15]. A May 8, 2020, New York Times, headline blared: "U.S. Drops Michael Flynn Case, in Move Backed by Trump."[16] The extraordinary move came after Mr. Flynn, the former national security adviser, fought the case in court for months, a reversal after pleading guilty twice and cooperating with investigators[17].

9.)    After the Department of Justice attempted to dismiss the lawsuit, the District Court sought briefing in terms of whether the criminal charges against Plaintiff would be dismissed. Plaintiff brought a writ of mandamus before the DC Circuit seeking an order to instruct the District Court to dismiss the criminal action. Following argument, the DC Circuit declined Plaintiff's Motion[18].

10.)    Plaintiff was pardoned by the President of the United States[19].

11.)    Plaintiff was reportedly paid $45,000 to deliver a speech at RT, a state-controlled Russian international television network, where he sat next to Russian president Vladimir Putin[20] during a presentation.

12.)    RT registered with the U.S. Department of Justice as a "foreign agent" in the United States in November of 2017.[21] Reuters reported on the filing, saying, "U.S. intelligence agencies said in a report in January that the television station, which broadcasts on cable in the United States, is 'Russia's state-run propaganda machine.'"

13.)    In 2017, the Director of National Intelligence issued a report titled "Assessing Russian Activities and Intentions in Recent US Elections" which called RT "The Kremlin's principal international propaganda outlet."[22]

---

[14] See, **Ex. 9**.

[15] See, **Ex 10**, Memorandum Option, dated December 16, 2019; *U.S. v. Flynn*.

[16] See, **Ex. 11**, U.S. Drops Michael Flynn Case, in Move Backed by Trump. The New York Times. May 7, 2020.

[17] See, **Ex. 11**.

[18] See, **Ex. 12**, *United States v. Flynn*, 507 F. Supp. 3d 116 (D.C. Cir 2020).

[19] See, **Ex. 13**, Notice of Executive Grant of Clemency and Consent Motion to Dismiss as Moot (with attachment including Presidential pardon of Plaintiff).

[20] See **Ex. 14**, Russians paid Mike Flynn 45K for Moscow Speech, Documents Show. NBC News. March 16, 2017.

[21] See, **Ex 14 (a)**, "Russia's RT America Registers as 'foreign Agent' in U.S." *Reuters*, November 13, 2017.

[22] See, **Ex. 14(b),** "Background to "assessing Russian Activities and Intentions in ... - DNI."

14.)    Plaintiff was cited by the Defense Department inspector general for failing to disclose lucrative speaking engagements and other business arrangements with foreign entities, prompting the U.S. government to pursue tens of thousands of dollars in penalties against him[23].

15.)    After Plaintiff was pardoned, on July 4, 2020 he posted on twitter taking the oath of office for holding office in the United States and added the phrase, "Where we go one we go all."[24]

16.)    On December 23, 2020, Politico published an article with the title, "Trump leans on QAnon figures in flailing effort to overturn election"[25] The politico article states: "He also met with Michael Flynn, the former Trump national security adviser who became a celebrated QAnon figure after seeking to rescind a guilty plea for lying to the FBI."

17.)    Plaintiff reportedly suggested martial law could be invoked to overturn the 2020 election and attended a White House meeting where suspending the U.S. Constitution was reportedly discussed[26];

18.)    The Daily Mail published an article with the headline "Mike Flynn endorses the selling of QAnon merchandise that pays into his legal defense fund with supporters saying buying t-shirts and hats helps pardoned ex-national security adviser 'in the fight against fake news". [27] The article states:

> **Believers in the QAnon conspiracy theory have floated that Flynn could be 'Q,'** the 'deep state' insider who leaves online clues to expose the pedophilia ring of Satan worshippers who are out to get Trump.

---

*Office of the Director of National Intelligence*, January 6, 2017. (See, pages 8 and 10).

[23] See, **Ex. 15,** Michael Flynn cited for unauthorized payments. The Washington Post. July 8, 2022. See also, **Ex. 16**, Army reviewing investigation into Michael Flynn's dealings with Russia, foreign firm. The Washington Post. March 12, 2021.

[24] See, **Ex. 17**, https://x.com/GenFlynn/status/1279590652200849409?s=20

[25] See, **Ex. 18**, Trump leans on QAnon figures in flailing effort to overturn election, Politico, December 23, 2020.

[26] See, **Ex. 19**, Heated Oval Office meeting included talk of special counsel, martial law as Trump advisors clash. CNN.com, December 20, 2020.  See also, **Ex. 20**. Trump Weighed Naming Election Conspiracy Theorist as Special Counsel. The New York Times. December 19, 2020.

[27] See, **Ex 21**, "Mike Flynn endorses the selling of QAnon merchandise that pays into his legal defense fund with supporters saying buying t-shirts and hats helps pardoned ex-national security adviser 'in the fight against fake news". The Daily Mail.  See also, **Ex. 21(a)**, Plaintiff's shirt show USA site, https://theshirtshowusa.com/product/snap-back-trucker-hat-black-camo (Accessed on 12/29/23).

The article also has photographs of merchandise sold by Plaintiff, which includes the phrase WWG1WWA--- an acronym for "Where we go 1 we go all".[28]

19.)   The following tweet is from General Flynn linking to the merchandise branded by Plaintiff with his name and the Q anon slogan "WWG1WGA":



20.)   On January 8, 2021, CNBC ran an article that explained that Plaintiff's twitter account was suspended, with the headline, "Twitter bans Michael Flynn, Sidney Powell and other QAnon accounts."  The article states: "Both Flynn and Powell are active in the QAnon community."[29]

21.)   According to the New York Times, Plaintiff appeared on a television program and "pushed for Mr. Trump to impose martial law and deploy the military to "rerun" the election."[30]

22.)   On February 6, 2021, the New York Times published an article entitled, "Pushing QAnon and Stolen Election Lies, Flynn Re-emerges: Recast by President Trump's most ardent supporters as a MAGA martyr, Michael T. Flynn has embraced his role as the man who spent four years unjustly ensnared in the Russia investigation."[31] The article goes on to state:

---

[28] Courts have described "Where We Go One, We Go All" as "a slogan used by adherents of the QAnon conspiracy theory." *U.S. v. Languerand*,  2021 WL 3674731, at *3 (DDC Aug. 19, 2021). **Ex. 22.**
[29]  See, **Ex. 23**, Twitter bans Michael Flynn, Sidney Powell and other QAnon accounts., CNBC January 8, 2021.
[30] See, **Ex. 20**.
[31] See, **Ex. 24,**  "Pushing QAnon and Stolen Election Lies, Flynn Re-emerges: Recast by President Trump's most ardent supporters as a MAGA martyr, Michael T. Flynn has embraced his role as the man who spent four years unjustly ensnared in the Russia investigation" The New York Times, February 6, 2020

> This past summer, Mr. Flynn posted a video of himself taking QAnon's "digital soldier" oath. To many of the movement's followers, Mr. Flynn ranks just below Mr. Trump. **Some have speculated that he is the mysterious figure known as "Q," the purported government insider with a high-level security clearance who began posting cryptic messages in 2017 about the deep state trying to destroy the president.** (e.s).

23.) According to the Associated Press, Plaintiff was a leader of the "Stop the Steal" effort to overturn the results of the 2020 presidential election[32].

24.) Associated Press and the PBS series Frontline found that Plaintiff has used public appearances to energize voters, made political endorsements to build alliances and amassed a network of nonprofit groups to advance the movement. Along the way, Plaintiff and his companies have earned hundreds of thousands of dollars for his efforts[33]. Plaintiff was the subject of an entire episode of the PBS series Frontline entitled "How did Michael Flynn go from being an elite soldier overseas to waging a "spiritual war" in America"[34]?

25.) On June 1, 2021, The New York Times ran an article with the headline, "Michael Flynn suggested at a QAnon-affiliated event that a coup should happen in the U.S."[35] The article states:

> He[36] and Mr. Flynn both spoke in front of a logo that included the QAnon slogan "WWG1WGA," short for "Where We Go One, We Go All."

26.) On June 9, 2021, the Lincoln Project ran advertisements critical of Plaintiff's suggestion that a coup attempt should happen in the United States[37].

27.) According to CNN, Plaintiff posted videos featuring QAnon slogans[38].

---

[32] See, **Ex. 25**, Takeaways from the AP/Frontline Michael Flynn investigation. Associated Press. September 7, 2022.

[33] See, **Ex. 25**, Takeaways from the AP/Frontline Michael Flynn investigation. Associated Press. September 7, 2022.

[34] See, Michael Flynn's Holy War. PBS October 18, 2022; https://www.pbs.org/wgbh/frontline/documentary/michael-flynns-holy-war/ (accessed on October 17, 2023).

[35] See, **Ex. 26**, Michael Flynn suggested at a QAnon-affiliated event that a coup should happen in the U.S., New York Times, June 1, 2021.

[36] Representative Louie Gohmer (R-TX).

[37] See, **Ex. 27**, Lincoln Project highlighting Flynn's coup comments in new ad. The Hill. June 9. 2021.

[38] See, **Ex. 28**, Michael Flynn posts video featuring QAnon slogans. CNN, July 7, 2020.

28.)     Newsweek magazine filed an article with the headline, "Elon Musk Blasted for Michael Flynn's Jan. 6 Twitter Reinstatement" The article states: "Leading up to the Capitol attack, Flynn was one of the most prominent supporters of false claims that the contest had been "stolen" by Biden. **Flynn was also a prominent proponent of the pro-Trump QAnon conspiracy theory, repeating and praising the related "where we go one we go all" slogan and making references to the debunked theory on Twitter**.[39]

29.)     Mr. Wilson was aware of each issue outlined above it items 1-25 at the time he issued the February 24, 2022 tweet that stated, "Putin employee".  In addition, Mr. Wilson was aware of items 1-26 when he retweeted Mr. Stewartson's tweet calling Plaintiff "Q" (among other things) on May 14, 2023.[40]

## LEGAL ANALYSIS

Plaintiff admits he is a public figure but fails to acknowledge the nature and extent of his notoriety. In fact, his own statements -- and the facts recounted in the Second Amended Complaint -- defeat any allegation of defamation, because they facially establish the Defendants' defenses of either truthfulness or well-founded opinion. All comments made by the Defendant concerning the Plaintiff, as alleged, are protected under the First Amendment.

Furthermore, Florida's Anti SLAPP law, prohibits this lawsuit, making this motion for summary judgment both timely and dispositive. Specifically, section 768.295, Florida Statutes prohibits persons from filing claims against another person or entity "without merit and primarily because such person or entity has exercised the constitutional right to free speech in connection with a public issue." Section 768.295 (3), Fla. Stat. SLAPP is an acronym for Strategic Lawsuits Against Public Participation, a lawsuit intended to harass, censor, intimidate, or otherwise silence critics by burdening them with the cost of legal defense.  In adopting Section 768,295, the legislature found that SLAPPs "are typically dismissed as unconstitutional, but often not before

---

[39] See, **Ex. 29**, Elon Musk Blasted for Michael Flynn's Jan. 6 Twitter Reinstatement, Newsweek, January 6, 2023.
[40] See, Ex. **Ex. 5**, the Affidavit of Rick Wilson.

the defendants are put through great expense, harassment and interruption of their duties… these lawsuits are an abuse of the judicial process and are used to censor, intimidate or punish citizens, businesses or organizations for involving themselves in public affairs…" Ch. 2000-174, §1, Laws of Florida.

The Anti-SLAPP statute (Section 769.295 (4), Florida Statutes), provides for an expedited process for lawsuits violating its provisions:

> A person or entity sued by a governmental entity or another person in violation of this section has **a right** to an *expeditious resolution of a claim* that the suit is in violation of this section. **A person or entity may move the court for an order dismissing the action or granting final judgment in favor of that person or entity.** *The person or entity may file a motion for summary judgment, together with supplemental affidavits, seeking a determination that the claimant's or governmental entity's lawsuit has been brought in violation of this section.* The claimant or governmental entity shall thereafter file a response and any supplemental affidavits. (e.s.)

## I.     MOTION TO DISMISS ANALYSIS

**A motion to dismiss based on the Anti-SLAPP statute is different a traditional motion to dismiss.** In *Gundel v. AV Homes, Inc*., 264 So. 3d 304 (Fla. 2nd DCA 2019), the Second DCA found, the statute "focuses not on whether a cause of action has been sufficiently alleged, but on whether the activity alleged… is protected activity." *Gundel*, 264 So. 3d at 314.  Accordingly, when addressing a motion to dismiss under the Anti-SLAPP law cannot merely accept as true the factual allegations in the four corners of the complaint and draw all reasonable inferences in favor of the claimant. *Id.*  After favorably comparing the Anti-SLAPP statute to other statutes providing immunity to suit, the Second District approved a burden shifting framework to resolve Anti-SLAPP motions to dismiss. *Id.* at 314.

First, the initial burden is placed on the SLAPP defendant to set forth a prima facie case that the Anti-SLAPP statute applies, i.e. whether they engaged in a protected activity. *Id.* Next, the burden shifts to the plaintiff to demonstrate that the claims are not "primarily" based on the

defendants' exercise of their First Amendment rights in connection with a public issue and are not "without merit". *Id.* The Second District noted that this burden shifting was necessary because, if the burden was placed exclusively on the defendant to obtain a dismissal based only on the Plaintiff's allegations in the complaint, the plaintiff could avoid dismissal by being intentionally vague, thus thwarting the purpose of the [Anti-SLAPP] statute." *Id.* The Second DCA recently reaffirmed this burden shifting framework in *Baird v. Mason Classical Acad. Inc.*, 317 So. 3d 264, (Fla. 2nd DCA 2021)[41].

In the instant Motion, information contained in the Complaint is the subject of the Motion to Dismiss. In addition, Mr. Wilson has attached 29 Exhibits[42] that further demonstrate that the issues discussed herein are protected based on the constitutional right to free speech in connection with public issue(s). Pursuant to Florida's Anti-SLAPP law, that material may be considered here as well. To the extent that supplemental material is considered, the Motion to Dismiss may be considered a Motion for Summary Judgment, but either scenario is provided for under § 768.295(4), Fla. Stat. to dispense with this claim.

### A. Defendant's Initial Burden to show that the Anti-SLAPP statute applies to the protected speech.

The Anti-SLAPP statute protects parties when they exercise "the rights of free speech in connection with public issues." § 768.295(1), Fla. Stat. Here, Mr. Wilson used Twitter (now known as X) as the medium to speak. Plaintiff claims that Mr. Wilson has 1.6 million followers on twitter. (See ¶ 100 of the second amended complaint). Statements made on Twitter are

---

[41] The 3rd DCA in *Lam v. Univision Communications, Inc.*, 329 So. 3d 190 (Fla. 3rd DCA 2021), declined to follow the *Gundel* decision and certified a conflict to the Supreme Court. However, the Florida Supreme Court has not ruled on this. **The *Gundel* decision binding precedent in this circuit.**

[42] With an additional web link to an episode of Frontline concerning Plaintiff.

encompassed by the definitions set out in 768.295(2)(a), Fla. Stat. See also *WPB Residents for Integrity in Gov't Inc., v. Materio*, 284 So. 3d 555, 562 (widely disseminated modes are protected First Amendment speech).

As to the content of the speech, the allegedly defamatory speech must be made in connection with a "public issue" in order to fall within the Anti-SLAPP statute's protection. The Anti-SLAPP statute does not provide more detail as to what constitutes a "public issue". Here, Mr. Wilson's statements calling Plaintiff "Putin employee" on Twitter and reposting another tweet that called Plaintiff "Q", were made in connection to public issues--- matters of political or social concern, or the subject of general interest to the public.

1. *Putin employee tweet (Motion to Dismiss analysis).*

According to the second amended complaint, Plaintiff issued a lengthy statement that was favorable to the Russian government on the day Russia invaded Ukraine. The statement argued that the United States continues to demonize Russia and that "President Putin calculated this strategic, historic, and geographic play and made the decision to move, and he did." Plaintiff also stated, "war results when diplomacy fails." Plaintiff further stated, "The WH ignored and laughed at Putin's *legitimate* security concerns, and *legitimate* ethnic problems in the Ukraine." (e.s.). Effectively, Plaintiff's statement to his followers blamed the U.S. government for failing to forestall Russia's invasion of Ukraine and to some degree justified Russia's action. It should come as no surprise that some, including Mr. Wilson, disagreed with General Flynn's position.

Unlike Russia -- where speech concerning the Russian invasion of Ukraine was stifled -- Plaintiff was free to speak his mind on this public issue. Mr. Wilson, too, is similarly free to express his opinion concerning Plaintiff's statement. The words "Putin employee" referred to Plaintiff's own lengthy written statement defending the Russian Government, as set forth in ¶ 67

of the second amended complaint. Accordingly, on the face of the Second Amended Complaint, the Defendants' statement is a protected statement on an issue of political or social concern. Defendant has the right to express his opinion as to the motivations of the author of that statement.

Ample case law exists holding that rhetorical classifications concerning social and political beliefs are protected opinions, particularly when those comments are made while discussing a public figure or activist.  See, e.g. *Pullum v. Johnson* 647 So. 2d 254, 258 (Fla. 1st DCA 1994) (religious broadcaster's reference to proponent of an ordinance allowing liquor sales as a "drug pusher" was rhetorical hyperbole not actionable as defamation), cited with approval by *Logue v. Book*, 297 So. 2d 605, 614 (Fla. 4th DCA 2020); *McCafferty v. Newsweek Media Grp., Ltd,* No. 18-cv-1276, 2019 WL 1078355, at *4 (E.D. Pa. Mar. 7, 2019), affd, 955 F.3d 352 (3dCir. 2020) (holding that characterizations of a plaintiff as "alt-right" were not actionable, because "these implications... are merely characterizations of [plaintiff's] political view.").

*2.  "Q" retweet (Motion to Dismiss analysis).*

Additionally, Mr. Wilson reposted a note where he was thanked for raising Plaintiff as an issue on television (although whatever Mr. Wilson stated about Plaintiff is absent from the claim here).  The post also included a statement concerning "Q".  But calling someone Q is meaningless. There are no allegations within the four corners of the second amended complaint that establish why calling Plaintiff Q is somehow injurious or what it even means.  The second amended complaint does not show why calling Plaintiff Q injured him.  But, as discussed by the Court in *Pullum Id., this statement on its face, without any further information,* is rhetorical hyperbole not actionable as defamation.

It also should be noted that Plaintiff has not added any facts to support any finding concerning what Q means or how it is injurious, even though this is the second amended complaint

and this same issue has been raised by Plaintiffs on two other occasions.  Amending the Complaint

with a third amended complaint would be futile.

### B.     Plaintiff's Claims are "Primarily" Based on Attacking Free Speech.

In light of the arguments above, the burden of proof now shifts to Plaintiff, who must

demonstrate that his claims are not filed "without merit and primarily because such person or entity

has exercised the constitutional right to free speech in connection with a public issue." 768.295(4)

Fla. Stat.; *Gundel* 264 So. 3d 314.

Plaintiff's claim against Mr. Wilson is an action for definition and for injurious falsehood

for two statements on twitter in connection with public issues.  These claims implicate Mr.

Wilson's first amendment rights.  Plaintiff filed this claim because Mr. Wilson exercises his first

amendment rights, not regarding being called Q or a Putin employee, but *generally* in ways that

Plaintiff does not like. The WHEREFORE clause of the second amended complaint exposes the

real motivation of this SLAPP suit, seeking:

> An award of compensatory, special, and punitive damages, as well
> as disgorgement of any and all income Defendants have made off of
> their lies about General Flynn, in the amount of fifty million dollars
> ($50,000,000.00)[43].

This damages award does not concern damages related to being called "Q" or a "Putin

employee"[44], instead it seeks damages concerning Mr. Wilson founding "an organization dedicated

to opposing Republicans"[45]; because Mr. Wilson "switched political beliefs overnight"[46]; "began

---

[43] This Court should take note of the change in the damages demand in the complaint escalating
from the initial demand (*seventy-five thousand dollars ($75,000.00) in damages*), to the amended
complaint, (*ten million dollars ($10,000,000.00) in damages*), to the second amended complaint,
(*fifty million dollars ($50,000,000.00) in damages*).
[44] Plaintiff will never be able to show damages for any such statements.
[45] See, second amended complaint at ¶ 34.
[46] See, second amended complaint at ¶ 34.

working with far-left publications"[47]; "spreads lies about Conservative figures associated with Donald Trump."[48]  Plaintiff takes the position that Mr. Wilson uses "defamatory and outrageous comments" (seemingly other speech that is not the subject of this action) to have raised a $87,404.908 through the Lincoln Project[49] (which is not a party to this action).[50]  But the only statements even at issue (with regard to Mr. Wilson, in the amended complaint) are "Putin employee" and "Q".  While Plaintiff's claims are absurd, they unmask his motivation behind bringing this lawsuit.  Plaintiff's amended complaint is an effort to curtail and inhibit Mr. Wilson's speech for political purpose.

### C.   Plaintiff cannot establish that protected speech was malicious.

The "actual malice" standard presents an "overwhelming burden" to defamation claims by public-figure plaintiffs. See *Demby v. English*, 667 So. 2d 350, 354 (Fla 1st DCA 1995). To state a claim under that rigorous standard, Plaintiff must aver facts tending to show, by "clear and convincing evidence," that Defendant subjectively "entertained serious doubts as to the truth" of the statements at issue. See *Don King Prods., Inc. v. Walt Disney Co*., 40 So. 3d 40, 43 (Fla. 4th DCA 2010). Failure to adequately plead actual malice is fatal to a complaint. See, *Frieder v. Prince*, 308 So. 2d 132, 134 (Fla. 3rd DCA 1975).

The second amended complaint on its face does not support a claim under the actual malice standard.   In the end, this is a SLAPP suit, it should be dismissed forthwith for the reasons discussed above. However, in the alternative, as permitted under Section 769.295 (4), Florida

---

[47] See, second amended complaint at ¶ 34.
[48] See, second amended complaint at ¶ 8.
[49]  Donors who contribute to federal super PACs are participating in a form of free speech. See, *Citizens United v. Federal Election Com'n,*  130 S. Ct. 876, 891 (2010). (First Amendment standards must give the benefit of any doubt to protecting rather than stifling speech).
[50] See, second amended complaint at ¶ 106-107.

Statutes, Defendant moves for summary judgment based on the undisputed facts and law discussed below.

II.    **SUMMARY JUDGMENT ANALYSIS.**

    A.  **Defendant's Initial Burden to show that the Anti-SLAPP statute applies to the protected speech.**

Whether the challenged statement is "reasonably capable of a defamatory interpretation" is a question of law. *Keller v. Miami Herald Publ'g Co.* 778 F. 2d 711, 714-715 (11th Cir. 1985). The key issue is not what is alleged in the Complaint but "how a reasonable and common mind would understand the statements," which should not receive "a tortured interpretation." *Schiler v. Viacom, Inc.,* 2016 WL 9280239, at *8 (S.D. Fla., Apr. 4, 2016).   In construing meaning, courts are to consider "all of the circumstances surrounding the statement," *Sanchez v. Cellco P'ship* 2006 WL 8432732, at *2 (S.D. Fla. Sept. 26, 2006).

Falsity "is the *sine qua non* for recovery in a defamation action."  But the record evidence establishes that the statements are opinions that by their nature cannot be proven as true or false on political issues and are protected under the First Amendment.  Accordingly, the anti-SLAPP statute applies.

    *1.  Putin Employee tweet (Summary Judgment analysis).*

General Flynn served as a senior governmental official, the national security advisor to the President of the United States, for 22 days.  He resigned because he admitted that he lied to the Vice President of the United States over issues concerning his contacts with the Russian Ambassador to the United States. He admitted, under oath that he made "material false statements and omissions", which impeded what was then an FBI counterintelligence investigation, that he served an agent of the Government of Turkey **_and_** that he failed to report the same as required under the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 *et seq.*

In addition, Plaintiff was reportedly paid $45,000 to deliver a speech at a state-controlled Russian international television network ("RT"), where he sat next to Russian president Vladimir Putin during a presentation. Director of National Intelligence called RT "The Kremlin's principal international propaganda outlet."[51]   RT registered as "foreign agent" with the Department of Justice[52].   Plaintiff was cited by the Defense Department inspector general for failing to disclose lucrative speaking engagements and other business arrangements with foreign entities, prompting the U.S. government to pursue tens of thousands of dollars in penalties against him.

Ultimately, Plaintiff was charged with a crime, recanted his plea (which was given under oath – twice), and pardoned.  But the Plaintiff chose to accept the pardon, which is similarly a confession of guilt.  See, *Burdick v. U.S.*, 236 U.S. 79, 94 (1915).

These points are all established by or otherwise published in widely available public records and news accounts, as set forth in the Statement of Undisputed Material Facts. Mr. Wilson was aware of all of the above, when he reviewed Plaintiff's Twitter statement on February 22, 2022, the day Russia invaded Ukraine.  See, **Ex. 5**, Affidavit of Rick Wilson.

Accordingly, with regard to the "Putin Employee" tweet, this is a statement of opinion. While Plaintiff subjectively describes the disseminated information as "smears and lies", others no doubt would characterize it as "fair comment" or "analytical criticism." *Comins v. Van Voorhis*, 135 So. 3d 545, 557 (Fla. 5th DCA 2014). See also, *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148,1159-60 (9th Cir. 2021) (cable host's description of news network as "paid Russian propaganda" is rhetorical hyperbole in context of other available information).

---

[51] See, **Ex. 14(b).**
[52] See, **Ex 14 (a).**

18

A publisher's reliance on "trustworthy sources demonstrates his lack of subjective belief that the [allegedly defamatory] articles [in suit] contained false statements." *Edward Lewis Tobinick MD v. Novella,* 848 F. 3d 935 (11th Cir. 2017). (no subjective awareness of probable falsity where "the publisher's allegations are supported by a multitude of prior reports upon which the publisher reasonably relied").  Here the record supports Mr. Wilson's statement such that any claim against him for defamation or injurious falsehood cannot stand.

2. *Q retweet. (Summary Judgment analysis).*

Plaintiff is a public figure. The tweet in question concerns a public issue.  There is nothing in the Complaint that supports any finding concerning defamation or injurious falsehood for calling Plaintiff "Q".   Plaintiff simply retweeted Mr. Stewartson and Mr. Stewartson commented on Mr. Wilson's television appearance.  Calling Plaintiff Q, in this context, is meaningless, and as noted above, Plaintiffs' Second Amended Complaint provides no explanation of the alleged harm or consequences nor any actual malice.

Furthermore, to the extent that the Court finds it necessary to examine the public record further, Plaintiff's own statements, media reports, and Plaintiff's sale of merchandise associated with the QAnon movement, tie Plaintiff to the movement.  It cannot be disputed that after Plaintiff was pardoned, on July 4, 2020 he posted on twitter taking the oath of office for holding office in the United States and added the phrase, "Where we go 1 we go all."  It cannot be disputed that Plaintiff's website sells merchandise with the slogan "WWG1WGA".[53]  Courts have found that that phrase "Where we go 1 we go all," is closely associated with the QAnon movement. See, *U.S. v. Languerand*, 2021 WL 3674731 at *3 (D.D.C. Aug. 19, 2021).

---

[53] See, https://theshirtshowusa.com/product/snap-back-trucker-hat-black-camo (Accessed on 12/29/23). **Ex. 21(a)**. Also, WWG1WGA is an acronym for the phrase, "Where we go 1 we go all."

If General Flynn does not want to be associated with QAnon, he can start by not selling merchandise with its slogans. Nevertheless, there is a wealth of material from reputable sources including the New York Times[54], the Daily Mail[55], CNN[56] and CNBC[57] concerning the depth and breath of Plaintiff's association with QAnon. These news organizations also include discussion from supporters and detractors of QAnon that speculate that Plaintiff is "Q". But in light of Plaintiffs' own statements and conduct, there is simply no possible basis for a lawsuit predicated on the statements made by the Defendant.

First, the statement that Plaintiff is "Q" is a statement of opinion. There is no public evidence as to who "Q" is or whether "Q" is a person or person(s). Whether Plaintiff is "Q" cannot be proven true or false. The U.S. Supreme Court considered this and found that, "Because statements of opinion are not capable of being proven true or false, and therefore, not actionable for defamation." See *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20 (1999), it is also for this Court to decide, as a matter of law, whether the complained of words are actionable expressions of fact or non-actionable expressions of pure opinion and/or rhetorical hyperbole. See *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006), citing *Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917,923 (M. D. Fla. 1996). The Court must look to the totality of the statement, the context in which it was published, and the words used to determine whether the statement is pure or mixed opinion. See, *Keller v. Miami Herald Pub. Co.,* 778 F.2d 711, 717 (11th Cir. 1985).

---

[54]  On June 1, 2021, The New York Times ran an article with the headline, "Michael Flynn suggested at a QAnon-affiliated event that a coup should happen in the U.S." See, **Ex. 24.** The article states, "Some have speculated that he [Plaintiff] is the mysterious figure known as "Q,"…"
[55]  "Believers in the QAnon conspiracy theory have floated that Flynn could be 'Q,' See, **Ex. 21**
[56] Plaintiff posted videos featuring QAnon slogans. See **Ex. 26.**
[57] "Both Flynn and Powell are active in the QAnon community." See, **Ex. 23.**

A "statement is substantially true if its substance or gist conveys essentially the same meaning that the truth would have conveyed." *Jews for Jesus v. Rapp* 997 So. 2d 1107-1108 (Fla. 2008); *Levan v. Cap. Cities/ABC, Inc.,* 190 F. 3d 1230, 1240 (11th Cir. 1999) (if "gist" or "sting" of challenged statement is substantially true, statement is not defamatory). Courts must "consider the context" of the statement and "disregard any minor inaccuracies that do not affect the substance of the statement." See *Wentz v. Project Veritas* 2019 WL 1716024 at *5 (M.D. Fla. Apr. 16, 2019). (granting summary judgment on truth where several allegedly defamatory statements were merely "recitations of [plaintiffs] own admitted actions and statements"). Given the record outlined herein statement that "he is Q" is defensible as substantially true.

Further, Florida law recognizes a difference between statements presented as fact and statements presented as an opinion or rhetorical hyperbole. See *Byrd v. Hustler Mag. Inc*., 433, So. 2d 593, 595 (Fla. 4th DCA 1983). In, *Koch v. Goldway*, 817 F. 3d 507, 509-510 (9th Cir. 1987), the Ninth Circuit found that insinuating that someone is a Nazi is "understood not as a statement of fact but as a slur against a political opponent… must be classified as opinion, nothing more."

Additionally, the Court in *Raible v. Newsweek, Inc*., 341 F. Supp. 804, 806-807 (W.D. Pa. 1972) explained that "[T]o call a person a bigot or other appropriate name descriptive of his political, racial, religious, economic, or sociological philosophies gives no raise to an action for libel". *Garrard v. Charleston Cnty. School District*, 838 S.E.2d 698, 714 (Ct. App. S.C. 2019) (concluding that whether someone behaved like a "racist douchebag" is a matter of opinion).

Certainly, calling Plaintiff Q is far below calling him a Nazi, but even if he were called that it would be within the realm of political speech that is protected under the Constitution. Here,

Plaintiff is a well-known and controversial public figure[58].  The notion that Plaintiff suffered any damage because he was called "Q" or a "Putin Employee" is absurd on its face.

### B.  Plaintiff's Claims are "Primarily" Based on Attacking Free Speech.

To overcome Defendants argument that this case violates the Florida Anti-SLAPP statute, Plaintiff must now demonstrate that his claims are not filed "without merit and primarily because such person or entity has exercised the constitutional right to free speech in connection with a public issue." 768.295(4) Fla. Stat.; *Gundel* 264 So. 3d 314.  But there is overwhelming evidence that undermines any such argument by the Plaintiff.  As is discussed above, this case does not concern damages related to being called "Q" or a "Putin employee".  Plaintiff knows that winning this case, with his history and involvement in these public issues is an impossibility.  Instead, he has chosen to utilize this court to harass Mr. Wilson (as is discussed above) because Plaintiff and Defendant have deep political disagreements (Plaintiff has been ridiculed in Defendant's book and in Lincoln Project's advertising).

Plaintiff regularly engages in political speech. According to the Second Amended Complaint, he runs a political action committee[59] and regularly advocates for positions to influence the public[60]. If General Flynn does not like Mr. Wilson's statements or those of the Lincoln Project, he can address that in the public square.  But this Court's docket should not be occupied a lawsuit that is frivolous and meant harass on its face.  Plaintiff (and certainly his attorneys) should know that there is no legal merit to their claims.  But that is not the point of this lawsuit.  This lawsuit is a classic attempt to inhibit Mr. Wilson's first amendment rights[61].

---

[58] See, **Ex. 1-16**.
[59] See second amended complaint at ¶ 19.
[60] See, **Ex. 14**.
[61] As an aside, it should not go unnoticed by this Court that Plaintiff's counsel chose to prominently include the home addresses of Defendants in the caption of the second amended complaint.  At the same time, Plaintiff's home address is omitted from the same caption.

### C.  Plaintiff cannot establish that protected speech was malicious.

Based on the undisputed record, General Flynn cannot prove by clear and convincing evidence that the allegedly defamatory statement was published with "actual malice." *New York Times v. Sullivan* 376 U.S. 254 (1964).  The "actual malice" standard presents an "overwhelming burden" to defamation claims by public-figure plaintiffs. See *Demby v. English*, 667 So. 2d 350, 354 (Fla 1st DCA 1995). To state a claim under that rigorous standard, Plaintiff must aver facts tending to show, by "clear and convincing evidence," that Defendant subjectively "entertained serious doubts as to the truth" of the statements at issue. See *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 43 (Fla. 4th DCA 2010). Failure to adequately plead actual malice is fatal to a complaint. See, *Frieder v. Prince*, 308 So. 2d 132, 134 (Fla. 3rd DCA 1975).  The standard is not satisfied "merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657 666 (1989).

Here, Plaintiff cites to 7 tweets from Mr. Wilson that Plaintiff was going to jail to support his claim that Mr. Wilson's subsequent statement "Putin employee" or "Q" statement(s) were malicious, (see, ¶109 of the second amended complaint). But Plaintiff (as is discussed above), pled guilty to a federal crime and withdrew his plea.  At the time of the tweet(s), whether Plaintiff *was or was not* going to jail for lying to the FBI was an issue of public concern.  Newspaper articles concerning whether Plaintiff *would or would not* go to jail were on the upper front cover of the New York Times. (See, **Ex. 9 and Ex. 11**).  Whether Plaintiff *would or would not* be jailed for lying to the FBI was such a matter of concern that it resulted in a Presidential pardon, which Plaintiff accepted (**Ex. 13**).  Those statements (¶109 of the second amended complaint) concerning

Plaintiff going to jail (which are not the subject of this lawsuit) are pure statements of opinion that are protected under the First Amendment.

### III. Failure to state a cause of action.

#### a. Plaintiff's Defamation Claim.

In the alternative, and only to the extent that the Court denies the Anti-SLAPP motion, Plaintiff has failed to state a cause of action for defamation. A claim of defamation requires "the following five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." See, *Kieffer v. Atheists of Florida, Inc*., 269 So. 3d 656 (Fla. 2nd DCA 2019, quoting *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). But the elements are not even pled here.  The claims of damages concern entities and issues that are outside of the allegations asserted against Mr. Wilson.  Plaintiff must meet a higher standard as a public figure but makes no effort to even plead how such comments injured him or how they constitute defamation given that these comments concern public issues.

#### b. Plaintiff's Injurious Falsehood Claim.

Likewise, Plaintiff's injurious falsehood claim fails to state a cause of action. A cause of action for "injurious falsehood", a consists of a group of torts for slander of title, disparagement of property, or trade libel. See *Sailboat Key, Inc., v. Gardner* 378 So. 2d 47, 48 (Fla. 3rd DCA 1979). The gist of the tort of injurious falsehood is the "intentional interference with another's economic relations." *Procacci v. Zacco*, 402 So. 2d 425, 426 (Fla. 4th DCA 1981), See also W. Page Keeton, et al., Prosser and Keeton on The Law of Torts § 128 at 964 (5th ed.1984).  Plaintiff did not even bother to plead the elements of injurious falsehood as it relates to Mr. Wilson.

This case should be dismissed with prejudice at this time under Florida's Anti-SLAPP law. However, there are no circumstances where this matter may proceed forward under the current amended complaint.

### c.   Plaintiff's claim for punitive damages violates Florida Law.

At this stage of the proceedings Plaintiff cannot state a claim for punitive damages pursuant to section 786.72, Florida Statues and Florida Rule of Civil Procedure 1.190(f).  In pertinent part §786.72(1) provides:

> In any civil action, no claim for punitive damages shall be permitted unless there is a **<u>reasonable showing</u>** by evidence in the record or proffered by the claimant which would  provide a reasonable basis for recovery of such damages. The claimant may move to amend her or his complaint to assert a claim for punitive damages as allowed by the rules of civil procedure.  (e.s.)

> Rule 1.190(f) provides:

> A motion for leave to amend a pleading to assert a claim for punitive damages shall make a reasonable showing, by evidence in the record or evidence to be proffered by the claimant, that provides a reasonable basis for recovery of such damages. The motion to amend can be filed separately and before the supporting evidence or proffer, but each shall be served on all parties at least 20 days before the hearing.

> Section 768.72, Florida Statutes, prohibits a Plaintiff from seeking punitive damages unless there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages.  But there is no proffer here and there is no record evidence at this stage of the proceeding.  It is embarrassing that Plaintiff and his counsel continue to push this argument when they can cite to no case where a punitive damages claim was permitted at this stage of the proceedings under current rules. Nevertheless, to the extent that the Court permits this matter to proceed forward (which it should not do), any reference to punitive damages should be stricken from the amended complaint.

25

**IV.    The Second Amended Complaint is an Impermissible "Shotgun Pleading".**

Additionally and in the alternative, the 126 paragraph amended complaint impermissibly comingles allegations against both Mr. Wilson, Mr. Stewartson and MeidasTouch into the same counts, even though the speech alleged for each is different.  While amended complaint consists of 152 paragraphs, Mr. Wilson is only named in 17 paragraphs. But the allegations asserted seem to be directed to Mr. Stewartson's speech only.

Shotgun pleadings are characterized by conclusory, vague, and immaterial facts that do not clearly connect to a particular cause of action, failing to separate each cause of action or claim for relief in distinct counts, or combining multiple claims against multiple defendants without specifying which defendant is responsible for what. *McDonough v. City of Homestead*, 771 Fed. Appx. 952, 955 (11th Cir. 2019) citing *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015).  Even though this issue was raised, Plaintiff has not corrected this issue. This is the third iteration of this complaint, there is no reason to believe that Plaintiff could somehow state this cause of action if given a fourth opportunity.

Again, this case should be dismissed *with* prejudice at this time. However, there are no circumstances where this matter may proceed forward under the current amended complaint.

**V.    Misjoinder of Co-Defendant(s) Stewartson and MeidasTouch**

Plaintiff alleges defamation and injurious falsehood against Defendant because he was called a "Putin employee" and "Q".  There is no allegation against Defendant Wilson that requires Co-Defendant Stewartson to be a party (the same is true concerning Plaintiff's allegations against Mr. Stewartson with regard to Mr. Wilson being a party to that action).  Likewise, Mr. Wilson has nothing at all to do with the allegations against MeidasTouch. There is no tie alleged between these parties.  It appears that Mr. Wilson is a party to this claim to thwart an effort to remove this matter

to federal court (because Mr. Wilson is a Florida resident, Defendants Stewartson and MeidasTouch would otherwise be able to establish diversity jurisdiction in Federal Court). Defendant Wilson joins in Co-Defendant Stewartson's argument concerning misjoinder.

## **CONCLUSION**

This lawsuit is an assault on the first amendment and Mr. Wilson's right to speak freely on matters of public concern.  It was brought to punish and retaliate against Mr. Wilson because he engages in political speech. Florida law prohibits this type of action.  This frivolous lawsuit should never have been filed.  There is no evidence or viable argument that would support the notion that this lawsuit *was not* initiated primarily because Mr. Wilson exercised his right to free speech in connection with public issues.

WHEREFORE, because Plaintiff has stated a claim that is prohibited under Florida's Anti-SLAPP law and cannot state a cognizable claim, his amended complaint should be dismissed with *prejudice*, or in the alternative, this Court should issue judgment to Defendant based on the record pursuant to Section 768.295(4), Florida Statutes.  Additionally, this Court should retain jurisdiction to assess reasonable attorneys' fees and costs against Plaintiff in relation to bringing this prohibited Anti-SLAPP suit.

Respectfully submitted on January 3, 2024.

/s/ *Leonard M. Collins*
Leonard M. Collins (FBN: 423210)
GRAYROBINSON, P.A.
301 S. Bronough Street, Suite 600
Tallahassee, Florida 32301
Telephone: 850-577-9090
leonard.collins@gray-robinson.com
*Attorney for Defendant, Rick Wilson*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been provided to

the following via electronic mail on January 3, 2024.

Craig A. Whisenhunt
RIPLEY WHISENHUNT, PLLC
8130 66th Street North, Suite 3
Pinellas Park, Florida 33781
Telephone: 727-256-1660
craiggrwrlawfirm.com
efiling@rightingwrongsflorida.com
*Attorneys for Defendant, Jim Stewartson*

Jared J. Roberts
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Telephone: 703-888-1943
jared@binnall.com
*Attorneys for Plaintiff, Michael T. Flynn*

George K. Randert
George A.D. Thurlow
RANDERT & MORTIMER, PLLC
535 Central Avenue, Suite 200
St. Petersburg, Florida 33701
Telephone: 727-823-4191
grandertarandertlaw.com
service@arandertlaw.com
gthurlow@randertlaw.com
tmccreary@randertlaw.com
*Attorneys for Defendant, Jim Stewartson*

Jonathan R. Huffman
James A. Boatman, Jr.
BOATMAN RICCI
3021 Airport-Pulling Rd. N., Suite 202
Naples, Florida 34105
Telephone: 239-330-1494
courtfilings@boatnnanricci.com
jrh@boatmanricci.com
*Attorneys for Plaintiff, Michael T. Flynn*

*/s/ Leonard M. Collins*
Leonard M. Collins (FBN: 423210)
GRAYROBINSON, P.A

# Exhibit 1

**The New York Times** | https://www.nytimes.com/2016/11/19/opinion/michael-flynn-an-alarming-pick-for-national-security-adviser.html

EDITORIAL

# Michael Flynn: An Alarming Pick for National Security Adviser

**By The Editorial Board**

Nov. 18, 2016



Retired Lt. Gen. Michael Flynn speaking at the Republican National Convention in July.
Shawn Thew/European Pressphoto Agency

Of all the disturbing scenes in the presidential campaign, the Republican Convention speech by retired Lt. Gen. Michael Flynn stood out. During a fiery address in which he lamented the decline of American exceptionalism and lambasted the Democratic nominee, Hillary Clinton, General Flynn joined the crowd in chants of "lock her up!" Smiling slyly, he shouted: "Yeah, that's right, lock her up!"

It was grotesque, but not entirely surprising for a military intelligence veteran who has earned a reputation for hotheadedness and poor judgment. Americans of all political backgrounds should be alarmed that General Flynn will be President-elect Donald Trump's national security adviser. It's likely, given his record, that he will encourage Mr. Trump's worst impulses, fuel suspicions of Muslims and bring to the job conflicts of interest from his international consulting work.

The role of national security adviser has grown in power and influence in recent years, with the Bush and Obama administrations vesting the office with great authority on matters including military operations, nuclear proliferation, diplomacy, foreign aid and responses to global pandemics. The job demands a knack for consensus building, the ability to make sense of vast amounts of information and the rigor to present the president with well-thought-out options to respond to complex challenges.

General Flynn played pivotal roles in military campaigns in Iraq and Afghanistan. While his skills served him well in those environments, when he was tapped to lead the Defense Intelligence Agency, his shortcomings as a manager and strategic thinker soon became glaring. His grasp on the truth was so flimsy at times that colleagues began mockingly referring to "Flynn facts."



Hanna Barczyk

General Flynn did not leave quietly after being fired by the Obama administration in 2014. He has since created a self-serving narrative, maintaining that he was dismissed for raising alarms about the threat posed by Islamist extremist groups, which he contends the Obama administration "coddles."

He has been extraordinarily incendiary in his characterizations of Islam. In February, he posted a link to a video on Twitter warning about the threat of Islam: "Fear of Muslims is RATIONAL." In August, he told The Washington Post that he agreed with some of Mr. Trump's views about Muslims; he called Islam an ideology and compared it to a cancer that has metastasized.

General Flynn's fearmongering "only plays into Al Qaeda's narrative that there is a clash of civilizations," Representative Adam Schiff, the ranking member of the House Intelligence Committee, said, "What he has expressed is dangerous and harmful to us."

In recent months, even while he advised Mr. Trump, General Flynn took on questionable consulting work, including speaking at a forum hosted by the state broadcaster Russia Today, which is infamous for its propaganda and serves as a mouthpiece for President Vladimir Putin. He also runs a consulting firm that has lobbied for a company with connections to Turkey's authoritarian president. Just last week, he wrote an article urging the extradition of a Turkish cleric whom the Turkish government said was the mastermind of the attempted coup in July.

A core theme of Mr. Trump's campaign was making America safer. With this appointment, he is doing the opposite.

A version of this article appears in print on , Section A, Page 22 of the New York edition with the headline: Donald Trump's Disturbing Picks: Michael Flynn, Too Hotheaded for a Sensitive Position

# Exhibit 2

The New York Times

https://www.nytimes.com/2017/02/13/us/politics/donald-trump-national-security-adviser-michael-flynn.html

# Michael Flynn Resigns as National Security Adviser

**By Maggie Haberman, Matthew Rosenberg, Matt Apuzzo and Glenn Thrush**

Feb. 13, 2017

Michael T. Flynn, the national security adviser, resigned on Monday night after it was revealed that he had misled Vice President Mike Pence and other top White House officials about his conversations with the Russian ambassador to the United States.

Mr. Flynn, who served in the job for less than a month, said he had given "incomplete information" regarding a telephone call he had with the ambassador in late December about American sanctions against Russia, weeks before President Trump's inauguration. Mr. Flynn previously had denied that he had any substantive conversations with Ambassador Sergey I. Kislyak, and Mr. Pence repeated that claim in television interviews as recently as this month.

But on Monday, a former administration official said the Justice Department warned the White House last month that Mr. Flynn had not been fully forthright about his conversations with the ambassador. As a result, the Justice Department feared that Mr. Flynn could be vulnerable to blackmail by Moscow.

In his resignation letter, which the White House emailed to reporters, Mr. Flynn said he had held numerous calls with foreign officials during the transition. "Unfortunately, because of the fast pace of events, I inadvertently briefed the vice president-elect and others with incomplete information regarding my phone calls with the Russian ambassador," he wrote. "I have sincerely apologized to the president and the vice president, and they have accepted my apology."

"I am tendering my resignation, honored to have served our nation and the American people in such a distinguished way," Mr. Flynn wrote.

The White House said in the statement that it was replacing Mr. Flynn with retired Lt. Gen. Joseph K. Kellogg Jr. of the Army, a Vietnam War veteran, as acting national security adviser.

Mr. Flynn was an early and ardent supporter of Mr. Trump's candidacy, and in his resignation he sought to praise the president. "In just three weeks," Mr. Flynn said, the new president "has reoriented American foreign policy in fundamental ways to restore America's leadership position in the world."

But in doing so, he inadvertently illustrated the brevity of his tumultuous run at the National Security Council, and the chaos that has gripped the White House in the first weeks of the Trump administration — and created a sense of uncertainty around the world.

Earlier Monday, Sean Spicer, the White House press secretary, told reporters that "the president is evaluating the situation" about Mr. Flynn's future. By Monday evening, Mr. Flynn's fortunes were rapidly shifting — his resignation came roughly seven hours after Kellyanne Conway, a counselor to the

president, said on MSNBC that Mr. Trump had "full confidence" in the retired general.

And when he did step down, it happened so quickly that his resignation does not appear to have been communicated to National Security Council staff members, two of whom said they learned about it from news reports.

Officials said Mr. Pence had told others in the White House that he believed Mr. Flynn lied to him by saying he had not discussed the topic of sanctions on a call with the Russian ambassador in late December. Even the mere discussion of policy — and the apparent attempt to assuage the concerns of an American adversary before Mr. Trump took office — represented a remarkable breach of protocol.

The F.B.I. had been examining Mr. Flynn's phone calls as he came under growing questions about his interactions with Russian officials and his management of the National Security Council. The blackmail risk envisioned by the Justice Department would have stemmed directly from Mr. Flynn's attempt to cover his tracks with his bosses. The Russians knew what had been said on the call; thus, if they wanted Mr. Flynn to do something, they could have threatened to expose the lie if he refused.

The Justice Department's warning to the White House was first reported on Monday night by The Washington Post.

In addition, the Army has been investigating whether Mr. Flynn received money from the Russian government during a trip he took to Moscow in 2015, according to two defense officials. Such a payment might violate the Emoluments Clause of the Constitution, which prohibits former military officers from receiving money from a foreign government without consent from Congress. The defense officials said there was no record that Mr. Flynn, a retired three-star Army general, filed the required paperwork for the trip.

Representative Adam B. Schiff of California, the top Democrat on the House Intelligence Committee, said in a statement late Monday that Mr. Flynn's resignation would not close the question of his contact with Russian officials.

"General Flynn's decision to step down as national security adviser was all but ordained the day he misled the country about his secret talks with the Russian ambassador," said Mr. Schiff, noting that the matter is still under investigation by the House committee.

Two other Democratic lawmakers — Representative John Conyers Jr. of Michigan and Representative Elijah E. Cummings of Maryland — called for an immediate briefing by the Justice Department and the F.B.I. over the "alarming new disclosures" that Mr. Flynn was a blackmail risk. "We need to know who else within the White House is a current and ongoing risk to our national security," they said in a statement.

Representative Devin Nunes, Republican of California and the chairman of the House intelligence committee, was supportive of Mr. Flynn until the end. "Washington, D.C., can be a rough town for honorable people, and Flynn — who has always been a soldier, not a politician — deserves America's gratitude and respect," Mr. Nunes said in a statement.

Case 1:21-cv-02587-AS-SLC   Document 218-2   Filed 03/02/24   Page 36 of 100

The White House had examined a transcript of a wiretapped conversation that Mr. Flynn had with Mr. Kislyak in December, according to administration officials. Mr. Flynn originally told Mr. Pence and others that the call was limited to small talk and holiday pleasantries.

But the conversation, according to officials who saw the transcript of the wiretap, also included a discussion about sanctions imposed on Russia after intelligence agencies determined that President Vladimir V. Putin's government tried to interfere with the 2016 election on Mr. Trump's behalf. Still, current and former administration officials familiar with the call said the transcript was ambiguous enough that Mr. Trump could have justified either firing or retaining Mr. Flynn.

Mr. Trump, however, had become increasingly concerned about the continued fallout over Mr. Flynn's behavior, according to people familiar with his thinking, and told aides that the media storm around Mr. Flynn would damage the president's image on national security issues.

Stephen K. Bannon, the president's chief strategist, asked for Mr. Flynn's resignation — a move that he has been pushing for since Friday, when it became clear that the national security adviser had misled Mr. Pence.

Around 8:20 p.m. Monday, a sullen Mr. Flynn was seen in the Oval Office, just as preparations were being made for the swearing-in of newly confirmed Treasury Secretary Steven T. Mnuchin. Soon after, Mr. Flynn's resignation letter started making the rounds.

Administration officials said it was unlikely that Mr. Kellogg would be asked to stay on as Mr. Flynn's permanent replacement. Mr. Flynn brought Mr. Kellogg into the Trump campaign, according to a former campaign adviser, and the two have remained close. K. T. McFarland, the deputy national security adviser who also was brought on by Mr. Flynn, is expected to leave that role, a senior official said.

One person close to the administration, who was not authorized to discuss the personnel moves and spoke on the condition of anonymity, said that retired Vice Admiral Robert S. Harward is the leading candidate to replace Mr. Flynn, although Mr. Kellogg and David H. Petraeus are being discussed. It was not clear whether Mr. Petraeus is still expected to appear at the White House this week, as initially discussed by advisers to the president.

Mr. Flynn's concealment of the call's content, combined with questions about his management of his agency and reports of a demoralized staff, put him in a precarious position less than a month into Mr. Trump's presidency.

Few members of Mr. Trump's team were more skeptical of Mr. Flynn than the vice president, numerous administration officials said. Mr. Pence, who used the false information provided by Mr. Flynn to defend him in a series of television appearances, was incensed at Mr. Flynn's lack of contrition for repeatedly embarrassing him by withholding the information, according to three administration officials familiar with the situation.

Mr. Flynn and Mr. Pence spoke twice in the past few days about the matter, but administration officials said that rather than fully apologize and accept responsibility, the national security adviser blamed his faulty memory — which irked the typically slow-to-anger Mr. Pence.

The slight was compounded by an episode late last year when Mr. Pence went on television to deny that Mr. Flynn's son, who had posted conspiracy theories about Hillary Clinton on social media, had been given a security clearance by the transition team. The younger Mr. Flynn had, indeed, been given such a clearance, even though his father had told Mr. Pence's team that he had not.

Officials said classified information did not appear to have been discussed during the conversation between Mr. Flynn and the ambassador, which would have been a crime. The call was captured on a routine wiretap of diplomats' calls, the officials said.

But current Trump administration officials and former Obama administration officials said that Mr. Flynn did appear to be reassuring the ambassador that Mr. Trump would adopt a more accommodating tone on Russia once in office.

Former and current administration officials said that Mr. Flynn urged Russia not to retaliate against any sanctions because an overreaction would make any future cooperation more complicated. He never explicitly promised sanctions relief, one former official said, but he appeared to leave the impression that it would be possible.

During his 2015 trip to Moscow, Mr. Flynn was paid to attend the anniversary celebration of Russia Today, a television network controlled by the Kremlin. At the banquet, he sat next to Mr. Putin.

Mr. Flynn had notified the Defense Intelligence Agency, which he once led, that he was taking the trip. He received a security briefing from agency officials before he left, which is customary for former top agency officials when they travel overseas.

Still, some senior agency officials were surprised when footage of the banquet appeared on RT, and believed that Mr. Flynn should have been more forthcoming with the agency about the nature of his trip to Russia.

*A correction was made on Feb. 13, 2017: An earlier version of this article misstated the day on which the White House sent out a series of conflicting signals about Michael T. Flynn, the national security adviser. It was Monday, not Tuesday. Also, because of an editing error, an earlier version quoted three posts from an unverified Twitter account purporting to be Mr. Flynn's, responding to the resignation.*

———

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com.     Learn more

Reporting was contributed by Mark Mazzetti, Eric Schmitt, Michael S. Schmidt and Max Fisher.

*Get politics and Washington news updates via Facebook, Twitter and in the Morning Briefing newsletter.*

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Facing Scrutiny Over Russia Call, Flynn Steps Down

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

DEC 0 1 2017

Clerk, U.S. District and
Bankruptcy Courts

|  |  |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.: |
| v. | Violation: 18 U.S.C. § 1001 (False Statements) |
| MICHAEL T. FLYNN, | |
| Defendant. | |

## STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America and the defendant, MICHAEL T. FLYNN, stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense; they are being submitted to demonstrate that sufficient facts exist that the defendant committed the offense to which he is pleading guilty.

1.     The defendant, MICHAEL T. FLYNN, who served as a surrogate and national security advisor for the presidential campaign of Donald J. Trump ("Campaign"), as a senior member of President-Elect Trump's Transition Team ("Presidential Transition Team"), and as the National Security Advisor to President Trump, made materially false statements and omissions during an interview with the Federal Bureau of Investigation ("FBI") on January 24, 2017, in Washington, D.C. At the time of the interview, the FBI had an open investigation into the Government of Russia's ("Russia") efforts to interfere in the 2016 presidential election, including the nature of any links between individuals associated with the Campaign and Russia, and whether there was any coordination between the Campaign and Russia's efforts.

2.     FLYNN's false statements and omissions impeded and otherwise had a material impact on the FBI's ongoing investigation into the existence of any links or coordination

between individuals associated with the Campaign and Russia's efforts to interfere with the 2016 presidential election.

*False Statements Regarding FLYNN's Request to the Russian Ambassador that Russia Refrain from Escalating the Situation in Response to U.S. Sanctions against Russia*

3.    On or about January 24, 2017, FLYNN agreed to be interviewed by agents from the FBI ("January 24 voluntary interview"). During the interview, FLYNN falsely stated that he did not ask Russia's Ambassador to the United States ("Russian Ambassador") to refrain from escalating the situation in response to sanctions that the United States had imposed against Russia. FLYNN also falsely stated that he did not remember a follow-up conversation in which the Russian Ambassador stated that Russia had chosen to moderate its response to those sanctions as a result of FLYNN's request. In truth and in fact, however, FLYNN then and there knew that the following had occurred:

        a.    On or about December 28, 2016, then-President Barack Obama signed Executive Order 13757, which was to take effect the following day. The executive order announced sanctions against Russia in response to that government's actions intended to interfere with the 2016 presidential election ("U.S. Sanctions").

        b.    On or about December 28, 2016, the Russian Ambassador contacted FLYNN.

        c.    On or about December 29, 2016, FLYNN called a senior official of the Presidential Transition Team ("PTT official"), who was with other senior members of the Presidential Transition Team at the Mar-a-Lago resort in Palm Beach, Florida, to discuss what, if anything, to communicate to the Russian Ambassador about the U.S. Sanctions. On that call, FLYNN and

the PTT official discussed the U.S. Sanctions, including the potential impact of those sanctions on the incoming administration's foreign policy goals. The PTT official and FLYNN also discussed that the members of the Presidential Transition Team at Mar-a-Lago did not want Russia to escalate the situation.

d.     Immediately after his phone call with the PTT official, FLYNN called the Russian Ambassador and requested that Russia not escalate the situation and only respond to the U.S. Sanctions in a reciprocal manner.

e.     Shortly after his phone call with the Russian Ambassador, FLYNN spoke with the PTT official to report on the substance of his call with the Russian Ambassador, including their discussion of the U.S. Sanctions.

f.     On or about December 30, 2016, Russian President Vladimir Putin released a statement indicating that Russia would not take retaliatory measures in response to the U.S. Sanctions at that time.

g.     On or about December 31, 2016, the Russian Ambassador called FLYNN and informed him that Russia had chosen not to retaliate in response to FLYNN's request.

h.     After his phone call with the Russian Ambassador, FLYNN spoke with senior members of the Presidential Transition Team about FLYNN's conversations with the Russian Ambassador regarding the U.S. Sanctions and Russia's decision not to escalate the situation.

3

*False Statements Regarding FLYNN's Request that Foreign Officials Vote Against or Delay a United Nations Security Council Resolution*

4.    During the January 24 voluntary interview, FLYNN made additional false statements about calls he made to Russia and several other countries regarding a resolution submitted by Egypt to the United Nations Security Council on December 21, 2016. Specifically FLYNN falsely stated that he only asked the countries' positions on the vote, and that he did not request that any of the countries take any particular action on the resolution. FLYNN also falsely stated that the Russian Ambassador never described to him Russia's response to FLYNN's request regarding the resolution. In truth and in fact, however, FLYNN then and there knew that the following had occurred:

        a.    On or about December 21, 2016, Egypt submitted a resolution to the United Nations Security Council on the issue of Israeli settlements ("resolution"). The United Nations Security Council was scheduled to vote on the resolution the following day.

        b.    On or about December 22, 2016, a very senior member of the Presidential Transition Team directed FLYNN to contact officials from foreign governments, including Russia, to learn where each government stood on the resolution and to influence those governments to delay the vote or defeat the resolution.

        c.    On or about December 22, 2016, FLYNN contacted the Russian Ambassador about the pending vote. FLYNN informed the Russian Ambassador about the incoming administration's opposition to the resolution, and requested that Russia vote against or delay the resolution.

4

d.   On or about December 23, 2016, FLYNN again spoke with the Russian Ambassador, who informed FLYNN that if it came to a vote Russia would not vote against the resolution.

*Other False Statements Regarding FLYNN's Contacts with Foreign Governments*

5.   On March 7, 2017, FLYNN filed multiple documents with the Department of Justice pursuant to the Foreign Agents Registration Act ("FARA") pertaining to a project performed by him and his company, the Flynn Intel Group, Inc. ("FIG"), for the principal benefit of the Republic of Turkey ("Turkey project"). In the FARA filings, FLYNN made materially false statements and omissions, including by falsely stating that (a) FIG did not know whether or the extent to which the Republic of Turkey was involved in the Turkey project, (b) the Turkey project was focused on improving U.S. business organizations' confidence regarding doing business in Turkey, and (c) an op-ed by FLYNN published in *The Hill* on November 8, 2016, was written at his own initiative; and by omitting that officials from the Republic of Turkey provided supervision and direction over the Turkey project.

ROBERT S. MUELLER, III
Special Counsel

By:

Brandon L. Van Grack
Zainab N. Ahmad
Senior Assistant Special Counsels
The Special Counsel's Office

## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

I have read every word of this Statement of the Offense, or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorneys, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: 11/30/17

Michael T. Flynn
Defendant

## ATTORNEYS' ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: 11/30/17

Robert K. Kelner
Attorney for Defendant

Stephen P. Anthony
Attorney for Defendant

6

# Exhibit 4

The New York Times
https://www.nytimes.com/2017/04/01/us/politics/michael-flynn-financial-disclosure-russia-linked-entities.html

# Michael Flynn Failed to Disclose Income From Russia-Linked Entities

**By Matthew Rosenberg**

April 1, 2017

WASHINGTON — Michael T. Flynn, the national security adviser who was forced out of the job in February, failed to list payments from Russia-linked entities on the first of two financial disclosure forms released Saturday by the Trump administration.

The first form, which he signed in February, does not directly mention a paid speech he gave in Moscow, as well as other payments from companies linked to Russia. The second, an amended version, lists the names of the companies that made the payments under a section for any nongovernment compensation that exceeds $5,000 "in a year." That list appears to include all of the work that Mr. Flynn, a retired three-star Army general, has done since leaving the military in 2014, without providing compensation figures for any of it.

No reason was given for the discrepancy between the two forms.

The Russia-linked payments were detailed in a letter released in March by congressional investigators, and included a $45,000 speaking fee from RT, formerly known as Russia Today, a Kremlin-backed news network, for a speech in 2015 in Moscow. During the same trip, Mr. Flynn attended the network's lavish anniversary dinner and was photographed sitting at the elbow of President Vladimir V. Putin of Russia.

Mr. Flynn has faced fierce criticism for the Moscow speech and for his lobbying efforts for Turkey. But the work paid well, and the disclosure forms showed income of nearly $1.5 million, a sizable amount for a man who left the military less than three years ago.

What Mr. Flynn, who spent most of his adult life earning a military officer's salary, does not appear to possess is the kind of income-earning investment portfolio enjoyed by most wealthy Americans, including the numerous millionaires and billionaires in the Trump administration. His form listed assets valued at $380,000 and $800,000, most of which is tied up in retirement funds.

Mr. Flynn reported an income of $1.37 million to $1.47 million. The bulk — $827,055 — came from the Flynn Intel Group, the consulting business he founded after being pushed out as the chief of the Defense Intelligence Agency in 2014. The rest included speaking fees and income earned for doing consulting work and sitting on corporate boards, such as that of Adobe Systems, which paid him $125,250.

The speaking fees, all of which were from 2016, ranged from about $10,000 to about $22,000. He gave talks to relatively run-of-the-mill groups like the Lincoln Chamber of Commerce in Nebraska, but also to the David Horowitz Freedom Center in California, which the Southern Poverty Law Center describes as

an anti-Muslim hate group.

It is unlikely that Mr. Flynn, who is seeking immunity from congressional and federal investigations into Russia's meddling in the election, will match the same income this year. He shuttered the Flynn Intel Group at the end of 2016, and then was forced out of the White House in February for misleading Vice President Mike Pence about the nature of phone calls he had with the Russian ambassador to the United States in December.

The payments for lobbying work that Mr. Flynn did for the Turkish government — and did not disclose until March — were handled through the Flynn Intel Group, and are not listed separately on the disclosure forms. Mr. Flynn did not work directly for the Turkish government; the firm that hired him, Inovo, is owned by a Turkish-American businessman with links to leaders in Ankara and asked him to work on an issue important to the government.

Follow Matthew Rosenberg on Twitter at @AllMattNYT

A version of this article appears in print on , Section A, Page 15 of the New York edition with the headline: Flynn Failed to Report Pay Tied to Russia

# Exhibit 5



# IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## IN AND FOR SARASOTA COUNTY, FLORIDA
### CIVIL DIVISION

MICHAEL T. FLYNN,

    *Plaintiff,*

                                    Case No. 2023-CA-004264 NC

v.

                                      Division C Circuit

JIM STEWARTSON,

AND

RICK WILSON,

    *Defendants.*

———————————————————————/

## AFFIDAVIT OF RICK WILSON

I, Rick Wilson affirm as follows:

   1.  I am over 18 years old and otherwise competent to make this affidavit, which is based upon my personal knowledge.

   2.  I am political strategist, media consultant and author based in Tallahassee, Florida.

   3.  Over the course of my career, I have produced advertising and provided strategic counsel to national, statewide, and local political candidates, SuperPACs, state parties, the national campaign committees, and corporate, association, and government clients across the nation and around the world.

   4.  I have authored two New York Times bestselling books: "Everything Trump Touches Dies: A Republican Strategist Gets Real About the Worst President Ever" and "Running Against the Devil: A Plot to Save America from Trump--- and Democrats from Themselves."

5.   I also am an opinion writer published in *The Washington Post, The New York Times, The Economist, The Daily Beast, Politico, The Hill, The London Spectator, Rolling Stone, The New York Daily News, USA Today, The Bulwark* and dozens of other publications. I am frequently called on for political insight on the national news networks, MSNBC, CNN, and international outlets.

6.   In 2020, I co-founded the Lincoln Project, a leading U.S. pro-democracy organization dedicated to the preservation, protection, and defense of democracy.

7.   I have personal knowledge of the facts and statements below, personal information and through review of documents and records and not on mere belief.

8.   Michael Flynn served as National Security Advisor to President Trump for 22 days.

9.   Russia invaded Ukraine on February 22, 2022.

10. I authored a New York Times Bestseller entitled, "Everything Trump Touches Dies: A Republican Strategist Gets Real About the Worst President Ever" At page 163 of the book, I describe Plaintiff as follows:

> Capo of *l'afaire Russe* MAGA Crew Mike Flynn, a disgraced former army general was so outrageously in bed with the Russians that even Trump was forced to fire him. A predecessor to Flynn as the Defense Intelligence Agency Director told me once that the Russophilic anti-Muslim general was "the most dangerous asshole ever to head a three letter."

11. I consume a substantial amount of media daily, I read newspapers and obtain information from a wide array of news sources.  I was aware of and relied upon the following editorials, newspaper articles and court filings when I made statements that are the subject of this lawsuit:

a.   The November 18, 2016, The New York Times editorial entitled; "Michael Flynn: An Alarming Pick for National Security Advisor."[1]

---

[1] See, **Ex. 1** New York Times Editorial, November 18, 2016.

b.   The New York Times, Feb. 13, 2017 article entitled, "Michael Flynn Resigns as national security advisor"[2].

c.   Statement of Offense in *United States of America v. Michael T. Flynn*.[3]; where Michael Flynn admitted under oath to making "material false statements and omissions", which impeded what was then an FBI counterintelligence investigation[4], that he served an agent of the Government of Turkey ***and*** that he failed to report the same as required under the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 *et seq* [5];

d.   April 1, 2017, New York Times article entitled, "Michael Flynn Failed to Disclose Income From Russia-Linked Entities."[6]

e.   Plaintiff published an article in The Hill, entitled, "Our Ally Turkey is in crisis and needs our support," concerning the interests of the Government of Turkey and the potential extradition of a person seeking political asylum[7].

f.   The Hill issued an editor's note to Plaintiff's article[8].

g.   The Washington Post, on March 10, 2017 covered the Hill's editor's note concerning Plaintiff.[9]

---

[2] See, **Ex. 2**, Michael Flynn Resigns as national security advisor, The New York Times, Feb. 13, 2017.

[3] See, **Ex. 2.**

[4] See, **Ex. 3**,

[5] See, **Ex. 3**, the Statement of Offense in United States of America v. Michael T. Flynn. See also, **Ex. 4**, Michael Flynn Failed to Disclose Income From Russia-Linked Entities. The New York Times, April 1, 2017.

[6] See **Ex 7**, Our Ally Turkey is in crisis and needs our support. The Hill, November 8, 2016 and modified on March 8, 2017.

[7] See **Ex 7**, Our Ally Turkey is in crisis and needs our support. The Hill, November 8, 2016 and modified on March 8, 2017.

[8] See **Ex 7**, Our Ally Turkey is in crisis and needs our support. The Hill, November 8, 2016 and modified on March 8, 2017.

[9] See, **Ex. 8**, The Hill publishes editor's note on Michael Flynn op-ed regarding Turkey. The Washington Post, March 10, 2017.

h. The New York Times. December 18, 2018, article, 'Not Hiding My Disgust': Judge Rebukes Flynn, Then Delays Sentencing.'[10]

i. The New York Times. May 7, 2020 article, "U.S. Drops Michael Flynn Case, in Move Backed by Trump."[11]

j. The New York Times, a May 8, 2020, article "U.S. Drops Michael Flynn Case, in Move Backed by Trump."[12]

k. Plaintiff brought a writ of mandamus before the DC Circuit seeking an order to instruct the District Court to dismiss the criminal action.  Following argument, the DC Circuit declined Plaintiff's Motion[13].

l. Plaintiff was pardoned by the President of the United States[14].

m. Plaintiff was reportedly paid $45,000 to deliver a speech at a state-controlled Russian international television network, where he sat next to Russian president Vladimir Putin[15] during a presentation.

n. RT, the Russian television network that reportedly paid Plaintiff $45,000, registered with the U.S. Department of Justice as a "foreign agent" in the United States in November of 2017.[16]  Reuters reported on the filing, saying, "U.S. intelligence agencies said in a report in January that the television station, which

---

[10] See, **Ex. 9**, 'Not Hiding My Disgust': Judge Rebukes Flynn, Then Delays Sentencing. The New York Times. December 18, 2018.

[11] See, **Ex 10**, Memorandum Option, dated December 16, 2019; *U.S. v. Flynn.*

[12] See, **Ex. 11**, U.S. Drops Michael Flynn Case, in Move Backed by Trump.  The New York Times. May 7, 2020.

[13] See, **Ex. 12**, *United States v. Flynn*, 507 F. Supp. 3d 116 (D.C. Cir 2020).

[14] See, **Ex. 13**, Notice of Executive Grant of Clemency and Consent Motion to Dismiss as Moot (with attachment including Presidential pardon of Plaintiff).

[15] See **Ex. 14**, Russians paid Mike Flynn 45K for Moscow Speech, Documents Show. NBC News. March 16, 2017.

[16] See, **Ex 14 (a)**, "Russia's RT America Registers as 'foreign Agent' in U.S." *Reuters*, November 13, 2017.

broadcasts on cable in the United States, is 'Russia's state-run propaganda machine' and that it contributed to the Kremlin's campaign to interfere with last year's presidential election in favor of Republican Party candidate Donald Trump."

o.   In 2017, the Director of National Intelligence issued a report titled "Assessing Russian Activities and Intentions in Recent US Elections" which called RT "The Kremlin's principal international propaganda outlet."[17]

p.   Plaintiff was cited by the Defense Department inspector general for failing to disclose lucrative speaking engagements and other business arrangements with foreign entities, prompting the U.S. government to pursue tens of thousands of dollars in penalties against him[18].

q.   After Plaintiff was pardoned, on July 4, 2020 he posted on Twitter taking the oath of office for holding office in the United States and added the Qanon catchphrase, "Where we go one we go all."[19]

r.   On December 23, 2020, Politico published an article with the title, "Trump leans on QAnon figures in flailing effort to overturn election"[20] The politico article states: "He also met with Michael Flynn, the former Trump national security adviser who became a celebrated QAnon figure after seeking to rescind a guilty plea for lying to the FBI."

---

[17]    See, **Ex. 14(b),** "Background to "assessing Russian Activities and Intentions in ... - DNI." *Office of the Director of National Intelligence*, January 6, 2017

[18] See, **Ex. 15,** Michael Flynn cited for unauthorized payments. The Washington Post. July 8, 2022. See also, **Ex. 16**, Army reviewing investigation into Michael Flynn's dealings with Russia, foreign firm. The Washington Post. March 12, 2021.

[19] See, **Ex. 17,** https://x.com/GenFlynn/status/1279590652200849409?s=20

[20]   See, **Ex. 18**, Trump leans on QAnon figures in flailing effort to overturn election, Politico, December 23, 2020.

s.   On December 20, 2020 CNN.com reported on a heated Oval Office meeting included talk of special counsel, martial law and  Plaintiff reportedly suggested martial law could be invoked to overturn the 2020 election and attended a White House meeting where suspending the U.S. Constitution was reportedly discussed[21];

t.   On December 30, 2020, The Daily Mail published an article with the headline "Mike Flynn endorses the selling of QAnon merchandise that pays into his legal defense fund with supporters saying buying t-shirts and hats helps pardoned ex-national security adviser 'in the fight against fake news".

u.   On January 8, 2021, CNBC ran an article that explained that Plaintiff's twitter account was suspended, with the headline, "Twitter bans Michael Flynn, Sidney Powell and other QAnon accounts."  The article states: "Both Flynn and Powell are active in the QAnon community."[22]

v.   According to the New York Times, Plaintiff appeared on a television program and "pushed for Mr. Trump to impose martial law and deploy the military to "rerun" the election."[23]

w.   On February 6, 2021, the New York Times published an article entitled, "Pushing QAnon and Stolen Election Lies, Flynn Re-emerges: Recast by President Trump's most ardent supporters as a MAGA martyr, Michael T. Flynn has embraced his role as the man who spent four years unjustly ensnared in the Russia

---

[21] See, **Ex. 19**, Heated Oval Office meeting included talk of special counsel, martial law as Trump advisors clash. CNN.com, December 20, 2020.  See also, **Ex. 20**. Trump Weighed Naming Election Conspiracy Theorist as Special Counsel. The New York Times. December 19, 2020.

[22] See, **Ex. 23**, Twitter bans Michael Flynn, Sidney Powell and other QAnon accounts. CNBC January 8, 2021.

[23] See, **Ex. 20**.

investigation."[24]

x. According to the Associated Press, Plaintiff was a leader of the "Stop the Steal" effort to overturn the results of the 2020 presidential election[25].

y. Plaintiff was the subject of an entire episode of the PBS series Frontline entitled "How did Michael Flynn go from being an elite soldier overseas to waging a "spiritual war" in America"[26]?

z. On June 1, 2021, The New York Times ran an article with the headline, "Michael Flynn suggested at a QAnon-affiliated event that a coup should happen in the U.S."[27]

aa. On June 9, 2021, the Lincoln Project ran advertisements critical of Plaintiff's suggestion that a coup attempt should happen in the United States.  The Lincoln Project's ad against General Flynn was covered by The Hill on June 9. 2021.[28]

bb. According to CNN, Plaintiff posted videos featuring QAnon slogans[29].

cc. I have personally seen the video, posted by General Flynn, where he plainly took an oath including the phrase "Where we go 1 we go all", which is closely associated with the QAnon movement.

---

[24] See, **Ex. 23,** "Pushing QAnon and Stolen Election Lies, Flynn Re-emerges: Recast by President Trump's most ardent supporters as a MAGA martyr, Michael T. Flynn has embraced his role as the man who spent four years unjustly ensnared in the Russia investigation" The New York Times, February 6, 2020

[25] See, **Ex. 24**, Takeaways from the AP/Frontline Michael Flynn investigation. Associated Press. September 7, 2022.

[26] See, Michael Flynn's Holy War. PBS October 18, 2022; https://www.pbs.org/wgbh/frontline/documentary/michael-flynns-holy-war/ (accessed on October 17, 2023).

[27] See, **Ex. 24**, Michael Flynn suggested at a QAnon-affiliated event that a coup should happen in the U.S., New York Times, June 1, 2021.

[28] See, **Ex. 25**, Lincoln Project highlighting Flynn's coup comments in new ad. The Hill. June 9. 2021.

[29] See, **Ex. 26**, Michael Flynn posts video featuring QAnon slogans. CNN, July 7, 2020.

dd. On January 6, 2023, Newsweek magazine filed an article with the headline, "Elon Musk Blasted for Michael Flynn's Jan. 6 Twitter Reinstatement" on January 6, 2023.[30]

**FURTHER AFFIANT SAYETH NAUGHT.**

By: _____

Printed Name: Rick Wilson

STATE OF FLORIDA
COUNTY OF LEON

The foregoing instrument was acknowledged before me by means of ✓ physical presence or ___ online notarization, this 3rd day of January , 2024, by Frederick Wilson of. This individual was ___ personally known or ✓ produced identification.

Driver's License
N.S.

---

[30] See, **Ex. 27**.

8

SWORN TO AND SUBSCRIBED before me this 3rd of January _____, 2024.

_Nicholas Samuel_
(Signature)

(AFFIX NOTARY SEAL)

_Nicholas Samuel_
(Printed Name)

NICHOLAS SAMUEL
MY COMMISSION # HH 452313
EXPIRES: October 8, 2027

9

# Exhibit 6





# EVERYTHING TRUMP TOUCHES DIES

*A Republican Strategist Gets Real About
the Worst President Ever*

## RICK WILSON

Free Press

NEW YORK   LONDON   TORONTO
SYDNEY   NEW DELHI



...launch the Mueller investigation, and haunt his every wak-
ing hour.

His choice to fire other officers, including Deputy Attorney Gen-
eral Sally Yates, Ethics Advisor Walt Shaub, U.S. Attorney Preet Bha-
rara, and FBI Deputy Director Andrew McCabe, created media and
political martyrs, guaranteeing them a role in the constellation of crit-
ics who were liberated and vocal.

Cape of infinite russe MAGA crew Mike Flynn, a disgraced for-
mer army general, was so outrageously in bed with the Russians that
even Trump was forced to fire him. A predecessor to Flynn as the
Defense Intelligence Agency director once told me the Russophilic
anti-Muslim general was "the most dangerous asshole ever to head a
three-letter."

The fastest route to being fired in the first six months of Trump's
regime was to have any record of working in Washington with ac-
tual adults. They should have known better, but Reince Priebus, Katie
Walsh, Mike Dubke, Sean Spicer, Rick Dearborn, and other DC pros
fell victim to Donald Trump's unmanaged and unmanageable person-
ality. They didn't understand that Trump's character would render
their experience moot, their efforts for naught, and their reputation
in tatters.

Congressman Tom Price, an affable back-bencher from Georgia,
was perfectly comfortable in Congress, but he made a critical mistake:
Donald Trump liked him, and Price accepted the position of secretary
of health and human services. Like many of Trump's appointees, Price
suddenly looked at the federal budget as his plaything, taking private
jet flights instead of flying commercial. He was the first to be fired, but
he wouldn't even be close to the last.

It wasn't that Price was a particularly bad actor in the great scheme
of things. It was that the environment of the Trump White House
made that kind of behavior normal. EPA head Scott Pruitt demanded
first-class and private jet travel because—I kid you not—people said
mean things about him on social media. Housing and Urban Develop-

# Exhibit 7

**TRENDING:**    **2024 ELECTIONS**    **ISRAEL-HAMAS WAR**    **THE HILL ON NEWSNATION**    **SPONSORED:**

FOREIGN POLICY

# Our ally Turkey is in crisis and needs our support

BY LT. GEN. MICHAEL T. FLYNN (R), CONTRIBUTOR - 11/08/16 5:46 PM ET

Share      Tweet    • • •    More



Getty Images

It is fair to say that most Americans don't know exactly what to make of our ally Turkey these days, as it endures a prolonged political crisis that challenges its long-term stability. The U.S. media is doing a bang-up job of reporting the Erdoğan government's crackdown on dissidents, but it's not putting it into perspective.

{mosads}We must begin with understanding that Turkey is vital to U.S. interests. Turkey is really our strongest ally against the Islamic State in Iraq and Syria (ISIS), as well as a source of stability in the region. It provides badly needed cooperation with U.S. military operations.

1/2/24, 2:14 PM
Case 1:21-cv-02587-AS-SLC    Document 218-2    Filed 02/03/24    Page 64 of 100
Our ally Turkey is in crisis and needs our support | The Hill

The primary bone of contention between the U.S. and Turkey is Fethullah Gülen, a shady Islamic mullah residing in Pennsylvania whom former President Clinton once called his "friend" in a well circulated video.



Gülen portrays himself as a moderate, but he is in fact a radical Islamist. He has publicly boasted about his "soldiers" waiting for his orders to do whatever he directs them to do. If he were in reality a moderate, he would not be in exile, nor would he excite the animus of Recep Tayyip Erdoğan and his government.



The late Seyed Qutb in particular was very much in the Gülen mold. The author of 24 books on education and the arts, he assembled an inner circle of intellectuals and influential politicians. But contrary to this well-masked façade, Qutb's writings provided the inspiration for terrorist groups like Al-Qaeda. Qutb was hanged in 1966 in Egypt for instigating rebellion.

Likewise, Hasan al Bana, an Egyptian who died in 1949, defined the first phase of pre-emptive jihad as a long and quiet process that can take as long as a quarter of a century, to prepare the forces for a decisive strike. Al Bana famously declared that the only acceptable form of law is Sharia.

To professionals in the intelligence community, the stamp of terror is all over Mullah Gülen's statements in the tradition of Qutb and al Bana. Gülen's vast global network has all the right markings to fit the description of a dangerous sleeper terror network. From Turkey's point of view, Washington is harboring Turkey's Osama bin Laden.

Washington's silence on this explosive topic speaks volumes when we hear the incredulous claim that the democratically elected president of Turkey staged a military coup, bombed his own parliament and undermined the confidence in Turkey's strong economy, just so that he could purge his political opponents.

This baseless claim is a dark reminder of the vicious rumors spread by our enemies that 9/11 was an inside job by the American intelligence apparatus as an excuse to invade Muslim lands to grab their oil!

To add insult to injury, American taxpayers are helping finance Gülen's 160 charter schools in the United States. These schools have been granted more H1-B visas than Google. It is inconceivable that our visa officers have approved thousands of visas for English teachers whose English is incomprehensible. A CBS "60 Minutes" program documented a conversation with one such imported English teacher from Turkey. Several lawsuits, including some in Ohio and Texas, point to irregularities in the operation of these schools.



However, funding seems to be no problem for Gülen's network. Hired attorneys work to keep the lucrative government source of income for Gülen and his network going. Influential charities such as Cosmos Foundation continue their support for Gulen's charter schools.

Incidentally, Cosmos Foundation is a major donor to Clinton Foundation. No wonder Bill Clinton calls Mullah Gülen "his friend." It is now no secret that Huma Abedin, Hillary Clinton's close aide and confidante, worked for 12 years as the associate editor for a journal published by the London-based Institute of Minority Muslim Affairs. This institute has promoted the thoughts of radical Muslim thinkers such as Qutb, al Bana and others.

The American public is being lulled into believing that Gülen is a Sufi scholar who promotes the teachings of Rumi, the Persian poet, works to expand interfaith dialogue and does a great job of providing American youth high-quality education in math and science as well as English.

Voices of concern about this shady character are quickly muffled by his vast network of public relations and legal professionals. He has established a false façade that he is a moderate at odds with Turkey's autocratic leader.

This image is a stark reminder of a great American mistake from another era — one that has raised the cost of international security forever. We all remember another quiet, bearded, elder cleric who sat under an apple tree in Neauphle-le-Château in the suburbs of Paris in 1978.

He claimed to be a man of God who wanted to topple a dictator and return the power to the people. Washington believed him. Sadly, shortly after his rise to power through the

The world has never been the same since that irreversible mistake. Ayatollah Khomeini, the quiet man of God under the apple tree, created the world's top sponsor of terror. His revolutionary guards created Hezbollah, the famous Lebanon-based terror organization.

The Ayatollah's terrorists have killed American servicemen and slaughtered Iraqi Sunnis by the thousands, and his brutal Quds Force killed innocent Sunni civilians in Syria. Ultimately, ISIS became the radical Sunni's response to the mayhem caused by our friendly mullah under the apple tree.

History repeats itself when people repeat the mistakes of the past. It is time we take a fresh look at the importance of Turkey and place our priorities in proper perspective. It is unconscionable to militate against Turkey, our NATO ally, as Washington is hoodwinked by this masked source of terror and instability nestled comfortably in our own backyard in Pennsylvania.

We need to adjust our foreign policy to recognize Turkey as a priority. We need to see the world from Turkey's perspective. What would we have done if right after 9/11 we heard the news that Osama bin Laden lives in a nice villa at a Turkish resort while running 160 charter schools funded by the Turkish taxpayers?

The forces of radical Islam derive their ideology from radical clerics like Gülen, who is running a scam. We should not provide him safe haven. In this crisis, it is imperative that we remember who our real friends are.


*Lt. Gen. Michael T. Flynn (ret.) is the former director of Defense Intelligence Agency and the author of New York Times Bestseller "The Field of Fight."*

*Editor's Note: On March 8, 2017, four months after this article was published, General Flynn filed documents with the Federal government indicating that he earned $530,000 last fall for consulting work that might have aided the government of Turkey. In the filings, Flynn disclosed that he had received payments from Inovo BV, a Dutch company owned by a Turkish businessman with ties to Turkey's president and that Inovo reviewed the draft before it was submitted to The Hill. Neither General Flynn nor his representatives disclosed this information when the essay was submitted.*

---

*The views expressed by contributors are their own and not the views of The Hill.*

Copyright 2023 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

SHARE          TWEET          ● ● ●   MORE

## SPONSORED CONTENT

Privacy Policy

### Elisabeth Shue Shows Off Her Perfect Figure In A New Photo
**Spicy Trends** | Sponsored

### Tallahassee Homeowners Ditch Insurance for This
**Otto Quotes** | Sponsored

Get Quote

### How Long Does $1 Million Last After 60?
**Fisher Investments** | Sponsored

Learn More

### Vanguard vs. Fidelity vs. Schwab
**SmartAsset** | Sponsored

Learn More

### Florida Weather Reporter Named Most Beautiful In The World
**SheBudgets.com** | Sponsored

Read More

### Millionaire laughs at poor family in restaurant, then waitress hands him an unbelievable note
**Trendscatchers** | Sponsored

### Teachers, Try this Intro to Weather Lesson for Free
**Generation Genius** | Sponsored

Watch Now

### People Born 1941-1971 Are Due a Large Surprise
**TheWalletGuru** | Sponsored

### Bone On Bone? This "bionic" Knee Sleeve Will Transform Your Knees Back 17 Years
**Fitnus Sleeve** | Sponsored

Learn more

## Teachers, Try this What is Engineering? Lesson for Free

**Generation Genius** | Sponsored

Watch Now

## This Year's Kia Telluride Is Turning Heads -- And Finally On Sale!

**FavoriteSearches** | Sponsored

## Most Affordable Camper Vans

**GoSearches** | Sponsored

## New Retirement Villages Near Tallahassee (Take A Look At The Prices)

**Qsearch** | Sponsored

Learn More

## Laura Ingraham Is Married To This Beauty

**Doctor Report** | Sponsored

## Gena Norris: Chuck And I Do This 1 Thing Daily To Feel Young

**Roundhouse Provisions** | Sponsored

Learn More

## The Killer 2024 Audi E-Tron Is Going For Great Deals (Take A Look)

**BestSearches** | Sponsored

Learn More

Video/Hill.TV

1/2/24, 2:14 PM
Case 1:21-cv-02587-AS-SLC   Document 218-2   Filed 02/03/24   Page 70 of 100
Our ally Turkey is in crisis and needs our support | The Hill



## Rising: January 2, 2024

**RISING**



## Rising: January 1, 2024



## Rising: December 29, 2023

**RISING**

Top Stories



## Harvard President Claudine Gay resigns amid plagiarism, antisemitism scandals

**EDUCATION**

---

## Most Popular

| | |
|---|---|
| **1** | **Former White House ethics lawyer says Trump will 'very swiftly' lose ...** |

---

| | |
|---|---|
| **2** | **House Republicans stew over members who caused upheaval** |

---

| | |
|---|---|
| **3** | **Harvard President Claudine Gay resigns amid plagiarism, antisemitism scandals** |

---

**5**    **Democrats fear electoral bloodbath in North Carolina**

#### What Do You Think?                                                       ⋮

Do you approve or disapprove of Vivek Ramaswamy's calls for Republican candidates to withdraw from the ballot in Maine, Colorado, and any other state that removes former President Trump from the ballot?

○  Approve

○  Neutral

○  Disapprove

○  Other / No opinion

* By clicking "NEXT" you agree to the following: We use cookies to collect your survey answers for market research and tailored advertising. If you would like to continue with this survey, please read and agree to the CivicScience Privacy Policy and Terms of Service

[ NEXT * ]

**DON'T MISS A BRIEF.**
**SIGN UP FOR OUR DAILY EMAIL.**

[ Your Email ]

1/2/24, 2:14 PM
Case 1:21-cv-02587-AS-SLC   Document 218-2   Filed 02/02/24   Page 74 of 100
Our ally Turkey is in crisis and needs our support | The Hill



**Resources**

**Other Areas**

**Contributors**

**Follow Us On**

 

**Get the App**



SUBSCRIBE TO PUSH NOTIFICATIONS

THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX

© 1998 - 2024 NEXSTAR MEDIA INC. | ALL RIGHTS RESERVED.

# Exhibit 8

🕐 This article was published more than **6 years ago**



*Democracy Dies in Darkness*

**ERIK WEMPLE**

## Opinion    The Hill publishes editor's note on Michael Flynn op-ed regarding Turkey

By Erik Wemple
Media critic  |  + Follow

March 10, 2017 at 7:46 p.m. EST

On Election Day, the Hill published an op-ed under the byline of Michael Flynn, a Donald Trump adviser and short-lived national security adviser in the Trump administration. In the op-ed, Flynn struck a positive tone about Turkey and its president, Recep Tayyip Erdogan. "We must begin with understanding that Turkey is vital to U.S. interests," reads the op-ed. "Turkey is really our strongest ally against the Islamic State in Iraq and Syria (ISIS), as well as a source of stability in the region. It provides badly needed cooperation with U.S. military operations."

Why such boosterism? The Associated Press reported earlier this week that Flynn had registered with the Justice Department as a foreign agent whose work "may have aided the Turkish government." That may be understating the case. The fired national security adviser's now-defunct consulting firm — Flynn Intel Group Inc. — was hired by Turkish businessman Ekim Alptekin, owner of a Dutch firm named Inovo BV, according to the AP. As part of the project, Flynn's firm was charged with "collecting information" about Fethullah Gulen, a cleric exiled in Pennsylvania and whom Erdogan has accused of promoting a failed July 2016 coup against him. Flynn was also tasked with pressuring U.S. officials to act against Gulen.

Just how did the Hill play into Flynn's consulting work? Well, the op-ed devotes large chunks of text to Gulen, starting with the assertion that he's a "shady Islamic mullah residing in Pennsylvania whom former President Clinton once called his 'friend' in a well circulated video"; that he calls himself a moderate but is actually a "radical Islamist"; that "Gülen's vast global network has all the right markings to fit the description of a dangerous sleeper terror network. From Turkey's point of view, Washington is harboring Turkey's Osama bin Laden"; and so on.

The concluding lines: "The forces of radical Islam derive their ideology from radical clerics like Gülen, who is running a scam. We should not provide him safe haven. In this crisis, it is imperative that we remember who our real friends are."

**Follow** this author's opinions                                                                                    +

The original op-ed provided little information as to why Flynn had taken such a deep and detailed interest in Gulen, or in Turkey for that matter. An italicized bio note at the bottom of the piece read as follows. "Lt. Gen. Michael T. Flynn (ret.) is the former director of Defense Intelligence Agency and the author of New York Times Bestseller 'The Field of Fight.'"

The current version of the story contains an editor's note that accounts better for Flynn's thing for U.S.-Turkey relations:

> Editor's Note: On March 8, 2017, four months after this article was published, General Flynn filed documents with the Federal government indicating that he earned $530,000 last fall for consulting work that might have aided the government of Turkey. In the filings, Flynn disclosed that he had received payments from Inovo BV, a Dutch company owned by a Turkish businessman with ties to Turkey's president and that Inovo reviewed the draft before it was submitted to The Hill. Neither General Flynn nor his representatives disclosed this information when the essay was submitted.

According to the AP: The op-ed resulted from research that Flynn's firm did under its arrangement with Inovo BV, though neither Inovo BV nor the Turkish government had "directed" him to do the op-ed. A news story in the Hill itself notes, "disclosures say there were no outside influences — including Inovo or the government of Turkey — that led to the op-ed, and Flynn was not paid to write it, according to the forms. But Flynn did send Inovo a draft before publication."

The episode provides an embarrassing look into how power wiggles around in Washington. A paid advocate loves nothing so much as presenting its propaganda to the public garnished with the sprigs of journalism. Though news organizations try to guard against this practice, it happens. As this blog reported, former Indiana congressman Dan Burton in early 2015 managed to place pro-Azeri pieces in the Washington Times and the Daily Caller without mention of his role as chairman of the Azerbaijan America Alliance.

The key is editing. Though the editor's note in the Hill indicates that Flynn & Co. hadn't "disclosed" their clear conflict of interest with respect to the op-ed, that's not really the point. Far more critical is this consideration: Did the Hill *ask* whether Flynn had any financial connection to Turkey, its government or anyone advocating on behalf of it? Did it *ask* whether this extended digression on the politics of Fethullah Gulen stemmed from anything other than an honest and impartial interest on Flynn's part?

Another question: The Daily Caller's Chuck Ross on Nov. 11 reported on Flynn's connection with Inovo BV — per a congressional lobbying disclosure — as well as the absence of a disclosure in the Hill op-ed. Why did it take so long to add this information?

The Erik Wemple Blog's attempts to interview the Hill on these questions have come up empty. Editor in Chief Bob Cusack didn't respond to emails, and a spokeswoman for the outfit told this blog, "Bob is not available and the editor's note speaks for itself."

# Exhibit 9

Case 1:21-cv-02587-ACR Document 213-2 Filed 02/02/24 Page 80 of 100

**The New York Times**

https://www.nytimes.com/2018/12/18/us/politics/michael-flynn-sentencing.html

# 'Not Hiding My Disgust': Judge Rebukes Flynn, Then Delays Sentencing

**By Sharon LaFraniere and Adam Goldman**

Dec. 18, 2018

WASHINGTON — A federal judge transformed a seemingly straightforward sentencing hearing for Michael T. Flynn, President Trump's first national security adviser, into a dramatic showdown on Tuesday, expressing "disgust" at Mr. Flynn's efforts to mislead federal investigators and dismissing suggestions he had been treated unfairly.

In an extraordinary two-hour session in Federal District Court in Washington, the judge, Emmet G. Sullivan, left no doubt that he viewed Mr. Flynn's crimes as serious enough to warrant prison time despite a recommendation from prosecutors that he receive a lenient sentence.

*[Update: Attorney General William Barr installs an outside prosecutor to review the case against Michael Flynn.]*

But Judge Sullivan gave Mr. Flynn the option of postponing his sentencing so he had additional time to prove the value of his cooperation with federal prosecutors. Mr. Flynn promptly took up the offer, delaying a decision on his fate at least until March.

The hearing underscored the gravity of the inquiry by the special counsel, Robert S. Mueller III, and the enormous consequences for those ensnared in it.

Mr. Flynn, 59, a retired three-star general whose military career spanned 33 years, pleaded guilty a year ago to lying to F.B.I. agents about his conversations with the Russian ambassador, Sergey I. Kislyak, in the month after Mr. Trump's election. He

also acknowledged that he lied in documents he filed with the Justice Department about his lobbying efforts on behalf of the Turkish government before the election.

"This is a very serious offense," Judge Sullivan said. "A high-ranking senior official of the government making false statements to the Federal Bureau of Investigation while on the physical premises of the White House."

At one point, Judge Sullivan asked whether Mr. Flynn could have been charged with additional crimes. Later, he even raised and then dropped the prospect of a case for treason.

The judge also walked back another provocative statement he had made, saying he "felt terrible" that he had wrongly accused Mr. Flynn earlier in the proceeding of selling out his country by simultaneously working as a foreign agent for Turkey and Mr. Trump's national security adviser. Mr. Flynn's work for Turkey ended before he took up his White House post.

Even though prosecutors had said they would accept a sentence of probation, the judge warned Mr. Flynn that he could not guarantee that outcome. Advisory sentencing guidelines recommend a maximum sentence of six months in prison.

"I can't make any guarantees, but I'm not hiding my disgust, my disdain for this criminal offense," the judge said.

Before Tuesday's hearing, Mr. Flynn and his lawyer, Robert K. Kelner, had implied in presentencing memos that the F.B.I. agents who had interviewed Mr. Flynn may have tricked him by failing to warn him that lying to investigators was a crime.

In raising the possibility of misconduct by the investigators, Mr. Flynn and his supporters further fueled efforts by Mr. Trump and some of his supporters to undercut the credibility of the special counsel's investigation.

But under questioning by Judge Sullivan, Mr. Flynn acknowledged that he knew it was a crime to lie to the F.B.I. and he reiterated his guilt.

The presentencing memo from Mr. Flynn's defense team had noted that F.B.I. agents had deliberately decided not to warn Mr. Flynn that lying to them was a criminal offense when they interviewed him in the West Wing on Jan. 24, 2017, four days after Mr. Trump's inauguration.

The agents also told Mr. Flynn that notifying the White House Counsel's Office would be time-consuming and prompt the Justice Department's involvement.

That kicked off a public controversy about the F.B.I.'s conduct, with Mr. Trump insisting the law-enforcement authorities had wrongly cornered Mr. Flynn. It also inspired speculation that Mr. Flynn, whose lawyer at one point discussed a possible pardon with a lawyer for Mr. Trump, was inviting the president to spare him punishment.

Before the hearing, Mr. Trump wished Mr. Flynn "good luck," saying he had been under "tremendous pressure."

Even after it, Sarah Huckabee Sanders, the White House press secretary, said Mr. Flynn had been wronged. "What we do know," she said, "is that the F.B.I. broke standard protocol in a way that they came in and ambushed General Flynn and in the way that they questioned him and in the way that they encouraged him not to have White House Counsel's Office present."

But in Judge Sullivan's fourth-floor courtroom, Mr. Kelner said he was merely trying to show that Mr. Flynn had been held to a higher standard than two other people who had pleaded guilty to lying to federal investigators for the special counsel: George Papadopoulos, a former Trump campaign aide, and Alex van der Zwaan, a Dutch lawyer who worked with Paul Manafort, Mr. Trump's former campaign chairman. Both men were warned in advance not to lie to investigators and one brought a lawyer to his F.B.I. interview.

The judge speedily dismissed that comparison, repeatedly noting that Mr. Flynn was a high-ranking government official who had betrayed the government's trust by lying "in the White House, in the West Wing."

Although Judge Sullivan has a reputation for being hard on government misconduct, he found no fault with the conduct of the F.B.I. or prosecutors. He said Mr. Flynn deceived not only F.B.I. agents, but also senior White House officials, who then repeated his lies to the American public.

"This is a very serious offense," he said. "This case is in a category by itself."

At one point, he asked Brandon L. Van Grack, the lead prosecutor, whether Mr. Flynn was guilty of treason. The question clearly surprised a phalanx of lawyers on Mr. Mueller's team who were present for the proceedings. Mr. Van Grack at first hesitated to answer, then later said the government had no evidence of treason, and the judge dropped the point.

Some of Judge Sullivan's sharpest rebukes involved Mr. Flynn's lies about his lobbying work for the Turkish government. Wrongly asserting that Mr. Flynn continued to work as an unregistered foreign agent during his short tenure as national security adviser, the judge gestured to the American flag at his side and declared: "I mean, arguably, that undermines everything this flag over here stands for. Arguably, you sold your country out."

For Mr. Flynn, who once led supporters of Mr. Trump's campaign in chants of "lock her up" against Hillary Clinton, more uncertainty lies ahead. Although prosecutors said they had gleaned almost all they could from him, Mr. Kelner told the judge that Mr. Flynn wanted to postpone his sentencing to put himself in the best position "to eke out the last modicum of cooperation."

Under his plea deal, Mr. Flynn met with investigators and prosecutors for the special counsel's office 19 times. In doing so, he became an early cooperator in an investigation that has spun off criminal cases now in the hands of other federal prosecutors.

The special counsel's office is investigating whether Mr. Trump obstructed justice, including by asking James B. Comey, the F.B.I. director at the time, to end the investigation into Mr. Flynn in early 2017. It is unclear whether Mr. Flynn knew

about the president's reported attempt to intervene on his behalf, or whether he has offered any insights on that front.

Prosecutors acknowledged that Mr. Flynn had helped the government secure an indictment in Northern Virginia against two of his former business associates for violating foreign lobbying rules. Prosecutors said the two men conspired with Turkey in 2016 to pressure the United States to expel a rival of President Recep Tayyip Erdogan.

Although he could have faced additional charges in that case that carried up to 15 years in prison, prosecutors said, Mr. Flynn was being treated only as a witness.

How exactly Mr. Flynn's lies hampered the special counsel's inquiry into Russia's meddling in the 2016 election remained, for now, unclear. So did the precise reasons he lied.

Judge Sullivan explicitly warned Mr. Flynn that even if he could show further evidence of how much he had helped the special counsel's office and the Justice Department, he might still sentence him to prison.

As Mr. Flynn left the federal courthouse, he faced a divided and raucous crowd in which some people yelled "U.S.A." while others chanted "Lock him up."

*Follow Adam Goldman and Sharon LaFraniere on Twitter: @adamgoldmanNYT and @SharonLNYT.*

Noah Weiland contributed reporting.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Flynn Was Looking for Leniency; Judge Gave Him a Stern Rebuke

# Exhibit 10

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| MICHAEL T. FLYNN, | Crim. Action No. 17-232 (EGS) |
|                Defendant. | |

**MEMORANDUM OPINION**

## I.   Introduction

On December 1, 2017, Defendant Michael T. Flynn ("Mr. Flynn"), a retired United States Army Lieutenant General and the former National Security Advisor to the President of the United States, pled guilty to willfully and knowingly making materially false statements and omissions to the Federal Bureau of Investigation ("FBI"), in violation of 18 U.S.C. § 1001(a)(2). Mr. Flynn admitted to lying about his conversations with Russia's Ambassador to the United States ("Russian Ambassador") during his FBI interview on January 24, 2017. The case was originally assigned to Judge Rudolph Contreras. Judge Contreras accepted the guilty plea, finding that Mr. Flynn—who was represented by experienced attorneys—knowingly, voluntarily, and intelligently entered into the Plea Agreement.

Six days later, on December 7, 2017, the case was randomly reassigned to this Court, which scheduled a sentencing hearing

for December 18, 2018. During that hearing, the Court conducted

an extension of the plea colloquy in view of statements made in

Mr. Flynn's sentencing memorandum that raised questions as to

whether Mr. Flynn sought to challenge the circumstances of his

FBI interview. In response to the Court's questions, Mr. Flynn

maintained his plea of guilty upon the advice of counsel. Mr.

Flynn neither challenged the conditions of his FBI interview nor

expressed any concerns with the government's obligations

pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and this

Court's Standing *Brady* Order of February 16, 2018. According to

the government, Mr. Flynn's substantial assistance to law

enforcement authorities led to criminal charges against

individuals in the United States District Court for the Eastern

District of Virginia. Rather than imposing a sentence on

December 18, 2018, this Court permitted Mr. Flynn to continue

his cooperation with the government. Seven months later,

however, the government decided not to call Mr. Flynn as a

witness in its case-in-chief in the Eastern District of

Virginia. Before that trial, Mr. Flynn retained new counsel. Mr.

Flynn now asserts his innocence, claims prosecutorial

misconduct, prays for dismissal, and urges this Court to hold

the prosecutors in civil contempt for alleged *Brady* violations.

Pending before the Court are several motions filed by Mr.

Flynn: (1) Motion to Compel the Production of *Brady* Material and

2

for an Order to Show Cause, ECF Nos. 109 & 111; (2) Sealed

Motion to Compel the Production of *Brady* Material, ECF No. 112;

(3) Sealed Motion for an Order to Show Cause, ECF No. 113; and

(4) Motion to Compel the Production of Newly Discovered *Brady*

Evidence, ECF No. 124. Upon careful consideration of the

parties' submissions, the applicable law, the entire record

herein, and for the reasons explained below, the Court **DENIES**

Mr. Flynn's motions.

## II.  Background

The Court assumes the parties' familiarity with the factual

and procedural background in this case. The Court briefly

summarizes the relevant background—drawn from the parties'

submissions and the Statement of the Offense ("SOF")

accompanying the Plea Agreement—to resolve the pending motions.

*See* SOF, ECF No. 4 at 1-5; *see also* Plea Agreement, ECF No. 1 at

1 ¶ 2.[1]

Mr. Flynn served as a surrogate and national security

advisor for then-candidate Donald J. Trump during the 2016

presidential campaign. SOF, ECF No. 4 at 1 ¶ 1. After the

November 2016 election, Mr. Flynn became a senior member of the

President-Elect's Transition Team. *Id*. Mr. Flynn served as the

---

[1] When citing electronic filings throughout this Opinion, the
Court cites to the ECF page number, not the page number of the
filed document.

National Security Advisor to President Trump between January 22,
2017 and February 13, 2017. Def.'s Ex. 1, ECF No. 133-1 at 1-2.

### A. Mr. Flynn's Criminal Conduct

The criminal conduct underlying the offense, as set forth
in the Information, was admitted to by Mr. Flynn when he entered
his guilty pleas in this case. *See, e.g.*, Information, ECF No. 1
at 1-2; Plea Hr'g Tr. (Dec. 1, 2017), ECF No. 16 at 18-19;
Sentencing Hr'g Tr. (Dec. 18, 2018), ECF No. 103 at 9-10. The
Information, which was filed on November 30, 2017, charged Mr.
Flynn with one count of willfully and knowingly making
materially false statements to the FBI, in violation of 18
U.S.C. § 1001(a)(2), during his interview with two FBI agents on
January 24, 2017 in the White House. *See* Information, ECF No. 1
at 1-2; *see also* Sentencing Hr'g Tr., ECF No. 103 at 32. Under
oath and with the advice of counsel, Mr. Flynn pled guilty to
the crime on December 1, 2017. Plea Hr'g Tr., ECF No. 16 at 30-
31; *see also* Plea Agreement, ECF No. 3 at 10. The SOF sets forth
the events relevant to this case. *See generally* SOF, ECF No. 4
at 1-5.[2]

---

[2] On November 30, 2017, Mr. Flynn affirmed: "I have read every
word of this [SOF], or have had it read to me. Pursuant to
Federal Rule of Criminal Procedure 11, after consulting with my
attorneys, I agree and stipulate to this [SOF], and declare
under penalty of perjury that it is true and correct." SOF, ECF
No. 4 at 6. Mr. Flynn's attorney acknowledged the same. *Id.*

On December 21, 2016, Egypt introduced a resolution to the United Nations ("U.N.") Security Council regarding Israeli settlements, and the vote on the resolution was scheduled for December 22, 2016. *Id.* at 4 ¶ 4. On December 29, 2016, then-President Barack H. Obama imposed sanctions on Russia for its interference in the 2016 presidential election. *See id.* at 2 ¶ 3(a). Before the President-Elect was sworn into office, Mr. Flynn engaged in conversations with the Russian Ambassador between December 22, 2016 and December 31, 2016. *Id.* at 2-5 ¶¶ 3-4.

The FBI opened an investigation into Russia's efforts to interfere in the 2016 election, which included determining the existence of any links between Russia and individuals associated with the Trump campaign. *Id.* at 1 ¶ 1.[3] As part of the

---

[3] On May 17, 2017, then-Acting Attorney General Rod J. Rosenstein appointed Robert S. Mueller, III to serve as Special Counsel for the United States Department of Justice and authorized the Special Counsel to investigate the Russian government's efforts to interfere in the 2016 election, including any matters arising from that investigation. Special Counsel Robert S. Mueller, III, U.S. Dep't of Justice, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Vol. I of II ("Mueller Report") (Mar. 2019), ECF No. 79-1 at 19. The Special Counsel was duly authorized to prosecute federal crimes arising from the investigation. *Id.* The Special Counsel concluded that Russia interfered in the 2016 presidential election in two principle ways: (1) carrying out a social media campaign favoring then-candidate Trump and disparaging then-candidate Hillary Rodham Clinton; and (2) "conduct[ing] computer-intrusion operations against entities, employees, and

investigation, Mr. Flynn made a series of materially false
statements about his conversations with the Russian Ambassador.
*Id.* at 1-2 ¶ 2 (stating that "[Mr.] FLYNN's false statements and
omissions impeded and otherwise had a material impact on the
FBI's ongoing investigation into the existence of any links or
coordination between individuals associated with the [Trump]
Campaign and Russia's efforts to interfere with the 2016
presidential election"); *see id.* at 2-5 ¶¶ 3-4; *see also*
Information, ECF No. 1 at 1-2. Mr. Flynn admitted to lying to
the FBI about his request on or about December 29, 2016 to the
Russian Ambassador that Russia refrain from escalating the
situation in response to the sanctions imposed by the United
States against Russia, and the Russian Ambassador telling Mr.
Flynn that Russia decided to moderate its response to the
sanctions. SOF, ECF No. 4 at 2-3 ¶ 3. In addition, Mr. Flynn
admitted to making false statements to the FBI about his request
on or about December 22, 2016 to the Russian Ambassador that
Russia vote against or delay Egypt's resolution to the U.N.
Security Council, that the Russian Ambassador never described to
Mr. Flynn Russia's response to his request, that Mr. Flynn did
not request certain countries to take a particular position on

----

volunteers working on the Clinton Campaign and then releas[ing]
stolen documents." *Id.* at 9. The Special Counsel's
"investigation also identified numerous links between the
Russian government and the Trump Campaign." *Id.*

the resolution, and that Mr. Flynn only asked the countries for
their respective positions on the vote. *Id.* at 4-5 ¶ 4.

Mr. Flynn also admitted to making false statements in the
documents that he submitted to the United States Department of
Justice ("DOJ") on March 7, 2017 under the Foreign Agents
Registration Act, 22 U.S.C. §§ 611-621 ("FARA"). *Id.* at 5 ¶ 5;
*see also* Addendum to Gov't's Mem. in Aid of Sentencing, ECF No.
75 at 3 (stating that "[Mr. Flynn] stipulated and agreed that he
violated FARA by making materially false statements" in the FARA
filings). Those FARA filings concerned a project that Mr. Flynn
and his company, Flynn Intel Group, Inc. ("FIG"), performed on
behalf of the Republic of Turkey. SOF, ECF No. 4 at 5 ¶ 5. Mr.
Flynn, however, was not charged with any FARA violations. *See*
Information, ECF No. 1 at 1; *see also* Status Hr'g Tr. (Sept. 10,
2019), ECF No. 114 at 20. For purposes of sentencing, Mr. Flynn
did not dispute the relevance of the FARA references in the
government's description of the nature and circumstances of his
offense. *See* Gov't's Mem. in Aid of Sentencing, ECF No. 46 at 3-
5; *see also* Def.'s Mem. in Aid of Sentencing, ECF No. 50 at 12.
Indeed, the government confirmed that Mr. Flynn could have been
charged with making false statements in the FARA filings.
Sentencing Hr'g Tr., ECF No. 103 at 28. Under the terms of the
Plea Agreement, the government agreed not to further prosecute
Mr. Flynn for the criminal conduct described in the SOF. Plea

7

Agreement, ECF No. 3 at 2 ¶ 3. In the final analysis, the
government did not charge Mr. Flynn with violating the Logan
Act, 18 U.S.C. § 953, or with being a foreign agent. *See*
Information, ECF No. 1 at 1.

### B. The Government's Discovery and Disclosure Obligations

Prior to Mr. Flynn signing the Plea Agreement, the
government, on November 22, 2017, provided Mr. Flynn's attorneys
with the FBI's FD-302 (dated February 15, 2017), which
summarized Mr. Flynn's January 24, 2017 FBI interview. Gov't's
Notice of Disc. Correspondence, ECF No. 123 at 1; *see also*
Def.'s Ex. 15, ECF No. 133-15 at 1. Mr. Flynn and defense
counsel participated in post-January 24, 2017 interviews. *See*
Gov't's Opp'n, ECF No. 122 at 4 n.1; *see also* Def.'s Ex. 15, ECF
No. 133-15 at 1. During five of those interviews, the government
provided "[Mr. Flynn] with dozens of relevant documents."
Gov't's Surreply, ECF No. 132 at 3 n.2.

On November 30, 2017, before Mr. Flynn signed the Plea
Agreement, the government made certain disclosures to Mr.
Flynn's counsel. The government informed defense counsel that
the DOJ's Inspector General ("IG") reviewed allegations
involving certain electronic communications of Peter Strzok
("Mr. Strzok"), one of the FBI agents who interviewed Mr. Flynn
on January 24, 2017, that showed a preference for a presidential
candidate. Gov't's Opp'n, ECF No. 122 at 5-6. This included

information about certain text messages between Mr. Strzok and
former FBI attorney Lisa Page ("Ms. Page"). *See id*. at 8-9; *see
also* Gov't's Surreply, ECF No. 132 at 9 n.6. The government also
disclosed to defense counsel "the IG's review, including the
IG's assessment as to whether those communications constituted
misconduct by [Mr.] Strzok." Gov't's Opp'n, ECF No. 122 at 5-6.
The government then informed defense counsel that Mr. Strzok and
the other interviewing FBI agent "had the impression *at the time*
that [Mr. Flynn] was not lying" or that the FBI agents "did not
think he was lying" during the January 24, 2017 FBI interview.
*Id*. at 6 (emphasis added). The government answered defense
counsel's questions after disclosing this information. *Id*. at 6.
Those disclosures were provided prior to Mr. Flynn signing the
Plea Agreement on November 30, 2017 and pleading guilty before
Judge Contreras on December 1, 2017. *See* Def.'s Ex. 1, ECF No.
133-1 at 3.

After receiving the government's disclosures and
productions, Mr. Flynn signed the Plea Agreement upon the advice
of counsel. *See* Plea Agreement, ECF No. 3 at 10. Judge Contreras
accepted Mr. Flynn's guilty plea on December 1, 2017, finding
that Mr. Flynn entered the plea knowingly, voluntarily, and
intelligently with the advice of counsel. Plea Hr'g Tr., ECF No.
16 at 4, 30-31. Mr. Flynn attested that his attorneys from
Covington & Burling LLP rendered legal services to his

9

satisfaction as part of the Plea Agreement and the related matters. Plea Agreement, ECF No. 3 at 10; *see also* Plea Hr'g Tr., ECF No. 16 at 6.

On December 7, 2017, this case was randomly reassigned to this Court. *See generally* Docket for Crim. Action No. 17-232. This Court entered its operative Standing *Brady* Order on February 16, 2018, requiring the government to produce any evidence in its possession that was favorable to the defendant and material to either the defendant's guilt or punishment. *See, e.g.*, Order, ECF No. 20 at 1-4. On February 21, 2018, the Court entered the Protective Order Governing Discovery pursuant to Federal Rule of Criminal Procedure 16(d). Protective Order, ECF No. 22 at 1-6. Shortly thereafter, the government produced additional documents to Mr. Flynn and defense counsel to comply with this Court's Standing *Brady* Order. *See* Gov't's Opp'n, ECF No. 122 at 8, 18 n.9; *see also* Def.'s Ex. 15, ECF No. 133-15 at 1.

The government's production consisted of more than 22,000 pages of documents. *See* Joint Status Report, ECF No. 107 at 5 ("Among those documents are all versions in the government's possession of the FBI report of the January 24, 2017 interview of [Mr. Flynn] and the interviewing agents' notes."); *see also* Gov't's Notice of Disc. Correspondence, ECF No. 123 at 1-3 (providing an itemized inventory of discovery correspondence and

10

its productions). More than 21,000 pages of those documents
related to Mr. Flynn's March 7, 2017 FARA filings, and the
remainder related to his false statements to the FBI on January
24, 2017. Gov't's Opp'n, ECF No. 122 at 8, 8 n.3. The government
contends that Mr. Flynn was not entitled to *Brady* material until
he was charged on November 30, 2017, but the government
nonetheless provided Mr. Flynn with materials before and during
the voluntary interviews. Gov't's Surreply, ECF No. 132 at 3
n.2. According to the government, Mr. Flynn "agree[d] to forgo
the right to any further discovery or disclosures of information
not already provided at the time of the entry of [his] guilty
plea." Plea Agreement, ECF No. 3 at 6 ¶ 9(C); *see also* Gov't's
Opp'n, ECF No. 122 at 1, 5.

### C. The Continuance of Mr. Flynn's Sentencing

On December 18, 2018, this Court accepted Mr. Flynn's
guilty plea a second time. Sentencing Hr'g Tr., ECF No. 103 at
5, 16. During that hearing, the Court extended the plea colloquy
in view of Mr. Flynn's statements in his sentencing memorandum,
which raised questions as to whether Mr. Flynn sought to
challenge the conditions of the FBI interview. *See generally*
Def.'s Mem. in Aid of Sentencing, ECF No. 50 at 6-18. In
response to the Court's question, defense counsel did *not*
express "any concerns that potential *Brady* material or other
relevant material was not provided to [Mr. Flynn]." Sentencing

Hr'g Tr., ECF No. 103 at 10. Defense counsel affirmed to this Court that Mr. Flynn was *not* entitled to any additional information. *Id*. at 10-11. Under oath, Mr. Flynn confirmed that his rights were not violated as a result of the circumstances of his January 24, 2017 FBI interview and the allegations of misconduct against FBI officials. *Id*. at 11-12. And Mr. Flynn declined the Court's invitation for the appointment of independent counsel to advise him. *Id*. at 9-10.

Noting that the Court's usual practice is to impose a sentence after the completion of a defendant's cooperation, the Court granted Mr. Flynn's request to continue the sentencing hearing to allow him to further cooperate with the government after considering defense counsel's representations that Mr. Flynn was prepared to continue his cooperation in the criminal case in the Eastern District of Virginia. *Id*. at 47-48. The trial in that case was scheduled to begin in July 2019. *See* Joint Status Report, ECF No. 71 at 1; *see also* Status Hr'g Tr. (June 24, 2019), ECF No. 94 at 5-6. In June 2019, Mr. Flynn retained new counsel. *See* Min. Order of June 14, 2019. Mr. Flynn did not testify at the trial in the Eastern District of Virginia. *See, e.g.*, Min. Order of July 9, 2019; Gov't's Resp. to Order of the Court, ECF No. 97 at 1-2; Def.'s Resp. to Order of the Court, ECF No. 98 at 1-11; Def.'s Suppl. Status Report,

ECF No. 121 at 1.[4] Motions practice ensued.

### D. Mr. Flynn's *Brady* Motions

Mr. Flynn moved to compel the production of *Brady* material

on August 30, 2019, and October 15, 2019, respectively. *See*

*generally* Def.'s Br. in Supp. of Def.'s Mot. to Compel Produc.

of Brady Material & Mot. for Order to Show Cause ("Def.'s Br."),

ECF No. 109; Def.'s Redacted Mot. to Compel & Mot. for Order to

Show Cause, ECF No. 111 ("Def.'s Mot."); Def.'s Sealed Mot. to

Compel Produc. of Brady Material, ECF No. 112; Def.'s Suppl.,

ECF No. 116; Def.'s Mot. to Compel Newly Discovered Brady Evid.,

---

[4] As previously stated, Mr. Flynn admitted that he made
materially false statements and omissions in the FARA filings.
SOF, ECF No. 4 at 5 ¶ 5. Months later, however, Mr. Flynn's new
counsel represented that she "advised the prosecutors [in the
Eastern District of Virginia] that Mr. Flynn did not know and
did not authorize signing the FARA form believing there was
anything wrong in it. [Mr. Flynn] honestly answered the
questions his former counsel posed to him to the best of his
recollection, and some with the benefit of hindsight." Def.'s
Mem. Opposing Coconspirator Designation of Non-Party Witness
Michael T. Flynn, *United States v. Rafiekian*, Crim. Action No.
18-457 (E.D. Va. July 8, 2019), ECF No. 270 at 6; *see id.* ("As
for the final filing, Mr. Flynn recalls only reading the cover
letter. Regardless of what he read, he did not intend to or
knowingly make any false statements, and this is a complex area
of law about which he knew nothing."); *see also* Def.'s Resp. to
Order of the Court, ECF No. 98 at 7 (stating that "Mr. Flynn
accepted responsibility in the [SOF] for [the] inaccuracies" in
the FARA filing, but "nowhere . . . did he sign or recite that
he willfully allowed the filing to proceed—knowing and intending
it to deceive or mislead"). The government sought to designate
Mr. Flynn as a co-conspirator. *United States v. Rafiekian*, No.
1:18-CR-457-AJT-1, 2019 WL 4647254, at *5 (E.D. Va. Sept. 24,
2019) (granting defendant's motion for acquittal), *appeal filed*,
No. 19-4803 (4th Cir. Oct. 31, 2019).

ECF No. 124. Defense counsel's theory is that "[t]he evidence

the defense requests, if produced, would defeat the factual

basis for the plea." Def.'s Reply, ECF No. 133 at 27 (footnote

omitted).

Thereafter, the government filed its opposition briefs,

arguing that it has satisfied its obligations under *Brady* and

this Court's Standing *Brady* Order. *See* Gov't's Opp'n, ECF No.

122 at 2; *see also* Gov't's Opp'n, ECF No. 124 at 1-2. According

to the government, Mr. Flynn "fails to establish that [the

requested] information is relevant—let alone favorable and

material—in this criminal case." Gov't's Opp'n, ECF No. 122 at

2. Mr. Flynn filed his reply briefs. *See* Def.'s Reply, ECF No.

133; *see also* Def.'s Reply, ECF No. 134. Because Mr. Flynn

raised issues for the first time in one of his reply briefs, *see*

Gov't's Notice of Claims Raised for the First Time in Reply, ECF

No. 131 at 1-4, the Court directed the parties to submit sur-

replies, *see* Min. Order of Oct. 29, 2019. The briefing is now

complete, and the Court exercised its discretion to cancel the

previously-scheduled motions hearing. *See* Min. Order of Oct. 28,

2019; *see also* LCrR 47(f). The motions are ripe and ready for

the Court's adjudication.

## III. **Legal Standard**

Pursuant to *Brady* and its progeny, the government has "an

affirmative duty to disclose exculpatory evidence to the

14

defense, even if no request has been made by the accused."
*United States v. Borda*, 848 F.3d 1044, 1066 (D.C. Cir.), *cert.*
*denied*, 137 S. Ct. 2315 (2017). In *Brady*, the United States
Supreme Court held that "the suppression by the prosecution of
evidence favorable to an accused upon request violates due
process where the evidence is material either to guilt or to
punishment, irrespective of the good faith or bad faith of the
prosecution." 373 U.S. at 87. "Impeachment evidence, . . . as
well as exculpatory evidence, falls within the *Brady* rule."
*United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *United*
*States v. Giglio*, 405 U.S. 150, 154 (1972)). However, "the
Constitution does not require the Government to disclose
material impeachment evidence prior to entering a plea agreement
with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622,
633 (2002).

To prove a *Brady* violation, a movant must establish three
elements: "[1] The evidence at issue must be favorable to the
accused, either because it is exculpatory, or because it is
impeaching; [2] that evidence must have been suppressed by the
[government], either willfully or inadvertently; and
[3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S.
263, 281-82 (1999). "To satisfy the prejudice component, the
defendant must show that 'there is a reasonable probability
that, had the evidence been disclosed to the defense, the result

15