have been "egregious Fourth Amendment violations" in this case
based, in part, on Judge Collyer's redacted opinion finding
"Fourth Amendment violations by the FBI in areas that *likely*
involve [the FBI's] actions against Mr. Flynn." Def.'s Br., ECF
No. 109 at 8 (emphasis added).

The government argues that Mr. Flynn "makes no mention of
[his] plea agreement" in which he waived his right to challenge
the admissibility of the evidence against him. *See* Gov't's
Opp'n, ECF No. 122 at 20 n.11. The government correctly notes
that a criminal defendant may waive his constitutional and
statutory rights under certain circumstances so long as it is a
knowing and voluntary waiver. *Id.* at 7 n.2 (collecting cases).
Indeed, "a guilty plea results in the defendant's loss of any
meaningful opportunity he might otherwise have had to challenge
the admissibility of evidence obtained in violation of the
Fourth Amendment." *Haring v. Prosise*, 462 U.S. 306, 320 (1983).
Mr. Flynn offers no opposition to the government's argument that
his guilty plea forecloses his Fourth Amendment challenges.
Buried in a footnote, however, Mr. Flynn asserts that "[t]he
government's *Brady* violations have suppressed evidence of Fourth
Amendment defenses [he] was entitled to pursue, especially if
that evidence also shows government misconduct." Def.'s Reply,
ECF No. 133 at 19 n.13.

A plea of guilty "represents a break in the chain of events

66

which has preceded it in the criminal process." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). "[W]hen a criminal defendant enters a guilty plea, 'he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.'" *Blackledge v. Perry*, 417 U.S. 21, 29 (1974) (quoting *Tollett*, 411 U.S. at 266). "A valid guilty plea also renders irrelevant . . . related government conduct that takes place before the plea is entered." *Class v. United States*, 138 S. Ct. 798, 805 (2018). As the D.C. Circuit has observed, "[a] knowing and voluntary guilty plea ordinarily waives all constitutional claims, including those arising under the Fourth Amendment, relating to the deprivation of rights occurring prior to the entry of the plea." *United States v. Fincham*, No. 99-3062, 2000 WL 274210, at *1 (D.C. Cir. Feb. 15, 2000) ("By entering an unconditional guilty plea, appellant waived his right to object to the constitutionality of the search and seizure.").

With these principles in mind, Mr. Flynn's guilty pleas support the government's waiver argument. *See, e.g.*, Gov't's Opp'n, ECF No. 122 at 20 n.11; Plea Agreement, ECF No. 3 at 6 ¶ 9(C) ("[B]y pleading guilty in this case [Mr. Flynn] agrees to waive certain rights afforded by the Constitution of the United States" including "to challenge the admissibility of evidence offered against [him]"); Plea Hr'g Tr., ECF No. 16 at 9. Because

67

his guilty pleas effectively bar him from raising claims based on any evidence obtained in violation of the Fourth Amendment, Mr. Flynn is not entitled to the information in Requests 24, 26, and 27 on that ground.

Even if Mr. Flynn did not waive his Fourth Amendment claims, Mr. Flynn must establish that the requested information is favorable. To determine whether Mr. Flynn has or has not established the favorability element of *Brady*, the Court need not express a view on the validity of any FISA warrants obtained from the Foreign Intelligence Surveillance Court. Mr. Flynn fails to demonstrate that any information related to the FISA warrant that he has identified is favorable to his guilt or punishment. Based on the government's representations, *see* Gov't's Surreply, ECF No. 132 at 12, FISA warrants are separate and apart from the FBI's investigation, *see id.*; *see also* SOF, ECF No. 4 at 1 ¶ 2 (stating that Mr. Flynn's "false statements and omissions impeded and otherwise had a material impact on the FBI's *ongoing investigation*") (emphasis added). The government correctly points out—and Mr. Flynn does not contest—that "[o]btaining a FISA warrant . . . is entirely different from the FBI interviewing an individual as part of an ongoing counterintelligence investigation." Gov't's Surreply, ECF No. 132 at 12; *see generally* Def.'s Sur-Surreply, ECF No. 135 at 1-17. The government argues that the FBI had "multiple bases" to

68

interview Mr. Flynn, including his false statements to White House officials about his conversations with the Russian Ambassador. Gov't's Surreply, ECF No. 132 at 12. Furthermore, Mr. Flynn does not explain the relevance of the FISA information or any earlier investigations to the charges in this case or his sentencing. *See* Def.'s Br., ECF No. 109 at 8. The Court therefore finds that Mr. Flynn has failed to demonstrate that he is entitled to the information in Requests 24, 26, and 27.

### d. Request 32

Request 32 seeks "[i]nformation about any parts of any polygraph examinations failed by [Mr.] Strzok after Mr. Flynn was first the subject of any FBI investigation—authorized or unauthorized." Def.'s Mot., ECF No. 111 at 7. The government neither confirms nor denies the existence of this information. Gov't's App. A, ECF No. 122-1 at 5. The government responds that such information—"[w]hether or not [it] exists"—is not helpful to Mr. Flynn because it is not favorable and material to sentencing. *Id.* Mr. Flynn fails to establish the favorability element or the materiality element. *See Sitzmann*, 74 F. Supp. 3d at 134.

To the extent that Mr. Flynn seeks such information under Rule 16, Mr. Flynn must show that the requested information is material to the preparation of his defense. *See Marshall*, 132 F.3d at 67-69. Mr. Flynn does not move to compel the production

of the requested information under Rule 16. *See generally* Def.'s
Mot., ECF No. 111 at 1-9; Def.'s Br., ECF No. 1-17. Nonetheless,
"Rule 16 . . . requires the government to disclose, upon
request, *inter alia*, statements by the defendant and documents
and objects in the government's control where 'the item is
material to preparing the defense,' Fed. R. Crim. P.
16(a)(1)(E)(i), or the government intends to use the item in its
case in chief, *id*. 16(a)(1)(E)(ii)." *United States v. Williams
Cos.*, 562 F.3d 387, 396 (D.C. Cir. 2009) (citations omitted).
"[I]n the context of Rule 16, 'the defendant's defense' means
the defendant's response to the Government's case in chief."
*Armstrong*, 517 U.S. at 462. Here, Mr. Flynn fails to demonstrate
that the polygraph results would have been material to preparing
his defense against his false statements to the FBI on January
24, 2017 or that the government intended to introduce any
polygraph results in its case-in-chief. Accordingly, the Court
finds that Mr. Flynn is not entitled to the information in
Request 32.

### e. Request 37

Request 37 seeks "[a]ll FBI 302s or any notes of interviews
of David Ignatius or any other reporter regarding the
publication of information concerning Mr. Flynn and/or the
reporters' contacts with James Clapper, [Mr.] McCabe, John
Brennan, Michael Kortan, or anyone in the FBI, DNI, DOD, DOJ, or

CIA regarding Mr. Flynn." Def.'s Mot., ECF No. 111 at 7. The government responds that this information is irrelevant and not helpful because it is unrelated to Mr. Flynn's false statements to the FBI in this case or his sentencing. Gov't's App. A, ECF No. 122-1 at 6. The Court agrees with the government because Mr. Flynn has neither established the *Brady* elements for the requested information in Request 37, *see Strickler*, 527 U.S. at 281-82, nor the relevance of such information, *see Trombetta*, 467 U.S. at 485.

### f. Request 38

Request 38 seeks "FBI 302s and interview notes of Jim Woolsey, including notes by SCO members of conversations with Woolsey about Mr. Flynn, [FIG], the Turkey project, and his separate meeting with officials of Turkey after the meeting that was the subject of the FIG FARA filing." Def.'s Mot., ECF No. 111 at 7. The government responds that this requested information is not helpful to Mr. Flynn, and asserts that it is unaware of information from Mr. Woolsey that is favorable and material to Mr. Flynn's sentencing. Gov't's App. A, ECF No. 122-1 at 6. Because Mr. Flynn has failed to demonstrate the relevance, favorability, and materiality of the requested information, the Court therefore finds that Mr. Flynn has not established that he is entitled to the information in Request 38.

### g. Request 36

Request 36 seeks "[u]nredacted scope memos written for the Special Counsel and any requests by Special Counsel that mention Mr. Flynn or his son." Def.'s Mot., ECF No. 111 at 7. The government responds that such information is not helpful, unfavorable, and not material to sentencing. Gov't's App. A, ECF No. 122-1 at 6. The government notes that the then-Acting Attorney General granted the Special Counsel with authority to investigate individuals, including Mr. Flynn. *Id*. Mr. Flynn does not explain how this information satisfies the favorability or materiality elements. The Court therefore finds that Mr. Flynn has failed to demonstrate that he is entitled to the requested information in Request 36.

### 6. Remaining Requests

### a. Request 23

Request 23 seeks "[t]he two-page Electronic Communication (EC) that allegedly began the 'Russia Collusion' investigation." Def.'s Mot., ECF No. 111 at 6. The government responds that this topic is irrelevant and unrelated to Mr. Flynn's false statements to the FBI on January 24, 2017 and his sentencing. Gov't's App. A, ECF No. 122-1 at 4. The Court agrees. Mr. Flynn has failed to establish the relevance of this requested information to his guilt and punishment in this case.

### b. Request 29

Request 29 seeks the "FBI 302s of KT McFarland, notes of interviews of her or her own notes, and text messages with Mr. Flynn from approximately December 27, 2016, until Flynn's resignation." Def.'s Mot., ECF No. 111 at 6. The government responds that the pertinent portion of the Mueller Report describes that "former Deputy National Security Advisor K.T. McFarland stated in an interview that [Mr. Flynn] relayed to her that he had conversations with the Russian Ambassador in December 2016, about which [Mr. Flynn] made false statements to the FBI on January 24, 2017." Gov't's App. A, ECF No. 122-1 at 5.

The Mueller Report provides a comprehensive summary of Mr. Flynn's communications with individuals working on the Trump Transition Team, including his communications with Ms. McFarland, regarding Mr. Flynn's conversations with the Russian Ambassador. *See* Mueller Report, ECF No. 79-3 at 26-30. Mr. Flynn does not challenge the sufficiency or accuracy of the Mueller Report's description. *See generally* Def.'s Reply, ECF No. 133 at 5-36. Mr. Flynn does not deny that he has access to the requested information in another form (*i.e.* the Mueller Report). *See id.*; *see also United States v. Harris*, No. CRIM. 06-00124 (ESH), 2006 WL 2882711, at *2 (D.D.C. Oct. 5, 2006) (finding no *Brady* violation where "defendant [said] nothing to contradict

73

the government's representation that the information contained

therein [was] cumulative of information to which she already

ha[d] access"). Mr. Flynn has not demonstrated that the

requested information is favorable. Even if the requested

information was exculpatory and suppressed, Mr. Flynn has

neither demonstrated that there is a reasonable probability that

the requested information would have led to a different outcome,

nor shown that the information he seeks would not be cumulative.

*See Harris*, 2006 WL 2882711, at *2.

### c. Request 34

Request 34 seeks "[a] full unredacted and copies of the

recordings of Mr. Flynn's calls with Ambassador Kislyak or

anyone else that were reviewed or used in any way by the FBI or

SCO in its evaluation of charges against Mr. Flynn." Def.'s

Mot., ECF No. 111 at 7. The government responds that "[w]hether

or not such information exists, it does not pertain to

information that would be favorable and material to sentencing."

Gov't's App. A, ECF No. 122-1 at 5. Without specifically

addressing the government's response, Mr. Flynn appears to seek

such information about the existence or non-existence of any

recordings between him and the Russian Ambassador because:

(1) "[o]ne would imagine there are differences between the

recordings of the calls and what Mr. Flynn recalled to the

agents who stopped by his office that day, but that is not

74

evidence that he lied, and he did not"; and (2) "[a]s the agents
themselves realized when they spoke to him, he may have been
wrong, but he was honest to the best of his recollection at the
time." Def.'s Sur-Surreply, ECF No. 135 at 7 n.6. Because Mr.
Flynn has failed to establish that the requested information,
whether or not it exists, is exculpatory, he has failed to
establish a *Brady* claim. The Court therefore finds that Mr.
Flynn has failed to demonstrate that he is entitled to the
information in Request 34.

### D. Mr. Flynn's Request for Classified Information

The Court next considers Mr. Flynn's request for classified
information. *See* Def.'s Br., ECF No. 109 at 13-16; *see also*
Gov't's Opp'n, ECF No. 122 at 13 ("A number of the defendant's
requests seek access to classified information that may or may
not exist."). Mr. Flynn also seeks access to his statements in
the DIA briefings and debriefings, which he claims have been
classified. Def.'s Reply, ECF No. 133 at 34. Mr. Flynn seeks
access to the unredacted information in certain documents and
summaries of the interviews. *Id.* at 32-34. Acknowledging that
"[m]any of those interview reports contain privileged material,
including classified information[,]" the government maintains
that "[i]nformation in those reports that could reasonably be
construed as favorable and material to [Mr. Flynn's] guilt or
punishment has been provided to [Mr. Flynn] in the form of

summaries." Gov't's Opp'n, ECF No. 122 at 15-16 n.8. The
government argues that Mr. Flynn has failed to demonstrate that
the requested information is helpful to the defense under the
standard set forth in *United States v. Yunis*, 867 F.2d 617, 623-
24 (D.C. Cir. 1989). *Id.* at 13-14.

Section 4 of the Classified Information Procedures Act
("CIPA"), 18 U.S.C. app. 3 § 4, governs the discovery of
classified information. *Libby*, 429 F. Supp. 2d at 7. "Although
this 'Section creates no new rights of or limits on discovery of
a specific area of classified information . . . [,] it
contemplates an application of the general law of discovery in
criminal cases to the classified information based on the
sensitive nature of the classified information.'" *Id.* (quoting
*Yunis*, 867 F.2d at 621). "A more stringent, three-part test
applies where the Defendant seeks classified information from
the Government[.]" *United States v. Kim*, No. CRIM. 10-255 CKK,
2013 WL 3866545, at *2 (D.D.C. July 24, 2013). First, the Court
must determine whether the information "crosse[s] the low hurdle
of relevance." *Yunis*, 867 F.2d at 623. Second, the Court must
evaluate whether "the assertion of privilege by the government
is at least a colorable one." *Id*. Third, "the threshold for
discovery in this context further requires that [the
information] . . . is at least 'helpful to the defense of [the]
accused.'" *Id.* (quoting *Roviaro v. United States*, 353 U.S. 53,

76

60-61 (1957)). In *Yunis*, the D.C. Circuit held that "classified
information is not discoverable on a mere showing of theoretical
relevance in the face of the government's classified information
privilege." *Id.*

Mr. Flynn relies on *Yunis* for the proposition that he is
entitled to his own statements in the DIA briefings and
debriefings. *See* Def.'s Reply, ECF No. 133 at 34 (citing *Yunis*,
867 F.2d at 621). Mr. Flynn's reliance on *Yunis* is misplaced.
While the D.C. Circuit in *Yunis* observed that Federal Rule of
Criminal Procedure 16(a)(1)(A) "entitles a defendant to discover
'any relevant written or recorded statements made by the
defendant,'" 867 F.2d at 621, Mr. Flynn ignores the D.C.
Circuit's guidance that "CIPA, on the other hand, as noted
above, provides procedures governing the defendant's access to
classified information sought to be discovered from the
government," *id*. at 622. According to the government, Mr. Flynn
elected not to follow the CIPA procedures. *See* Gov't's Opp'n,
ECF No. 122 at 12; *see also* Joint Status Report, ECF No. 107 at
4.

"Federal Rule of Criminal Procedure 16(a)(1)(A) and
(B) provide that the Government, upon a defendant's request,
must disclose certain of defendant's oral, written, and recorded
statements, but *this right is not absolute*." *United States v.
Hausa*, 232 F. Supp. 3d 257, 261 (E.D.N.Y. 2017) (emphasis

77

added); *accord United States v. Libby*, 429 F. Supp. 2d 46, 48

(D.D.C. 2006) (Rule 16(d)(1) permits the Court to deny or

restrict discovery to protect national security).[14] Mr. Flynn

does not address or cite Rule 16(d)(1). *See* Def.'s Reply, ECF

No. 133 at 32-35. Even if Mr. Flynn did so, the D.C. Circuit in

*Yunis* held that the district court abused its discretion in

ordering the disclosure of transcripts of classified audio

recordings of conversations between the defendant and the FBI's

informant under CIPA because the disclosure would have harmed

national security and the statements "were no more than

theoretically relevant and were not helpful to the presentation

of the defense or essential to the fair resolution of the

cause." 867 F.2d at 625.

　　By any conceivable measure, Mr. Flynn's requested

information is neither helpful nor relevant to the defense. *See*

*id*. at 623. Despite this Court's discussion of *Yunis* and the

need for the analysis to focus on whether the requested

information is relevant and helpful with regard to Mr. Flynn's

---

[14] Rule 16(d)(1) provides:

　　At any time the court may, for good cause, deny,
　　restrict, or defer discovery or inspection, or grant
　　other appropriate relief. The court may permit a party
　　to show good cause by a written statement that the court
　　will inspect ex parte. If relief is granted, the court
　　must preserve the entire text of the party's statement
　　under seal.

Fed. R. Crim. P. 16(d)(1).

sentencing, *see* Status Hr'g Tr. (Sept. 10, 2019), ECF No. 114 at
7, 10, 14, Mr. Flynn fails to show how the requested information
meets the "relevant and helpful" standard, *see* Def.'s Reply, ECF
No. 133 at 32-33. To the extent that the information in the DIA
briefings and debriefings are classified, Mr. Flynn fails to
explain how his statements in those records are relevant to his
false statements in this case or sentencing. *See id.* at 34.
Mr. Flynn's main argument for those records—that the "DIA
reports the defense requests will not only exonerate him of
being any kind of foreign agent but evince that the FBI/DOD knew
this all along," *id.*—does not meet the relevancy threshold, *see*
*Yunis*, 867 F.2d at 623, given that the government has not
charged Mr. Flynn with being a foreign agent.

Neither does Mr. Flynn demonstrate that he is entitled to a
letter from the former United Kingdom's National Security
Advisor regarding the Steele reporting or the information beyond
the summaries that the government has provided to him. *See*
Def.'s Reply, ECF No. 133 at 33-35. The government provided Mr.
Flynn with summaries of the documents because some of the
information contains privileged material, including classified
information. *See* Gov't's Opp'n, ECF No. 122 at 15-16, 16 n.8;
*see also* 18 U.S.C. app. 3 § 4. And the government submitted the
full interview reports under seal for the Court's *in camera*
review. Gov't's Opp'n, ECF No. 122 at 16 n.8. Having carefully

reviewed those submissions, the Court agrees with the government that the summaries of the interviews contain the relevant information. Mr. Flynn's requests for additional information are based on speculation and theoretical relevance. *See Yunis*, 867 F.2d at 623-25. Furthermore, the credibility of the Steele reporting is irrelevant and not helpful to Mr. Flynn's defense. *See id*. The Court therefore finds that Mr. Flynn has failed to satisfy the requirements as set forth in *Yunis*.[15] Accordingly, the Court need not address Mr. Flynn's requests for a preservation order and a finding of civil contempt against the prosecutors because Mr. Flynn has not established the elements for a *Brady* claim. *See* Def.'s Br., ECF No. 109 at 12 n.14, 17.

### E. Remaining Issues

Having found that Mr. Flynn did not demonstrate that he is entitled to the requested information under *Brady* and *Yunis*, the

---

[15] Mr. Flynn seeks the Court's intervention for defense counsel's request for security clearances. *See, e.g.*, Joint Status Report, ECF No. 107 at 2-3 (stating that "the government continues to deny our request for security clearances. Our attempts to resolve that issue with the government have come to a dead end, thus requiring the intervention of this Court"); Def.'s Br., ECF No. 109 at 9 n.12 ("This classified and heavily redacted opinion is one of the documents for which defense counsel requests a security clearance and access."); Def.'s Mot., ECF No. 111 at 3 (stating that "the prosecutors exude arrogance in their flat denials of both our request for security clearances"). On September 5, 2019, the Court held a sealed and *ex parte* hearing concerning Mr. Flynn's request for the Court's intervention. *See* Min. Entry of Sept. 5, 2019. To the extent that Mr. Flynn continues to press for the Court's intervention, the request is moot in light of the Court's denial of his *Brady* motions.

Court next considers Mr. Flynn's remaining arguments. First, Mr.
Flynn argues that the government failed to move to disqualify
his former counsel due to an "intractable conflict of interest."
Def.'s Reply, ECF No. 133 at 21. Next, Mr. Flynn contends that
he was "ambush[ed]" during his January 24, 2017 FBI interview
and "trapp[ed]" into "making statements they could allege as
false." *Id*. at 5. The Court will address each argument in turn.

### 1. Conflict of Interest

The Sixth Amendment to the United States Constitution
guarantees "[i]n all criminal prosecutions, the accused shall
enjoy the right . . . to have the [a]ssistance of [c]ounsel for
his defense." *United States v. Celis*, 608 F.3d 818, 828 n.3
(D.C. Cir. 2010) (quoting U.S. Const. amend. VI). The Supreme
Court has recognized that there is a strong "presumption in
favor of counsel of choice," *Wheat v. United States,* 486 U.S.
153, 161 (1988), but there is also a "right to representation
that is free from conflicts of interest," *Wood v. Georgia,* 450
U.S. 261, 271 (1981). "[T]he Sixth Amendment right to conflict-
free representation is subject to knowing and voluntary waiver."
*United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 200 (D.C.
Cir. 2013). Furthermore, the Court has "an independent interest
in ensuring that criminal trials are conducted within the
ethical standards of the profession and that legal proceedings
appear fair to all who observe them." *Wheat*, 486 U.S. at 160.

According to Mr. Flynn, he "paid [Covington & Burling] more than $1 million to investigate, prepare, and then defend the FARA registration in response to NSD/FARA section's and David Laufman's demands." Def.'s Reply, ECF No. 133 at 21. Mr. Flynn argues that his former attorneys were obligated to withdraw their representation even if he was fully informed in writing of the potential conflict. *Id.* at 21 (footnote omitted). According to Mr. Flynn, his former attorneys had an un-waivable conflict of interest by representing him for: (1) the charge stemming from the false statements that he made during his January 24, 2017 FBI interview; and (2) the potential criminal charges as to the false statements in his FARA filings. *Id.* Mr. Flynn argues that he pled guilty without access to the information requested in his *Brady* motions, *id.* at 20, but he stops short of arguing that his guilty pleas were invalid, *id.* at 21. Neither does Mr. Flynn allege ineffective assistance of counsel. *See generally id.* at 20-22. Rather, Mr. Flynn contends that the government "harvested a guilty plea" without bringing to the Court's attention the conflict-of-interest issue, *id.* at 22, and Mr. Flynn waived the potential conflict of interest without being adequately informed, Def.'s Sur-Surreply, ECF No. 135 at 16.

The government responds that it raised the potential conflict of interest with Mr. Flynn's former counsel on November 1, 2017, and November 16, 2017. Gov't's Surreply, ECF No. 132 at

11. The lead prosecutor memorialized both conversations, and Mr. Flynn's former counsel explained to the government on November 1, 2017 that "they (Covington) were aware of the potential conflict, had previously discussed it with [Mr. Flynn], and that [Mr. Flynn] was interested in nevertheless continuing to be represented by Covington." Gov't's Ex. 5, ECF No. 132-5 at 2. On November 16, 2017, former counsel confirmed to the government that Mr. Flynn "waived any such conflict" after "they had 'thoroughly discussed' the issue with [him], including that they (Covington) could be fact witnesses and have differing interests from [Mr. Flynn] on issues relating to the alleged false statements." *Id*. Indeed, Mr. Flynn's former attorneys testified in a criminal trial in a different federal district court regarding the FARA filings. *See* Def.'s Sur-Surreply, ECF No. 135 at 16.[16] As the government correctly points out, Mr. Flynn

---

[16] The Court takes judicial notice of the existence of a news article concerning the testimony of Mr. Flynn's former attorney in *United States v. Rafiekian*, Crim. Action No. 18-457 (E.D. Va.). *See Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015) ("Taking judicial notice of the *existence* of [news] articles is entirely proper."). On July 16, 2019, Mr. Flynn's former counsel testified that Mr. Flynn "reviewed and approved a filing to [DOJ] that he has admitted contains false statements but claims he did not read." Rachel Weiner, *Michael Flynn Reviewed FARA Filing He Later Called False, Ex-lawyer Testifies*, Wash. Post. (July 16, 2019, 10:34 PM), https://www.washingtonpost.com/local/public-safety/michael-flynns-ex-lawyer-testifies-on-the-former-national-security-advisers-consulting-work/2019/07/16/f317b28a-a801-11e9-86dd-d7f0e60391e9_story.html.

declined this Court's invitation for the appointment of "an
independent attorney to speak with [the] defendant, review the
defendant's file, and conduct necessary research to render a
second opinion for [the] defendant." Gov't's Surreply, ECF No.
132 at 11 (quoting Sentencing Hr'g Tr., ECF No. 103 at 9). Mr.
Flynn, however, contends that the government was obligated to
alert the Court of the potential conflict of interest. Def.'s
Sur-Surreply, ECF No. 135 at 16-17.

     The Court is not persuaded by Mr. Flynn's arguments for two
reasons. First, Mr. Flynn's reliance on *Wheat*, a case that
involved multiple and successive joint representation, is
misplaced. In that case, the Supreme Court addressed the issue
of whether "a criminal defendant's right under the Sixth
Amendment to his chosen attorney is qualified by the fact that
the attorney has represented other defendants charged in the
same criminal conspiracy." *Wheat*, 486 U.S. at 159. Because there
is "an independent duty to ensure that criminal defendants
receive a trial that is fair" and there is a "need to
investigate potential conflicts" in cases involving joint
representation, *id*. at 161, the Court explained that "where a
court justifiably finds an actual conflict of interest, there
can be no doubt that it may decline a proffer of waiver, and
insist that defendants be separately represented," *id*. at 162.
The Supreme Court upheld the district court's disqualification

84

of a defense attorney who sought to represent a defendant after
representing co-defendants in the same complex drug distribution
case because the decision to disqualify was within the trial
judge's discretion and it did not violate the defendant's Sixth
Amendment right to counsel of choice. *Id.* at 163-64. Although
the government brought the "potential for serious conflict of
interest" to the district court's attention, *id.* at 156, the
Supreme Court's holding in *Wheat* does not compel the government
to raise potential conflicts of interest with the Court, *see id.*
at 163-164. Contrary to Mr. Flynn's assertion, *Wheat* did not
require the government to move for disqualification of his
former counsel.

Next, Mr. Flynn's argument—that he was not fully informed
of the conflict of interest—is unavailing. *See* Def.'s Sur-
Surreply, ECF No. 135 at 16; *see also* Def.'s Reply, ECF No. 133
at 21 n.14 (citing D.C. Rules Prof'l Conduct R. 1.7(c)(2)). Mr.
Flynn cites Rule 1.7(c)(2) of the District of Columbia Rules of
Professional Conduct, which provides that "[a] lawyer may
represent a client with respect to a matter in the circumstances
described in [Rule 1.7(b)] if . . . "[t]he lawyer reasonably
believes that the lawyer will be able to provide competent and
diligent representation to each affected client." D.C. Rules
Prof'l Conduct R. 1.7(c)(2). Rule 1.7(b) provides that "a lawyer
shall not represent a client with respect to a matter if" the

lawyer takes or will likely take adverse positions or if the
"lawyer's professional judgment on behalf of a client will be or
reasonably may be adversely affected by the lawyer's
responsibilities to or interests in a third party or the
lawyer's own financial, business, property, or personal
interests." *Id.* R. 1.7(b). Rule 1.7(a) provides that "a lawyer
shall not advance two or more adverse positions in the same
matter." *Id.* R. 1.7(a).

Conflicts of interest under Rule 1.7(b) may be waived by
the client with informed consent. *See, e.g.*, D.C. Rules Prof'l
Conduct R. 1.7(c)(1) (lawyer may represent the client if the
"potentially affected client provides informed consent to such
representation after full disclosure of the existence and nature
of the possible conflict and the possible adverse consequences
of such representation"); *id.* R. 1.0(e) (defining "informed
consent" as "the agreement by a person to a proposed course of
conduct after the lawyer has communicated adequate information
and explanation about the material risks of and reasonably
available alternatives to the proposed course of conduct").
Unlike a conflict under Rule 1.7(b), "a conflict arising [under
1.7(a)] from the lawyer's advancing adverse positions in the
*same matter* cannot be waived in advance or otherwise." *Id.* R.
1.7 cmt. 32 (emphasis added); *see id.* R. 1.0(h) (defining
"matter" as "any litigation, administrative proceeding, lobbying

86

activity, application, claim, investigation, arrest, charge or
accusation, the drafting of a contract, a negotiation, estate or
family relations practice issue, or any other representation,
except as expressly limited in a particular rule").

Rule 1.7(a)'s "absolute prohibition" on conflicting
representations in the *same* matter is "inapplicable" where "the
adverse positions to be taken relate to different matters." D.C.
Rules Prof'l Conduct R. 1.7(a) cmt. 3. Here, Mr. Flynn does not
argue that his former counsel advanced adverse positions in this
criminal matter. *See* Def.'s Reply, ECF No. 133 at 21; *see also*
Def.'s Surreply, ECF No. 135 at 16. Instead, Mr. Flynn contends
that his former counsel was an adverse witness in the case in
the Eastern District of Virginia—a *different* jurisdiction and a
*different* matter involving a *different* defendant. Furthermore,
the government did not bring criminal charges based on the FARA
filings against Mr. Flynn in this case or in the separate case
in the Eastern District of Virginia. Thus, the Court will assume
that Mr. Flynn relies on Rule 1.7(b) because he cites to Rule
1.7(c)(2), Def.'s Reply, ECF No. 133 at 21 n.14, and "FIG and
[Mr.] Flynn subsequently retained Covington to represent them in
connection with any potential FARA filing," *Rafiekian*, 2019 WL
4647254, at *5.

The gravamen of Mr. Flynn's argument concerns the "decisive
issue" of waiver. *Lopesierra-Gutierrez*, 708 F.3d at 200. The

D.C. Circuit has explained that "a court may decline to accept a waiver if the conflict of interest jeopardizes the integrity of the proceedings." *Id*. "In making this determination, a court balances the defendant's right to choose his representative against *both* the defendant's countervailing right to conflict-free representation *and* the court's independent interest in the integrity of criminal proceedings." *Id*. And "[t]he outcome of that balance turns on the nature and extent of the conflict." *Id*.

In *Lopesierra-Gutierrez*, the D.C. Circuit held that the district court acted within its discretion in finding that the defendant knowingly, intelligently, and voluntarily waived any conflict of interest where: (1) his attorney was implicated in criminal activity for accepting laundered funds that were purportedly the product of the defendant's drug conspiracy; and (2) "a stipulation bar[red] presentation of incriminating testimony" at the jury trial. *Id*. at 202. In doing so, the D.C. Circuit rejected the defendant's argument that his waiver was not knowing or voluntary. *Id*. The D.C. Circuit reasoned that the defendant assured the district court that he had waived any potential conflict of interest despite being advised that his attorney would have adverse interests as the subject of a criminal investigation. *Id*. The D.C. Circuit explained that the defendant was "represented by an independent attorney" and he

"was fully aware of the nature of the conflict and the consequences of waiver." *Id.* The D.C. Circuit concluded that the defendant "made a rational and informed decision that, given the stipulation and the limited nature of his attorney's conflict, he wanted to proceed. That he now wishes he had chosen differently gives us no reason to doubt the validity of that choice." *Id.*

Here, it is undisputed that this Court did not have the opportunity to address the conflict-of-interest issue, determine whether an actual conflict existed at the time, or decide whether Mr. Flynn's waiver of the potential conflict of interest was knowing and voluntary. *Cf. Iacangelo v. Georgetown Univ.*, 710 F. Supp. 2d 83, 94 (D.D.C. 2010) (scheduling a hearing to determine whether a client gave his "informed consent" to determine whether a law firm had a waivable conflict of interest). Mr. Flynn cites no controlling precedent to support the proposition that the government was required to bring the conflict-of-interest issue to the Court's attention. *See* Def.'s Reply, ECF No. 133 at 22. And Mr. Flynn does not ask this Court to find—and the Court cannot find—that his waiver was neither knowing nor voluntary.

## 2. Mr. Flynn's Other Theories

Finally, the Court summarily disposes of Mr. Flynn's arguments that the FBI conducted an ambush interview for the

purpose of trapping him into making false statements and that the government pressured him to enter a guilty plea. The record proves otherwise. *See, e.g.*, Def.'s Br., ECF No. 109 at 4 (arguing that the government was "putting excruciating pressure on [Mr. Flynn] to enter his guilty plea"); Def.'s Reply, ECF No. 133 at 5 (arguing that "high-ranking FBI officials orchestrated an ambush-interview . . . for the purpose of trapping him into making false statements they could allege as false"); *id.* at 6 (asserting that the FBI and others "plot[tted] to set up an innocent man and create a crime"); *id.* at 18 (contending that "[t]he FBI had no factual or legal basis for a criminal investigation" and that the FBI's investigation was a "pretext for investigating Mr. Flynn"); *id.* at 27 (arguing that "Mr. Flynn was honest with the [FBI] agents to the best of his recollection at the time, and the [FBI] agents knew it").

The sworn statements of Mr. Flynn and his former counsel belie his new claims of innocence and his new assertions that he was pressured into pleading guilty to making materially false statements to the FBI. *E.g.*, Sentencing Hr'g Tr., ECF No. 103 at 11 (affirming it was not his "contention that Mr. Flynn was entrapped by the FBI"); *id.* (affirming that "Mr. Flynn's rights were [not] violated by the fact that he did not have a lawyer present for the interview"); Plea Agreement, ECF No. 3 at 10 ("I fully understand this [Plea] Agreement and agree to it without

reservation. I do this voluntarily and of my own free will,
intending to be legally bound."); Plea Hr'g Tr., ECF No. 16 at
29 (affirming that no one "forced, threatened, or coerced [Mr.
Flynn] in any way into entering this plea of guilty"). And it is
undisputed that Mr. Flynn not only made those false statements
to the FBI agents, but he also made the same false statements to
the Vice President and senior White House officials, who, in
turn, repeated Mr. Flynn's false statements to the American
people on national television. *See* Gov't's Surreply, ECF No. 132
at 8.

\* \* \*

Mr. Flynn's requested relief is dismissal of this case. *See*
Def.'s Reply, ECF No. 133 at 36; *see also* Def.'s Sur-Surreply,
ECF No. 135 at 17. He seeks dismissal of the charges against him
and the entire prosecution for government misconduct. *E.g.*,
Def.'s Reply, ECF No. 133 at 7, 23 n.15, 36; Def.'s Sur-
Surreply, ECF No. 135 at 17. The government disagrees. *See*
Gov't's Surreply, ECF No. 132 at 12-15. This case is not *United*
*States v. Theodore F. Stevens*, Criminal Action No. 08-231(EGS),
the case that Mr. Flynn relies on throughout his briefing. In
that case, the Court granted the government's motion to dismiss,
and the government admitted that it had committed *Brady*
violations and made misrepresentations to the Court. *In re*
*Special Proceedings*, 825 F. Supp. 2d 203, 204 (D.D.C. 2011)

(Sullivan, J.). Even if Mr. Flynn established a *Brady* violation
in this case, dismissal would be unwarranted because "[t]he
remedy for a *Brady* violation is retrial, not dismissal." *United
States v. Borda*, 941 F. Supp. 2d 16, 19 n.1 (D.D.C. 2013)
(citing *Pettiford*, 627 F.3d at 1228). "[D]ismissal is
appropriate only as a last resort, where no other remedy would
cure prejudice against a defendant." *Pasha*, 797 F.3d at 1139.

## V. Conclusion

For the reasons set forth above, the Court **DENIES**
Mr. Flynn's Motion to Compel the Production of *Brady* Material
and for an Order to Show Cause, ECF Nos. 109 & 111; Mr. Flynn's
Sealed Motion to Compel the Production of *Brady* Material, ECF
No. 112; Mr. Flynn's Sealed Motion for an Order to Show Cause,
ECF No. 113; and Mr. Flynn's Motion to Compel the Production of
Newly Discovered *Brady* Evidence, ECF No. 124. An appropriate
Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:  Emmet G. Sullivan
United States District Judge
December 16, 2019**

# Exhibit 11

# The New York Times

"All the News That's Fit to Print"

Mostly cloudy, periodic afternoon rain and drizzle, mid-high 56. **Tonight,** rain ending, colder, low 38. **Tomorrow,** showers, windy, high 49. Weather map appears on Page B12.

VOL. CLXIX . . . No. 58,687    © 2020 The New York Times Company    **NEW YORK, FRIDAY, MAY 8, 2020**    $3.00

---

## American Outbreak Caught Fire in New York



MARCH 7   Times Square on a typically crowded Saturday, when the nation was on the cusp of realizing the extent of the pandemic.   VICTOR J. BLUE FOR THE NEW YORK TIMES

### Travel From City Seeded Spread Nationwide

**By BENEDICT CAREY and JAMES GLANZ**

New York City's coronavirus outbreak grew so large by early March that the city became the primary source of new infections in the United States, new research reveals, as thousands of infected people traveled from the city and seeded outbreaks around the country.

The research indicates that a wave of infections swept from New York City through much of the country before the city began setting social distancing limits to stop the growth. That helped to fuel outbreaks in Louisiana, Texas, Arizona and as far away as the West Coast.

The findings are drawn from geneticists' tracking signature mutations of the virus, travel histories of infected people and models of the outbreak by infectious disease experts.

"We now have enough data to feel pretty confident that New York was the primary gateway for the rest of the country," said Nathan Grubaugh, an epidemiologist at the Yale School of Public Health.

The central role of New York's outbreak shows that decisions made by state and federal officials — including waiting to impose distancing measures and to limit international flights — helped shape the trajectory of the outbreak and allowed it to grow in the rest of the country.

The city joins other densely populated urban hot spots around the world, starting with Wuhan, China, and then Milan, that have become vectors for the virus's spread.

Travel from other American cities also sparked infections across the country, including from an early outbreak centered in the Seattle area that seeded infections in more than a dozen states, researchers say. Even if New York had managed to slow the virus, it probably would have continued to spread from elsewhere, they say.

But the Seattle outbreak proved to be a squall before the larger storm gathering in New York, where, at the end of February, thousands of infected people packed trains and restaurants, thronged tourist attractions and passed through its three major airports.

*Continued on Page A9*

## Back to Business May Not Mean Back to Work

**By PATRICIA COHEN and TIFFANY HSU**

With unemployment claims surpassing 33 million since March, the nation's near-term economic outlook hinges on whether patchwork reopenings can mend the coronavirus pandemic's damage — and how soon.

Nearly 3.2 million were added to state jobless rolls last week, the Labor Department said Thursday, and economists expect the monthly jobs report on Friday to put the April unemployment rate at 15 percent or higher — a Depression-era level.

But even a figure of that magnitude will almost certainly understate the calamity. Officials in some states say more than a quarter of their work force is unemployed. And experts say it is impossible to calculate how many jobs might come back as states lift shelter-in-place rules.

"We don't know what normal is going to look like," said Martha Gimbel, an economist and a labor market expert at Schmidt Futures, a philanthropic initiative.

The biggest questions are how many workers will be willing to go back, how many businesses will have full-time jobs for them, and how quickly customers will return to the shopping and spending habits that stoke the consumer-driven economy.

In addition to weighing the risk of exposure to the virus, some

### Jobless Claims Climb Above 33 Million

laid-off workers face the prospect of making less on the job than they do on unemployment — including a temporary $600 weekly supplement enacted in a flurry of federal emergency legislation.

At the same time, many employers may not survive, particularly small ones, while others are likely to open with reduced hours and staff. And most Americans remain uneasy about the

moves to reopen, with 67 percent saying they would be uncomfortable going into a store and 78 percent saying they would be uncomfortable eating at a restaurant, according to a survey that The Washington Post and the University of Maryland released this week.

"States want to relaunch their economies, but they're going to be doing so in an environment of high unemployment, reduced income and fear," said Gregory Daco, chief U.S. economist at Oxford Economics. "It's not a matter of saying, 'Hey, go out and spend.' It's a matter of people being able

*Continued on Page A14*



A job center in Jackson, Miss. On Thursday, the Labor Department reported nearly 3.2 million new unemployment claims.   COURTLAND WELLS FOR THE NEW YORK TIMES

## White House Blocks C.D.C. Reopening Guidance

**By ABBY GOODNOUGH and MAGGIE HABERMAN**

WASHINGTON — As President Trump rushes to reopen the economy, a battle has erupted between the White House and the Centers for Disease Control and Prevention over the agency's detailed guidelines to help schools, restaurants, churches and other establishments safely reopen.

A copy of the C.D.C. guidance obtained by The New York Times includes sections for child care programs, schools and day camps, churches and other "communities of faith," employers with vulnerable workers, restaurants and bars, and mass transit administrators. The recommendations include using disposable dishes and utensils at restaurants, closing every other row of seats in buses and subways while restrict-

### Religious and Economic Concerns Are Raised

ing transit routes among areas experiencing different levels of coronavirus infection, and separating children at school and camps into groups that should not mix throughout the day.

But White House and other administration officials rejected the recommendations over concerns that they were overly prescriptive, infringed on religious rights and risked further damaging an economy that Mr. Trump was banking on to recover quickly. One senior official at the Department of Health and Human Services with deep ties to religious conservatives objected to any controls

on church services.

"Governments have a duty to instruct the public on how to stay safe during this crisis and can absolutely do so without dictating to people how they should worship God," said Roger Severino, the director of the Department of Health and Human Services' Office for Civil Rights, who once oversaw the DeVos Center for Religion and Civil Society at the Heritage Foundation.

A spokesman for the C.D.C. said the guidance was still under discussion with the White House and a revised version could be published soon.

"Over the last week, C.D.C. has been working on additional recommendations and guidance for reopening communities, returning to public events, and I expect, even today, that we're going to re-

*Continued on Page A11*

---

## U.S. DROPS PURSUIT OF FLYNN, IN MOVE BACKED BY TRUMP

### Unusual Reversal Comes as Barr Steps Up Scrutiny of Russia Investigation

**By ADAM GOLDMAN and KATIE BENNER**

WASHINGTON — After an extraordinary public campaign by President Trump and his allies, the Justice Department dropped its criminal case on Thursday against Michael T. Flynn, Mr. Trump's first national security adviser.

Mr. Flynn had previously pleaded guilty twice to lying to F.B.I. agents about his conversations with a Russian diplomat during the presidential transition in late 2016.

The move was the latest example of Attorney General William P. Barr's efforts to chisel away at the results of the Russia investigation. Documents that Mr. Flynn's lawyers cited as evidence of prosecutorial misconduct were turned over as part of a review by an outside prosecutor whom Mr. Barr assigned to re-examine the case. Mr. Barr has cast doubt not only on some of the prosecutions in the investigation but also on its premise, assigning another independent prosecutor to scrutinize its origins.

The decision for the government to throw out a case after a defendant had already pleaded guilty was also highly unusual. Former prosecutors struggled to point to any precedent and portrayed the Justice Department's

justification as dubious.

By abandoning the case, the department undid what had been one of the first significant acts of the special counsel investigation into possible ties between the Trump campaign and Russia's 2016 election interference — the prosecution of a retired top Army general turned national security adviser who pleaded guilty to lying to investigators.

Though Mr. Trump fired Mr.

*Continued on Page A24*



Michael T. Flynn, a former top adviser to President Trump.   TOM BRENNER FOR THE NEW YORK TIMES

## Justices Throw Out Convictions In 'Bridgegate' but Find Abuses

**By ADAM LIPTAK and NICK CORASANITI**

WASHINGTON — The Supreme Court on Thursday unanimously overturned the convictions of two defendants in the "Bridgegate" scandal that snarled traffic on the world's busiest bridge, upended New Jersey politics and doomed the presidential aspirations of Chris Christie, the state's governor at the time.

The case resulted from a decision in 2013 by associates of Mr. Christie to close access lanes to the George Washington Bridge in a wild scheme that was meant to punish one of the governor's political opponents and ended up creating four days of enormous traffic jams that posed risks to public safety.

That was an abuse of power, the Supreme Court ruled, but not a federal crime.

The associates, Bridget Anne

### New Jersey Corruption Wasn't Federal Crime

Kelly and Bill Baroni, were convicted of wire fraud and other federal charges for their roles in concocting what they said was a "traffic study" that caused extreme delays for motorists seeking to cross the bridge from Fort Lee, N.J., to Manhattan.

The mayor of Fort Lee, Mark Sokolich, a Democrat, had rebuffed a request to endorse Mr. Christie's re-election bid in 2013, and this was his punishment. Mr. Christie has denied any knowledge of the scheme.

"Time for some traffic problems in Fort Lee," Ms. Kelly, an aide to Mr. Christie, wrote in an email to officials at the Port Authority of New York and New Jersey, which operates the bridge.

*Continued on Page A22*

## Echo of 'Stop and Frisk' Is Seen In Social-Distance Crackdown

**By ASHLEY SOUTHALL**

A police officer enforcing social distancing rules broke up a group of people on a stoop during a nighttime cookout in East New York, Brooklyn, punching one man in the face. Another dispute between officers and residents of the same predominantly black neighborhood over the guidelines led to a man being knocked unconscious. Days later, three men were arrested after taking part in a sprawling vigil at the Queensbridge Houses for a rapper who was said to have died of the coronavirus.

Tensions are increasingly flaring in black and Hispanic neighborhoods over officers' enforcement of social distancing rules, leading some prominent elected

### In 40 Brooklyn Arrests, 35 People Were Black

officials to accuse the New York Police Department of engaging in a racist double standard as it struggles to shift to a public health role in the coronavirus crisis.

The arrests of black and Hispanic residents, several of them filmed and posted online, occurred on the same balmy days that other photographs circulated showing police officers handing out masks to mostly white visitors at parks in Lower Manhattan, Williamsburg and Long Island City. Video captured crowds of

*Continued on Page A15*

---



**BUSINESS B1-8**

**That Can-Do Attitude**
The surge in demand for processed foods has can factories speeding up production to keep pace.   PAGE B5

**Haves and Have-Nots**
Analyses show uneven distribution of loans intended to provide relief for small businesses.   PAGE B4

**INTERNATIONAL A18-20**

**Lethal Gas Leak in India**
Neighbors of an LG plastics factory woke up about 2:30 a.m. enveloped by a mist of toxic styrene vapor. Hundreds were sickened. Eleven died.   PAGE A18

**A Soldier of Misfortune**
An American was the central character in a bungled operation to overthrow the president of Venezuela.   PAGE A19

**OBITUARIES A27-29**

**Perennial Talk Radio Host**
Barry Farber began broadcasting in New York in 1960, and he never stopped talking. He was 90.   PAGE A27

**SPORTSFRIDAY B9-11**

**Lifting a Monthslong Timeout**
Sports are slowly restarting even as uneven rules and health risks fill a new world with uncertainty.   PAGE B9

**Two Titles, and So Much More**
The Knicks of the early '70s made a template of virtue and sportsmanship entertainment, Harvey Araton writes.   PAGE B10

**NATIONAL A21-24**

**Arrests in Black Jogger's Killing**
A white father and son were charged with murder in the shooting death of an unarmed black man they chased down and confronted while he was jogging in Brunswick, Ga.   PAGE A23

**A Closed-Door Campaign**
Because of the pandemic, candidates are struggling to plan for a fall presidential race that isn't likely to include the most basic tool to get voters to the polls: a knock on the door.   PAGE A21

**EDITORIAL, OP-ED A30-31**

**David Brooks**   PAGE A30

**WEEKEND ARTS C1-16**

**The Artist's Inspiration**
Sketches by John Singer Sargent, on exhibit together for the first time, give a new, often intimate view of his African-American muse, Thomas McKeller.   PAGE C1





# Exhibit 12

507 F.Supp.3d 116
United States District Court, District of Columbia.

UNITED STATES of America
v.
Michael T. FLYNN, Defendant.

Crim. Action No. 17-232 (EGS)
|
Signed 12/08/2020

**Synopsis**
**Background:** Defendant, a former National Security Advisor to the President, was charged with willfully and knowingly making materially false statements to the Federal Bureau of Investigation (FBI). After defendant initially pleaded guilty, but then moved to withdraw his guilty plea, the government moved to dismiss the criminal information. The President subsequently granted defendant a full and unconditional pardon, and defendant and the government subsequently moved to dismiss the case as moot.

**Holdings:** The District Court, Emmet G. Sullivan, J., held that:

[1] district court has discretion to review an unopposed motion by the government to dismiss an indictment, information, or complaint;

[2] a judge may deny an unopposed motion by the government to dismiss an indictment, information, or complaint if, after an examination of the record, she is not satisfied that the reasons advanced for the proposed dismissal are substantial, or she finds that the prosecutor has otherwise abused his discretion;

[3] government's submission in support of its motion to dismiss criminal information was not a mere conclusory statement of the reasons for dismissal, and thus, denial of leave was not warranted on such ground;

[4] government's motion to dismiss criminal information was moot; and

[5] Presidential pardon mooted case.

Motion to dismiss case granted.

West Headnotes (31)

**[1]    Criminal Law**      Judicial Notice

District court would take judicial notice of President's social media post, announcing pardon of former National Security Advisor, when considering motion to dismiss case charging National Security Advisor with willfully and knowingly making materially false statements to the FBI; the veracity of the statement could be accurately and readily determined from sources whose accuracy could not reasonably be questioned. 18 U.S.C.A. § 1001(a)(2); Fed. R. Evid. 201(b)(2).

**[2]    Criminal Law**      Authority and discretion of court or prosecution

Based on its terms, the "leave of court" requirement in rule giving the government authority to dismiss an indictment, information, or complaint, obviously vests some discretion in the court. Fed. R. Crim. P. 48(a).

**[3]    Criminal Law**      Authority and discretion of court or prosecution

The requirement of judicial leave in rule giving the government authority to dismiss an indictment, information, or complaint, gives the court a role in dismissals following indictment. Fed. R. Crim. P. 48(a).

1 Case that cites this headnote

**[4]    Criminal Law**      Authority and discretion of court or prosecution

District court has discretion to review an unopposed motion by the government to dismiss an indictment, information, or complaint; history of the rule belies the notion that its only scope and purpose is the protection of the defendant. Fed. R. Crim. P. 48(a).

**[5]**   **Criminal Law** 🔑 Authority and discretion of court or prosecution

While courts have a role in considering motions by the government to dismiss an indictment, information, or complaint, they are limited to narrow circumstances in which they may exercise their discretion in denying leave to dismiss; after all, decisions to dismiss pending criminal charges lie squarely within the ken of prosecutorial discretion and at the core of the Executive's duty to see to the faithful execution of the laws. Fed. R. Crim. P. 48(a).

1 Case that cites this headnote

**[6]**   **Criminal Law** 🔑 Authority and discretion of court or prosecution

Consistent with the system of checks and balances, courts considering a motion by the government to dismiss an indictment, information, or complaint are tasked with making their own determination on whether dismissal would be in the public interest, in order to uphold the crucial responsibility of maintaining the public perception of fairness and integrity in the justice system. Fed. R. Crim. P. 48(a).

**[7]**   **Criminal Law** 🔑 Authority and discretion of court or prosecution

On a motion by the government to dismiss an indictment, information, or complaint, the court's role is not to serve merely as a rubber stamp for the prosecutor's decision, even when the defendant concurs in the dismissal; rather, it is the court's duty to exercise a discretion for the protection of the public interest. Fed. R. Crim. P. 48(a).

**[8]**   **Criminal Law** 🔑 Authority and discretion of court or prosecution

On a motion by the government to dismiss an indictment, information, or complaint, the trial court conducts an examination of the record to

ensure that the government's efforts to terminate the prosecution are not tainted with impropriety. Fed. R. Crim. P. 48(a).

**[9]**   **Criminal Law** 🔑 Authority and discretion of court or prosecution

A judge may deny an unopposed motion by the government to dismiss an indictment, information, or complaint if, after an examination of the record, (1) she is not satisfied that the reasons advanced for the proposed dismissal are substantial; or (2) she finds that the prosecutor has otherwise abused his discretion. Fed. R. Crim. P. 48(a).

**[10]**   **Criminal Law** 🔑 Authority and discretion of court or prosecution

**Criminal Law** 🔑 Proceedings; Dismissal with or Without Prejudice

In exercising its role pursuant to rule giving the government authority to dismiss an indictment, information, or complaint, the court will not be content with a mere conclusory statement by the prosecutor that dismissal is in the public interest, but will require a statement of reasons and the underlying factual basis. Fed. R. Crim. P. 48(a).

**[11]**   **Criminal Law** 🔑 Authority and discretion of court or prosecution

Rule giving the government authority to dismiss an indictment, information, or complaint contemplates exposure of the reasons for dismissal in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors, and in pursuance of this purpose to gain the court's favorable discretion, it should be satisfied that the reasons advanced for the proposed dismissal are substantial; thus, to honor the purpose of the rule, the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision. Fed. R. Crim. P. 48(a).

**[12]**  **Criminal Law**  🔑  Authority and discretion of court or prosecution

**Criminal Law**  🔑  Grounds and Considerations

A court may deny a motion by the government to dismiss an indictment, information, or complaint upon a finding of abuse of prosecutorial discretion where dismissal would be contrary to the public interest; in conducting this analysis, the court determines whether the government's efforts to terminate the prosecution are tainted with impropriety. Fed. R. Crim. P. 48(a).

**[13]**  **Criminal Law**  🔑  Authority and discretion of court or prosecution

Courts considering a motion to dismiss an indictment, information, or complaint must be mindful not to second-guess the underlying charging decisions or impose their own views about the adequacy of the underlying criminal charges because their conception of the public interest differs from that of the prosecuting attorney. Fed. R. Crim. P. 48(a).

**[14]**  **Criminal Law**  🔑  Authority and discretion of court or prosecution

**Criminal Law**  🔑  Grounds and Considerations

Examples of prosecutorial impropriety, as could warrant denying the government's motion to dismiss an indictment, information, or complaint, would include where dismissal does not serve due and legitimate prosecutorial interests, where dismissal was a sham or a deception, and where the prosecutor's dismissal was based on acceptance of a bribe, personal dislike of the victim, and dissatisfaction with the jury impaneled. Fed. R. Crim. P. 48(a).

**[15]**  **Criminal Law**  🔑  Authority and discretion of court or prosecution

**Criminal Law**  🔑  Grounds and Considerations

The corrupt dismissal of politically well-connected individuals would constitute an abuse of discretion, as could warrant denying the government's motion to dismiss and indictment, information, or complaint. Fed. R. Crim. P. 48(a).

**[16]**  **Criminal Law**  🔑  Authority and discretion of court or prosecution

**Criminal Law**  🔑  Proceedings; Dismissal with or Without Prejudice

Government's submission in support of its motion to dismiss criminal information charging defendant, a former National Security Advisor to the President, with willfully and knowingly making material false statements to the FBI, was not a mere conclusory statement of the reasons for dismissal, and thus, denial of leave was not warranted on such ground; government sought to justify its decision to seek dismissal by providing several reasons and facts underlying its decision. 18 U.S.C.A. § 1001(a)(2); Fed. R. Crim. P. 48(a).

**[17]**  **Fraud**  🔑  Materiality and effect

A lie influencing the possibility that an investigation might commence stands in no better posture under statute imposing criminal liability for making false statements to federal investigators than a lie distorting an investigation already in progress. 18 U.S.C.A. § 1001.

**[18]**  **Fraud**  🔑  Materiality and effect

The standard for materiality under statute imposing criminal liability for making false statements to federal investigators asks only whether the defendant's statements were capable of affecting the general function of the tribunal when it interviewed him. 18 U.S.C.A. § 1001.

**[19]**  **Fraud**  🔑  Materiality and effect

A statement is "material" under statute imposing criminal liability for making false statements to federal investigators if it has a natural tendency to influence, or is capable of influencing, either

a discrete decision or any other function of the agency to which it was addressed. 18 U.S.C.A. § 1001.

**[20]** **Fraud** 🔑 In general; false statements or entries

**Fraud** 🔑 Materiality and effect

Proof of actual reliance on the statement is not required under statute imposing criminal liability for making false statements to federal investigators; the government need only make a reasonable showing of its potential effects. 18 U.S.C.A. § 1001.

**[21]** **Criminal Law** 🔑 Authority and discretion of court or prosecution

"Leave of court" standard in rule giving the government authority to dismiss an indictment, information, or complaint, requires the court to consider the objective reasonableness of the government's justification for seeking dismissal; where the government justifies its motion by ignoring applicable law to now question the strength of its case, substantial doubt arises about the government's stated reasons for seeking dismissal. Fed. R. Crim. P. 48(a).

**[22]** **Criminal Law** 🔑 Authority and discretion of court or prosecution

The court is particularly ill-suited to reviewing the strength of a case for which the government moves to dismiss the indictment, information, or complaint; that said, the role of the court is to conduct an examination of the record in order to ensure that the government's efforts to terminate the prosecution are not tainted with impropriety. Fed. R. Crim. P. 48(a).

**[23]** **Criminal Law** 🔑 Authority and discretion of court or prosecution

On a motion by the government to dismiss an indictment, information, or complaint, the court examines the factual basis underlying

the government's reasons because not doing so would amount to rubber stamping the government's decision, contrary to the requirement of rule allowing such a motion. Fed. R. Crim. P. 48(a).

**[24]** **Criminal Law** 🔑 Proceedings; Dismissal with or Without Prejudice

Government's motion to dismiss criminal information charging defendant, a former National Security Advisor to the President, with willfully and knowingly making materially false statements to the FBI, was moot, given the President's decision to pardon defendant and defendant's acceptance of the pardon. 18 U.S.C.A. § 1001(a)(2); Fed. R. Crim. P. 48(a).

**[25]** **Constitutional Law** 🔑 Pardon and parole

**Pardon and Parole** 🔑 Pardon

**Pardon and Parole** 🔑 Reprieve

The executive can reprieve or pardon all offenses after their commission, either before trial, during trial or after trial, by individuals, or by classes, conditionally or absolutely, and this without modification or regulation by Congress. U.S. Const. art. 2, § 2, cl. 1.

1 Case that cites this headnote

**[26]** **Pardon and Parole** 🔑 Pardon

The pardon power is not without limitations; for example, a presidential pardon generally must be accepted to be effective. U.S. Const. art. 2, § 2, cl. 1.

1 Case that cites this headnote

**[27]** **Pardon and Parole** 🔑 Effect of pardon

Once accepted, a full and absolute pardon releases the wrongdoer from punishment and restores the offender's civil rights without qualification. U.S. Const. art. 2, § 2, cl. 1.

1 Case that cites this headnote

**[28]**    **Pardon and Parole**    👈    **Effect of pardon**

A pardon does not necessarily render "innocent" a defendant of any alleged violation of the law. U.S. Const. art. 2, § 2, cl. 1.

**[29]**    **Pardon and Parole**    👈    **Pardon**

**Pardon and Parole**    👈    **Effect of pardon**

A pardon is an act of grace, proceeding from the power entrusted with the execution of the laws, which exempts the individual on whom it is bestowed, from the punishment the law inflicts for a crime he has committed. U.S. Const. art. 2, § 2, cl. 1.

**[30]**    **Pardon and Parole**    👈    **Effect of pardon**

A pardon does not blot out guilt or expunge a judgment of conviction. U.S. Const. art. 2, § 2, cl. 1.

1 Case that cites this headnote

**[31]**    **Criminal Law**    👈    **Abatement**

**Pardon and Parole**    👈    **Effect of pardon**

Presidential pardon mooted case in which defendant, a former National Security Advisor to the President, was charged with willfully and knowingly making materially false statements to the FBI; scope of the pardon was extraordinarily broad, applying not only to the false statements offense to which defendant pled guilty, but also purporting to apply to any and all possible offenses that he might be charged with in the future in relation to the case and investigation, and defendant accepted President's full and unconditional pardon. U.S. Const. art. 2, § 2, cl. 1; 18 U.S.C.A. § 1001(a)(2).

**Attorneys and Law Firms**

**\*120** Zainab Naeem Ahmad, Gibson, Dunn & Crutcher, LLP, New York, NY, Brandon Lang Van Grack, Hashim M. Mooppan, Jocelyn S. Ballantine, Kenneth Clair Kohl, U.S.

Attorney's Office for the District of Columbia, Washington, DC, for United States of America.

Jesse R. Binnall, Abigail Frye, Pro Hac Vice, Lindsay R. McKasson, Pro Hac Vice, Harvey & Binnall, PLLC, Alexandria, VA, Robert K. Kelner, Covington & Burling LLP, Washington, DC, W. William Hodes, Pro Hac Vice, The William Hodes Law Firm, The Villages, FL, Molly McCann, Pro Hac Vice, Sidney Powell, Pro Hac Vice, Sidney Powell, P.C., Dallas, TX, for Defendant.

## MEMORANDUM OPINION

EMMET G. SULLIVAN, United States District Judge

Pending before the Court are: (1) the government's motion to dismiss the criminal information against Mr. Flynn with prejudice pursuant to Federal Rule of Criminal Procedure 48(a), *see* Gov't's Mot. Dismiss Criminal Information Against Def. Michael T. Flynn ("Gov't's Mot. Dismiss"), ECF No. 198; and (2) the government's notice of executive grant of clemency and consent motion to dismiss this case as moot, *see* Notice Executive Grant Clemency Consent Mot. Dismiss Moot ("Consent Mot. Dismiss"), ECF No. 308. Upon careful consideration of the motions, the applicable law, the entire record herein, and for the reasons explained below, the Court **DENIES AS MOOT** the government's motion to dismiss pursuant to Rule 48(a), and **GRANTS** the government's consent motion based on the presidential pardon and **DISMISSES** this case **AS MOOT**.

## I. Background

Mr. Flynn served as a surrogate and national security advisor for then-candidate Donald J. Trump during the 2016 presidential campaign. Statement of Offense ("SOF"), ECF No. 4 at 1 ¶ 1.[1] After the November 2016 election, Mr. Flynn became a senior member of the President-Elect's Transition Team. *Id.* Mr. Flynn served as the National Security Advisor to President Trump from January 22, 2017 until he resigned on February 13, 2017. Ex. 1 to Def.'s Reply Mot. Compel, ECF No. 133-1 at 1-2.

### A. The FBI Investigation Into Mr. Flynn's Activities

The criminal conduct underlying the offense, as set forth in the Information, was admitted to by Mr. Flynn when he entered his guilty pleas in this case. *See, e.g.*, Information, ECF No. 1 at 1-2; Plea Hr'g Tr. (Dec. 1, 2017), ECF No.

16 at 18-19; Sentencing Hr'g Tr. (Dec. 18, 2018), ECF No. 103 at 9-10. The Information, which was filed on November 30, 2017, charged Mr. Flynn with one count of willfully and knowingly making materially false statements to the Federal Bureau of Investigation ("FBI"), in violation of 18 U.S.C. § 1001(a)(2), during his interview with two FBI agents on January 24, 2017 in the White House. *See* Information, ECF No. 1 at 1-2; *see also* Sentencing Hr'g Tr., ECF No. 103 at 32. Under oath and with the advice of counsel, Mr. Flynn pled guilty to the crime on December 1, 2017. Plea Hr'g **\*121** Tr., ECF No. 16 at 30-31; *see also* Plea Agreement, ECF No. 3 at 10.

According to the record evidence in this case, on July 31, 2016, the FBI opened an investigation, code-named "Crossfire Hurricane," into the Russian Federation's ("Russia") efforts to interfere in the 2016 election, which included determining the existence of any links between Russia and individuals associated with the Trump campaign. SOF, ECF No. 4 at 1 ¶ 1.[2] Among other things, the Crossfire Hurricane investigation set out to determine who, if anyone, from the campaign may have "been in a position to have received the alleged offer of assistance from Russia." Ex. 1 to Amicus Br., ECF No. 225-1 at 13.

Against this backdrop, and "as part of the larger Crossfire Hurricane umbrella," the FBI launched an investigation into Mr. Flynn on August 16, 2016, in order to determine whether he was "being directed and controlled by and/or coordinating activities with the Russian Federation in a manner which may be a threat to the national security and/or possibly a violation of the Foreign Agents Registration Act, [18 U.S.C. § 951 et seq.], or other related statutes." *See* Ex. 2 to Gov't's Mot. Dismiss, ECF No. 198-3 at 2-3. The communication describing the opening of the investigation into Mr. Flynn, code-named "Crossfire Razor," noted that: (1) Mr. Flynn was "an adviser to the Trump team on foreign policy issues"; (2) he had "ties to various state-affiliated entities of the Russian Federation"; (3) he had "traveled to Russia in December 2014"; and (4) he had "an active TS/SCI clearance." *Id.* At some point prior to January 4, 2017, though, the FBI drafted a "Closing Communication" to close the case, noting that certain investigative steps had yielded "no derogatory information" on Mr. Flynn and that the "FBI is closing this investigation." *See* Ex. 1 to Gov't's Mot. Dismiss, ECF No. 198-2 at 2, 5. The document also stated: "If new information is identified or reported to the FBI regarding the activities of CROSSFIRE RAZOR, the FBI will consider reopening the investigation if warranted." *Id.* at 5. Despite the written

communication, the case was not closed at that time. *See* Gov't's Mot. Dismiss, ECF No. 198 at 4.

On December 21, 2016, Egypt introduced a resolution to the United Nations ("U.N.") Security Council regarding Israeli settlements, and the vote on the resolution was scheduled for December 22, 2016. SOF, ECF No. 4 at 4 ¶ 4. On December 29, 2016, then-President Barack H. Obama imposed sanctions on Russia for its interference in the 2016 presidential election. *See id.* at 2 ¶ 3(a). Before the President-Elect was sworn into office and prior to the closing of Crossfire Razor, Mr. Flynn **\*122** engaged in conversations with the then-Russian Ambassador between December 22, 2016 and December 31, 2016. *Id.* at 2-5 ¶¶ 3-4. Based on these communications, the FBI continued its investigation into Mr. Flynn and did not close the investigation of him. *See* Gov't's Mot. Dismiss, ECF No. 198 at 4-7.

As the investigation continued, Mr. Flynn made a series of materially false statements to FBI investigators during an interview at the White House on January 24, 2017 about his conversations with the Russian Ambassador. SOF, ECF No. 4 at 1-2 ¶ 2 (stating that "[Mr.] FLYNN's false statements and omissions impeded and otherwise had a material impact on the FBI's ongoing investigation into the existence of any links or coordination between individuals associated with the [Trump] Campaign and Russia's efforts to interfere with the 2016 presidential election"); *see id.* at 2-5 ¶¶ 3-4; *see also* Information, ECF No. 1 at 1-2. Mr. Flynn admitted to lying to the FBI about his request on or about December 29, 2016 to the Russian Ambassador that Russia refrain from escalating the situation in response to the sanctions imposed by the United States against Russia, and about the Russian Ambassador telling Mr. Flynn that Russia decided to moderate its response to the sanctions. SOF, ECF No. 4 at 2-3 ¶ 3. In addition, Mr. Flynn admitted to making false statements to the FBI about his request on or about December 22, 2016 to the Russian Ambassador that Russia vote against or delay Egypt's resolution to the U.N. Security Council, that the Russian Ambassador never described to Mr. Flynn Russia's response to his request, that Mr. Flynn did not request certain countries to take a particular position on the resolution, and that Mr. Flynn only asked the countries for their respective positions on the vote. *Id.* at 4-5 ¶ 4.

Separately, Mr. Flynn also admitted to making false statements in the documents that he submitted to the United States Department of Justice on March 7, 2017 under the Foreign Agents Registration Act, 22 U.S.C. §§ 611–621

("FARA"). *Id.* at 5 ¶ 5; *see also* Addendum to Gov't Mem. in Aid of Sentencing, ECF No. 75 at 3 (stating that "[Mr. Flynn] stipulated and agreed that he violated FARA by making materially false statements" in the FARA filings). Those FARA filings concerned a project that Mr. Flynn and his company, Flynn Intel Group, Inc. ("FIG"), performed on behalf of the Republic of Turkey. SOF, ECF No. 4 at 5 ¶ 5. Mr. Flynn, however, was not charged with any FARA violations. *See* Information, ECF No. 1 at 1; *see also* Status Hr'g Tr. (Sept. 10, 2019), ECF No. 114 at 20. For purposes of sentencing, Mr. Flynn did not dispute the relevance of the FARA references in the government's description of the nature and circumstances of his offense. *See* Gov't Mem. in Aid of Sentencing, ECF No. 46 at 3-5; *see also* Def.'s Mem. in Aid of Sentencing, ECF No. 50 at 12. Indeed, the government confirmed that Mr. Flynn could have been charged with making false statements in the FARA filings. Sentencing Hr'g Tr., ECF No. 103 at 28. Under the terms of the Plea Agreement, the government agreed not to further prosecute Mr. Flynn for the criminal conduct described in the SOF. Plea Agreement, ECF No. 3 at 2 ¶ 3. In the final analysis, the government did not charge Mr. Flynn with violating the Logan Act, 18 U.S.C. § 953, or with being a foreign agent. *See* Information, ECF No. 1 at 1.

### B. Mr. Flynn's Guilty Pleas And Subsequent Motion To Withdraw His Guilty Plea

On November 30, 2017, Mr. Flynn entered into a plea agreement with the government upon the advice of counsel. *See* **\*123** Plea Agreement, ECF No. 3 at 10. Judge Rudolph Contreras accepted Mr. Flynn's guilty plea on December 1, 2017, finding that Mr. Flynn entered the plea knowingly, voluntarily, and intelligently with the advice of counsel. Plea Hr'g Tr., ECF No. 16 at 4, 30-31.

On December 7, 2017, this case was randomly reassigned to this Court. *See generally* Docket for Crim. Action No. 17-232. On December 18, 2018, this Court accepted Mr. Flynn's guilty plea a second time. Sentencing Hr'g Tr., ECF No. 103 at 5, 16. During that hearing, the Court extended the plea colloquy in view of Mr. Flynn's statements in his sentencing memorandum, which raised questions as to whether Mr. Flynn sought to challenge the conditions of the FBI interview. *See generally* Def.'s Mem. in Aid of Sentencing, ECF No. 50 at 6-18. Under oath, Mr. Flynn confirmed that his rights were not violated as a result of the circumstances of his January 24, 2017 FBI interview and the allegations of misconduct against FBI officials. *Id.* at 11-12. And Mr. Flynn declined the Court's invitation for the appointment of independent counsel to advise him. *Id.* at 9-10.

Noting that the Court's usual practice is to impose a sentence only after the completion of a defendant's cooperation, the Court granted Mr. Flynn's request to continue the sentencing hearing to allow him to further cooperate with the government after considering defense counsel's representations that Mr. Flynn was prepared to continue his cooperation in the criminal case in the Eastern District of Virginia. *Id.* at 47-48. The trial in that case was scheduled to begin in July 2019. *See* Joint Status Report, ECF No. 71 at 1; *see also* Status Hr'g Tr. (June 24, 2019), ECF No. 94 at 5-6. In June 2019, Mr. Flynn retained new counsel. *See* Min. Order (June 14, 2019). Mr. Flynn did not testify at the trial in the Eastern District of Virginia. *See, e.g.*, Min. Order (July 9, 2019); Gov't's Resp. to Order of the Court, ECF No. 97 at 1-2; Def.'s Resp. to Order of the Court, ECF No. 98 at 1-11; Def.'s Suppl. Status Report, ECF No. 121 at 1.

Thereafter, in August 2019 and October 2019, respectively, Mr. Flynn filed motions to compel the production of certain materials pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the Court's Standing *Brady* Order. *See generally* Def.'s Br. in Supp. of Def.'s Mot. to Compel Produc. of *Brady* Material & Mot. for Order to Show Cause, ECF No. 109; Def.'s Redacted Mot. to Compel & Mot. for Order to Show Cause, ECF No. 111; Def.'s Sealed Mot. to Compel Produc. of *Brady* Material, ECF No. 112; Def.'s Suppl., ECF No. 116; Def.'s Mot. to Compel Newly Discovered *Brady* Evid., ECF No. 124. In these motions, Mr. Flynn asserted his innocence for the first time in this case, alleged prosecutorial misconduct, and sought dismissal. In December 2019, the Court issued a Memorandum Opinion and separate Order denying Mr. Flynn's *Brady* motions, finding that Mr. Flynn failed to establish a single *Brady* violation, and holding that Mr. Flynn's false statements to the FBI were material within the meaning of 18 U.S.C. § 1001(a) for the purpose of resolving those motions. *See* Order, ECF No. 143; Mem. Op., ECF No. 144 at 53, 92.

As the Court and the parties prepared to proceed with sentencing, in January 2020, Mr. Flynn moved to withdraw his guilty plea. *See* Mot. Withdraw Guilty Plea, ECF No. 151; Suppl. Mot. Withdraw Guilty Plea, ECF No. 160-2. On January 29, 2020, Mr. Flynn filed a motion to dismiss for alleged egregious government misconduct and in the interest of justice. *See* Mot. Dismiss Case Egregious Gov't Misconduct, ECF No. 162. In February **\*124** 2020, the government opposed Mr. Flynn's motion to dismiss, stating that Mr. Flynn "relies on allegations that do not pertain to

his case, that the Court already rejected, and that have no relevance to his false statements to the FBI on January 24, 2017." Gov't Response Def.'s Mot. Dismiss, ECF No. 169 at 11. The government did not file a response to Mr. Flynn's motions to withdraw his guilty pleas due to its incomplete review of Mr. Flynn's former counsel's productions relevant to Mr. Flynn's claims of ineffective assistance of counsel, as well as a dispute between Mr. Flynn and his former counsel. *See* Mot. Continue Briefing, ECF No. 165; *see also* Min. Order (Feb. 10, 2020).

### C. The Government's Motion To Dismiss

On May 7, 2020, the government filed a motion to dismiss the criminal information against Mr. Flynn with prejudice pursuant to Federal Rule of Criminal Procedure 48(a). *See* Gov't's Mot. Dismiss, ECF No. 198 at 12. For the first time in this case, the government claimed that: (1) Mr. Flynn's false statements to the FBI agents were not "material" to any investigation; (2) the government is doubtful that it could prove the falsity of Mr. Flynn's statements; and (3) the government has no "substantial federal interest in penalizing a defendant for a crime that it is not satisfied occurred and that it does not believe it can prove beyond a reasonable doubt." *Id.* at 1-2.

On the same day, and with the consent of the government, Mr. Flynn filed a motion to withdraw all of his pending motions without prejudice. *See id.* at 10 n.3; Michael Flynn's Mot. Withdraw Pending Mots., ECF No. 199. Mr. Flynn also filed a notice of consent to the government's Rule 48(a) motion on May 12, 2020, demanding the immediate dismissal of this case with prejudice. *See* Michael Flynn's Consent Gov't's Mot. Dismiss, ECF No. 202. On May 13, 2020, the Court appointed John Gleeson ("Mr. Gleeson") as amicus curiae to present arguments in opposition to the government's Rule 48(a) motion and to address whether Mr. Flynn should be held in criminal contempt for perjury pursuant to 18 U.S.C. § 401; Federal Rule of Criminal Procedure 42; the Court's inherent authority; and any other applicable statutes, rules, or controlling law.[3] *See* Order Appointing Amicus Curiae, ECF No. 205.[4] On May 19, 2020, the Court set a briefing schedule and scheduled oral argument for July 16, 2020, adding that the order was subject to a motion for reconsideration, for good cause shown. *See* Min. Order (May 19, 2020).[5] Thereafter, Mr. Gleeson filed his brief on June 10, 2020. *See* Amicus Br., **\*125** ECF No. 225. Mr. Flynn filed his response and two supplemental responses, and the government filed its response. *See* Gov't's Reply, ECF No. 227; Mem. Opp'n, ECF

No. 228; Suppl., ECF No. 231; Suppl., ECF No. 237. Mr. Gleeson filed his reply brief on September 11, 2020. *See* Amicus Reply Br., ECF No. 243.

### D. Mr. Flynn's Mandamus Petition

On the same day that the Court set the briefing schedule on the government's motion, Mr. Flynn filed an emergency petition for a writ of mandamus in the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), seeking an order to: (1) direct the Court to grant the government's unopposed Rule 48(a) motion; (2) vacate the Court's Order appointing amicus curiae; and (3) reassign the case to a different district judge for any further proceedings. *See* Pet. Writ Mandamus, *In re Flynn*, No. 20-5143 (D.C. Cir. May 19, 2020). Two days later, the D.C. Circuit ordered this Court to file a response and invited the government, in its discretion, to file a response. *See* Per Curiam Order, *In re Flynn*, No. 20-5143, 2020 WL 5224128 (D.C. Cir. May 21, 2020). The government and this Court filed their responses on June 1, 2020. *See* Judge Sullivan Response, *In re Flynn*, No. 20-5143 (D.C. Cir. June 1, 2020); Gov't's Response, *In re Flynn*, No. 20-5143 (D.C. Cir. June 1, 2020).

On June 24, 2020, a divided panel of the D.C. Circuit granted in part Mr. Flynn's petition and directed the Court to grant the government's unopposed Rule 48(a) motion. *In re Flynn*, 961 F.3d 1215, 1223, 1227 (D.C. Cir. 2020). The panel majority declined to reassign the case to a new judge, *id.* at 1223; and vacated as moot the Order appointing Mr. Gleeson as amicus curiae, *id.* at 1227. The Clerk of Court docketed the June 24, 2020 Order in this case. *See* USCA Order, ECF No. 233.

On July 9, 2020, this Court filed a petition for rehearing en banc, *see* Pet. Reh'g En Banc, *In re Flynn*, No. 20-5143 (D.C. Cir. June 9, 2020); to which both Mr. Flynn and the government filed a response, Flynn Response, *In re Flynn*, No. 20-5143 (D.C. Cir. June 20, 2020); Gov't's Response, *In re Flynn*, No. 20-5143 (D.C. Cir. June 20, 2020).

On July 30, 2020, the D.C. Circuit ordered the case to be heard en banc based on a suggestion of a member of the court, and vacated its June 24, 2020 order. *See* Per Curiam Order, *In re Flynn*, No. 20-5143, 2020 WL 4355389 (D.C. Cir. July 30, 2020); *see also In re Flynn*, 973 F.3d 74, 77 n.1 (D.C. Cir. 2020). Following oral argument, on August 31, 2020, the D.C. Circuit denied Mr. Flynn's petition for a writ of mandamus. The D.C. Circuit, per curiam, denied Mr. Flynn's requests to compel the immediate grant of the government's motion and to vacate the Court's appointment

of amicus because Petitioner had not established that he has "no other adequate means to attain the relief he desires." *In re Flynn*, 973 F.3d at 79. The D.C. Circuit also declined to mandate that the case be reassigned to a different district judge because Mr. Flynn had not established a clear and indisputable right to reassignment. *Id.* at 78, 82. The D.C. Circuit further held that the case is not moot. *Id.* at 78 n.2.

### E. Resumption Of Hearing On The Government's Motion To Dismiss

Following the D.C. Circuit's denial of Mr. Flynn's mandamus petition and pursuant to this Court's September 1, 2020 Minute Order, the parties filed a joint status report proposing deadlines for further briefing on the government's Rule 48(a) motion, as well as proposed dates for a **\*126** hearing on the motion. *See* Joint Status Report, ECF No. 238. The parties also agreed that the Court need not wait until the D.C. Circuit's Order denying mandamus relief became effective on September 21, 2020 — 21 days after its issuance, pursuant to Circuit Rule 41(a)(3) — to proceed with briefing. *Id.* at 2.

In accordance with the parties' proposed hearing date and briefing schedule, which the Court granted, *see* Min. Order (Sept. 4, 2020), Mr. Gleeson filed his reply brief on September 11, 2020, *see* Amicus Reply Br., ECF No. 243. The government filed a supplement, *see* Gov't's Suppl., ECF No. 249; and Mr. Flynn filed three supplements, *see* Suppl., ECF No. 248; Suppl., ECF No. 251; Suppl., ECF No. 257. The Court heard oral argument on the government's Rule 48(a) motion on September 29, 2020. Following the motion hearing, Mr. Flynn filed a supplement in support of the government's Rule 48(a) motion, *see* Suppl., ECF No. 264; and Mr. Gleeson filed a supplement to his briefing, *see* Amicus Suppl., ECF No. 265. Mr. Flynn also filed a motion for recusal and other relief. *See* Mot. for Recusal, ECF No. 261. In that motion Mr. Flynn requested, among other things, that the Court grant the government's motion to dismiss pursuant to Rule 48(a) and that, upon dismissal of the case, the Court recuse itself from further proceedings. After the Court dismisses the case as moot pursuant to the presidential pardon, the Court will deny the motion for recusal as moot.

### F. The President Pardons Mr. Flynn

**[1]**  On November 25, 2020, President Trump granted Mr. Flynn a "full and unconditional pardon" for: (1) "the charge of making false statements to Federal investigators," in violation of 18 U.S.C. § 1001, as charged in the Information in this case; (2) "any and all possible offenses arising from the facts set forth in the Information and Statement of Offense" filed in this case "or that might arise, or be charged, claimed, or asserted, in connection with the proceedings" in this case; (3) "any and all possible offenses within the investigatory authority or jurisdiction of the Special Counsel appointed on May 17, 2017, including the initial Appointment Order No. 3915-2017 and subsequent memoranda regarding the Special Counsel's investigatory authority"; and (4) "any and all possible offenses arising out of facts and circumstances known to, identified by, or in any manner related to the investigation of the Special Counsel, including, but not limited to, any grand jury proceedings" in this District or in the United States District Court for the Eastern District of Virginia. Ex. 1 to Consent Mot. Dismiss, ECF No. 308-1 at 1; *see also* Donald Trump (@realDonaldTrump), Twitter (Nov. 25, 2020, 4:08 PM), https://twitter.com/realDonaldTrump/status/1331706255221228608.[6]

Mr. Flynn accepted the pardon, and Mr. Flynn and the government subsequently moved to dismiss this case as moot. *See* Consent Mot. Dismiss, ECF No. 308 at 2.

## II. Legal Standards And Analyses

### A. Federal Rule Of Criminal Procedure Rule 48(a)

### 1. The Court Has Discretion To Review The Unopposed Rule 48(a) Motion

**[2]**     **[3]**     **[4]**  Rule 48(a) provides that the "government may, with leave of court, dismiss **\*127** an indictment, information, or complaint." Fed. R. Crim. P. 48(a). Based on its terms, the "leave of court" requirement "obviously vest[s] some discretion in the court." *Rinaldi v. United States*, 434 U.S. 22, 29 n.15, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977). As the D.C. Circuit has recognized, the "requirement of judicial leave ... gives the court a role in dismissals following indictment." *United States v. Ammidown*, 497 F.2d 615, 620-21 (D.C. Cir. 1973). The government, however, casts doubt on the authority of courts to review a Rule 48(a) motion to dismiss when the defendant in the case does not oppose the motion. The government argues that the rule "ordinarily allows a court to review a motion to dismiss only to protect the interests of the defendant." Gov't's Reply, ECF No. 227 at 17. Yet the text and history of Rule 48(a), as well as precedent in this and other circuits, demonstrate that courts have the authority to review unopposed Rule 48(a) motions as well.

"[T]he history of the Rule belies the notion that its only scope and purpose is the protection of the defendant." *United States v. Cowan*, 524 F.2d 504, 512 (5th Cir. 1975). Before Rule 48(a)'s passage in 1944, "federal prosecutors wielded the power to drop criminal charges," or enter a nolle prosequi, "at will." *See* Thomas Ward Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?*, 73 Stan. L. Rev. Online 28, 30 (2020). However, the perception that prosecutors were seeking dismissals for politically well-connected defendants led some judges to "feel complicit in dealings they deemed corrupt." *Id.*; *see, e.g., United States v. Woody*, 2 F.2d 262, 262-63 (D. Mont. 1924) (finding that the prosecution had moved to dismiss the case for reasons that "savor[ed] altogether too much of some variety of prestige and influence (family, friends, or money) that too often enables their possessors to violate the laws with impunity; whereas persons lacking them must suffer all the penalties," but "reluctantly" dismissing the case because leave of court was not required).

In 1941, the Supreme Court appointed an Advisory Committee to create rules of criminal procedure, and the Committee took into consideration such concerns. Frampton, *Why Do Rule 48(a) Dismissals Require "Leave of Court"?, supra,* at 31-32. As originally proposed by the Advisory Committee, Rule 48(a) allowed a prosecutor to dismiss without leave of court but required that the prosecutor state reasons for seeking dismissal. *Id.* at 34. The Supreme Court, in response to the draft rule, pointed out that the proposed "rule apparently gives the Attorney General or the United States Attorney unqualified authority to nolle pros a case without consent of the court," inquiring "[i]s this now the law, and in any event should it be the law, any more than that the Government can confess error in a criminal case without the consent of the court?" *Id.* at 34-35; *see also Cowan*, 524 F.2d at 510. The Supreme Court, in its note, directed the Committee's attention to *Young v. United States*, 315 U.S. 257, 62 S.Ct. 510, 86 L.Ed. 832 (1942), which held that the fact that a prosecutor confesses error in a case "does not relieve th[e] Court of the performance of the judicial function." 315 U.S. at 258, 62 S.Ct. 510. In the opinion, the Supreme Court explained that "[t]he public interest that a result be reached which promotes a well-ordered society is foremost in every criminal proceeding. The interest is entrusted to our consideration and protection as well as that of the enforcing officers." *Id.* at 259, 62 S.Ct. 510.

Despite the Supreme Court's concerns, the Advisory Committee's final draft of Rule 48(a) again required only that prosecutors submit a statement of reasons for dismissal. *See* Frampton, *Why Do* **\*128** *Rule 48(a) Dismissals Require "Leave of Court"?, supra,* at 36-37. However, in promulgating the rule, the Supreme Court deleted this requirement and added the requirement that the prosecutor obtain leave of court. *Id.* at 37; *see also Ammidown*, 497 F.2d at 620. In so doing, the Court made it "manifestly clear that [it] intended to clothe the federal courts with a discretion broad enough to protect the public interest in the fair administration of criminal justice." *Cowan*, 524 F.2d at 512.

This Circuit's precedent is consistent with this history. For example, in *Ammidown*, the D.C. Circuit acknowledged that Rule 48(a) "gives the court a role" when "the defendant concurs in the dismissal but the court is concerned whether the action sufficiently protects the public." 497 F.2d at 620. The D.C. Circuit explained that courts carry out this role in such a situation "to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors." *Id.* (citation omitted). Despite this language in *Ammidown*, however, the government relies on *United States v. Fokker Services B.V.*, 818 F.3d 733 (D.C. Cir. 2016), to argue that judicial intervention is warranted only when the defendant objects to dismissal because "the 'principal object of the leave of court requirement' has been understood to be a narrow one—'to protect a defendant against prosecutorial harassment.'" Gov't's Reply, ECF No. 227 at 20-21 (quoting *Fokker*, 818 F.3d at 742).

But *Fokker* does not address the Court's authority to consider an unopposed Rule 48(a) motion; it involved a deferred prosecution agreement rather than a guilty plea. *Fokker*, 818 F.3d at 737. *Fokker* also does not suggest that courts may *only* review opposed Rule 48(a) motions for prosecutorial harassment—the case simply quotes language from *Rinaldi*, stating that preventing harassment is the *principal* object of the rule. *Id.* at 742 (quoting *Rinaldi*, 434 U.S. at 29 n.15, 98 S.Ct. 81).

Furthermore, the Court's authority to consider the unopposed Rule 48(a) motion here is not contrary to the Supreme Court's decision in *Rinaldi*. In *Rinaldi*, the Court reviewed an agreement between the defendant and government to dismiss an indictment based on the government's violation of a federal policy precluding multiple prosecutions for the same act. 434 U.S. at 24-25, 98 S.Ct. 81. The Supreme Court, in a footnote, stated:

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

The words "leave of court" were inserted in Rule 48(a) without explanation. While they obviously vest some discretion in the court, the circumstances in which that discretion may properly be exercised have not been delineated by this Court. The principal object of the "leave of court" requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection.... But the Rule has also been held to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest. *See United States v. Cowan*, 524 F.2d 504 (CA5 1975); *United States v. Ammidown*, 162 U.S. App. D.C. 28, 33, 497 F.2d 615, 620 (1973). It is unnecessary to decide whether the court has discretion under these circumstances, since, even assuming it does, the result in this case remains the same.

*Id.* at 29 n.15, 98 S.Ct. 81. Significantly, the *Rinaldi* court thus left this question open, while also recognizing that courts, including the D.C. Circuit, have reviewed unopposed Rule 48(a) motions. *Id.*; *see also Ammidown*, 497 F.2d at 620 (noting that the "primary concern, at least as discerned **\*129** by subsequent decisions of other federal courts, was that of protecting a defendant from harassment," but nonetheless finding that the court has a role in reviewing unopposed Rule 48(a) motions).

At the September 29, 2020 motion hearing, the government emphasized a different aspect of its argument. It conceded that the Court should not act as a rubber stamp and that it has a role to play when presented with an unopposed Rule 48(a) motion. Hr'g Tr., ECF No. 266 at 40:9-12. But, in the government's view, this role is limited to determining whether "the decision to dismiss is the considered view, the authoritative view of the Executive Branch as a whole," *id.*; rather being the "rogue" decision of an individual prosecutor, *id.* at 99:16-23.[7] The government argued that this standard appropriately reconciles the concerns about favoritism and pretext that led to the "leave of court" language in the Rule with the separation of powers principal that "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (citation omitted); *see also Fokker*, 818 F.3d at 742 ("[D]ecisions to dismiss pending charges ... lie squarely within the ken of prosecutorial discretion."). The Court is not persuaded by the government's argument, however, because it

fails to acknowledge the possibility that the "considered view of the Executive Branch as a whole" could be contrary to the public interest.

Accordingly, the Court is persuaded that it has discretion to consider the unopposed Rule 48(a) motion before it.

## 2. The Court May Review Rule 48(a) Motions For Deficient Reasoning Or Prosecutorial Abuse

**[5]** While courts have a role in considering Rule 48(a) motions, they are limited to narrow circumstances in which they may exercise their discretion in denying leave to dismiss. *See Fokker*, 818 F.3d at 742. After all, "decisions to dismiss pending criminal charges ... lie squarely within the ken of prosecutorial discretion" and "at the core of the Executive's duty to see to the faithful execution of the laws." *Id.* at 741-42 (citations omitted). But, as explained above, this Circuit's precedent does not hold that Rule 48(a) confers unqualified power or discretion on the Executive Branch. *See id.* at 741-42 (explaining that the "presumption of regularity" applies to prosecutorial decisions only in the "absence of clear evidence to the contrary"); *see also Cowan*, 524 F.2d at 513 (stating that the "leave of court" phrase "was intended to modify and condition the absolute power of the Executive, consistently with the Framer's concept of Separation of Powers, by erecting a check on the abuse of Executive prerogatives").

**[6]   [7]   [8]** Instead, consistent with our system of checks and balances, courts are tasked with making their own determination on whether dismissal would be in the "public interest," *Rinaldi*, 434 U.S. at 29 n.15, 98 S.Ct. 81; in order to uphold the "crucial" responsibility of "maintaining **\*130** [the] public perception of fairness and integrity in the justice system," *Rosales-Mireles v. United States*, —— U.S. ——, 138 S. Ct. 1897, 1907, 201 L.Ed.2d 376 (2018); *see also Mistretta v. United States*, 488 U.S. 361, 407, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship."). The court's role is not "to serve merely as a rubber stamp for the prosecutor's decision," even when "the defendant concurs in the dismissal." *Ammidown*, 497 F.2d at 620, 622. Rather, it is the court's "duty to exercise a discretion for the protection of the public interest." *Cowan*, 524 F.2d at 511. The trial court therefore conducts an "examination of the record" to ensure that the government's "efforts to terminate the prosecution [are not] tainted with impropriety." *Rinaldi*, 434 U.S. at 30, 98 S.Ct. 81.

**[9]** With the above principles in mind, in response to the government's motion to dismiss under Rule 48(a), the Court holds that a judge may deny an unopposed Rule 48(a) motion if, after an examination of the record, (1) she is not "satisfied that the reasons advanced for the proposed dismissal are substantial"; or (2) she finds that the prosecutor has otherwise "abused his discretion." *Ammidown*, 497 F.2d at 620-22.

**[10]** **[11]** First, in exercising its role pursuant to Rule 48(a), "the court will not be content with a mere conclusory statement by the prosecutor that dismissal is in the public interest, but will require a statement of reasons and the underlying factual basis." *Id.* at 620. Rule 48(a) "contemplates exposure of the reasons for dismissal 'in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors,' and in pursuance of this purpose 'to gain the Court's favorable discretion, it should be satisfied that the reasons advanced for the proposed dismissal are substantial.' " *Id.* "Thus, to honor the purpose of the rule, the trial court at the very least must know the prosecutor's reasons for seeking to dismiss the indictment and the facts underlying the prosecutor's decision." *United States v. Derr*, 726 F.2d 617, 619 (10th Cir. 1984); *see also United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 486 (S.D.N.Y. 1964) ("[T]o gain the Court's favorable discretion, it should be satisfied that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based.").

**[12]** **[13]** **[14]** **[15]** Second, a court may deny a Rule 48(a) motion upon a finding of abuse of prosecutorial discretion where dismissal would be "contrary to the public interest." *See In re Richards*, 213 F.3d 773, 787 (3d Cir. 2000). In conducting this analysis, the court determines whether the government's "efforts to terminate the prosecution [are] tainted with impropriety." *Rinaldi*, 434 U.S. at 30, 98 S.Ct. 81. However, courts must be mindful not to "second-guess the underlying charging decisions" or "impose [their] own views about the adequacy of the underlying criminal charges" because "their conception of the public interest differs from that of the prosecuting attorney." *Fokker*, 818 F.3d at 744-45 (citations omitted). Examples of prosecutorial impropriety would include where dismissal "does not serve due and legitimate prosecutorial interests," *Ammidown*, 497 F.2d at 622; where dismissal "was a sham or a deception," *Cowan*, 524 F.2d at 514; and where the prosecutor's dismissal was based on "acceptance of a bribe, personal dislike of the victim, and dissatisfaction with the jury impaneled," *United States*

*v. Smith*, 55 F.3d 157, 159 (4th Cir. 1995). In addition, as indicated by the history of Rule 48(a), the corrupt dismissal **\*131** of politically well-connected individuals would also constitute an abuse of discretion. *See Woody*, 2 F.2d at 262.

**3. Whether To Deny Leave In This Case Is A Close Question, But Is Mooted By Mr. Flynn's Acceptance Of The President's Pardon**

**[16]** As an initial matter, the Court does not find that the government's submission is a mere conclusory statement of the reasons for dismissal, and so denial of leave would not be warranted on this ground. The majority of the cases finding denial of leave appropriate based on "conclusory statements" most often involve motions providing only one or two sentences referring generally to the "public interest." *See, e.g., Derr*, 726 F.2d at 619 (affirming denial of leave to dismiss when the government offered no reasons for dismissal other than that it would "best meet the ends of justice"). Here, on the other hand, the government has sought to justify its decision to seek dismissal by providing several reasons and facts underlying its decision. *See id.*

However, while not conclusory, many of the government's reasons for why it has decided to reverse course and seek dismissal in this case appear pretextual, particularly in view of the surrounding circumstances. For example, Mr. Flynn was serving as an adviser to President Trump's transition team during the events that gave rise to the conviction here, and, as this case has progressed, President Trump has not hidden the extent of his interest in this case. According to Mr. Gleeson, between March 2017 and June 2020, President Trump tweeted or retweeted about Mr. Flynn "at least 100 times." Amicus Br., ECF No. 225 at 66. This commentary "has made clear that the President has been closely following the proceedings, is personally invested in ensuring that [Mr.] Flynn's prosecution ends, and has deep animosity toward those who investigated and prosecuted [Mr.] Flynn." *Id.*

At the September 29, 2020 motion hearing, Mr. Flynn's counsel, in response to the Court's question, stated that she had, within weeks of the proceeding, provided the President with a brief update on the status of the litigation. Hr'g Tr., ECF No. 266 at 56:18-20. Counsel further stated that she requested that the President not issue a pardon. *Id.* at 56:23-24. However, the President has now pardoned Mr. Flynn for the actions that instigated this case, among other things. Ex. 1 to Consent Mot. Dismiss, ECF No. 308-1 at 1.

And simultaneous to the President's "running commentary," many of the President's remarks have also been viewed as suggesting a breakdown in the "traditional independence of the Justice Department from the President." *See, e.g.*, Amicus Br., ECF No. 225 at 67-68; *id.* at 68 (quoting *Excerpts from Trump's Interview with the Times*, N.Y. Times (Dec. 28, 2017), https://www.nytimes.com/2017/12/28/us/politics/trump-interview-excerpts.html) (reporting President Trump's statement that he enjoys the "absolute right to do what I want to do with the Justice Department").

Given this context, the new legal positions the government took in its Rule 48(a) motion and at the motion hearing raise questions regarding its motives in moving to dismiss. The government advances two primary reasons[8] justifying dismissing the **\*132** case based on its assessment of the strength of the case: (1) it would be difficult to prove the materiality of Mr. Flynn's false statements beyond a reasonable doubt; and (2) it would be difficult to prove the falsity of those statements beyond a reasonable doubt. *See* Gov't's Reply, ECF No. 227 at 31. As explained below, the Court finds both stated rationales dubious to say the least, arguably overcoming the strong presumption of regularity that usually attaches to prosecutorial decisions.

**a. Materiality**

The government's first rationale is that it believes that Mr. Flynn's false "statements were not 'material' to any viable counterintelligence investigation—or any investigation for that matter—initiated by the FBI." Gov't's Mot. Dismiss, ECF No. 198 at 13; *see also* Gov't's Reply, ECF No. 227 at 34-35. In making its arguments, however, the government relies on a newly-minted definition of "materiality" that is more circumscribed than the standard in this Circuit. The government describes the materiality threshold as requiring more than "mere 'relevance' "; rather, the false statement must have "probative weight" and be "reasonably likely to influence the tribunal in making a determination *required to be made.*" Gov't's Mot. Dismiss, ECF No. 198 at 12-13 (quoting *Weinstock v. United States*, 231 F.2d 699, 701 (D.C. Cir. 1956)). Therefore, "[t]he materiality threshold thus ensures that misstatements to investigators are criminalized only when linked to the particular 'subject of [their] investigation.' " *Id.* at 13 (quoting *United States v. Kim*, 808 F. Supp. 2d 44, 59 (D.D.C. 2011)).

**[17]  [18]  [19]  [20]**  However, that is not the law. Rather, "[a] lie influencing the possibility that an investigation might commence stands in no better posture under § 1001 than a lie distorting an investigation already in progress." *See United States v. Hansen*, 772 F.2d 940, 949-50 (D.C. Cir. 1985) ("Application of § 1001 does not require judges to function as amateur sleuths, inquiring whether information specifically requested and unquestionably relevant to the department's or agency's charge would really be enough to alert a reasonably clever investigator that wrongdoing was afoot."). Instead, the standard asks only whether Mr. Flynn's statements were "capable of affecting" the "general function" of the FBI when it interviewed him. *United States v. Verrusio*, 762 F.3d 1, 21 (D.C. Cir. 2014). As the D.C. Circuit held in *United States v. Moore*, 612 F.3d 698 (D.C. Cir. 2010), "a statement is material if it has a natural tendency to influence, or is capable of influencing, either a discrete decision *or any other function of the agency to which it was addressed.*" 612 F.3d at 701 (emphasis added); *see also United States v. Rodgers*, 466 U.S. 475, 479, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984) (calling the application of 18 U.S.C. § 1001 "sweeping"). "Proof of actual reliance on the statement is not required; the Government need only make a reasonable showing of its potential effects." *United States v. Diggs*, 613 F.2d 988, 999 (D.C. Cir. 1979); *see Moore*, 612 F.3d at 702 (holding that defendant's false statement "was capable of affecting the Postal Service's general function of tracking packages and identifying the recipients of packages entrusted to it" and defendant's false information "could have impeded the ability of the Postal Service to investigate the trafficking of narcotics through the mails").

Given the materiality threshold's expansive scope, the government's new use of the narrowed definition of "materiality" is perplexing, particularly given that the government has previously argued in this case that the materiality standard required only that a statement have a "natural tendency to influence, or [be] capable of influencing." **\*133** *See* Gov't's Surreply Def.'s Reply Support Mot. Compel, ECF No. 132 at 10-11. The government, for its part, offers no response as to why it relies on this new, more stringent definition. Nor does the government direct the Court's attention to any other case in which it has advanced this highly-constrained interpretation of materiality as applied to a false statements case.

Notably, during the September 29, 2020 motion hearing, the government seemed to suggest that, when moving for dismissal of an action pursuant to Rule 48(a), the government

need not refer to the correct materiality standard at all when determining whether a false statement is "material." *See* Hr'g Tr., ECF No. 266 at 78:21-79:3 ("[W]hen we move to dismiss, the question in our mind is not what is the legal standard of materiality for whether the evidence here will be sufficient to sustain a conviction on appeal. The question is whether we, the Department of Justice, think this evidence is material ...."). In view of the government's previous argument in this case that Mr. Flynn's false statements were "absolutely material" because his false statements "went to the heart" of the FBI's investigation, the government's about-face, without explanation, raises concerns about the regularity of its decision-making process.

 [21]  Furthermore, Rule 48(a)'s "leave of court" standard requires the court to consider the objective reasonableness of the government's justification for seeking dismissal. Where, as here, the government justifies its motion by ignoring applicable law to now question the strength of its case, substantial doubt arises about the government's stated reasons for seeking dismissal.

Several of the government's arguments regarding materiality also appear to be irrelevant or to directly contradict previous statements the government has made in this case. For example, as Mr. Gleeson points out, many of the "bureaucratic formalities" the government asserts reveal the "confusion and disagreement about the purpose and legitimacy of the interview and its investigative basis"—such as the drafting of the FBI's Closing Communication or internal conversations between FBI and Department of Justice officials regarding whether to notify the Trump administration of Mr. Flynn's false statements—are not relevant to proving materiality. *See* Amicus Reply Br., ECF No. 243 at 19. Nor is it relevant whether Mr. Flynn was an "agent of Russia" or guilty of some other crime at the time he made the false statements. Furthermore, while the government argues that, "since the time of [Mr. Flynn's guilty] plea, extensive impeaching materials had emerged about key witnesses the government would need to prove its case," Gov't's Reply, ECF No. 227 at 35; the government had been aware of much of this evidence since early on in the case, *see, e.g.*, Gov't's Response Def.'s Mot. Compel, ECF No. 122 at 8-9. Under *Ammidown*, the Court must be satisfied that the government undertook a "considered judgment," 497 F.2d at 620; and asserting a factual basis that is largely irrelevant to meeting any legal threshold likely does not meet this standard.

### b. Falsity

The government's second rationale is that it "does not believe it could prove that Mr. Flynn knowingly and willfully made a false statement beyond a reasonable doubt." Gov't's Mot. Dismiss, ECF No. 198 at 18; *see also* Gov't's Reply, ECF No. 227 at 38-39. To support this rationale, the government initially pointed to the fact, which was known at the time Mr. Flynn pled guilty, that the FBI agents who interviewed him did not think he was lying, and it also noted the "equivocal" or "indirect"  **\*134**  nature of Mr. Flynn's responses. Gov't's Mot. Dismiss, ECF No. 198 at 18. The government further contends that evidentiary problems have "emerged" including: (1) "inconsistent FBI records as to the actual questions and statements made," *id.* at 19; (2) "Director [James] Comey's own sentiment that the case was a 'close one,' " *id.* (quoting Ex. 5 to Gov't's Mot. Dismiss, ECF No. 198); and (3) "substantial impeaching materials on the key witnesses,"[9] Gov't's Reply, ECF No. 227 at 39. At the September 29, 2020 motion hearing, the government raised two more points: (4) evidence that Mr. Flynn had a faulty memory, Hr'g Tr., ECF No. 266 at 44:8, 155:5**;** and (5) the notes of the FBI's Assistant Director for Counter Intelligence as to the FBI interview's goal, *id.* at 83:11-20.

 [22]   [23]  The Court is mindful that it is "particularly ill-suited" to reviewing the strength of the case. *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *see also In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) (finding that the trial court's belief that "the evidence was strong and conviction extremely likely" was an inappropriate basis to deny leave). That said, the role of the Court is to conduct an "examination of the record" in order to ensure that the government's "efforts to terminate the prosecution [are not] tainted with impropriety." *Rinaldi*, 434 U.S. at 30, 98 S.Ct. 81. Moreover, the Court examines the factual basis underlying the government's reasons because not doing so would amount to rubber stamping the government's decision, contrary to the requirement of Rule 48(a). Here, the government has invited the Court's examination of its evidence. *See* Hr'g Tr., ECF No. 266 at 42:22-43:1 (stating that "we're completely unafraid here to address ... the specifics as to why we thought we needed to dismiss this case.... we'd be happy to go through the evidence."). Accordingly, the Court will briefly address some of the evidence the government points to as it is troubled by the apparently pretextual nature of certain aspects of the government's ever-evolving justifications. *See Foster v. Chatman*, 578 U.S.

488, 136 S. Ct. 1737, 1751, 195 L.Ed.2d 1 (2016) ("[T]he prosecution's principal reasons for the strike shifted over time, suggesting that those reasons may be pretextual.").

As an initial matter, whether or not the FBI agents thought Mr. Flynn was lying is irrelevant in a false statements case. *See Brogan v. United States*, 522 U.S. 398, 402, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998). And the government has not explained how evidence that the government previously stated was "consistent and clear," Gov't's Surreply, ECF No. 132 at 4-5; suddenly became "equivocal" or "indirect." With regard to the "inconsistent records" rationale, the government has not pointed to evidence in the record in this case that contradicts the FD-302 that memorialized the FBI agents' interview with Mr. Flynn. Furthermore, the government's reliance on Director Comey's opinion about whether Mr. Flynn lied is suspect given that Director Comey was not present at the interview and that there are valid questions regarding the admissibility of his personal opinion.

With regard to Mr. Flynn's alleged "faulty memory," Mr. Flynn is not just anyone; he was the National Security Advisor to the President, clearly in a position of trust, who claimed that he forgot, within less than a month, that he personally asked for a favor from the Russian Ambassador that undermined the policy of the sitting President prior to the President-Elect taking office. With regard to the **\*135** government's concerns about the Assistant Director for Counter Intelligence's contemplating the goal of the interview, an objective interpretation of the notes in their entirety does not call into question the legitimacy of the interview. Finally, and critically, under the terms of Mr. Flynn's cooperation agreement, the government could have used his admissions at trial, *see* Plea Agreement, ECF No. 3 at 8 ¶ 11; but the government ignores this powerful evidence. Again, under *Ammidown*, the Court must be satisfied that the government undertook a "considered judgment." 497 F.2d at 620. Asserting factual bases that are irrelevant to the legal standard, failing to explain the government's disavowal of evidence in the record in this case, citing evidence that lacks probative value, failing to take into account the nature of Mr. Flynn's position and his responsibilities, and failing to address powerful evidence available to the government likely do not meet this standard.

 **[24]**  Thus, the application of Rule 48(a) to the facts of this case presents a close question. However, in view of the President's decision to pardon Mr. Flynn, Mr. Flynn's acceptance of the pardon, and for the reasons stated in the following section, the appropriate resolution is to deny as moot the government's motion to dismiss pursuant to Rule 48(a).

### B. The Presidential Pardon Power

Article II, Section 2, of the United States Constitution provides that "[t]he President ... shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." U.S. Const. Art. II, § 2, cl. 1. Though the Constitution confers the pardoning power on the President generally, it is well-established that "the judiciary has served as the supreme interpreter of the scope of the constitutional powers since *Marbury v. Madison*." *See* William F. Duker, *The President's Power to Pardon: A Constitutional History*, 18 Wm. & Mary L. Rev. 475, 506 (1977); *see also Marbury v. Madison*, 5 U.S. 137, 177, 1 Cranch 137, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Thus, the Court looks to precedent to determine the validity of presidential pardons.

Beginning with *Marbury*, the Supreme Court has long suggested that the President's power to pardon is largely unqualified. While not specifically mentioning the power to pardon, the Supreme Court in *Marbury* explained that, "[b]y the [C]onstitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." 5 U.S. at 165-66. The Supreme Court stated that in such cases, "whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion." *Id.* at 166. Because the power had been "entrusted to the executive, the decision of the executive is conclusive." *Id.* Thus, the Supreme Court in *Marbury* laid the foundation for the view that the President has a "general, unqualified grant of power to pardon offenses against the United States." *The Laura*, 114 U.S. 411, 413, 5 S.Ct. 881, 29 L.Ed. 147 (1885).

 **[25]**  In view of the principles set out in *Marbury*, the Supreme Court thereafter instructed that the President's power to pardon is "granted without limit." *United States v. Klein*, 80 U.S. 128, 147, 13 Wall. 128, 20 L.Ed. 519 (1871); *see also Ex parte Garland*, 71 U.S. 333, 380, 4 Wall. 333, 18 L.Ed. 366 (1866) ("This power of the President **\*136** is not subject to legislative control. Congress can neither limit the effect of his pardon, nor exclude from its exercise any

class of offenders."). The "executive can reprieve or pardon all offenses *after their commission*, either before trial, during trial or after trial, by individuals, or by classes, conditionally or absolutely, and this without modification or regulation by Congress." *Ex parte Grossman*, 267 U.S. 87, 120, 45 S.Ct. 332, 69 L.Ed. 527 (1925) (emphasis added).

 **[26]**   **[27]** The pardon power, however, is not without limitations. For example, a presidential pardon generally must be accepted to be effective. *See Burdick v. United States*, 236 U.S. 79, 94, 35 S.Ct. 267, 59 L.Ed. 476 (1915); *but see Biddle v. Perovich*, 274 U.S. 480, 486-87, 47 S.Ct. 664, 71 L.Ed. 1161 (1927) (finding, where defendant sought his release upon the grounds that he had not accepted the commutation of his death sentence to life imprisonment, that "the public welfare, not his consent, determines what shall be done"). "Once accepted, a full and absolute pardon 'releases the wrongdoer from punishment and restores the offender's civil rights without qualification.' " *United States v. Arpaio*, No. 16-cr-1012, 2017 WL 4839072, at *1 (D. Ariz. Oct. 19, 2017) (quoting *Absolute Pardon*, Black's Law Dictionary (10th ed. 2014)).

 **[28]**   **[29]**   **[30]** On the other hand, a pardon does not necessarily render "innocent" a defendant of any alleged violation of the law. Indeed, the Supreme Court has recognized that the acceptance of a pardon implies a "confession" of guilt. *See Burdick*, 236 U.S. at 94, 35 S.Ct. 267 ("[A pardon] carries an imputation of guilt; acceptance a confession of it."); *see also United States v. Schaffer*, 240 F.3d 35, 38 (D.C. Cir. 2001) ("[A]cceptance of a pardon may imply a confession of guilt.") (citing *In re North*, 62 F.3d 1434, 1437 (D.C. Cir. 1994)). As Chief Justice Marshall wrote, "[a] pardon is an act of grace, proceeding from the power intrusted with the execution of the laws, which exempts the individual on whom it is bestowed, from the punishment the law inflicts *for a crime he has committed*." *United States v. Wilson*, 32 U.S. 150, 150, 7 Pet. 150, 8 L.Ed. 640 (1833) (emphasis added). In other words, "a pardon does not blot out guilt or expunge a judgment of conviction." *In re North*, 62 F.3d at 1437. Furthermore, a pardon cannot "erase a judgment of conviction, or its underlying legal and factual findings." *Arpaio*, 2017 WL 4839072, at *1 (citing *United*

*States v. Crowell*, 374 F.3d 790, 794 (9th Cir. 2004)); *but see Schaffer*, 240 F.3d at 38 (vacating "all opinions, judgments, and verdicts of this court and the District Court" where "[f]inality was never reached on the *legal question* of [the defendant's] guilt" (emphasis added)).

 **[31]** Here, the scope of the pardon is extraordinarily broad − it applies not only to the false statements offense to which Mr. Flynn twice pled guilty in this case, but also purports to apply to "any and all possible offenses" that he might be charged with in the future in relation to this case and Special Counsel Mueller's investigation. Ex. 1 to Consent Mot. Dismiss, ECF No. 308-1 at 1. However, the Court need only consider the pardon insofar as it applies to the offense to which Mr. Flynn twice pled guilty in this case. Mr. Flynn has accepted President Trump's "full and unconditional pardon." *See* Consent Mot. Dismiss, ECF No. 308 at 2. The history of the Constitution, its structure, and the Supreme Court's interpretation of the pardon power make clear that President Trump's decision to pardon Mr. Flynn is a political decision, not a legal one. Because the law recognizes the President's political power to pardon, the appropriate course is to dismiss this case as **\*137** moot. However, the pardon "does not, standing alone, render [Mr. Flynn] innocent of the alleged violation" of 18 U.S.C. § 1001(a)(2). *Schaffer*, 240 F.3d at 38. Accordingly, in view of the Supreme Court's expansive view of the presidential pardon power, the Court grants the consent motion to dismiss this case as moot. *See, e.g., id.*

### III. Conclusion

For the reasons stated above, the Court **DENIES AS MOOT** the government's motion to dismiss pursuant to Rule 48(a), ECF No. 198; and **GRANTS** the government's consent motion, ECF No. 308, based on the presidential pardon and **DISMISSES** this case **AS MOOT**. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**All Citations**

507 F.Supp.3d 116

---

Footnotes

1    When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

2    On May 17, 2017, then-Acting Attorney General Rod J. Rosenstein appointed Robert S. Mueller, III to serve as Special Counsel for the United States Department of Justice and authorized the Special Counsel to investigate the Russian government's efforts to interfere in the 2016 election, including any matters arising from that investigation. Special Counsel Robert S. Mueller, III, U.S. Dep't of Justice, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Vol. I of II ("Mueller Report") (Mar. 2019), ECF No. 79-1 at 19. The Special Counsel was duly authorized to prosecute federal crimes arising from the investigation. *Id.* The Special Counsel concluded that Russia interfered in the 2016 presidential election in two principal ways: (1) carrying out a social media campaign favoring then-candidate Trump and disparaging then-candidate Hillary Rodham Clinton; and (2) "conduct[ing] computer-intrusion operations against entities, employees, and volunteers working on the Clinton Campaign and then releas[ing] stolen documents." *Id.* at 9. The Special Counsel's "investigation also identified numerous links between the Russian government and the Trump Campaign." *Id.*

3    The Court is persuaded by the arguments presented that issuing an Order to Show Cause would amount to an atypical action and so does not address this issue in this Memorandum Opinion.

4    The Court appreciates the thorough, careful, and thoughtful analysis provided by Court-appointed amicus curiae.

5    Pursuant to this schedule, the following amici submitted briefs: Separation of Powers Scholars; National Association of Criminal Defense Lawyers; Former Federal Prosecutors and High-Ranking Department of Justice Officials; Opening Arguments Media, LLC; We Who Serve-VSO; Kamil Ekim Alptekin; Steady State and Former National Security Officials; Federal Practitioners; Chairman and Members of the Committee on the Judiciary, U.S. House of Representatives; Lawyers Defending American Democracy; Watergate Prosecutors; Citizens United, Citizens United Foundation, and Presidential Coalition, LLC; the States of Ohio, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Louisiana, Mississippi, Missouri, Oklahoma, South Carolina, Texas, Utah, and West Virginia; and Criminal Law Professors. The Court appreciates the perspectives expressed by *amici.*

6    The Court takes judicial notice of President Trump's tweet as the veracity of this statement "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see Hawaii v. Trump, 859 F.3d 741, 773 n.14 (9th Cir. 2017), vacated on other grounds,* ––– U.S. ––––, 138 S. Ct. 377, 199 L.Ed.2d 275 (2017).

7    At oral argument during the en banc mandamus proceedings, the government took the remarkable position that even if, hypothetically, it was undisputed that the Attorney General of the United States accepted a bribe in exchange for dismissing a case, a district court would have no authority under Rule 48(a) to deny the government's motion once the court ascertained that the government stood by its decision to dismiss the case. Oral Argument at 1:53, *In re Flynn*, No. 20-5143 (D.C. Cir. Aug. 11, 2020), https://www.cadc.uscourts.gov/recordings/recordings.nsf/DocsByRDate?OpenView&count=100&SKey=202008.

8    The government also asserted that dismissal is warranted because "the interests of justice do not support continuing the prosecution." Gov't's Reply, ECF No. 227 at 9. Because the majority of the government's apparent reasons underlying this rationale "are just the same facts that are legally irrelevant to its materiality and falsity assertions," Amicus Reply Br., ECF No. 243 at 24, the Court does not address this argument separately.

9    The Court has addressed this rationale in the materiality section *supra.*

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **MICHAEL T. FLYNN,** | **Crim. No. 17-232 (EGS)** |
| **Defendant** | |

**<u>NOTICE OF EXECUTIVE GRANT OF CLEMENCY AND</u>**
**<u>CONSENT MOTION TO DISMISS AS MOOT</u>**

On November 25, 2020, the President of the United States issued an executive grant of clemency to Michael T. Flynn. *See* Attachment. In particular, the President granted General Flynn "a full and unconditional pardon" for (1) the charge of making false statements to Federal investigators, in violation of Section 1001, Title 18, United States Code, as charged in the Information filed in this case (Doc. 1); (2) any and all possible offenses arising from the facts set forth in the Information and Statement of Offense filed under that docket number or that might arise, or be charged, claimed, or asserted, in connection with the proceedings under that docket number (Doc. 4); (3) any and all possible offenses within the investigatory authority or jurisdiction of the Special Counsel appointed on May 17, 2017, including the initial Appointment Order No. 3915-2017 and subsequent memoranda regarding the Special Counsel's investigatory authority; and (4) any and all possible offenses arising out of facts and circumstances known to, identified by, or in any manner related to the investigation of the Special Counsel, including, but not limited to, any grand jury proceedings in the United States District Court for the District of Columbia or the United States District Court for the Eastern District of Virginia.

Article II recognizes the power of the President to "grant Reprieves and Pardons for offenses against the United States, except in Cases of Impeachment." U.S. Const., Art. II, § 2, cl.

1. The power of pardon conferred by the Constitution upon the President is otherwise unlimited, and may be exercised at any time after the commission of a crime, either before legal proceedings are taken or during their pendency, or after conviction and judgment. *In re Garland*, 71 U.S. 333 (1866). Criminal contempt is included within the President's power to pardon. *Ex Parte Grossman*, 267 U.S. 87, 121-22 (1925).

Accordingly, the President's pardon, which General Flynn has accepted, moots this case. *United States v. Schaffer*, 240 F.3d 35, 38 (D.C. Cir. 2001). The pardon not only encompasses the Section 1001 charge that is the subject of the government's pending motion to dismiss (Doc. 198), but also any possible future perjury or contempt charge in connection with General Flynn's sworn statements and any other possible future charge that this Court or the court-appointed amicus has suggested might somehow keep this criminal case alive over the government's objection (e.g., a charge under the Foreign Agents Registration Act, Section 618(a), Title 22, United States Code, arising out of the facts set forth in the Statement of Offense). In short, the government's prior motion to dismiss, as well as all other pending motions in this case, are moot in light of the President's full and unconditional pardon to General Flynn. No further proceedings are necessary or appropriate, as the Court must immediately dismiss the case with prejudice. *Schaffer*, 240 F.3d at 38.