United States v. Languerand, Not Reported in Fed. Supp. (2021)
Case 1:21-cv-02587-AS-SLC   Document 218-7   Filed 02/02/24   Page 1 of 30
2021 WL 3674731

important" of the four § 3142(g) considerations. Klein, 2021 WL 1377128, at *10 (citation omitted).

c. History and Characteristics of the Defendant

The third consideration in weighing pre-trial detention under § 3142(g) is the defendant's "history and characteristics," including his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3).

Mr. Languerand's "past conduct" is particularly concerning to the Court. Over the past several years, Mr. Languerand has exhibited a distinct tendency toward threatening and violent conduct. In 2019, he was the subject of a protective order issued by the Vermont Superior Court based on a complaint alleging a pattern of threats, harassment, and stalking.[16] See Ex. 3 to Gov't Opp'n [ECF No. 22-3] at 3–4; Ex. 4 to Gov't Opp'n [ECF No. 22-4] at 1–2. Following a hearing (which Mr. Languerand did not attend),[17] the Vermont Superior Court granted the requested order, finding that Mr. Languerand had "[c]aused [the plaintiff] physical harm," "[p]laced [her] in fear of imminent serious physical harm," and "[s]talked Plaintiff." Ex. 4 to Gov't Opp'n at 2–3. Then, three months later, Mr. Languerand was charged with aggravated assault for an incident in which he beat an acquaintance while they were both riding in a car. See Ex. 6 to Gov't Opp'n [ECF No. 22-6] at 3–4.

*9 Mr. Languerand has also exhibited a concerning pattern of following conspiracy theories into belligerent confrontations with the people around him. Mr. Languerand appears to be a devotee of the QAnon conspiracy theory, see Gov't Opp'n at 7; supra n.8, and his past conduct demonstrates a preoccupation with false allegations of pedophilia and child sex trafficking. Of course, Mr. Languerand has every right to believe whatever he wants, but he does not have a right to accost and threaten individuals he thinks support pedophilia. In the months preceding January 6th, for instance, Mr. Languerand "yell[ed] at [Black Lives Matter] protestors about pedophilia," Ex. 9 to Gov't Opp'n [ECF No. 22-9], and left a menacing voicemail for a Morristown, VT, city employee about purported pedophilic symbols on road barriers, telling the employee that "[Languerand] will be watching [him] and knows what he looks like," Ex. 11 to Gov't Opp'n [ECF No. 22-11] at 2. In one particularly concerning incident, Mr.

Languerand repeatedly threatened the proprietors of a pizza restaurant via messages on Instagram before "[coming] to the restaurant and ... shouting about how they were running a child sex slave operation in their basement."[18] Ex. 10 to Gov't Opp'n [ECF No. 22-10]. In response to an inquiry about this last incident, the Lamoille County Sheriff's Department told the Burlington Police that "they deal with [Mr. Languerand] on a frequent basis, all for similar behavior." Id.

Actions demonstrating a "willing[ness] to allow ... personal beliefs [to] override the rule of law" weigh against a defendant seeking pre-trial release. See Klein, 2021 WL 1377128, at *10. This is especially the case when that willingness is evinced by a pattern of behavior rather than one-off involvement in the January 6th riot. See Hale-Cusanelli, 3 F.4th at 454–57 (affirming pre-trial detention of defendant in part because of his previous violent and racially tinged conduct); Fairlamb, 2021 WL 1614821, at *7 ("[A] defendant's history of violence offers some of the strongest evidence of his future dangerousness."); see also Gieswein, 2021 WL 3168148, at *16 (finding that the defendant's "history and characteristics" weighed against detention because "Mr. Gieswein's actions on January 6, 2021 stand in direct conflict with his history"). And though Mr. Languerand's "belief in conspiracy theories is concerning when considered in the context of this case," Gieswein, 2021 WL 3168148, at *16, more important than the content of his beliefs is Mr. Languerand's clear tendency to act on them. Indeed, as Judge Sullivan recognized in Gieswein, the relevant inquiry is not what the defendant thinks but whether his "history and characteristics reflect an ability to abide by the law." Id. Mr. Languerand's past conduct, especially in combination with his actions on January 6th, thus casts serious doubt on his ability to resist his violent inclinations and conform his conduct to law.

Finally, Mr. Languerand's past conduct demonstrates a deep distrust and hostility toward law enforcement. The government has proffered various police reports describing Mr. Languerand's less-than-friendly interactions with law enforcement officers. On March 3, 2019, Mr. Languerand "became extremely hostile" during a traffic stop, "yell[ing] and scream[ing] profanity at [the officers]" and later telling them that he "hates cops." Ex. 5 to Gov't Opp'n [ECF No. 22-5]. In May 2020, Mr. Languerand told a sheriff's deputy responding to a call that "he didn't give a fuck who [the deputy] was and what [he] was doing." See Ex. 7 to Gov't Opp'n [ECF No. 22-7]. Then, when defendant's dog approached the officer, Mr. Languerand, in a statement

Case 1:21-cv-02587-AS-SLC   Document 218-7   Filed 02/02/24   Page 2 of 30

**United States v. Languerand, Not Reported in Fed. Supp. (2021)**

2021 WL 3674731

presaging the "poem" he wrote about the FBI in March 2021, said "if you shoot my dog I'll shoot you." Id. Defendant's attacks on law enforcement on January 6th and his ongoing hostility to the FBI, see Gov't Opp'n at 8–9, thus appear to be part of a broader pattern of disrespect and belligerence toward law enforcement.

**\*10** The Court acknowledges, as defense counsel noted at oral argument, that these incidents "have not resulted in criminal convictions." Hr'g Tr. at 9:22–10:1. Yet the fact that police have received at least half a dozen calls regarding Mr. Languerand's belligerent and threatening behavior in the past eighteen months is nonetheless a troubling indication of his tendency toward violent confrontation. Furthermore, though not a "criminal conviction" per se, the protective order entered against Mr. Languerand in 2019 includes judicial findings that he "physical[ly] harm[ed]," threatened, and stalked the complainant in that matter. Counsel's categorical statement that none of Mr. Languerand's prior altercations "caus[ed] physical injury to anyone else," Hr'g Tr. at 7:6–10, is thus untrue. See also Ex. 6 to Gov't Opp'n (describing how defendant physically assaulted an acquaintance in a moving car and then left him on the side of the road). To the extent that some of Mr. Languerand's victims have emerged from their encounters with him unharmed (if also afraid), the Court considers that a matter of their good fortune rather than an indication of Mr. Languerand's harmlessness.

Defendant's troubling history outweighs any points in his favor under § 3142(g)(3)(A). Mr. Languerand does have a home in South Carolina with his grandparents, but he had only lived there for four months before his arrest, he has very few "ties" to that "community," and the Court sees little evidence of close "family ties" with anyone other than his grandparents. See Ex. 2 to Gov't Opp'n at 1–2. He also has a relatively stable employment history, see id., and, to his credit, Mr. Languerand's former employer is eager to rehire him should he be released, Hr'g Tr. at 4:15–5:1. Mr. Languerand is also a former member of the military, a relevant consideration under this factor, see Foy, 2021 WL 2778559, at \*5; Padilla, 2021 WL 1751054, at \*7–8, but his military service lasted only three years before terminating in an administrative separation, Ex. 2 to Gov't Opp'n at 2.

Although certain aspects of defendant's "history and characteristics" weigh in favor of release, the troubling pattern of violent conduct apparent from the evidence before the Court substantially outweighs those other considerations. Mr. Languerand's conduct on January 6th was not an

aberration; it was the culmination of a troubling pattern of confrontational and violent behavior suggesting an "inability (or refusal) to exercise his independent judgment and conform his behavior to the law." United States v. Chansley, Case No. 21-cr-3 (RCL), 2021 WL 861079, at \*10 (D.D.C. Mar. 8, 2021). The Court finds that defendant's history and characteristics point toward pre-trial detention.

### d. Nature and Seriousness of the Danger

The final factor to be considered under § 3142(g) is "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). This is by its nature the broadest of the statutory factors, calling for an "open-ended assessment of the 'seriousness' of the risk to public safety." Padilla, 2021 WL 1751054, at \*8 (quoting United States v. Cua, Crim. A. No. 21-107 (RDM), 2021 WL 918255, at \*5 (D.D.C. Mar. 10, 2021)). "Because this factor substantially overlaps with the ultimate question whether any conditions of release 'will reasonably assure ... the safety of any other person and the community,' it bears heavily on the Court's analysis." Cua, 2021 WL 918255, at \*5 (quoting 18 U.S.C. § 3142(e)).

For many of the reasons stated in the previous section, the Court finds that this final factor also weighs in favor of detention. Mr. Languerand's decision to engage in violence against law enforcement on January 6th, his pattern of belligerence and even violence toward members of the community, and his track record of hostility toward law enforcement all suggest that he poses a serious danger of engaging in similar conduct again if released.

Looking forward, the Court is particularly concerned that nothing seems to have changed for Mr. Languerand since January 6th. Unlike many of the rioters now facing charges for their conduct, Mr. Languerand has expressed no remorse for his actions at the Capitol,[19] cf. Cua, 2021 WL 918255, at \*4 (weighing defendant's deep remorse and regret in favor of pretrial release), nor has the Court been presented with any evidence that Mr. Languerand "chose to cooperate with law enforcement [or] voluntarily surrender," Padilla, 2021 WL 1751054, at \*8 (citing Chrestman, 2021 WL 765662, at \*14; Whitton, 2021 WL 1546931, at \*11). Rather, in the months since January 6th, Mr. Languerand has repeatedly referred to himself and his fellow rioters as "Patriots," see Gov't Opp'n at 4, and, in a note written less than a week before his arrest, Mr. Languerand accused the FBI of "persecuting the patriots

2021 WL 3674731

who stood up for their constitutional rights [on January 6th]." Gov't Opp'n at 7–8.

**\*11** Likewise, there is no indication that Mr. Languerand has given up the conspiracy theories which have led him into the confrontations described above. Importantly, these theories, along with the militia organizations with whom Mr. Languerand appears to sympathize, not only advance falsehoods but affirmatively justify violence against lawfully constituted authorities.[20] And even more troublesome, January 6th was not the first time defendant has <u>acted</u> on those theories—Mr. Languerand has repeatedly demonstrated that he is willing to use confrontational behavior and violence in the service of his beliefs.

The foregoing is sufficient for the Court to conclude that Mr. Languerand would pose an "articulable threat to the community" if released. <u>Munchel</u>, 991 F.3d at 1282. This standard does not require a defendant to have made explicit threats of a specific future act, nor does it require the Court to find that January 6th will repeat itself if the defendant is released. Rather, the pattern of defendant's prior behavior, the culmination of that pattern on January 6th, and his failure to repudiate either his actions at the Capitol or the beliefs that justify such conduct are sufficient for the Court to conclude that Mr. Languerand poses an articulable threat to engage in similar violent, confrontational behavior if released.

The weapons found in his room in South Carolina heighten the seriousness of this threat. Although he has volunteered to relinquish those (lawful) weapons as a condition of release, <u>see</u> Hr'g Tr. at 5:2–5, the very fact that Mr. Languerand acquired and possessed an assault rifle, two shotguns, ammunition, and brass knuckles is indicative of the magnitude of the threat posed by his willingness to promote his beliefs through violent confrontation. The danger is not of fisticuffs but of deadly force. And even if Mr. Languerand did surrender his weapons, his conduct both before and on January 6th "establishes that, even without possessing weapons in his home or resorting to extensive planning in advance, he has both the 'resources and capabilities' " to harm members of his community. <u>See</u> <u>Padilla</u>, 2021 WL 1751054, at \*9 (quoting <u>Munchel</u>, 991 F.3d at 1283).

Although defense counsel has put forward an extensive list of conditions the Court could impose on Mr. Languerand, <u>see</u> Def.'s Mot. at 12–13; Hr'g Tr. at 5:2–10, the Court harbors substantial doubts about defendant's willingness to comply with these conditions.[21] Mr. Languerand's negative

opinion of police and of the FBI is readily apparent, and, if anything, the law enforcement response to January 6th has only deepened his feelings of hostility, particularly toward federal law enforcement. <u>See</u> Gov't Opp'n at 7–8. According to Mr. Languerand, the FBI is engaged in "persecuting ... patriots" and protecting the "seditious infiltration of [a] psychopathic criminal mafia into the government." <u>See</u> <u>id.</u> at 8. Such does not augur well for his compliance with federally mandated release conditions. Even though it is unclear to what extent his ire applies to federal law enforcement writ large, the Court is not willing, especially in light of defendant's pattern of disrespect toward law enforcement, to stake the very real community safety concerns posed by Mr. Languerand on his word that he will obey restrictive conditions of pre-trial release. Likewise, the Court agrees with the government that Mr. Languerand's use of cocaine while in the military, <u>see</u> Ex. 2 to Gov't Opp'n at 3, is probative of his likelihood to comply with the release conditions imposed by this Court. <u>See</u> Hr'g Tr. at 11:24–12:10. The Court finds it unlikely that release to the custody of his grandparents will succeed in changing Mr. Languerand's behavior where the strict regulations of military life failed.

**\*12** For these reasons, the Court finds that the government has met its burden of "prov[ing] by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community." <u>Munchel</u>, 991 F.3d at 1280 (internal quotation marks and citation omitted).

## II. <u>Flight Risk</u>

In addition to posing a danger to the community if released, a defendant may be detained pending trial if a court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e)(1). In assessing flight risk under § 3142, "the Court considers the same four factors under § 3142(g) that were integral to the dangerousness analysis." <u>Padilla</u>, 2021 WL 1751054, at \*11 (citing <u>Vasquez-Benitez</u>, 919 F.3d at 550–51). "A determination that an individual is a flight risk must be supported by a preponderance of the evidence." <u>Vasquez-Benitez</u>, 919 F.3d at 551. The government argues that Mr. Languerand's lack of connection to any given place, his history of moving around, and the hefty sentence he likely faces render Mr. Languerand a flight risk that cannot be mitigated with release conditions. Gov't Opp'n at 18–19. The Court agrees.

Case 1:21-cv-02587-AS-SLC Document 218-7 Filed 02/02/24 Page 4 of 30

United States v. Languerand, Not Reported in Fed. Supp. (2021)
2021 WL 3674731

First, the nature of the offenses with which Mr. Languerand is charged. Mr. Languerand faces five felony charges carrying the possibility of significant jail time. See Gov't Opp'n at 19 (estimating that "Defendant is facing a sentencing guidelines range of 63–78 months, before the imposition of any upward departures"). And as discussed above, the evidence against Mr. Languerand is quite strong. This combination of a potentially lengthy sentence plus the magnitude of the evidence against him might inspire Mr. Languerand to skip town rather than face the music.

Furthermore, his history and characteristics show that Mr. Languerand has not only the motive but also the opportunity to evade these proceedings. Other than the availability of a home and job in South Carolina, see Hr'g Tr. at 4–5, Mr. Languerand does not have any significant connection to that state. This is not a case where the defendant seeking pre-trial release has a wife and two children in the place where his prosecution is pending. Cf. Vasquez-Benitez, 919 F.3d at 551. Mr. Languerand is almost entirely unencumbered should he wish to leave South Carolina.[22] Moreover, the limited record before the Court reveals that Mr. Languerand has lived in five different states over the course of his life and has family in both Vermont and Florida, giving him a bevy of options should he wish to flee. Ex. 2 to Gov't Opp'n at 1–2. Finally, Mr. Languerand has a history of not attending court proceedings. Although not a perfect analogue to the present criminal prosecution, Mr. Languerand did not attend the January 2019 hearing on a petition for a protective order against him, despite the fact that he was "provided with reasonable notice of the proceeding." See Ex. 4 to Gov't Opp'n at 1. That fact thus weighs somewhat against him as well.

**\*13** To be sure, certain considerations do weigh in favor of release. Section 3142(g)(3)(A) instructs the court to consider, inter alia, a defendant's "family ties, employment, financial resources, length of residence in the community,

[and] community ties" in assessing if he is a flight risk. Though Mr. Languerand has not resided in South Carolina for very long, he does have legitimate family connections to the area. His grandparents continue to reside in Little River, SC, and they have expressed, through defense counsel, a willingness to house and monitor defendant should he be released. See Hr'g Tr. at 4:3–13. In addition, defense counsel represented at oral argument that Mr. Languerand's former employer, an excavator, is willing and indeed eager to re-employ him should he be released. Hr'g Tr. at 4:14–5:1; see also Def.'s Mot. at 11. Nonetheless, there is an important difference between reasons to stay in South Carolina and reasons not to leave. In the end, there is little keeping Mr. Languerand in South Carolina should he decide to flee.

In light of the foregoing, the Court finds by a preponderance of the evidence that no conditions will reasonably assure defendant's appearance as required.

## Conclusion

For the reasons explained above, the Court finds based on clear and convincing evidence that defendant Nicholas Languerand's pretrial detention is warranted because he poses a concrete, prospective threat to the safety of the community that cannot be mitigated by any combination of release conditions. Additionally, the Court finds based on a preponderance of the evidence that no combination of conditions will reasonably assure defendant's appearance at future proceedings as required. Accordingly, the Court will deny Mr. Languerand's motion to revoke his detention order. A separate Order will issue on this date.

## All Citations

Not Reported in Fed. Supp., 2021 WL 3674731

Footnotes

1    The government's opposition, as well as the eleven exhibits attached to it, were filed under seal. See Min. Order (Aug. 4, 2021). Some of these materials are referenced in this opinion. The Court has consulted with the parties, however, and neither the United States nor Mr. Languerand object to the public release of this opinion.

2    The following factual summary relies on the Statement of Facts submitted alongside the initial criminal complaint filed against Mr. Languerand, see Statement of Facts [ECF No. 1-1], as well as the evidence proffered by the government in its opposition to defendant's motion, see Gov't Opp'n at 4–11. The parties do not contest this evidence or descriptions at this stage, see Rough Tr. of Hr'g (Aug. 5, 2021) at 5 ("Hr'g Tr."), only the inferences to be drawn from them. Thus, unless otherwise noted, the Court will take the proffered descriptions as true for the purposes of this motion.

Additionally, citations to the transcript of the August 5 hearing on this motion are to a rough draft of the transcript. When finalized, the transcript will be posted to the docket. Discrepancies between the rough transcript and the final version may exist.

3    Mr. Languerand is identifiable in these videos by his clothing: a black sweatshirt over top of a plaid shirt, blue jeans, a black face mask, and, most importantly, a distinctive red and black knit hat. See Statement of Facts at 2; Gov't Opp'n at 4–6. Defendant's subsequent social media posts depict him wearing these clothes, see Statement of Facts at 2, and when federal agents searched his residence, they found items matching those in the videos. See Gov't Opp'n at 6.

4    Exhibits 1A and 1B of the government's opposition are videos and are thus unable to be filed using the ECF system. Accordingly, counsel for the government provided these videos to the Court and opposing counsel by secure means and filed a "Notice of Filing of Items Incompatible with CM/ECF Filing" [ECF No. 21] on August 3, 2021.

5    The government describes this as a "cannister [sic] of what appears to be pepper spray," Gov't Opp'n at 5, but after reviewing the video evidence proffered by the government, the Court declines to adopt this characterization for present purposes. The exact nature of this object, however, need not be determined at the present time and is, of course, subject to additional evidentiary development. Elsewhere in the video, Mr. Languerand appears to throw a drink bottle at the officers holding the archway. Ex. 1A to Gov't Opp'n at 0:29–0:36. This conduct is not referenced in the Statement of Facts, nor does it appear to form the basis of, at least, Counts Two through Five of the Indictment against Mr. Languerand. See Indictment as to Nicholas Languerand ("Indictment") [ECF No. 6].

6    At another point in the riot, Mr. Languerand came into possession of a riot shield, hit it against the ground, and then brandished it between himself and a police officer. See Statement of Facts at 4–5. In the initial criminal complaint filed against Mr. Languerand, he was charged with converting property of the United States to his own use, in violation of 18 U.S.C. § 641, based on this action. Id. at 5. That charge is not, however, reflected in the Indictment, see Indictment, and the relationship between this incident and the charges actually pending against Mr. Languerand is unclear.

7    A different Reddit post by "blessthisimmunity17" identifies the author as Nicholas Languerand. Statement of Facts at 3. On the basis of this self-identification as well as the other reasons set out in the Statement of Facts, see id. at 2–3, the Court does not doubt the government's assertion that these posts were made by Mr. Languerand, nor does defendant appear to contest his authorship of these posts, see Hr'g Tr. at 5.

8    For the association of this phrase with QAnon, see Will Rahn & Dan Patterson, What is the QAnon conspiracy theory?, CBS News (March 29, 2021), available at https://www.cbsnews.com/news/what-is-the-qanon-conspiracy-theory/. Mr. Languerand also used this phrase, complete with the distinctive capitalization pattern, in a post on Reddit in which he identified himself by name. See Statement of Facts at 3.

9    The Proud Boys "describes itself as a pro-Western fraternal organization for men who refuse to apologize for creating the modern world," and members "routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values." United States v. Pezzola, No. CR 21-52-1 (TJK), 2021 WL 1026125, at *1 (D.D.C. Mar. 16, 2021) (citations omitted).

10    "The Three Percenters are a domestic militia that advocates for resistance to the U.S. federal government polic[i]es it considers to infringe on personal, local, and gun ownership rights." United States v. Gieswein, Crim. A. No. 21-24 (EGS), 2021 WL 3168148, at *11 n.10 (D.D.C. July 27, 2021) (citation and quotation marks omitted).

11    Though the photos themselves do not identify the masked person as Mr. Languerand, one photo appears to depict the subject wearing the same black sweatshirt with gold lettering that Mr. Languerand wore on January 6th. See Gov't Opp'n at 7.

12    Defendant's motion principally raised constitutional arguments against his continued detention. See, e.g., Def.'s Mot. at 10–11, 13. At oral argument, however, defense counsel backed away from those contentions, clarifying that he is "not insisting that there is some constitutional issue that has been missed." Hr'g Tr. at 3. On the basis of that representation,

2021 WL 3674731

the Court will not address the constitutional argument raised in the motion and instead will focus, as both parties did at oral argument, on the statutory factors set out in 18 U.S.C. § 3142(g).

13    Mr. Languerand does not dispute that he is eligible for pretrial detention. It is settled law that using a dangerous weapon to forcibly assault an officer of the United States in violation of 18 U.S.C. § 111(b) qualifies as a "crime of violence" for purposes of the Bail Reform Act. See, e.g., United States v. Padilla, Crim. No. 21-214 (JDB), 2021 WL 1751054, at *5 (D.D.C. May 4, 2021); Gieswein, 2021 WL 3168148, at *8; see also United States v. Quaglin, 851 F. App'x 218, 218 (D.C. Cir. 2021) ("Appellant is charged with violating 18 U.S.C. § 111(b) – an offense which is categorically a crime of violence.").

14    The only two misdemeanor charges are the two violations of 40 U.S.C. § 5104(e)(2): Disorderly Conduct in a Capitol Building and Act of Physical Violence in the Capitol Grounds or Buildings. See 40 U.S.C. § 5109(b) (prescribing maximum penalty of six months' imprisonment for violations of § 5104(e)(2)); see also Gov't Opp'n at 1–2.

15    Defense counsel urged at oral argument that Mr. Languerand "did not personally injure anybody" during the riot, Hr'g Tr. at 6, but the Court considers that outcome to have been the result of defendant's bad aim and the officers' good fortune. The Court declines to give Mr. Languerand extra credit for his accidental failure to cause the harm he clearly intended to inflict. See Padilla, 2021 WL 1751054, at *8 ("That this attempt was unsuccessful is fortuitous but does not change the fact that Padilla intended to engage in violent conduct to harm others." (internal citation omitted)).

16    Among other things, the complaint alleged that Mr. Languerand had sent "threatening texts saying he is going to kill me, himself, or other people I associate with," and it related one particular incident when Mr. Languerand repeatedly threatened to kill the complainant if she attended a certain party. Ex. 3 to Gov't Opp'n at 3–4. At a different time, Mr. Languerand allegedly "pounded on [the complainant's] door uncontrollably so [she] had no choice but to open it," at which point Mr. Languerand shoved his dog's food bowl into her stomach and "made [her] take [his] dog" for the rest of the day. Id. at 5.

17    The Vermont court's findings include the statement that "the Defendant was provided with reasonable notice and opportunity to be heard" at this hearing. See Ex. 4 to Gov't Opp'n at 1. This failure to attend, though not a direct analogue to the present proceeding, does weigh against Mr. Languerand under § 3142(g)(3)(A).

18    These claims of sex trafficking in the basement of a pizza restaurant mirror similar claims surrounding the Comet Ping Pong restaurant in Washington, D.C., a conspiracy theory colloquially known as "Pizzagate." Indeed, Mr. Languerand's decision to act on these claims resembles the (much more serious) actions of Ryan Jaselskis and Robert Maddison Welch, who each entered Comet Ping Pong and, respectively, fired a gun and attempted to set a fire. See Det. Mem. [ECF No. 5], United States v. Jaselskis, 1:19-cr-64-TJK (D.D.C. Feb. 26, 2019); Compl. Statement of Facts [ECF No. 1-1], United States v. Welch, 1:16-cr-847-KBJ (D.D.C. Dec. 12, 2016).

19    The Court notes here, as it did in Klein, that "it is [Mr. Languerand's] constitutional right to challenge the allegations against him and hold the government to its burden of proof." Klein, 2021 WL 1377128, at *11 (citing United States v. Lawrence, 662 F.3d 551, 562 (D.C. Cir. 2011)). The Court is not "punish[ing]" Mr. Languerand's "failure to express remorse," id. (quoting Lawrence, 662 F.3d at 562), but rather noting that defendant's ongoing pride in his actions on January 6th is probative of his likelihood to engage in similar conduct again if released.

20    Although there is no evidence that Mr. Languerand is a member of or has had any contact with the Proud Boys or Three Percenters, the presence of those groups' symbols on his phone suggests at the very least sympathy with their goals. See Gov't Opp'n at 9. For more on the aims and methods of these organizations, see supra notes 9–10.

21    Though the Court appreciates the willingness of his grandparents to serve as third-party custodians, see Hr'g Tr. at 4:3–13, it was at his grandparents' house in South Carolina where Mr. Languerand successfully stockpiled weapons, see Gov't Opp'n at 6–7. Having a loving home simply does not address the Court's concerns about the threat Mr. Languerand poses to public safety. Cf. Hr'g Tr. at 17:12–17

22    Defense counsel notes that Mr. Languerand is indigent, see Def.'s Mot. at 12, but neither the record nor Mr. Languerand's threadbare assertions support the conclusion that defendant is so penniless that he would be unable to relocate to a new state should he desire.

Case 1:21-cv-02587-AS-SLC   Document 218-7   Filed 02/02/24   Page 7 of 30

United States v. Languerand, Not Reported in Fed. Supp. (2021)

2021 WL 3674731

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S.
Government Works.

# Exhibit 23



WATCH **LIVE**

TECH

# Twitter bans Michael Flynn, Sidney Powell and other QAnon accounts

PUBLISHED FRI, JAN 8 2021•4:45 PM EST    UPDATED SAT, JAN 9 2021•10:45 AM EST



**Salvador Rodriguez**
**@SAL19**

WATCH LIVE

## KEY POINTS

Twitter on Friday announced that it would permanently suspend accounts dedicated to sharing content related to the far-right QAnon conspiracy theory.

As part of this purge, the company suspended the accounts of Michael Flynn and Sidney Powell, supporters of President Donald Trump.





**SIGN UP TO RECEIVE JIM'S FREE DAILY NEWSLETTER**

**Jim Cramer's top 10 things to watch daily in the stock market**

Email address

**SIGN UP**

By subscribing to this newsletter, you agree to our terms of service and privacy policy, together with the disclaimer, and agree to receive general marketing emails from CNBC



MARKETS



CNBC TV



WATCHLIST



MENU

 ◯ **WATCH** LIVE

content related to the far-right QAnon conspiracy theory.

As part of this purge, the company suspended the accounts of Michael Flynn and Sidney Powell, supporters of President Donald Trump.

"The accounts have been suspended in line with our policy on Coordinated Harmful Activity," the company said in a statement to NBC News. "We've been clear that we will take strong enforcement action on behavior that has the potential to lead to offline harm, and given the renewed potential for violence surrounding this type of behavior in the coming days, we will permanently suspend accounts that are solely dedicated to sharing QAnon content."

**Former U.S. national security adviser Michael Flynn gestures as supporters of U.S. President Donald Trump rally to protest the results of the election in front of Supreme Court building, in Washington, U.S., December 12, 2020.**
*Jonathan Ernst | Reuters*



**SIGN UP TO RECEIVE JIM'S FREE DAILY NEWSLETTER**

**Jim Cramer's top 10 things to watch daily in the stock market**

By subscribing to this newsletter, you agree to our terms of service and privacy policy, together with the disclaimer, and agree to receive general marketing emails from CNBC

✕


MARKETS


CNBC TV


WATCHLIST

MENU



WATCH LIVE

of Ron Watkins, who is the administrator of the website 8kun, formerly known as 8chan.

Attorney Sidney Powell speaks at a press conference on election results in Alpharetta, Georgia, U.S., December 2, 2020.
*Elijah Nouvelage | Reuters*

The suspensions come in the wake of the insurgency at the U.S. Capitol on Wednesday.

Twitter's [Coordinated Harmful Activity policy](#) does not allow groups engaged in activity that results in harm on Twitter or in the real world.

Twitter had previously taken action against thousands of QAnon-related accounts [in July 2020](#). Although some accounts involved in the QAnon movement can be tough to find, Flynn was a prominent actor in the political sphere, and he [took an oath to QAnon in July](#) in a video available publicly.



SIGN UP TO RECEIVE JIM'S FREE DAILY NEWSLETTER

Jim Cramer's top 10 things to watch daily in the stock market

By subscribing to this newsletter, you agree to our terms of service and privacy policy, together with the disclaimer, and agree to receive general marketing emails from CNBC



MARKETS



CNBC TV



WATCHLIST

MENU



WATCH **LIVE**



**VIDEO**   00:00

**Social media platforms block Trump after violence on Capitol Hill**

## TRENDING NOW



**1**   Harvard University President Claudine Gay resigns amid plagiarism claims



**2**   Rivian stock falls 10% on declining fourth-quarter EV deliveries



**3**   How long $1 million in retirement savings lasts in every state—and where it runs out fastest



**SIGN UP TO RECEIVE JIM'S FREE DAILY NEWSLETTER**

**Jim Cramer's top 10 things to watch daily in the stock market**

By subscribing to this newsletter, you agree to our terms of service and privacy policy, together with the disclaimer, and agree to receive general marketing emails from CNBC


MARKETS


CNBC TV


WATCHLIST

MENU










Subscribe to CNBC PRO

Licensing & Reprints

Select Personal Finance

Join the CNBC Panel

Select Shopping

Digital Products

Internships

About CNBC

Site Map

Careers

Contact

Subscribe to Investing Club

CNBC Councils

CNBC on Peacock

Supply Chain Values

Closed Captioning

News Releases

Corrections

Ad Choices

Podcasts

Help

     

## News Tips

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

## Advertise With Us

PLEASE CONTACT US



SIGN UP TO RECEIVE JIM'S FREE DAILY NEWSLETTER

Jim Cramer's top 10 things to watch daily in the stock market

By subscribing to this newsletter, you agree to our terms of service and privacy policy, together with the disclaimer, and agree to receive general marketing emails from CNBC.

Privacy Policy



○ WATCH **LIVE**

Terms of Service

© 2024 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by



SIGN UP TO RECEIVE JIM'S FREE DAILY
NEWSLETTER

**Jim Cramer's top 10
things to watch daily in
the stock market**

By subscribing to this newsletter, you agree to our terms of service and privacy policy, together with the disclaimer, and agree to receive general marketing emails from CNBC


**MARKETS**


**CNBC TV**


**WATCHLIST**

**MENU**

# Exhibit 24

# *Pushing QAnon and Stolen Election Lies, Flynn Re-emerges*

Recast by President Trump's most ardent supporters as a MAGA martyr, Michael T. Flynn has embraced his role as the man who spent four years unjustly ensnared in the Russia investigation.

 **By Matthew Rosenberg**

Feb. 6, 2021

In Washington's respectable circles, Michael T. Flynn, the former national security adviser, is a discredited and dishonored ex-general, a once-esteemed military intelligence officer who went off the rails ideologically and then was fired a mere 24 days into the Trump administration for lying to the F.B.I. about contacts with the Russian ambassador.

As if he cared.

Where others see disgrace, Mr. Flynn, 62, has found redemption. Recast by former President Donald J. Trump's most ardent supporters as a MAGA martyr, Mr. Flynn has embraced his role as the man who spent four years unjustly ensnared in the Russia investigation.

He was one of the most extreme voices in Mr. Trump's 77-day push to overturn the election, a campaign that will be under scrutiny as the former president's second impeachment trial gets underway next week. Mr. Flynn went so far as to suggest using the military to rerun the vote in crucial battleground states. At one point, Mr. Trump even floated the idea of bringing Mr. Flynn back into the administration, as chief of staff or possibly F.B.I. director, people familiar with the conversations told The New York Times.

And now, safely pardoned and free to speak his mind, Mr. Flynn has emerged from the Trump presidency much as he entered it — as the angry outsider who pushes fringe ideas, talks of shadowy conspiracies and is positioning himself as a voice of a far right that, in the wake of the Capitol riot, appears newly, and violently, emboldened.

All that has changed for Mr. Flynn are the subjects at hand, and his apparent willingness to cash in on his notoriety.

Mr. Flynn's dark view of Islam and eagerness to cultivate President Vladimir V. Putin of Russia have given way to an embrace of QAnon, the pro-Trump conspiracy theory, and a readiness to question the very fabric of American democracy. He has swapped a government job and an obsessive focus on "radical Islamic terrorism" for selling QAnon-branded T-shirts and a new media partnership with conspiracy theorists called Digital Soldiers.

Yet his underlying message remains much the same as it was back in 2016, when he was leading chants of "lock her up" at Trump rallies: Washington's establishment is irredeemably corrupt, and real Americans — that is, supporters of himself and Mr. Trump — are wise to it.

"This country is awake," he declared at the pro-Trump rally in Washington last month. "We will not stand for a lie."

It was the night before a mob attacked the Capitol, and the crowd on hand in Washington's Freedom Plaza — some of whom would take part in the coming violence — left little doubt about where Mr. Flynn stood.

"We love you, we love you, we love you," they chanted. None of the other speakers at the rally — a boldface-name collection of Trumpworld characters like Roger Stone and Alex Jones — got as enthusiastic a reception.

With Mr. Trump now in his post-presidency at Mar-a-Lago, a loose coalition that draws together militia members and conspiracy theorists along with evangelical Christians and suburban Trump supporters is searching for direction. Call it the alt-truth movement, and if it is to coalesce into something more permanent, it may well be, at least in part, because figures like Mr. Flynn continue to push false claims of how a deep-state cabal stole the election.

Case 1:21-cv-02587-ASJ-SLC - Document 218-7 - Filed 02/02/24 - Page 17 of 30

"In order for us to breathe the fresh air of liberty, we, the people, we are the ones that will decide our path forward, America's future forward," he said at the Jan. 5 rally. "It may not be a Republican Party, it may not be a Democratic Party, it will be a people's party."

## Martial Law

Mr. Flynn, who did not respond to an interview request for this article, spent 33 years as an Army intelligence officer, earning a reputation for being outspoken and unconventional and, in the years that followed the Sept. 11 attacks, for being unusually good at unwinding terrorist networks.

Much of that work involved mapping out loose webs of ideological fellow travelers, figuring out who gave voice to extremist ideas and who committed the violence — two groups that were not always directly tied to each other. If a similar attempt was made to map the network of people who spread Mr. Trump's stolen-election lie that led to the storming of the Capitol, Mr. Flynn himself would probably appear as one of those leading voices for his part in riling up Mr. Trump's supporters without taking part in the attack.

Perhaps most responsible for Mr. Flynn's re-emergence is the conspiracy-theorizing lawyer Sidney Powell. Ms. Powell took over his legal defense in the Russia investigation after he had twice pleaded guilty in a deal to cooperate with prosecutors, and charted a combative new path. She challenged the deal and, marshaling a small army of like-minded Twitter users, recast Mr. Flynn from a turncoat into a victim, a man who had taken the fall to save his son, who was also under investigation.



Mr. Flynn with his son, Mike Flynn Jr., at Trump Tower in New York in 2016.  Sam Hodgson for The New York Times

It was the story of the Russia investigation as a malevolent plot that first began priming tens of millions of Americans to believe Mr. Trump's conspiracy theories about the deep state. As one of the heroes of that narrative, Mr. Flynn became an ideal messenger when it was refashioned into the demonstrably false claim that Democrats and their deep-state allies had rigged the election.

Within days of being pardoned on Nov. 27, Mr. Flynn began sharing those views in the right-wing media.

In some appearances, he described himself as a marked man. "I gotta make sure I'm a moving target, because these son-of-a-guns, they're after me, in a literal and a figurative sense," he told listeners of "The Matrixxx Groove Show," a QAnon podcast.

In an interview with Newsmax, the conservative channel, he suggested Mr. Trump could impose martial law in swing states he had lost and rerun the elections.

"People out there talk about martial law like it's something that we've never done," Mr. Flynn said. He noted that the military had taken over for civilian authorities dozens of times in American history, though he did not mention that it had never done so to help decide an election.

The suggestion horrified many of Mr. Flynn's former compatriots in uniform. Even discussing personal politics is frowned upon in the military, and most generals see it as their duty to stay above the political fray after retirement, as well. There have long been exceptions, of course, but to many who had served with Mr. Flynn, a retired general calling for the military to help decide an American election represented a new level of recklessness.

"Mike, stop. Just stop. You are a former soldier," Tony Thomas, a retired general who headed the Joint Special Operations Command, wrote on Twitter.

Throughout his military career, in fact, all most of Mr. Flynn's fellow soldiers had known about his politics was that he was a registered Democrat. Then came 2016, and the sight of a retired general leading chants for the imprisonment of Hillary Clinton, a former senator and secretary of state.

When a number of generals privately and publicly urged him to dial back his support for Mr. Trump, Mr. Flynn called them "disrespectful." If they could use their titles to get on corporate boards, he could use his to back Mr. Trump, he countered in an interview at the time, saying, "I care deeply about this country."

In any case, he said, he had never really been part of their club.

## 'Flynn Facts'

Mr. Flynn has described his family as "definitely lower middle class," and he joined the military without the West Point pedigree of many of his peers. He graduated instead from the Army's Reserve Officer Training Program at the University of Rhode Island, a short drive from the town where he was raised.

Yet he rose to be a lieutenant general, among the most respected military officers of his generation. He helped reshape the Joint Special Operations Command at the height of the war in Iraq, and ran military intelligence in Afghanistan during the Obama administration's troop surge. In 2012, President Barack Obama named him director of the Defense Intelligence Agency.

Mr. Flynn, the Obama administration's director of the Defense Intelligence Agency, testifying before Congress with James Clapper, then head of national intelligence.
Christopher Gregory/The New York Times

Then his career unraveled. After only two years, he was forced out when his attempt to reform the sprawling agency left subordinates squabbling and his superiors alarmed.

Mr. Flynn, though, claimed that he had been fired for refusing to toe the Obama administration's line that Islamist militants were in retreat. His position was vindicated with the rise of the Islamic State, and Mr. Flynn quickly became something of a cult figure among conservatives for what they saw as his brave stand against the Obama administration's perfidy.

As his relentless focus on Islamist militancy intensified, his views veered hard to the right. He argued that militants posed a threat to the very existence of the United States, and at times crossed the line into outright Islamophobia, tweeting "fear of Muslims is RATIONAL."

In Mr. Trump, he found a presidential candidate who shared his dark and conspiratorial view of Islam.

The similarities between the two men did not end there: Both shared a fondness for Twitter and often exhibited a loose relationship with the truth. When Mr. Flynn ran the D.I.A., his dubious assertions were so common that subordinates came up with a name for them: "Flynn facts." (In January, he was among those banned from Twitter with Mr. Trump.)

So it was no great stretch to see Mr. Flynn hurling conspiracy theories about an election that federal election-security experts considered among the best run on record, and for Mr. Trump to listen.



Supporters gathered outside a sentencing hearing in Washington in 2018 after Mr. Flynn pleaded guilty to lying to the F.B.I.    Saul Loeb/Agence France-Presse — Getty Images

Last Dec. 18, Mr. Flynn participated in a raucous White House meeting in which Ms. Powell proposed that the president appoint her as a special counsel investigating voter fraud. Mr. Trump at one point also raised the idea of putting Mr. Flynn in charge of the F.B.I., and later suggested making him chief of staff for the final weeks of his administration, according to Trump and Flynn associates familiar with the conversations, all of whom spoke on the condition of anonymity to avoid angering either man.

Whether the president was serious about either idea is an open question. But Mr. Flynn shot them down, saying he needed to focus on paying off millions of dollars in legal debts he had amassed fighting off the Russia investigation.

## Joining the Fringe

His plan for paying those bills appears to rely on leveraging his public persona into cold, hard cash. There are the T-shirts and other merchandise, which he is selling through a company called Shirt Show USA. The website features shirts emblazoned with #FightLikeAFlynn and camo trucker hats with the emblem "WWG1WGA," a reference to a popular QAnon motto, "Where we go one, we go all."

Michael Flynn, a Trump-era general, embraces QAnon conspiracy theory - The New York Times

Then there is his new media venture, Digital Soldiers, which will publish reader-submitted stories. Mr. Flynn is building it with UncoverDC, a website that has pushed QAnon and conspiracy theories about the Covid-19 pandemic and President Biden.

The tenor of Digital Soldiers is unmistakably QAnon, a movement centered on the claim that Mr. Trump, secretly aided by the military, was elected to smash a cabal of Democrats, international financiers and deep-state bureaucrats who worship Satan and abuse children. The supposed dishonesty of the mainstream media is central to QAnon, and Digital Soldiers — a phrase followers often use to describe themselves — represents Mr. Flynn's fullest embrace of the movement to date.

"Digital Soldiers from all over the world have stepped up to fill the void where real journalism once stood," the website says.

This past summer, Mr. Flynn posted a video of himself taking QAnon's "digital soldier" oath. To many of the movement's followers, Mr. Flynn ranks just below Mr. Trump. Some have speculated that he is the mysterious figure known as "Q," the purported government insider with a high-level security clearance who began posting cryptic messages in 2017 about the deep state trying to destroy the president.



Mr. Flynn posted a video of himself taking a QAnon oath this past summer.

"They really take his word as gospel," said Travis View, a close observer of the movement who hosts the podcast "QAnon Anonymous." "In the mythology, they often say that he knows where the bodies are buried, and that's why they tried to railroad him over Russia."

The phrase "digital soldiers" is drawn from a speech Mr. Flynn gave shortly after the 2016 election during which he inadvertently laid the groundwork for the conspiracy theory. He compared the Trump campaign to an insurgency — a theme that QAnon adherents would later adopt for themselves — with "an army of digital soldiers."

"This was irregular warfare at its finest — in politics," he said.

Among QAnon faithful, who believe that Mr. Trump and others use public statements to send secret signals, Mr. Flynn's speech is considered something of a foundational text. And now, in naming his new media outlet Digital Soldiers, many believe he is sending them a message to carry on, even though Mr. Trump left office before the predicted apocalyptic showdown with his enemies — know as "the storm" — could come to pass.

As one QAnon devotee noted in an IRC channel, a relatively dated online chat room technology favored by those particularly suspicious of possible surveillance, "If they kill or capture Trump, Flynn can still carry out the mission."

"The troops march to the beat of his drum," wrote the user, who went by the screen name "specialist."

The plan, the user added, was "masterful."

Ken Vogel and Maggie Haberman contributed reporting.

**Matthew Rosenberg**, a Washington-based correspondent, was part of a team that won a Pulitzer Prize in 2018 for reporting on Donald Trump and Russia. He previously spent 15 years as a foreign correspondent in Asia, Africa and the Middle East. More about Matthew Rosenberg

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Flynn Is Back, Selling Anger And T-Shirts

# Exhibit 25

# Takeaways from the AP/Frontline Michael Flynn investigation





An investigation by The Associated Press and Frontline finds that Michael Flynn, the retired Army general and former Trump national security adviser, has been building a political movement mixing conspiracy theory with Christian nationalist ideas. (Sept. 7/ Video edited by Serginho Roosblad)

Photos 13

Read More

BY MICHELLE R. SMITH
Published 4:21 PM EST, September 7, 2022



Israel-Hamas war      Japan plane crash      Trump appeals Maine ruling      Harvard President resigns      Powerball jackpot

ADVERTISEMENT

[An investigation by The Associated Press and the PBS series "Frontline"](#) found that Flynn has used public appearances to energize voters, made political endorsements to build alliances and amassed a network of nonprofit groups to advance the movement. Along the way, Flynn and his companies have earned hundreds of thousands of dollars for his efforts.

The AP and "Frontline" spoke with dozens of people, reviewed campaign finance records, corporate and charity filings, social media posts and similar open-source information, and attended several public events where Flynn appeared. Reporters examined dozens of Flynn's speeches, interviews and public appearances.

Flynn himself sat down for a rare on-camera interview with what he calls the mainstream media.

Takeaways from the investigation:

---

## A FOUNDATION OF CHRISTIAN NATIONALIST IDEAS

Flynn made more than 60 in-person speeches in 24 states, according to a count by the AP and "Frontline." He often asserts that the United States was founded on Judeo-Christian values. The bedrock, he warns, is crumbling.

Flynn often says the country is in the midst of a "spiritual war" and that many of his fellow citizens are "evil."

"They dress like us and they talk like us, but they don't think and act like us," he told a podcaster recently. "And they definitely do not want what it is that we want."

Christian nationalism seeks to merge the identity of Christians and Americans, and pushes the idea that the United States was founded on biblical principles and has a favored relationship with a Christian God, said Samuel Perry, a sociologist at the University of Oklahoma, who studies conservative Christianity and politics.

The thread of Christian nationalism runs through many of Flynn's events.

At one fundraiser, a preacher prayed over Flynn, saying America would stay a Christian nation and that Flynn was "heavy armaments" in the Lord's quiver. At the Christian Patriot's Rally at a church in Northern California, Flynn was presented with an assault-style rifle on stage. In Virginia in July, he said pastors "need to

be talking about the Constitution from the pulpit as much as the Bible." In Texas last November, Flynn told a crowd "this is a moment in time where this is good versus evil."

"If we are going to have one nation under God, which we must, we have to have one religion. One nation under God, and one religion under God, right?" he said.

## 99 ENDORSEMENTS

The AP and "Frontline" found that Flynn has endorsed 99 candidates for the 2022 election cycle. At least 80% have publicly spread lies or sown doubt about Trump's 2020 loss, or participated in efforts to overturn the election, the AP and "Frontline" found. About two dozen of the candidates were at the Capitol on Jan. 5-6, 2021. One-third have served in the military. At least 38 have used Christian nationalist rhetoric.

More than 40 of Flynn's endorsements were for candidates seeking state or even local posts. He endorsed candidates for the state legislature in Michigan, Ohio, Arizona, Florida, Texas and Missouri. In Arizona, Michigan, California and Colorado, he gave his approval to candidates for secretary of state, a position that typically involves the administration of elections.

A dozen gubernatorial candidates won Flynn's backing, including nominees Dan Cox in Maryland and Doug Mastriano in Pennsylvania. Both organized buses to take people to Washington for what turned out to be the siege at the Capitol on Jan. 6.

Some Flynn-backed candidates made baseless claims of election fraud after they lost in the primaries.

Flynn and his allies have suggested he wants to get back into government. Some Flynn critics worry the growing influence that flows from the network he's building may help him get there.

## FINANCING ELECTION DENIAL

Flynn has become involved in well-financed groups that advocate changes to the way elections are run, based on the false premise there is widespread voting fraud.

Flynn and Patrick Byrne, founder of Overstock.com, last year launched The America Project. The group said it planned to spend $50 million in the 2021 budget year, according to a filing with North Carolina charity regulators. Its leaders told AP that it had spent tens of millions less than that.

Flynn was named chairman of America's Future Inc., one of the country's oldest conservative nonprofit groups. It had about $3 million in assets at the end of 2020, and Flynn told the AP and "Frontline" in February that he had raised an estimated $1.7 million since becoming chairman.

The two groups have spent millions on election-related endeavors, including a misinformation-driven review of the 2020 presidential election results commissioned by Arizona Republicans.

1/3/24, 10:27 AM
Case 1:21-cv-02587-AS-SLC   Document 218-7   Filed 02/03/24   Page 26 of 30
Takeaways from our investigation into Michael Flynn and the movement to overturn the ...

The America Project's leadership has said it has given millions more to "grassroots organizations" around the country. Campaign finance records show it has given hundreds of thousands of dollars to various political groups. It also launched an initiative in several states to mobilize and train poll watchers and precinct captains, and to drive get-out-the-vote efforts.

The initiative has raised alarm bells with pro-democracy advocates.

———

Associated Press writers Richard Lardner, Eric Tucker, Helen Wieffering and Aaron Kessler, photographer Carolyn Kaster and "Frontline" producers Richard Rowley and Paul Abowd contributed to this report.

———

To reach AP's investigative team, email investigative@ap.org

———

For full coverage of the Capitol riot, go to https://www.apnews.com/capitol-siege



**MICHELLE R. SMITH**
Smith reports for AP's global investigations team. She is based in Providence, Rhode Island.

ADVERTISEMENT



Meet Dr. Gardner

Internal Medicine Physician in Wynnewood, PA

MORE INFO

# Exhibit 26

**The New York Times** | https://www.nytimes.com/2021/06/01/us/politics/flynn-coup-gohmert-qanon.html

# Michael Flynn suggested at a QAnon-affiliated event that a coup should happen in the U.S.

At the same event, Representative Louie Gohmert, a Republican from Texas, repeated a widely debunked claim that right-wing extremists were not solely responsible for the Capitol riot.

 **By Maggie Astor**

June 1, 2021

Michael T. Flynn, a former national security adviser, suggested that a military coup was needed in the United States during a Memorial Day weekend conference organized by adherents of the QAnon conspiracy theory, drawing criticism from political scientists, veterans, Democrats and a handful of prominent Republicans.

Appearing at the "For God & Country Patriot Roundup" conference in Dallas, Mr. Flynn listened to an audience member ask, "I want to know why what happened in Myanmar can't happen here" — referring to the Myanmar military's overthrow of a quasi-democratic government and brutal crackdown on dissent, which some QAnon supporters have cited approvingly. Mr. Flynn replied: "No reason. I mean, it should happen here. No reason."

Many criticized the comment, including Representative Liz Cheney, a Republican who was kicked out of her House leadership position this month for criticizing former President Donald J. Trump and saying she would do everything possible to ensure he was not the Republican Party's presidential nominee in 2024. On Twitter, Ms. Cheney said, "No American should advocate or support the violent overthrow of the United States."



1/2/24, 2:38 PM
Case 1:21-cv-02587-AS-SLC  Document 218-7  Filed 02/02/24  Page 30 of 30
Michael Flynn Suggests a Coup Should Happen in U.S. - The New York Times

Mr. Flynn — who suggested in December that Mr. Trump could invoke martial law to force new elections in swing states — responded to backlash to his remark by arguing Monday in a post on Telegram, a messaging app, that he meant the opposite.

"I am no stranger to media manipulating my words, and therefore let me repeat my response to a question asked at the conference: There is no reason it (a coup) should happen here (in America)," he wrote.

Speaking at the same conference over the weekend, Representative Louie Gohmert, Republican of Texas, said that right-wing extremists were not solely responsible for the Capitol riot. The false idea that left-wing groups were responsible is popular among some conservatives.

Mr. Gohmert also minimized the severity of the riot — in which a mob of American supporters of Mr. Trump tried violently to stop Congress from certifying the results of the 2020 election — by citing past attacks by foreigners: "Some of us think Pearl Harbor was the worst attack on democracy. Some of us think 9/11 was the worst attack. Some of us think that those things were worse attacks on democracy." (President Biden has called the riot "the worst attack on our democracy since the Civil War.")

A spokeswoman for Mr. Gohmert did not immediately respond to a request for comment on Tuesday.

He and Mr. Flynn both spoke in front of a logo that included the QAnon slogan "WWG1WGA," short for "Where We Go One, We Go All."

A recent poll by the Public Religion Research Institute and the Interfaith Youth Core found that 14 percent of Americans, including about one in four Republicans, believed in three central tenets of the QAnon conspiracy theory: that the United States is being run by a cabal of Satanist pedophiles, that "American patriots may have to resort to violence" to get rid of that cabal, and that a "storm" will soon "restore the rightful leaders."

**Maggie Astor** is a political reporter based in New York. Previously, she was a general assignment reporter and a copy editor for The Times and a reporter for The Record in New Jersey. More about Maggie Astor