UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN P. "JACK" FLYNN et al.,

Plaintiffs,

-against-

CABLE NEWS NETWORK, INC.,

Defendant.

21-cv-2587 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge.

## BACKGROUND

Plaintiffs Jack and Leslie Flynn have sued Defendant Cable News Network (better known as CNN) under Rhode Island's false-light statute. The Flynns claim $75 million in damages. The entire dispute stems from a six-minute segment and, more specifically, the segment's use of a two-second clip in which the Flynns appear. The Flynns say the segment falsely painted them as "QAnon followers."

The parties agree that QAnon is "an American conspiracy movement that began in 2017." Dkt. 212 ¶ 4. The conspiracy centers around "Q," who is supposedly "a high-ranking government official" who "leak[s] top secret information" about the "Deep State." *Id.* There have been about 5,000 of these leaks (or "Q drops"). *Id.* The Flynns say that "a series of outlandish beliefs … have grown out of these Q drops." *Id.* ¶ 5. But just exactly what those beliefs *are* is unclear (and is one of the main subjects of this opinion). Before this suit was filed, Jack himself characterized QAnon as "[j]ust People doing their own research and learning independence of thought to find the truth." Dkt. 198-11.

The CNN report at issue aired in February 2021. It was framed around an October 2020 event called "Q Con Live!" Dkt. 212 ¶ 86. The report opens with a series of short clips from the event, followed by the reporter's voiceover explaining that the footage was from a "gathering of QAnon followers in Arizona just two weeks before November's election." Dkt. 184-1 at 0:01–0:22. The video next shows the so-called QAnon Shaman, who is wrapped in a flag that says, "WHERE WE GO ONE WE GO ALL." *Id.* at 0:37–0:42. The voiceover explains, "He's known as the QAnon Shaman, and he would go on to storm the Capitol in January." *Id.* The video then cuts to someone at the event singing "where we go one, we go all." *Id.* at 0:43–0:50. The voiceover then says, "'Where we go one, we go all': an infamous QAnon slogan promoted by Trump's first National Security Advisor, Michael Flynn." *Id.* at 0:51–0:58.

At that point, the video cuts to the key clip. It shows a row of six people raising their right hands. *Id.* at 0:58–1:00. Standing toward the middle of the group, Michael Flynn says, "Where we go one, we go all." *Id.* Alongside Michael Flynn are Jack and Leslie, though they say nothing. *Id.* The video then returns to Q Con, and the voiceover continues, "And played as an anthem at this

meeting of Trump supporters." *Id.* at 1:01–1:03. The rest of the segment discusses President Trump's refusal to disavow QAnon, the January 6 attack on the Capitol, and the QAnon movement more generally. *Id.* at 1:04–5:52. Neither Jack nor Leslie is shown or mentioned again. Finally, for nearly the whole segment, there is a headline-style chyron that reads, "CNN GOES INSIDE A GATHERING OF QANON FOLLOWERS." *Id.* at 0:01–5:13.

The Flynns originally had two claims: defamation per se and false light. Am. Compl., Dkt. 7. Before this case was reassigned to me, the Court dismissed the defamation claim but not the false-light claim. Dkt. 42. CNN has now moved for summary judgment on the false-light claim.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–26 (1986).

Rhode Island's invasion-of-privacy statute lays out the elements of its false-light claim:

(a) Right to privacy created. It is the policy of this state that every person in this state shall have a right to privacy which shall be defined to include any of the following rights individually:

…

(4) The right to be secure from publicity that reasonably places another in a false light before the public;

(i) In order to recover for violation of this right, it must be established that:

(A) There has been some publication of a false or fictitious fact which implies an association which does not exist;

(B) The association which has been published or implied would be objectionable to the ordinary reasonable man under the circumstances[.]

9 R.I. Gen. Laws Ann. § 9-1-28.1(a). The statute also creates a private right of action. § 9-1-28.1(b).

This statute differs from the common-law tort in that (among other differences) it requires a "false or fictitious fact," making the claim here more like defamation. *Compare* § 9-1-28.1(a)(4)(i)(A), *with* Restatement (Second) of Torts § 652E. In interpreting the statute, the Supreme Court of Rhode Island has imported many defamation doctrines, noting that plaintiffs should not be able to

"evad[e] the limitations of a successful defamation action by using the alternate theory of a false-light claim." *Cullen v. Auclair*, 809 A.2d 1107, 1112 (R.I. 2002). And it pulls many of those doctrines from the Second Restatement of Torts. *See, e.g.*, *id.* Separately, this case involves potential liability for speech, so it implicates "a complex mixture of common-law rules and constitutional doctrines." *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022) (citation omitted). Below, the Court draws on all these sources.

## DISCUSSION

"To recover under § 9-1-28.1(a)(4), [a] plaintiff must establish that there has been some publication of a false or fictitious fact which implies an association which does not exist; and the association which has been published or implied would be objectionable to the ordinary reasonable man under the circumstances." *Cullen*, 809 A.2d at 1112 (cleaned up).

"[I]t is the responsibility of the court to determine as a matter of law whether a statement portrays an individual in a false light under § 9-1-28.1(a)(4)." *Id.* That is, "the threshold determination of whether a statement is capable of bearing a defamatory meaning is for the court to decide, [and] the ultimate conclusion on whether such a meaning was indeed conveyed is for the jury to decide." *Healey v. New Eng. Newspapers, Inc.*, 520 A.2d 147, 150 (R.I. 1987) (citation omitted). "In determining whether a particular communication is capable of bearing a defamatory meaning," the question "is what the person to whom the communication was published reasonably understood as the meaning intended to be expressed." *Budget Termite & Pest Control, Inc. v. Bousquet*, 811 A.2d 1169, 1172 (R.I. 2002) (cleaned up).

Here, the Flynns' claim is that CNN called them "QAnon followers." *See* Dkt. 197 at 18–21; Dkt. 221 at 1. Although CNN never overtly said that, a false fact may be implied. *See McCann v. Shell Oil Co.*, 551 A.2d 696, 697–98 (R.I. 1988). The Court assumes without deciding that the video was capable of implying that the Flynns were QAnon followers. That implication, "once defined, is treated like a claim for direct defamation." *Cheng*, 51 F.4th at 444; *see also Biro v. Conde Nast*, 883 F. Supp. 2d 441, 468–69 (S.D.N.Y. 2012). In other words, the Court will analyze the issue as if CNN called the Flynns "QAnon followers" explicitly. But determining "whether a communication is capable of bearing a particular meaning" is only the first step. Restatement (Second) of Torts § 614(1)(b). It is still a matter for the Court to decide "whether that meaning is defamatory." *Id.*

It was not. Calling the Flynns "QAnon followers" was, in defamation law–speak, an opinion.[1] And an opinion is "actionable only if it implies the allegation of undisclosed defamatory facts as

---

[1] "[W]hether a statement is opinion … as opposed to a factual representation is a question of law for the court." *Rapaport v. Barstool Sports Inc.*, 2024 WL 88636, at *2 (2d Cir. Jan. 9, 2024) (quoting *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985)); *see Cullen*, 809 A.2d at 1112. Confusingly, "opinion" in this context captures several kinds of statements, including those that would not be called "opinions" colloquially. *See* Cass R. Sunstein, *Hard Defamation Cases*, 25 Wm. & Mary L. Rev. 891, 904 n.35 (1984) ("'Fact' and 'opinion' thus operate as labels for conclusions based on a host of considerations."); *see also* Robert D. Sack, *Sack on Defamation* § 4:1 (5th ed. 2017).

the basis for the opinion." Restatement (Second) of Torts § 566.[2] Put differently, "the dispositive inquiry here is … whether the challenged statement can reasonably be construed to be stating or implying [defamatory] facts about the [Flynns]." *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 148 (2d Cir. 2000).[3]

Here, the statement neither stated nor implied defamatory facts, so it is a nonactionable opinion. This conclusion is based on two independent—but mutually reinforcing—grounds.[4] First, the statement is unverifiable. And second, it was a comment on disclosed, nondefamatory facts. Both characteristics ensure that the reasonable viewer understands that the statement is the speaker's opinion (rather than stating facts) and that the speaker is not harboring additional, undisclosed facts to justify the statement. So Rhode Island law and the First Amendment demand its protection.

## I.   The statement is an opinion

### A.  Whether the Flynns are QAnon followers is unverifiable

#### 1.  *Rhode Island law, the First Amendment, and public concern*

One type of opinion is an unverifiable statement. Under Rhode Island law, a statement is an opinion if it is "too imprecise and vague to be verifiable as either true or false." *Ferreira v. Child & Fam. Servs.*, 222 A.3d 69, 75 (R.I. 2019) (citation omitted). Under the First Amendment, too, "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least situations, like the present, where a media defendant is

---

[2] This rule applies under both Rhode Island and federal law. *See Healey*, 520 A.2d at 150–51; *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990). And because the protection attaches to the speech, the form of liability doesn't matter; both state and federal law protect opinions in the same way for false-light claims. *Cullen*, 809 A.2d at 1112; *Machleder v. Diaz*, 801 F.2d 46, 54 (2d Cir. 1986); *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013) (collecting cases); *see also Milkovich*, 497 U.S. at 20 ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.").

[3] The cases are often imprecise in the terms they use, so it's sometimes unclear which part of the inquiry they are addressing. They shift between calling a statement an "opinion," "nonactionable," "protected," "privileged," and the like. Holding that a "statement" is "nonactionable" could mean that the statement (in isolation) doesn't state false facts or that the statement neither states nor implies false facts. To simplify things here (and tracking the Restatement approach), the Court first considers whether the statement is an "opinion" in that it doesn't state false facts (Part I) and then separately analyzes whether the statement, as an opinion, nevertheless implies false facts (Part II). A byproduct of this approach is the occasional misfit between the language in this opinion and that in a cited case, but they are getting at the same idea.

The Court also notes that in using the "opinion" label, it is not ignoring *Milkovich*'s declaration that there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" 497 U.S. at 18. *Milkovich* cited the Restatement throughout the opinion, and their approaches are essentially "congruent." Dan B. Dobbs et al., *Dobbs' Law of Torts* § 568 (2d ed. 2024). *Milkovich* was simply emphasizing that "expressions of 'opinion' may often imply an assertion of objective fact." *Id.* But it also held that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* at 20; *see also id.* at 24 (Brennan, J., dissenting) ("[W]hile the Court today dispels any misimpression that there is a so-called opinion privilege *wholly in addition* to the protections we have already found to be guaranteed by the First Amendment, it determines that a protection for statements of pure opinion is dictated by *existing* First Amendment doctrine."). Both parts of the Court's opinion test the statement for provably false factual assertions and implications.

[4] The Court ordered and received supplemental briefing on these issues. Dkts. 219–21; *cf.* Fed. R. Civ. P. 56(f).

involved." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–20 (1990).[5] And under both, the burden is on the plaintiff to prove falsity. *See Beattie v. Fleet Nat. Bank*, 746 A.2d 717, 721 (R.I. 2000); *Swerdlick v. Koch*, 721 A.2d 849, 862 (R.I. 1998); *Cullen*, 809 A.2d at 1112–13; *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 778 (1986).

Here, the statement was on matters of public concern. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up). The target audience may be "narrow" so long as the speech "addresses *matters* that concern the public." *Heim v. Daniel*, 81 F.4th 212, 228 (2d Cir. 2023). This "inclusive standard" aims to keep "debate on public issues … wide-open." *Id.* at 228–29 (citation omitted). Speech "of only private concern" involves purely personal squabbles, internal business affairs, and the like. *See Snyder*, 562 U.S. at 453. Whether speech deals with matters of public concern is a "question of law that is determined by the content, form and context of a given statement, as revealed by the whole record." *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008) (internal quotation marks omitted).

The speech here plainly fits the bill. QAnon itself is a topic of public concern, and the segment also reported on the connections between QAnon, January 6, and former president Trump. The Flynns acknowledge that the report as a whole was on matters of public concern. Dkt. 197 at 25–26. They argue that including them in the report did not "further[]" any "legitimate public interest" because (1) they are not public figures and (2) "the clip does not relate to the public concern that is the subject of the Report." *Id.*

The first argument misunderstands the law. The public-figure and public-concern tests have little to do with each other. *Compare Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 137 (2d Cir. 1984), *with Snyder*, 562 U.S. at 453. And the second argument fails because it presumes the Flynns' favored conclusion on the merits. Connections between QAnon and those in power were the core public concern addressed by the report. The clip of Michael Flynn—President Trump's first National Security Advisor—saying a phrase associated with QAnon certainly addresses that concern, even if the Flynns think it was totally innocent.[6]

---

[5] Although *Milkovich* addressed statements of public concern, it did not rule out protection for statements not of public concern. *Milkovich*, 497 U.S. at 20–23; *cf. Flamm*, 201 F.3d at 148 (holding that *Milkovich* "did not decide … whether the same rules apply to nonmedia defendants"). And before *Milkovich*, the Second Circuit articulated the test without the public-concern requirement. *See Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977) ("An assertion that cannot be proved false cannot be held libellous."); *Machleder*, 801 F.2d at 54 (requiring falsity for false-light claims). So even if the statement here was not of public concern, it would likely still be protected. *See Augenbaum v. Anson Invs. Master Fund LP*, 2024 WL 263208, at *4 (S.D.N.Y. Jan. 24, 2024) ("[T]he Court is bound by [Second Circuit precedent] unless it would be impossible to comply with both its commands and those of the Supreme Court[.]").

[6] As explained later, the Flynns claim that they didn't know that the phrase was associated with QAnon, but they don't dispute that it was in fact.

The Flynns' argument boils down to the idea that including *them* wasn't integral to the report. *See* Dkt. 197 at 28 (arguing that CNN should've "blur[red] out Jack and Leslie's images like MSNBC did"). But this argument operates at the wrong level of generality. The question is whether the speech "addresses *matters* that concern the public," not whether the particular method of doing so had broad public or persuasive appeal. *Heim*, 81 F.4th at 228. In *Snyder*, the Supreme Court focused on "the fact that the overall thrust and dominant theme of [the speech] spoke to broader public issues," "even if a few of the signs … were viewed as containing messages related to [the plaintiffs and their family] specifically." 562 U.S. at 454. So too here.

And even if the report needed to justify including the Flynns, it could. They are Michael Flynn's family members, and they were defending him in the court of public opinion while also fundraising for his defense in a court of law. *See, e.g.*, Dkt. 212 ¶¶ 27, 43. Whether those in Michael Flynn's orbit were involved with QAnon goes to the broader question of public concern: whether those in power were involved and to what extent.

*2. Examples of unverifiable statements*

So, under both Rhode Island and federal law, calling the Flynns "QAnon followers" is an opinion if it isn't verifiable. But of course, verifiability itself isn't always clear. *See* Frederick F. Schauer, *Language, Truth, and the First Amendment*, 64 Va. L. Rev. 263, 279 (1978) ("Verifiability is not a property that either does or does not obtain. Rather, it is a property that may be present in varying degrees."). Before diving into the facts here, it is useful to get a sense of the cases from 30,000 feet.

On one side of the line, accusing someone of perjuring himself, raping someone at gunpoint, libeling someone, or personally approving prostitution on his property are sufficiently definite to be proven false. *Milkovich*, 497 U.S. at 21; *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 64 (2d Cir. 1980); *Buckley v. Littell*, 539 F.2d 882, 896 (2d Cir. 1976); *Adelson v. Harris*, 774 F.3d 803, 807 (2d Cir. 2014).

But accusing someone of being far-right, right-wing, a conspiracy theorist, a fascist, part of the radical right, a communist, a blackmailer, a scab, a toady, a hypocrite, a racist, a fraud, or a bully is not verifiable. *Cheng*, 51 F.4th at 446–47 (first three); *Buckley*, 539 F.2d at 893–94 (fascism, radical right); *Cianci*, 639 F.2d at 65 n.14 (communist); *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 12–14 (1970) (blackmail); *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284–86 (1974) (scab); *Hotchner v. Castillo-Puche*, 551 F.2d 910, 912–13 (2d Cir. 1976) (toady, hypocrite); *Rapaport v. Barstool Sports Inc.*, 2024 WL 88636, at *3 (2d Cir. Jan. 9, 2024) (racism, fraud); *Toray Plastics (Am.), Inc. v. Paknis*, 2022 WL 3368720, at *5 (D.R.I. Aug. 16, 2022) (bully).

Stated generally, a phrase "cannot be defamatory unless in a given context it reasonably can be understood as having an easily ascertainable and objectively verifiable meaning," but the latter group of "words [and] phrases evoke[s] a multiplicity of meanings." *Leddy v. Narragansett Television, L.P.*, 843 A.2d 481, 489 (R.I. 2004) (citation omitted); *see also Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 129 (1st Cir. 1997) ("The vaguer a term, or the more meanings it

6

reasonably can convey, the less likely it is to be actionable."). "QAnon follower" falls on the latter side of the line.

### 3. Based on the summary-judgment record, "QAnon follower" lacks a definite meaning

The Flynns argue that "whether individuals harbor beliefs that align with or follow QAnon can be proven true or false." Dkt. 221 at 1. They describe the "beliefs" that are "central to QAnon" as the following:

> QAnon is "a deranged conspiracy cult," "based on age-old racist and anti-Semitic beliefs," and is "a dangerous and violent movement, a movement that has become insurrectionist." *See* Pls.' Opp. Summary Judgment at 3; *see also* Declaration of Jared Roberts, Dkt. No. 206, Ex. A ("Roberts Ex. A") at 30:22–31:9. [Court's note: the correct citation is 31:22–32:9.] QAnon followers hold specific, outlandish beliefs that include a belief in "a secret global cabal of Democrats and celebrities [who] worship Satan[,] sexually abuse[] children and dr[ink] their blood in order to ingest a chemical called adrenochrome." Roberts Ex. A at 90:3–16. These followers also hold beliefs that Donald Trump "is a messianic figure," and some even "believe there's a lineage … from JFK, Trump through to our Lord Jesus Christ." *Id.* at 36:7–25; 88:11–19.

*Id.* at 1–2 (alterations other than note in original). This characterization is repeated elsewhere in the Flynns' filings. *See* Dkt. 197 at 2–4 (citing, in addition to the above, Roberts Ex. A at 20:21–21:21); Dkt. 212 at ¶¶ 4–8, 104–108. The only exhibit cited is the deposition of the reporter who created the video. So that deposition is all the evidence that the Flynns have about what being a "QAnon follower" means. *See* Fed. R. Civ. P. 56(c)(3).

Yet they have mischaracterized that testimony. The quoted material in the Flynns' filings is almost entirely from the statements of the *attorney* conducting the deposition, which the witness does not endorse. From the outset, the witness makes clear that QAnon is a "fluid" set of beliefs, and he rejects that there are any unifying features other than some "memes" and "slogans." Dkt. 198-1 at 20:2–24:22. Later, the witness says that "parts" of a statement about QAnon's origins and effects are accurate, but he still resists that there are unifying beliefs or behaviors. *Id.* at 32:10–36:25. Later still, the witness again rejects that QAnon has a stable core, instead noting that its "beliefs can be broad and evolving." *Id.* at 87:12–89:2, 90:3–91:18. Finally, the witness notes that even the nature and identity of Q—surely what one would think of as forming the core of *Q*Anon— are unsettled. *Id.* at 53:22–54:4. Even read in the light most favorable to the Flynns, the deposition (in context) clearly supports the idea that QAnon is an amorphous, undefined concept. (Reproduced (at length) in the appendix are the portions of the deposition transcript cited by the Flynns, plus the surrounding context, with the Flynns' quotations underlined.)

And CNN points to other record evidence to shore up this point. CNN's expert testified that QAnon is "elastic and difficult to define," lacks a "coherent belief system," and that there "is no definition [of] what a QAnon follower is, or what 'following' QAnon actually entails." Dkt. 184-6 at 4–5, 7. Similarly, the Flynns' expert agreed that QAnon is an "a la carte belief system," "not

an "[o]rthodoxy," and there's no "formula for how you indicate QAnon belief." Dkt. 184-117 at 60:14–16, 111:7–17, 203:9–15.

The Flynns' filings themselves reinforce this theme. The very first paragraph of the amended complaint describes QAnon as "a far right-wing, loosely organized network and community of believers who embrace a range of unsubstantiated beliefs." Am. Compl. ¶ 1. And rather than grounding the meaning of "QAnon" in something concrete, their other descriptions just add more value judgments to the mix. *Id.* ¶¶ 2–3, 15, 19, 23(a), 26 (describing QAnon as "right-wing," a "deranged conspiracy cult," "based on age-old racist and anti-Semitic beliefs," promoting "ancient and dark biases and bigotry," "detached from reality," having an "utter disregard for the facts," "mentally ill and crazy," "dangerous," "violent," "racist," "extremist," "insurrectionist," a "do-mestic terrorist organization," and stating that "trusting the plan [is] an important part of QAnon belief" (internal quotation marks omitted)).

Perhaps one could argue (though the Flynns don't) that the report itself gives "QAnon fol-lower" some fixed meaning. But it doesn't. At one point in the video, a commentator says QAnon is about "community": "One of my big takeaways from attending the Q conference is that the QAnon movement is about so much more than just the predictions … it's about the community. The people there felt like they were part of something big and revolutionary and that they were opposing absolute evil." Dkt. 184-1 at 3:20–3:35. Later, the reporter traces QAnon to Silicon Val-ley, Trump, lies, racism, anti-Semitism, and hate:

> It was enabled by the infrastructure that was built in Silicon Valley that rewarded, you know, lies and hate. It was obviously fueled by … the former president, Presi-dent Trump. But also, you know, a lot of this is just really … based on the existing sort of history of hate and racism in this country, which QAnon has enabled and given license to many Americans to now freely express openly.… But a lot of this goes back [to], and sort of I think just begins to scratch the surface [of], some of the more fundamental challenges of racism and anti-Semitism and hate.

*Id.* at 4:18–5:03. Plus, right after the clip of the Flynns, the voiceover describes Q Con as "this meeting of Trump supporters." *Id.* at 1:01–1:03; *see also* Dkt. 181-8 at 11:21–25 (witness describ-ing QAnon as being about, at least in part, support for Trump). At the end of the video, the reporter swaps "followers" for "believers," and calls QAnon a "conspiracy theory." Dkt. 184-1 at 5:40–5:52. None of these many descriptions gives "QAnon" a stable meaning.

The Flynns gesture at a version of this kind of video-context argument by taking issue with the fact that they appear in the same video as those who stormed the Capitol on January 6. But the report itself dispels the idea that every QAnon follower was part of January 6. In the video, the reporter says that he knows of only two people at Q Con who were part of January 6, and he identifies them specifically. *Id.* at 2:08–2:34. He adds that one of them was known for organizing "anti-lockdown protests in California" and the other went on a hunger strike in prison because it "didn't have organic food." *Id.* So even if the video implied that QAnon and insurrectionism were related, a reasonable viewer wouldn't be drawing one-to-one comparisons.

Stepping back, the whole reason for the report was that QAnon was (and is) poorly understood. *See Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 226 (2d Cir. 1985) ("[T]he court should examine the broader social context into which the statement fits[.]" (internal quotation marks omitted)). And while the report tried to shed some light on QAnon, it still acknowledged that the movement is a strange, loosely associated group without a clear driving force.

Based on this record, especially focusing on those materials cited by the Flynns, *see* Fed. R. Civ. P. 56(c)(3), they can't genuinely dispute the facts that QAnon lacks any meaningful core and that the phrase "QAnon follower" is subject to many interpretations.

### 4. The statement here is an unverifiable opinion

Without discernible tenets, the phrase "QAnon follower" is unverifiable and, thus, is an opinion. This conclusion flows from the verifiability requirement itself, but it is confirmed by the case law. In particular, the parallels between this case and *Buckley* are striking and instructive. In *Buckley*, the Second Circuit held that two statements were protected as unverifiable: (1) that the plaintiff was a "fellow traveler" of "fascism," and (2) that he acted as a "deceiver" by circulating material from "openly fascist journals." 539 F.2d at 893–95.

As a matter of framing, the *Buckley* court emphasized its "primary concern" for the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks." *Id.* at 889 (citation omitted). And it criticized the district court for failing to "approach the task of interpreting the debatable meaning of the alleged libels in the light of the[se] imperatives." *Id.* at 888 n.3.

*Hepps* reflects the same concern. Even if the statement is in some sense "false" but the Flynns just can't prove it, that is the price of freedom: "[R]equiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so." *Hepps*, 475 U.S. at 778. Where, as here, the evidence is at best "ambiguous" or "uncertain"—and far from "conclusive[]"—"the Constitution requires [courts] to tip [the balance] in favor of protecting true speech." *Id.* at 776.

Of course, there is "another side to the equation": the "important social values which underlie the law of defamation." *Milkovich*, 497 U.S. at 22 (citation omitted). But a trial on a statement that can't be proved true or false doesn't vindicate those values. Juries aren't allowed to speculate about statements like these "because[,] lacking a clear method of verification[,] the trier of fact may improperly tend to render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject." *Mr. Chow*, 759 F.2d at 226 (cleaned up); *cf. Time, Inc. v. Hill*, 385 U.S. 374, 406 (1967) (Harlan, J., concurring in part and dissenting in part) ("Any nation which counts the Scopes trial as part of its heritage cannot so readily expose ideas to sanctions on a jury finding of falsity."). So even if this case were close to the line, the First Amendment favors more speech, not less. *See Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 188 (2d Cir. 2000) ("Where the question of truth or falsity is a close one, a court should err on the side of non-actionability." (citation omitted)).

In any event, this case is not a tossup. In *Buckley*, as here, neither side could pin down precise definitions of the terms. 539 F.2d at 890–91. *Buckley* pointed to several indicators of that imprecision. First, the *Buckley* plaintiff's principal witness (the plaintiff himself) "indicated that the common understanding and usage of 'fascist' and 'radical right' … are matters of significant ambiguity." *Id.* at 893 n.10. Here, too, the Flynns rely exclusively on the reporter's testimony, but he took pains to emphasize that QAnon belief was "fluid." And CNN points out that the Flynns' own expert repeated that sentiment.

Second, the plaintiff in *Buckley* had previously made certain statements about fascism, but "he took the occasion of the trial to repudiate that usage, [which] further pointed up the looseness of the term." *Id.* at 892. Here, the Flynns contend that QAnon is defined by a set of "specific, outlandish beliefs," Dkt. 221 at 2, but Jack previously said that "[t]here is nothing wrong with QAnon. Just People doing their own research and learning independence of thought to find the truth," Dkt. 198-11; *see also id.* (Jack tweeting, "I was told today that QAnons are dangerous people to be aligned with.… True or not, most people seem pretty normal to me who support the idea of Q."); Dkt. 212 ¶ 59 (Jack tweeting, "Honestly I ask myself about this Q thing and look for a reason not to trust anything about it."); *id.* (Jack tweeting, "I don't know who or what Q is so there's that. But no one[']s hurting each other[;] it's civilized[,] [it's] encouraging people to learn independently[, and it] supports [T]rump and the [C]onstitution. So. WTF. #WWG1WGA.").

Third, the meaning of the terms in *Buckley* was blurred by the surrounding speech. At some points, the statements equated the "radical right" or "right wing" with fascism. And the plaintiff described the "radical right" "in terms of such generalities as 'irresponsible,' 'thoughtless' or 'sometimes racist,' or only circularly as consisting of 'right wing agitators.'" 539 F.2d at 891 n.7. As discussed above, "QAnon follower" has also become a rough substitute for "right-wing," "extremist," "racist," "Trump supporter," or any of the other dozens of adjectives recounted in the prior section. Similarly, the Flynns specifically contrast QAnon with "left-wing." *See* Am. Compl. ¶ 21 n.6 (describing "right-wing QAnon followers" and "left-wing obsession"); *id.* ¶ 2 (describing coverage by "left-wing media outlets"); Dkt. 212 ¶ 60 (Jack retweeting a "breakdown" of "QAnon vs. Antifa"); *cf. Cheng*, 51 F.4th at 446 & n.6 (pointing out that the plaintiff alleged that "far-right" was defamatory while the complaint described the defendant as "to the extreme political left").

"Beyond the ambiguity and looseness of the terms 'fascist' and 'radical right,' the usage of the term 'fellow traveler'" in *Buckley* was also unclear. 539 F.2d at 891. It "is equally consistent with … connoting an innocent dupe as with … a conscious political adherent." *Id.* at 891–92. And whether the plaintiff's republication of fascist journals was with "approval" or "denunciation" fell in the "same highly debatable categor[y] [that] cannot give rise to recovery." *Id.* at 895.

Here, the term "follower" is also ambiguous. The Flynns repeat the Court's explanation from the motion-to-dismiss opinion: "[T]he term QAnon follower would be reasonably understood by a viewer to mean an adherent to the QAnon movement, in the sense that a member of a faith follows its belief system." *Flynn v. Cable News Network, Inc.*, 621 F. Supp. 3d 432, 437 (S.D.N.Y. 2022) (Woods, J.). That interpretation continues to be a fair one, but it doesn't settle the verifiability question.

In the language of *Buckley*, must a follower be a "conscious political adherent"? Or can she be an "innocent dupe"? The reporter testified that many people simply get "sucked into the[] rabbit hole[]" of QAnon and "are victims," just like *Buckley*'s "innocent dupe." Dkt. 198-1 at 33:4–11.

More broadly, just *how* intense or conscious an adherence is enough? What if someone thinks QAnon makes some good points? What if she heard those points secondhand and doesn't know that the ideas are associated with or originated from QAnon? What if, as the Flynns admit, they are "friendly" and "aligned with QAnon" on at least some issues, namely its support for Michael Flynn? Dkt. 197 at 22. Illustrating this idea, CNN points to a news article that labeled 107 former candidates for Congress as "QAnon supporters" based on wildly varying degrees of involvement. Dkt. 212 ¶ 12. Relatedly, *Buckley*'s discussion of "approval" versus "denunciation" is also helpful. If someone accepts some parts of QAnon but rejects others, whether she is a "follower" falls in the same "highly debatable categor[y]" as whether a certain publication approves or denounces an ideology. *Buckley*, 539 F.2d at 895. Indeed, another court recently held that whether a website "promoted" QAnon "reflect[ed] subjective judgments about the nature of [its] coverage," rendering the statements opinions. *Cheng*, 51 F.4th at 447.

At its root, whether someone is a "follower" is deep in the political thicket: "When used in political discourse, terms of relation and association often have meanings that are debatable, loose, and varying, rendering the relationships they describe insusceptible of proof of truth or falsity." *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 512 (S.D.N.Y. 2012) (internal quotation marks omitted) (applying *Buckley* to the statement that someone was a "leader" of a political party). Similarly, the Flynns tried to show that QAnon has a belief system by quoting the reporter's testimony that "QAnon ha[s] become[] like a religion." Dkt. 197 at 4 (citation omitted). But that comparison precisely illustrates the problem. All the difficulties discussed above show why courts are loath to decide who is a true believer. *Cf. Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.").

Finally, there is also a unique twist to QAnon followership. It is undisputed that "Q instructed his followers to deny being QAnon followers." Dkt. 212 ¶ 7. If a QAnon follower is asked under oath whether she is a QAnon follower, what is the honest response? And how should the jury interpret it? This problem feels a bit like trying to hold a trial on opposite day: Saying yes violates a supposed tenet of followership. Does that mean she's not a true believer, making her answer untrue? If she answers no, is she really lying? After all, Q told her that "[t]here is no 'Q[A]non.'" *Id.* Exactly how one untangles this brain teaser isn't dispositive; it's just another point of ambiguity.

\* \* \* \* \*

"It can be seen, the moment that we are involved in ascertaining what meaning [the defendant's] statement[s] purport to convey, that we are in the area of opinion as opposed to factual assertion." *Buckley*, 539 F.2d at 892. *Buckley* held "that the use of 'fascist,' 'fellow traveler' and 'radical right' as political labels in [the speech at issue] cannot be regarded as having been proved

to be statements of fact, among other reasons, because of the tremendous imprecision of the meaning and usage of these terms in the realm of political debate." *Id.* at 893. The terms "refer[red] to a whole range of meanings and characteristics," so any "search for the precisely articulable meaning of the statements about [the plaintiff] to the ordinary reader could only be, in a sense, an arbitrary one." *Id.* at 894.

The court noted that the case might be different if the statement were about "membership [in a political party] or well-defined political affiliation." *Id.* But that was a far cry from being a fellow traveler of fascism, "which, whether as used by [the defendant] or as perceived by a reader, are concepts whose content is so debatable, loose and varying, that they are insusceptible to proof of truth or falsity." *Id.*; *cf. Turner v. Devlin*, 848 P.2d 286, 296 (Ariz. 1993) (Martone, J., concurring in the judgment and in the opinion in part) ("[H]ow can it be said that being a communist is provably false? What litmus test does one use to test the label? Marx? Engels? Lenin? Gorbachev? Sartre? Kazantzakis?").

The Flynns have not carried their burden to provide evidence showing that the meaning of "QAnon follower" is any less "debatable, loose and varying," so the same conclusion follows. QAnon has, in many ways, taken on a life of its own, becoming a sort of "undefined slogan[] that [is] part of the conventional give-and-take in our economic and political controversies—like … 'fascist.'" *Cafeteria Emps. Union, Loc. 302 v. Angelos*, 320 U.S. 293, 295 (1943). No one knows what it means, but it's provocative. That's opinion.

### B. Even if QAnon followership is verifiable, the statement is still an opinion because it's a conclusion drawn from disclosed facts

A second type of opinion is a conclusion drawn from disclosed facts. Under Rhode Island law, when "the bases for the conclusion are fully disclosed, [the] reasonable reader would consider the [conclusion] … the opinion of the author drawn from the circumstances related." *Beattie*, 746 A.2d at 724 (cleaned up). And though neither the Second Circuit nor the Supreme Court has explicitly held the same under the First Amendment, every circuit to consider the question has done so, as have courts in this district. *See Biro*, 883 F. Supp. 2d at 468 (collecting cases); *cf. Cianci*, 639 F.2d at 65 (noting the doctrine's limited utility in the context of a specific criminal accusation). The Court finds these holdings persuasive. They ultimately spring from the same part of *Milkovich* as the previous section: If a statement is unverifiable, it lacks a "*provably false* factual connotation." *Milkovich*, 497 U.S. at 20 (emphasis added). Similarly, "if it is clear from the context that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated," Restatement (Second) of Torts § 566 cmt. c, the statement lacks a "provably false *factual connotation*," *Milkovich*, 497 U.S. at 20 (emphasis added); *id.* at 28 n.5 (Brennan, J., dissenting) ("Conjecture … alerts the audience that the statement is one of belief, not fact.").

This rule holds even if the conclusion is technically verifiable. Restatement (Second) of Torts § 566 cmt. c. ("The opinion may be ostensibly in the form of a factual statement if it is clear from the context that the maker is not intending to assert another objective fact but only his personal

comment on the facts which he has stated."). That is, a statement is an opinion if it is "an interpretation, a theory, conjecture, or surmise" based on disclosed facts (and the facts themselves are not actionable so long as they are nondefamatory). *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (Posner, J.); *accord Cullen*, 809 A.2d at 1111; *see also Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002) ("[E]ven a provably false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise[.]" (internal quotation marks omitted)). As before, this is a question of law. Restatement (Second) of Torts § 566 cmt. c; *Hawkins v. Oden*, 459 A.2d 481, 484 (R.I. 1983).[7]

Calling the Flynns "QAnon followers" was a conclusion based on the following disclosed, nondefamatory facts: (1) the Flynns stood with Michael Flynn, their right hands raised, as he recited the phrase "where we go one, we go all," and (2) the phrase was a QAnon slogan. The Flynns don't dispute these facts. On the first part, they haven't challenged the clip's authenticity. As to the second, they say they didn't know that the phrase was a QAnon slogan. Dkt. 212 ¶¶ 9–12. But that's irrelevant. They don't contest that the phrase was in fact a QAnon slogan, and true statements are nondefamatory. *See id.*; *see also* Dkt. 221 at 3 (the Flynns' submission referring to "the now-infamous QAnon slogan"); *Gross v. Pare*, 185 A.3d 1242, 1247 (R.I. 2018) ("[T]he events upon which [the plaintiff's false-light] claim is premised *actually occurred*; therefore we cannot logically conclude that any publication regarding the dispute at issue was false or fictitious.").

The Flynns disagree that the video included a factual basis for their being QAnon followers. Dkt. 221 at 3. Yet this argument is in tension with the most basic part of their case: that a reasonable viewer would *infer* from the video that they were QAnon followers. The reasonable viewer must have some factual basis to draw the inference. It is not enough that they merely appeared in a video that also included QAnon followers. Several reporters and news anchors appear in the video, but it's obvious from context that the video isn't calling them "QAnon followers." And as noted above, the Flynns admit that they were "friendly" and partly "aligned with QAnon," often posting or reposting QAnon-related content. *See, e.g.*, Dkt. 212 ¶¶ 18–27, 29, 53–63, 67–68, 71, 74–76. So if the video had played the clip of the Flynns and said that the Flynns had engaged with QAnon for Michael Flynn's legal defense, the Flynns couldn't complain. *See Air Wisc. Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014) ("A statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." (cleaned up)). Instead, as the Flynns argue, the "gist, the sting" comes from the inference that they are QAnon *followers*. *See* Dkt. 197 at 23 (quoting *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991)). That inference arises (if at all) from the video's connecting the clip, the phrase, and QAnon.

The Flynns' real challenge is to the reasonableness of CNN's (implied) statement based on those facts. *See* Dkt. 221 at 2–3. But an "opinion based on disclosed or assumed nondefamatory

---

[7] And the burden of proof is on the plaintiff because the question is still whether the statement's meaning is defamatory. *See Cullen*, 809 A.2d at 1109–10. But the burden matters little in this case. The Court need only review the statement and its context to decide whether the statement was a comment on disclosed, nondefamatory facts.

facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is." Restatement (Second) of Torts § 566 cmt. c; *accord Beattie*, 746 A.2d at 722, 727. To illustrate just how bare the explanation can be, consider these examples:

> 3. A writes to B about his neighbor C: "I think he must be an alcoholic." A jury might find that this was not just an expression of opinion but that it implied that A knew undisclosed facts that would justify this opinion.

> 4. A writes to B about his neighbor C: "He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic." The statement indicates the facts on which the expression of opinion was based and does not imply others. These facts are not defamatory and A is not liable for defamation.

Restatement (Second) of Torts § 566 cmt. c, illus. 3–4; *see also Beattie*, 746 A.2d at 725 ("If I write, without more, that a person is an alcoholic, I may well have committed a libel prima facie; but it is otherwise if I write that I saw the person take a martini at lunch and accordingly state that he is an alcoholic." (cleaned up)).[8]

These examples confirm that even a factual-sounding statement accompanied by a paltry explanation still counts as an opinion. Here, it is clear from context that CNN's implicitly calling the Flynns "QAnon followers" was a conclusion based on disclosed facts. Even if the Flynns are right that the factual basis was thin, unreasonable, or that it takes a substantial logical leap to get to the conclusion CNN drew, it is nevertheless an opinion. *See Rapaport*, 2024 WL 88636, at *4 (finding "erroneous" accusation of a "stalking charge" to be an opinion when it was accompanied by a news article documenting the target's harassment charge) (citation omitted)).

## II.   The statement isn't capable of implying undisclosed, defamatory facts

Concluding that the statement is an opinion doesn't end the inquiry. Recall that an opinion is actionable if it implies a false statement of fact as its basis. Whether it does so is another question of law. Restatement (Second) of Torts § 566 cmt. c. Classic examples of statements that could imply defamatory facts, depending on the context, are "I think he's an alcoholic" and "in my opinion, he's a liar." *See id.* cmt. c, illus. 3; *Milkovich*, 497 U.S. at 18–19. By contrast, unverifiable or explained statements are exceedingly unlikely, as a practical matter, to imply defamatory facts. Indeed, the Flynns haven't identified such a case, and neither has the Court.

Start with unverifiable statements. The cases indicate that if a statement is unverifiable because it is open to many interpretations, a reasonable reader would not infer that the author had some particular undisclosed, defamatory facts in mind as the statement's basis. *Mr. Chow*, 759 F.2d at

---

[8] Although the Restatement's example uses "I think," that doesn't make a substantive difference. *See Milkovich*, 497 U.S. at 19.

229 ("[A] reader cannot rationally view an unverifiable statement as conveying actual facts." (citation omitted)); *id.* at 226 ("[T]he average reader is considerably less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning." (internal quotation marks omitted)); *Lewis v. Abramson*, 673 F. Supp. 3d 72, 91 (D.N.H. May 9, 2023) ("Nor do these statements, viewed in context, imply the existence of underlying facts, given that the terms are inherently subjective and value laden.").

The situation is similar, and perhaps even stronger, for explained statements. By disclosing the facts on which the opinion is based, the cases make clear that the author forecloses the possibility (at least to the reasonable reader) that she has some further, unstated facts justifying the opinion. *Biro*, 883 F. Supp. 2d at 468 (collecting cases); *Beattie*, 746 A.2d at 721 ("When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed defamatory facts." (cleaned up)); Restatement (Second) of Torts § 566 cmt. c.

As in those cases, the statement here isn't capable of implying defamatory facts as a basis for the opinion. The Flynns argue that "not disclosing the facts surrounding the Flynn family … could result in a reasonable viewer believing there is more to the story." Dkt. 221 at 3. But it's unclear why a reasonable viewer would think so, and the Flynns haven't done much to develop this argument. It is undisputed that those using "where we go one, we go all" have been labeled QAnon "adherents," "supporters," and "believers." Dkt. 212 ¶ 12; *see United States v. Languerand*, 2021 WL 3674731, at *3 (D.D.C. Aug. 19, 2021). So it's not like the statement here would uniquely puzzle the reasonable viewer.

Nor do the Flynns explain what the "more" might be. Procedurally, that failure is critical. *See Celle*, 209 F.3d at 178 ("A plaintiff in a libel action must identify a … defamatory meaning of the challenged statement[.]"). Without a specific meaning to evaluate, the Court can't decide whether the statement is capable of bearing that meaning or whether that meaning is defamatory—the whole subject of this opinion. The Flynns bear the burden on these elements, so vaguely suggesting some undisclosed, defamatory facts is not enough. *See* Restatement (Second) of Torts § 566 cmt. c.

Substantively, this failure is likely a symptom of the statement's unverifiability: because the statement can mean so many things, the Flynns can't show that a reasonable viewer would infer any one thing. And even if QAnon followership were verifiable, the argument would still fail. As explained above, claiming that a reasonable viewer would demand "more" strains the most basic part of the Flynns' case: that a reasonable viewer would *infer* from the video that they were QAnon followers. They haven't explained how a reasonable viewer could (1) draw the inference from the video that the Flynns were QAnon followers yet (2) be so dissatisfied with her own inference that she (3) draws the additional inference that the author is withholding some facts that justified the first inference. This contrivance confirms the logic that statements with a disclosed basis don't imply another basis. And it is only more logical when the "statement" itself is already an inference.

15

In effect, the Flynns' position would undercut the explained-statement rule entirely. Recall the alcoholic examples and that an explained statement is a protected opinion "no matter how unjustified and unreasonable the opinion may be." Restatement (Second) of Torts § 566 cmt. c; *accord Beattie*, 746 A.2d at 722, 727. Even if a viewer might be left dissatisfied by the explanation here, that dissatisfaction doesn't give rise to liability. Instead, by providing the "source material," the video here "enables [viewers] to draw their own conclusions based on facts accessible to everyone." *Cheng*, 51 F.4th at 447 (internal quotation marks omitted). So the proper remedy is devaluation in the marketplace of ideas.

In any event, the Flynns' main argument isn't that the statement implies undisclosed facts as its basis. By "more to the story," they seem to be referring to two things. First, by calling them "QAnon followers," the report equates them with bad actors. Dkt. 197 at 23 (describing the harm "of being labeled a QAnon follower is that you are like the QAnon Shaman"). Second, they say the report was required to provide the context that the Flynns think would make a viewer conclude that they weren't QAnon followers. Dkt. 221 at 3. Both arguments fail.

The first argument relies on the wrong kind of implication. The rule is that an opinion is "actionable only if it implies the allegation of undisclosed defamatory facts *as the basis for the opinion*." Restatement (Second) of Torts § 566 (emphasis added). The Flynns' argument is that *from* the opinion, the viewer would draw some *other* inference about the Flynns. That kind of inference isn't actionable. The rule is concerned with the author implying that he "is privy to facts about the person that are unknown to the general reader" and that it is his "private, first-hand knowledge which substantiates the opinions he expresses." *Hotchner*, 551 F.2d at 913. But by giving the viewer "the tools necessary to independently evaluate the opinion," she won't "rely on unfounded opinion that defames an individual." *Mr. Chow*, 759 F.2d at 226 n.5. If instead a plaintiff could play six degrees of separation with every statement, no opinion (or any other statement, for that matter) would be protected.

The second argument fares no better. Even if the report could have portrayed the Flynns more fairly, that is beside the point. The question is whether the statement contained or implied false facts. There is no full-context requirement. The Flynns try to draw such a requirement from the Supreme Court of Rhode Island's decision in *Healey*, but to no avail.

In *Healey*, a reporter published criticism of a doctor by the family of someone who had died. 520 A.2d at 148–49. The deceased had collapsed near a YMCA while the doctor was in the building. *Id.* at 148. No one had told the doctor until thirty minutes later. *Id.* When told, the doctor asked if he could help, but he was told that someone was already performing CPR and an ambulance was either on the scene or about to be. *Id.* The reporter happened to be at the YMCA and witnessed these events. *Id.* at 149. The reporter then talked to others, including the deceased's family, who criticized the doctor "for his failure to respond." *Id.* at 149. The reporter published an article with the criticism but without the exculpatory information. *Id.* The doctor then sued the reporter for defamation, and the court held that there were "serious factual disputes." *Id.* at 153.

*Healey* doesn't require a reporter to include all possible context. True, the court mentioned that the reporter had witnessed the events and knew that the criticism was based on a false premise. *Id.* at 151. But that discussion was included only to address the case's "unusual twist": that the defendant was the reporter, not the deceased's family, the source of the critical opinion. *Id.* The court included the reporter's knowledge to justify his potential liability when he wasn't the speaker. *Id.* That "unusual twist" isn't present here.

Once *Healey* straightened out the party-specific "twist," it straightforwardly applied the rule described at the outset. The article published the "opinion" that the doctor "acted in a callous and wanton manner" by failing to respond. *Id.* at 152. And that opinion "may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion." *Id.* That is, unlike this case, the opinion was clearly based on the factual premise that the doctor could've responded but chose not to. And further unlike this case, the opinion was neither unverifiable nor explained. *Healey* discussed the exculpatory material only to note that including it would have prevented the reasonable reader from inferring defamatory facts, not to create a new requirement. *See id.* at 153. So even if the Flynns believe that including more context would have dispelled any implied, defamatory facts, they haven't shown that there were any implied facts to dispel.

## CONCLUSION

For these reasons, even assuming that the CNN report could imply that the Flynns were QAnon followers, that statement isn't actionable. Defendant's motion for summary judgment is GRANTED. The motions to exclude and strike are DENIED as moot because granting any of those motions would not change the outcome of this one. The Clerk of Court is directed to close Dkts. 178, 185, 187, and 222, enter judgment for Defendant, and close this case.

SO ORDERED.

Dated: April 24, 2024
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge

## APPENDIX

From the outset, the witness makes clear that QAnon is a "fluid" set of beliefs, and he rejects that there are any unifying features other than some "memes" and "slogans":

Q Okay. All right. Mr. O'Sullivan, let's take a look at Page 1, Paragraph 1. I want to quote from what the—what's written in the Wall Street Journal. We're going to look at the Wall Street Journal independently, but the Wall Street—Paragraph 1 of the Amended Complaint indicates that the Wall Street Journal concludes that QAnon is a "far right wing, loosely organized network and community of believers who embrace a range of unsubstantiated beliefs." Do you agree with that statement?

A I think that is mostly accurate, yes.

Q What's inaccurate about it?

A I don't know if all people who support QAnon would necessarily identify themselves as far right wing, but certainly a lot of them would. But I think, you know, that's—it is—yes, it[']s mostly accurate.

Q The Wall Street Journal article goes on to state, "These views center on the idea that a cabal of Satan-worshiping pedophiles mainly consisting of what they see as elitist Democrats, politicians, journalists, entertainment moguls and other institutional figures have long controlled much of the so-called deep state government, which they say sought to undermine President Trump, mostly with aid of media and entertainment outlets." Do you agree with that statement?

A Do we have a date on this Wall Street Journal article?

Q It's February—we're going to see it. It's February 4.

A What year?

Q 2021.

A 2021? I would—that is certainly a description of QAnon that, you know, I think for the most part sums up a lot of the beliefs, but, you know, I think if you were to have two self-professed QAnon followers in the room, they might not necessarily agree on everything, so that is part of the kind of the QAnon belief system, is you don't have to necessarily buy into everything. But a lot of this is true.

…

Q Would you agree with me that the central view of QAnon is that a cabal of Satan-worshiping pedophiles control the government?

A I wouldn't, no.

Q You don't agree that that's a central tenet of the QAnon belief system?

A No.

Q What are the—what are the pillars or tenets of the QAnon belief system?

A It's pretty fluid, I would say.

Q Give me your top ten.

A Sure. Well, one, I would say it seemed to change and evolve over time. Certainly, you know, I think there's a range and a spectrum, right, of folks who follow QAnon. There are certainly people I've encountered that, you know, would adhere to a lot of what the Wall Street Journal describes here. But then there's a lot of people, too, who like QAnon but they don't necessarily believe that there's a Satan-worshiping cabal. They might be very interested in QAnon because of its links to what is said about the 2020 election and alleged election fraud and things like that. So I think it's a kind of wide Spectrum of beliefs? I think the commonality among QAnon supporters or followers of Q or QAnon is the use of the kind of memes and the slogans that are associated with the movement.

Q Any other tenets of the QAnon belief system?

…

[A] Trump is—for a lot of people Trump is the essential figure in it. He's the hero-type figure, as is General Michael Flynn is a figure in the movement for some. There's a lot of unusual beliefs that I'm still trying to wrap my head around about John F. Kennedy and JFK, Jr., that they're in some way involved and perhaps not even dead. But again, it's a range of beliefs. As I say, I've been in the room with QAnon supporters, so—professed QAnon supporters and, you know, there's not—there's not one core definition. There's not a Ten Commandments as such in the QAnon faith, as it were.

…

Q You would agree that there is a belief system that is composed of certain tenets?

A There is a set of beliefs, but I don't think there's a—you know, everybody has to believe in X, Y and Z. I think actually a lot of QAnon followers, supporters, would take issue with this portrayal in the Wall Street Journal, would take issue with the description by media. They would say, "I don't believe that, I believe something else. My focus is mostly about Trump or mostly about Flynn."

Dkt. 198-1 at 20:2–24:22.

Later, the witness says that "parts" of a statement about QAnon's origins and effects are accurate, but he still resists that there are unifying beliefs or behaviors:

Q Mr. O'Sullivan, do you agree with the statements that CNN and Mr. Cooper made in the special report, Inside the QAnon Conspiracy? [Court's Note: "Inside the QAnon Conspiracy" is a CNN documentary about QAnon. It is not the report at issue.]

A What specific statements? Could you point me to some?

Q Sure. If you can—I'm going to read the rest of Paragraph 2. "CNN called QAnon a deranged conspiracy cult. CNN stated that some of Q's conspiracy claims were actually based on age-old racist and anti-Semitic beliefs. CNN asserted that QAnon, like the Nazis, promoted ancient and dark biases and bigotry in world history. CNN stated that QAnon supporters were detached from reality and had an utter disregard for the facts. CNN alleged that QAnon followers were mentally ill and crazy. CNN concluded that it was abundantly clear that QAnon was a dangerous and violent

<u>movement, a movement that has become insurrectionist</u>." Do you agree with those statements made by CNN in the special report?

…

[A] I think part of—parts of it are accurate. I think in the broader sense, you know, it's been two years since I watched this documentary, I guess, but, yeah, a lot of this is true. I didn't write that report or that script. So I don't have the context here for everything. I would just make the broader point about this being, if we break this down, yes, a lot of this is—I couldn't take issue with what is here, but I would make the broader point that, you know, my reporting, and I think even the week this aired back in 2021, I think the lady I interviewed was in this report, too, maybe. I could be wrong about that. A lot of people get kind of sucked into these rabbit holes of misinformation, QAnon online, and they're not violent, they're not anti-Semitic, and they're not necessarily mentally ill or crazy or go on and take part in a dangerous and violent insurrection. I think that a lot of people get sucked into these things are victims. But I still think, you know, the broader umbrella of that is <u>QAnon is dangerous, absolutely</u>. And particularly because <u>it</u>, you know, <u>pulls people into just a very dark frame of mind, I think, which could lead to violence or could, at least, lead to one condoning violence</u>. So I think on the whole of what I see here, yes. I think, yeah.

…

Q Okay. You agree that QAnon is a <u>deranged conspiracy cult</u>? You agree with that; correct?

A QAnon is wacky. There's definitely absurd elements to it. "Deranged" I suppose is a word some folks would use. I wouldn't necessarily say deranged. A conspiracy, yes, based on a cult. I think it certainly has some characterizations of a cult, yeah. But I wouldn't necessarily use these words.

Q Okay. Do you believe that QAnon is based on <u>age-old racist and anti-Semitic beliefs</u>?

A Some of it certainly comes through, yeah, but again, I would just point out that, you know, a lot of the QAnon followers and former QAnon followers that I have spoken to, you know, don't hold those views.

Q Do you believe that QAnon is a <u>dangerous and violent movement</u>?

…

[A] I think it certainly has the potential to lead to violence, and obviously we saw, you know, with my report in question, we did see that from that QAnon event that I attended, some of those people went on to take part in the attack on the Capitol January 6. I certainly think—yeah, I think in many aspects it has the—it is dangerous, and can be violent. But again, I've also spoken to, you know, housewives and moms who have found themselves going down these rabbit holes and they are not necessarily turning violent, you know.

Q Of course, you took security with you to the Q Con Live event; correct?

A Yes.

Q And you took security because you were concerned for your safety?

A At that time, 2020, just before the election, obviously a very politically charged time in the U.S., CNN being in the center of the politics. It was kind of practice at that point for CNN correspondents and others, when we're going to basically any political events, to bring security. Certainly any political events I was going to at that point, I had security.

Q All right. How did—just to follow up on something you said earlier, how does JFK and JFK, Jr. fit into the QAnon belief system? What did QAnon believe JFK and JFK, Jr. were going to do?

A I'm trying to figure that one out. Depending on the followers you speak to, there's a different set of beliefs on how JFK plays into all of this. So based off my reporting and many conversations—more conversations than I probably would have liked to have about this—some people believe that JFK, Jr. is not dead. That he faked his own death to—he thought he was going to get assassinated and that, you know, he came up with a plan with Trump to fake his death and then save America. Others also believe that JFK actually wasn't assassinated and others <u>believe there's a lineage</u> with, you know, <u>from JFK, Trump through to our Lord Jesus Christ</u>.

*Id.* at 32:10–36:25.

Later still, the witness again rejects that QAnon has a stable core, instead noting that its "beliefs can be broad and evolving":

Q … Looking at the transcript, I want to ask you some questions about some of the things that are in here. The very first page, Mr. Anderson represents, quote, "QAnon is based on this fantasy that Donald Trump is some kind of messianic figure waging a crusade against <u>a secret global cabal of Democrats and celebrities who worship Satan, sexually abuse children and harvest their blood in order to extract, ingest a chemical called adrenochrome</u>." Do you agree with Mr. Anderson's statement?

…

[A] Yeah, I think that's a fair enough understanding, outline of the understanding of QAnon, but I don't think, you know—it's not necessarily—it doesn't outline everything, because as I mentioned before, QAnon's beliefs can be broad and evolving.

…

Q You would agree, though, that Mr. Anderson's statement is accurate?

…

[A] I think that's, you know, a fair summary of a lot of the beliefs. I would have added, and I think it gets into the piece, you know, the election stuff also, but that kind of gets, you know, to the point Anderson made here that Trump <u>is a messianic figure</u>. It certainly touches on a lot of what people who like QAnon might follow.

…

Q You would agree with me, though, this doesn't mention anything to do with the election at all?

A I mean, I think it definitely gets into it, I'm sure, but I think the fact that Donald Trump is some kind of messianic figure would be a reference to that.

…

Q When did the QAnon movement first embrace as one of its tenets the idea that <u>a secret global cabal of Democrats and celebrities who worship Satan sexually abused children and drank their blood in order to ingest a chemical called adrenochrome</u>—when did that become part of the QAnon system?

…

[A] I couldn't give you an exact date.

Q Do you recall if it was before or after the election of 2020?

A This kind of thing would have been before the election, yeah.

Q Have you ever in your lifetime ever seen any evidence or any documents that would show that Jack Flynn or Leslie Flynn subscribed to this belief system that a secret cabal of Democrats and celebrities sexually abuse children and drank their blood to ingest andrenochrome? [*sic*]

…

[A] I've seen evidence of both taking the QAnon oath, and in Jack's case posting a lot of QAnon memes and slogans and whatnot. And, you know, I can't speak for what is in their heart, but I do know that from speaking to a lot of former QAnon followers and observing, you know, current followers or people who in 2021 and 2020 were followers of this movement, that seeing those phrases, slogans, oaths, being shared by the Flynns was extremely important because it kind of gave a lot of these people a—the idea that they were on to something. That's not to say that all those people necessarily believed the adrenochrome and all that stuff, but whatever aspects of QAnon those people had embraced, seeing the Flynns share the oath was important to them.

*Id.* at 87:12–89:2, 90:3–91:18.